1   ROB BONTA
    Attorney General of California
2   DONNA M. DEAN
    Supervising Deputy Attorney General
3   THOMAS M. MCMAHON
    Deputy Attorney General
4   State Bar No. 106074
     300 South Spring Street, Suite 1702
5    Los Angeles, CA  90013-1230
     Telephone:  (213) 269-6616
6    Fax:  (916) 731-2120
     E-mail:  Thomas.McMahon@doj.ca.gov
7   *Attorneys for Defendants*
    *Lori Pozuelos and Jason Wessely*
8

9              IN THE UNITED STATES DISTRICT COURT

10            FOR THE CENTRAL DISTRICT OF CALIFORNIA

11

12  | | |
    |---|---|
    | **JEFF T. GRANGE, M.D.,** | 5:22-cv-00340 DSF (AGRx) |
    | Plaintiff, | **SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF POZUELOS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** |
    | v. | |
    | **LORI POZUELOS AND JASON WESSELY,** | |
    | Defendants. | Date:          April 8, 2024<br>Time:          1:30 p.m.<br>Courtroom:  7D<br>Judge:        The Honorable Dale S. Fischer<br>Trial Date:   11/12/2024<br>Action Filed: 2/24/2022 |

23      In connection with the Motion for Summary Judgment, or in the Alternative,

24  Partial Summary Judgment ("Motion") filed by Defendant Lori Pozuelos

25  ("Pozuelos") and opposed by Plaintiff Jeff T. Grange, M.D. ("Plaintiff"), and after

26  considering the evidence and argument presented by the parties, the Court should

27  adopt the following Statement of Uncontroverted Facts and Conclusions of Law.

28  / / /

                                  1

# UNCONTROVERTED FACTS

| Uncontroverted Facts | Evidentiary Support |
|---|---|
| 1.  Defendant Lori Pozuelos ("Pozuelos") is a Detective with the California Department of Insurance ("CDI"). She has been a Detective with CDI since April 2011 and have been continuously assigned to the CDI's Fraud Division ("Fraud Division"). | 1.  Declaration of Lori Pozuelos ("Pozuelos Decl."), ¶¶ 1-2. |
| 2.  Prior to her current assignment, Pozuelos was an Investigator for the California Department of Alcoholic Beverage Control from July 2001 to March 2011. She obtained a Bachelor of Arts degree from California State University, San Bernardino, in June 1999, majoring in Criminal Justice. Pozuelos has received 640 hours of personalized training and instruction from Peace Officer Standards and Training (P.O.S.T.), Specialized Investigators Basic Course at Golden West College. She receives continual training through P.O.S.T., and has attended fraud symposiums, conferences, meetings, and trainings related to Health Care Fraud. | 2.  Pozuelos Decl., ¶ 2. |
| 3.  The Fraud Division is within the Enforcement Branch of CDI and is responsible for investigating crimes related to section 550 of the Penal Code, the California Insurance Code, and other related crimes discovered during an investigation. In her position as a Detective within the Fraud Division, Pozuelos conducts criminal investigations related to insurance fraud, which includes worker's compensation, auto insurance fraud, healthcare fraud, disability fraud, provider fraud, and medical billing fraud. | 3.  Pozuelos Decl., ¶ 3. |

| | | |
|---|---|---|
| | Pozuelos is responsible for gathering and analyzing facts and evidence, interviewing witnesses, making physical arrests, preparing and serving search warrants, preparing detailed reports, referring criminal cases to the local District Attorney's Office or California Attorney General's Office for consideration of filing of criminal charges, and testifying at criminal hearings. | |
| 4. | Beginning in 2014, and throughout the investigation at issue in this case, Pozuelos was assigned to the CDI Fraud Division's Healthcare Provider Task Force, which focuses on healthcare provider fraud. The Task Force was comprised of Detectives from the Fraud Division who were responsible for investigating crimes that generally involved medical billing fraud by healthcare providers such as medical clinics, doctor's offices, chiropractors, and other licensed or unlicensed professionals. As part of the taskforce, Pozuelos worked alongside attorneys and investigators with County District Attorney's offices who were assigned to investigate and prosecute healthcare fraud. She attended numerous meetings related to healthcare fraud, which included various state, federal, and local agencies discussing cases related to health care fraud and current trends of health care fraud. She attended trainings and conferences which focused on health care fraud. | 4.  Pozuelos Decl., ¶ 4. |
| 5. | From July 2016 to February of 2020, on behalf of the Fraud Division, Pozuelos was involved in a criminal fraud investigation of Plaintiff Jeff Grange, M.D. ("Grange") and a company with which he was closely associated as an owner, director and officer, Symons Emergency Specialties, Inc., dba Symons Ambulance | 5.  Pozuelos Decl., ¶ 5. |

| | | |
|---|---|---|
| 1 | ("Symons"). Over this period of time, Pozuelos' immediate supervisors were Sergeant Tom Perez, Sergeant Katrina Blake, and Sergeant Joe Lopez. Pozuelos was the only Fraud Division detective permanently assigned to this investigation, and with the exception of some assistance from time to time within the Fraud Division, such as a group review of Symons' emails to screen the criminal investigation from any privileged materials, Pozuelos personally conducted all aspects of the investigation. | |
| 6. | Pozuelos performed the criminal fraud investigation of Grange and Symons in partnership with the District Attorney's Office of San Bernardino County ("SBDA"). She initially worked with Deputy District Attorney ("DDA") Diane Harrison, to whom she submitted her initial Report of Investigation ("ROI"), dated October 27, 2017. Thereafter, Pozuelos worked with DDA Lance Cantos, who continued to guide the investigation and who ultimately made the decision to file criminal charges against Grange on February 27, 2020. Pozuelos also worked with DDA Rebeca Hynds ("DDA Hynds"), who made the decision to seek a Temporary Restraining Order with respect to certain assets of Grange and Symons. At all times, Pozuelos took direction from the SBDA with respect to the criminal fraud investigation of Grange and Symons. The SBDA made the decisions on whether and when to file criminal charges, which statutes and incidents would be used, and what orders would be sought in connection therewith. The SBDA prepared, and filed or submitted, the relevant documents with the San Bernardino County Superior Court pertaining to the charging and arrest of Grange, including the documents that were prepared for | 6. Pozuelos Decl., ¶ 6;<br><br>Deposition Transcript of Lance Cantos ("Cantos Tr."), Tab 35 of Exhibits in support of the Motion ("Exhibits") and Declaration of Thomas M. McMahon ("McMahon Decl.") at ¶ 4, pages and lines 8:21-25, 10:6-7, 10:16-17, 10:23-11:24, 12:23-13:13, 13:24-15:21, 16:9-17:2, 26:10-27:7, 31:25-32:14, 32:24-33:7, 35:2-36:1, 36:10-13, 60:17-61:10, 62:19-64:23, 65:4-66:10, 68:11-69:9; 71:16-72:8; 72:13-73:6. |

| | | | |
|---|---|---|---|
| 1<br>2<br>3 | | Pozuelos' signature and the confidential discovery package for the court that supported her belief in the existence of probable cause. | |
| 4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20 | 7. | CDI's Fraud Liaison Bureau, within CDI's Legal Branch, handles civil fraud investigations and *qui tam* litigation. The Fraud Liaison Bureau was not involved in the criminal fraud investigation of Grange and Symons. Accordingly, Pozuelos did not share information about her investigation with CDI counsel, including Mitch Neumeister, who were simultaneously participating in a civil *qui tam* litigation initiated by an insurance company against Grange and Symons. Nor did CDI counsel share information from their investigation in the civil litigation against Grange and Symons with Pozuelos, prior to the charging and arrest of Grange. At all times, CDI maintained a barrier between the criminal and civil fraud investigations concerning Grange and Symons. DDA Diane Harrison and DDA Lance Cantos specifically directed Pozuelos to maintain this barrier, and she did so. DDA Lance Cantos also did not exchange substantive information about the investigations of Grange and Symons with CDI counsel in the civil litigation. | 7. | Pozuelos Decl., ¶ 7;<br><br>Cantos Tr. at 18:11-13, 18:22-20:1, 20:8-23:18, 42:11-43:22, 44:10-14, 45:2-8, 48:5-14, 52:22-54:8, 55:1-5, 55:12-56:3, 56:14-20, 57:7-20, 65:23-66:10, 66:19-22, 67:2-5, 67:24-68:2, 68:11-69:9, 69:10-22;<br><br>Deposition Transcript of Rebecca Hynds ("Hynds Tr."), Tab 36 of Exhibits and McMahon Decl. at ¶ 5, at pages and lines 25:5-13;<br><br>Deposition Transcript of Mitchell S. Neumeister ("Neumeister Tr."), Tab 38 of Exhibits and McMahon Decl. at ¶ 7, at pages and lines 9:21-10:1, 14:4-13, 19:24-20:5, 28:8-15. |
| 21<br>22<br>23<br>24<br>25<br>26<br>27<br>28 | 8. | Pozuelos had only a few administrative communications with Mr. Neumeister concerning Grange and Symons. He and other CDI counsel contacted Pozuelos on a few occasions to inquire whether and when criminal charges would be filed against Grange or Symons, because they were preparing for trial. Neumeister thought that the filing of criminal charges could result in a stay of the civil action. Pozuelos responded to those inquiries by stating that she did not know, and that the decision rested | 8. | Pozuelos Decl., ¶ 8;<br><br>Neumeister Tr. at 12:22-10, 21:5-12, 21:20-22:25, 25:18-26:12, 35:9-23, 36:4-22, 37:9-20. |

| | |
|---|---|
| with the SBDA. Cantos also told Neumeister that he did not know whether, or when, criminal charges would be filed. In either December of 2019 or January of 2020, CDI counsel advised Pozuelos that the civil litigation trial would begin in February of 2020. Pozuelos also had a few conversations with Mr. Neumeister due to the cross-over of some witnesses and document productions related to both the criminal investigation and the civil litigation. After Grange was arrested on February 27, 2020, Mr. Neumeister contacted Pozuelos and asked her to confirm the facts of the arrest. However, Pozuelos had had no prior communications with him about the SBDA's decision to file criminal charges on February 27, 2020, and to seek and execute an arrest warrant on that day. After the verdict in the civil litigation, Pozuelos had communications with Mr. Neumeister in order to obtain copies of the civil litigation trial transcripts for use by the SBDA in the criminal prosecution. | |
| 9.    Pozuelos' participation in the criminal fraud investigation of Grange and Symons began on or about July 29, 2016, when the Riverside County District Attorney's Office (RDA) referred a complaint to CDI's Fraud Division that they had received from the Los Angeles County Emergency Medical Services Agency. RDA referred the complaint to CDI because they did not have jurisdiction. The complaint alleged that Symons had submitted a fraudulent bill to a medical insurer for an ambulance transport that did not take place. Pozuelos reviewed copies of the relevant billing records and interviewed the complainant, P.H. P.H. stated that at a concert on August 1, 2015, she felt nauseous and dehydrated. At a first aid tent that was staffed by Symons, she received water and an | 9.    Pozuelos Decl., ¶ 9; Exhibit Tabs 1 through 3; Sealed Exhibit Tabs 4 and 5. |

| | |
|---|---|
| IV drip. P.H. was told the service was provided free of charge by the event's sponsor. However, Symons subsequently billed P.H.'s medical insurer for, among other things, $4,875.00 for ambulance service. After Cigna denied the claim, Symons sent P.H. a bill for the same service. P.H. told Pozuelos she had not been transported anywhere, and that no ambulance had been involved with her care. However, Symons billed her medical insurer for ambulance service by using medical billing code A0434, "Specialty or Critical Care Transport." Pozuelos also interviewed a representative of P.H.'s medical insurer, Cigna, who told Pozuelos that Cigna would not pay a bill based upon the "Specialty or Critical Care Transport" code if no ambulance service was provided. | |
| 10. True and correct copies of Symons' patient care record for P.H., the claim form submitted by Symons to Cigna, the denial of coverage letter sent by Cigna to P.H.'s father, Pozuelos' interview note with P.H., and Pozuelos' interview note with the Cigna representative are set forth at Tabs 1 through 3 of the Exhibits ("Exhibits") filed in support of the Motion, and at Tabs 4 and 5 of the Sealed Exhibits ("Sealed Exhibits") filed in support of the Motion. The names and personal identifying information of all patients referenced in the Pozuelos Declaration, and the Exhibits, have been redacted for confidentiality reasons. | 10. Pozuelos Decl., ¶ 10; Exhibit Tabs 1 through 3 and Sealed Exhibit Tabs 4 and 5. |
| 11. Pozuelos decided to broaden the criminal fraud investigation of Grange and Symons to determine if Symons had a pattern of billing for ambulance service that it had not provided. Pozuelos obtained copies of bills submitted by Symons to other medical insurers during the | 11. Pozuelos Decl., ¶ 11. |

| | |
|---|---|
| same time frame for ambulance service at special events where Symons staffed the first aid tent. These bills also used the "Specialty or Critical Care Transport" billing code, A0434, to support charges in the vicinity of $5,000. In most of these additional cases, the medical insurer paid Symons' bill. Once again, Pozuelos contacted the individual patients whose medical insurer had been billed. Each of them advised Pozuelos that they received only minimal care, for minor symptoms, at a medical aid tent. They were not transported anywhere, and no ambulance had been involved in their care. Pozuelos also interviewed the medical insurers' authorized representatives, who stated that they would not have paid the bill submitted by Symons if they had known that Symons provided no ambulance service. | |
| 12.   For example, at a concert on August 2, 2015, N.G. was treated at a first aid tent staffed by Symons. N.G. complained of nausea and dehydration. She was given an IV drip and allowed to rest. She was asked to provide her insurance information, but was told she would not be billed for the service. However, Symons then billed N.G.'s medical insurer, United Healthcare, $4,875.00 for ambulance service, using the "Specialty or Critical Care Transport" code. United Healthcare paid the bill. However, N.G. told Pozuelos that no ambulance or transport was involved in the care she received. United Healthcare's representative told Pozuelos that if they had known that Symons had provided no ambulance service to N.G., they would not have paid Symon's bill. True and correct copies of Symons' patient care record for N.G., the claim form submitted by Symons to United Healthcare, the explanation of | 12.   Pozuelos Decl., ¶ 12; Exhibit Tabs 6 through 10; Sealed Exhibit Tabs 11 and 12. |

| | |
|---|---|
| benefits from United Healthcare, the payment by United Healthcare to Symons, an email from Grange concerning the billing of N.G.'s insurance, Pozuelos' interview note with N.G. and her father, and Pozuelos' interview note with United Healthcare's representative are at Tabs 6 through 10 of the Exhibits, and Tabs 11 and 12 of the Sealed Exhibits. | |
| 13.  Pozuelos documented a total of eight cases, with similar facts, in which Symons billed medical insurers for ground ambulance service that it had not provided. Pozuelos concluded that there was probable cause to believe that Grange and Symons had committed medical insurance fraud. | 13.  Pozuelos Decl., ¶ 13. |
| 14.  On January 17, 2017, Pozuelos met with DDA Diane Harrison to discuss the findings from her document reviews and interviews. During this meeting, DDA Harrison gave Pozuelos a copy of a complaint regarding the billing of air ambulance transports by Symons. The complaint had been filed in the civil litigation by SIMNSA, a medical insurer to whom Symons had submitted a bill for an air ambulance transport. The civil litigation complaint that Pozuelos was given did not involve the ground ambulance billing that she had been investigating. However, DDA Harrison asked Pozuelos to broaden her criminal investigation of Grange and Symons to include billings for air ambulance transports. | 14.  Pozuelos Decl., ¶ 14. |
| 15.  After meeting with DDA Harrison, Pozuelos contacted various county agencies that regulated Symons to determine the type of license under which Symons was operating. Pozuelos was advised that Symons | 15.  Pozuelos Decl., ¶ 15. |

| | |
|---|---|
| was not a licensed air ambulance provider, and should not be providing such services. Pozuelos also contacted the Federal Aviation Agency to determine if Symons was certified as an air ambulance provider. She was advised Symons did not have the required certification to provide air ambulance transports. | |
| 16. To further investigate Symons' billings for air ambulance transports, Pozuelos reviewed billing records obtained from various insurance companies. She prepared and served search warrants for Symons' bank records and email records, and reviewed the documents produced. Pozuelos also interviewed numerous witnesses regarding Symons' billings for air ambulance transports. During the course of her investigation, Pozuelos learned that Symons did not own, lease or operate any helicopters used for air ambulance transports, and only provided medical care to the patient, whether on the ground or onboard. Symons medical professionals did not always accompany the patient during an air transport. However, on numerous occasions, at special events in Southern California and Mexico where Symons was under contract to provide medical care services, Symons billed the patient's medical insurer for providing an air ambulance transport, using the billing code A0431, "Rotary Wing Air Transport." Almost all of the bills were for a six-figure amount. Pozuelos was advised that the air ambulance transports that Symons billed for were actually provided by either the San Bernardino County Sheriff's Department (SBCSD)'s Air Rescue Unit or by a private company under contract with the event promoter. | 16. Pozuelos Decl., ¶ 16.<br><br>Deposition Transcript of Jeff Grange ("Grange Tr."), Tab 37 of Exhibits and McMahon Decl., ¶ 6, at pages and lines 127:9-14, 128:14-17, 133:25-134:7. |

| | |
|---|---|
| 17. Personnel from SBCSD Air Rescue Unit advised Pozuelos that Symons was not authorized to bill medical insurers for air ambulance transports that were actually provided by the SBCSD Air Rescue Unit. Roger Norman, a representative of SCORE, a road race sponsor in Mexico, told Pozuelos that Symons had no permission to bill medical insurers for helicopter transports that had actually been provided by another company under contract with SCORE. Although a representative of the prior ownership of SCORE, Paul Fish, told Pozuelos that Symons *could* bill medical insurers for services, Pozuelos discovered from Symons' bank records that Symons made an unexplained payment of $29,626.001 to Mr. Fish, which was exactly half of a recent payment received by Symons on an air ambulance transport claim. Because the payment to Mr. Fish strongly suggested that he had financially benefitted from the medical insurer's payment to Symons, Pozuelos discounted his statement that Symons was authorized to bill medical insurers. | 17.  Pozuelos Decl., ¶ 17. |
| 18. Pozuelos also spoke with representatives of approximately 10 medical insurers about Symons' practice of billing for air ambulance transport services. In most cases, Pozuelos was directed to an authorized spokesperson who was best qualified to respond to her questions. Pozuelos did not interview the actual employees who had processed Symons' bills for air ambulance transport service, because the bills are submitted and paid electronically, making it difficult to identify such an employee, and unlikely that such an employee would have recalled the claim or been authorized to speak for the medical insurer about its | 18.  Pozuelos Decl., ¶ 18. |

| | |
|---|---|
| policies. The medical insurer representatives Pozuelos spoke with told her that Symons' use of the "Rotary Wing Transport" code, and submission of bills that were in the six-figures, meant that Symons had actually provided the air ambulance transport, *i.e.*, the helicopter. If they had known that Symons only provided medical care to the patient, whether on the ground or on board, and did not provide the helicopter transport, they would not have paid Symons' bill for air ambulance transport. | |
| 19. For example, L.H. was injured on April 26, 2016 while participating in a road race in Baja California, Mexico. Symons was under contract with the event sponsor to provide medical services. L.H. was treated at the scene by Symons' personnel, and then transported to a hospital in a helicopter that was not owned, leased or operated by Symons. However, Symons subsequently billed L.H.'s medical insurer, Blue Shield of California ("BSC"), $247,000 for air ambulance transport, using the billing code A0431, "Rotary Wing Air Transport." After an initial rejection, BSC ultimately paid Symons' bill. A representative of BSC told Pozuelos, however, that they would not have paid this bill if they had known that Symons had not provided the helicopter transport. The $247,000 payment was deposited into a Symons' bank account, but was then transferred into a Grange bank account. True and correct copies of Symons' patient care record for L.H., Symons' claim form submitted to BSC, emails with Grange concerning the billing of L.H.'s insurance, Pozuelos' two interview noted with L.H. and his wife, and Pozuelos' interview note with BSC's representative are at Tabs 13 through 15 of the Exhibits, and | 19. Pozuelos Decl., ¶ 19; Exhibit Tabs 13 through 15; Sealed Exhibit Tabs 16 through 18. |

| | |
|---|---|
| Tabs 16 through 18 of the Sealed Exhibits. | |
| 20. In another example, C.M. was injured on March 21, 2015 while attending a concert in San Bernardino County. Symons was under contract with the event sponsor to provide medical services at the venue. C.M. was treated at the scene by Symons' personnel. Symons' personnel then transferred care of C.M. to the SBCSD Air Rescue unit, which transported C.M. to a hospital in a helicopter that was not owned, leased or operated by Symons, but rather, by the SBCSD Air Rescue Unit. The patient care records do not establish that any Symons personnel was onboard the flight. Symons subsequently billed C.M.'s medical insurer, Kaiser, $140,525 for an air ambulance transport, using the billing codes A0431 ("Rotary Wing Air Transport") and A0436 ("Rotary Wing Air Mileage"). Kaiser paid Symons' bill. A representative of Kaiser told Pozuelos that they would not have paid this bill if they had known that Symons had not provided the air ambulance transport. The $140,525 payment was deposited into a Symons' bank account, but was then transferred into a Grange bank account. True and correct copies of Symons' patient care record for C.M., the SBCSD Air Rescue Unit's patient care record for C.M., emails with Grange concerning the billing of C.M.'s insurance, the claim form submitted by Symons to Kaiser, Kaiser's payment to Symons, Pozuelos' interview notes with Captain Rose of the SBCSD Air Rescue Unit, and Pozuelos' interview note with Kaiser's representative are at Tabs 19 through 23 of the Exhibits and Tabs 24 and 25 of the Sealed Exhibits. | 20. Pozuelos Decl., ¶ 20; Exhibit Tabs 19 through 23; Sealed Exhibit Tabs 24 and 25. |

| | |
|---|---|
| 21. Pozuelos documented a total of 16 cases, with similar facts, in which Symons billed a medical insurer a six-figure amount for an air ambulance transport that Symons was not licensed to provide, and had not in fact provided. These cases provided additional probable cause for Pozuelos to believe that Grange and Symons had committed medical insurance fraud. | 21. Pozuelos Decl., ¶ 21. |
| 22. The Symons company emails that Pozuelos obtained pursuant to a search warrant revealed that Grange was personally involved in the billing of medical insurers for ground and air ambulance transports. Although the bills were physically submitted to the medical insurers by other employees of Symons, the emails established that Grange was directing this activity. For example, as noted above, Grange provided L.H.'s information to the Symons' biller via email in order to bill the claim. There was an additional email discussion about the amount that should be billed for L.H.'s claim. Another example, as noted above, was for the claim submitted for C.M. Grange provided C.M.'s information to the biller and the biller asked Grange to review the records before she sent them to Kaiser. Additional examples of Grange's personal involvement in the billing process are in the emails that Pozuelos obtained and reviewed, at Tab 26 of the Exhibits. Among other things, these emails reveal that Jeff Grange needed to "feel better about what we just billed for our helicopter transport! :-)." Grange was also involved in a discussion about a $247,000 "magic number" for air transport bills, after a $520,000 claim "stirred the pot at Blue Cross" and put Symons' billings "on their radar screen." Grange also discussed an "air transport bonus" for a Symons' | 22. Pozuelos Decl., ¶ 22; Exhibit Tab 26;<br><br>Grange Tr. at 181:9-182:21. |

| | |
|---|---|
| biller. He specifically directed another biller to "just do CCT (Critical Care Transport) for now" on a patient's bill. | |
| 23. After reviewing Symons' billings and bank records, Pozuelos determined that the fraudulent bills submitted by Symons to medical insurers, for both ground and air ambulance transports, had resulted in fraudulent billings by Symons that totaled approximately $3,628,826.76, and fraudulent payments to Symons that totaled approximately $2,005,210. | 23. Pozuelos Decl., ¶ 23. |
| 24. After the additional ten months of investigating Symons' billings for air ambulance transports, on November 8, 2017, Pozuelos submitted her initial Report of Investigation ("ROI") to DDA Harrison. A true and correct copy of the ROI is at Tab 27 of the Sealed Exhibits. Pozuelos recommended that, with respect to the eight ground ambulance examples and sixteen air ambulance examples described in the ROI, SBDA should file criminal insurance fraud charges against the following officers and/or directors of Symons: Jeff Grange, Judd Symons, and Dawn Downs. Pozuelos told DDA Harrison that she was still reviewing email records obtained for Grange and Symons' accounts, and that a supplemental report would follow. DDA Harrison told Pozuelos that she would need to review the supplemental report before deciding on the filing of criminal charges. | 24. Pozuelos Decl., ¶ 24; Sealed Exhibit Tab 27. |
| 25. On June 22, 2018, Pozuelos submitted a supplemental report to DDA Harrison concerning the email review referenced above ("Supplemental Report"). A true and correct copy of the | 25. Pozuelos Decl., ¶ 25; Sealed Exhibit Tab 28; Cantos Tr. at 69:23-70:11, 71:10-15. |

| | | |
|---|---|---|
| 1 2 3 4 5 6 7 8 9 | Supplemental Report is at Tab 28 of Sealed Exhibits. Over the course of the investigation, she regularly supplied the SBDA with additional reports, interview notes and supporting documentation, in further evidence of the medical insurance fraud. For example, after submitting the initial Report of Investigation, Pozuelos documented additional examples of the ground transport fraud referenced in paragraphs 11 and 13, above. Eight of them, involving Kaiser, were eventually included in the criminal complaint filed by the SBDA. | |
| 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 | 26.  In August of 2018, the case was transferred from DDA Harrison to DDA Lance Cantos. From August of 2018 to February 2020, Pozuelos met and communicated with DDA Cantos on multiple occasions to discuss the case and complete any follow-up tasks that he requested. DDA Cantos had many other case responsibilities, was not experienced in medical insurance fraud issues and needed additional time to become familiar with the Symons and Grange investigation. The approximate volume of all the reports, interview notes, emails, bank records and other supporting documents that Pozuelos had prepared or obtained, and had submitted to SBDA, was several hundred thousand pages or 140 gigabytes of data. Before February of 2020, DDA Cantos did not communicate to Pozuelos any decision as to whether or not SBDA would file criminal charges based upon the information that she had obtained, analyzed and submitted. | 26.  Pozuelos Decl., ¶ 26; Cantos Tr. at 70:22-71:15, 47:10-15. |
| 25 26 27 28 | 27.  In April of 2019, DDA Hynds was assigned to assist the SBDA's criminal investigation with a potential filing of an application for a temporary restraining order with respect to certain assets of Symons and Grange pursuant to Penal Code | 27.  Pozuelos Decl., ¶ 27; Hynds Tr. at 8:20-9:3, 9:9-14, 9:17-24, 11:9-18, 12:4-13:3,13:18-14:10, 14:21-16:8. |

| | |
|---|---|
| section 186.11 ("186.11 Application"). SBDA advised Pozuelos that if they decided to file criminal charges, this procedure would be used to place a hold upon assets for possible restitution. | |
| 28.  During her investigation, Pozuelos learned that with respect to several of the six-figure air ambulance transport payments deposited into a Symons bank account, including the L.H. and C.M. claims referenced above, the bank records also revealed that a similar sum was subsequently transferred from the Symons bank account into a Grange bank account, and was then transferred into an escrow for the acquisition of real property by Grange and/or Dawn Downs (Grange's spouse). Pozuelos asked Marshall Wesson ("Wesson"), a CDI Forensic Auditor experienced in the forensic analysis of financial records, to review the Symons and Grange bank records and prepare an audit report ("Audit Report") that traced air ambulance transport payments from medical insurers, to Symons' bank accounts, to Grange bank accounts, to escrows for property acquisitions related to Grange. A true and correct copy of the Audit Report that Wesson prepared is at Tab 29 of the Sealed Exhibits. These numerous examples of Grange deriving a direct personal financial benefit from a medical insurer's six-figure payment to Symons for "rotary wing air transport" bill provided Pozuelos with further proof that Grange was personally involved in causing the fraudulent billing in question. Pozuelos provided a copy of the Audit Report to DDA Hynds. | 28.  Pozuelos Decl., ¶ 28, Sealed Exhibit Tab 29. |
| 29.  On February 10, 2020, CDI Captain Vladimir Mikulich ("Mikulich") told Pozuelos and Lopez that he had learned that SBDA was going to file the criminal charges against | 29.  Pozuelos Decl., ¶ 29.<br><br>Cantos Tr. at 27:20-30:10, 38:15-22, 73:14-74:5. |

| | |
|---|---|
| Grange. Mikulich and Lopez decided that CDI detectives would arrest Grange after the issuance of an arrest warrant by the court. This was the first time that Pozuelos learned that SBDA had decided to file criminal charges against Grange and arrest him. Pozuelos later learned that the timing of this decision by SBDA was related to their concern about the statute of limitation potentially expiring with respect to some of the incidents referenced in the ROI. The timing of the criminal charges was not designed to prejudice Grange in the civil litigation. | |
| 30.  Pozuelos' supervisor, Sergeant Lopez, formed a CDI arrest team consisting of himself, Detective Jason Wessely and Detective Anthony Camacho. Pozuelos advised them of information she had received that Grange had multiple weapons and a secured home, as well as upcoming travel plans. Pozuelos learned from the San Bernardino County Superior Court's online docket of the civil litigation against Symons that the trial of that matter was underway, and Pozuelos confirmed Grange's attendance at the trial through a visit to the Court's parking lot and observing his vehicle on February 26, 2020. Pozuelos did not know whether, or when, Grange might testify. For reasons of officer safety, the CDI arrest team decided to make the arrest of Grange in the Court's parking lot after he had attended trial for the day, and had been screened for weapons at court. Because the case involved major fraud allegations, and a risk of flight existed, they did not consider a self-surrender option. | 30.  Pozuelos Decl., ¶ 30. |
| 31.  On February 26, 2020, Pozuelos met with DDA Rebeca Hynds and on February 27, 2020, she met with DDA Lance Cantos to review and | 31.  Pozuelos Decl., ¶ 31, Exhibit Tabs 30 through 33; |

| | |
|---|---|
| sign declarations that the SBDA had prepared for her with respect to (i) the SBDA's application for an arrest warrant, (ii) the SBDA's Motion for a Bail Hearing pursuant to Penal Code section 1275.1 to screen the fruits of the fraud from use in posting bail, and (iii) the SBDA's 186.11 Application. True and correct copies of the declarations that Pozuelos reviewed and signed are at Tabs 30 through 33 of the Exhibits. | Cantos Tr. at 38:23-25, 39:3-13; Hynds Tr. at 17:22-18:4, 21:5-19, 23:3-24, 31:22-32:1, 32:19-33:20, 34:4-18, 35:22-36:5. |
| 32. With respect to the copy of Pozuelos' declaration that was electronically submitted by the SBDA to the Superior Court in support of the felony arrest warrant (Exhibit Tab 31), it states that probable cause is supported by "the official law enforcement reports prepared regarding this matter, a true copy of the pertinent parts of which is submitted in conjunction with this declaration and incorporated by reference." The SBDA determined which law enforcement reports would be submitted to the Superior Court in the confidential discovery package that supported the filing of the criminal complaint and the issuance of the arrest warrant, submitted that discovery package to the court, and advised Pozuelos by email on the morning of February 27, 2020 that the discovery package had been submitted. It was Pozuelos' understanding that the ROI she had prepared was included in the discovery package submitted to the court. | 32. Pozuelos Decl., ¶ 32, Exhibit Tab 31. Cantos Tr. at 11:10-24, 12:23-13:13, 13:24-15:21, 31:25-32:14, 32:24-33:7, 60:17-61:10, 62:19-64:23, 65:4-22; Hynds Tr. at 38:13-22, 57:8-58. |
| 33. With respect to Pozuelos' declarations in support of the 1275.1 Motion and the 186.11 Application (Exhibit Tabs 32 and 33), she summarized the facts concerning the tracing of certain fraudulently induced medical insurance payments to certain assets that were related to Grange. | 33. Pozuelos Decl., ¶ 33, Exhibit Tabs 32 and 33. |

| | | |
|---|---|---|
| | It was her understanding that a copy of the more detailed Audit Report was also included in the discovery package that SBDA was delivering to the court in support of the filing of the criminal complaint. In her declarations, Pozuelos made no recommendation concerning whether the court should set bail, or if so, in what amount. It was her understanding that SBDA was requesting that Grange be held until a bail hearing, so that any fraudulently obtained assets that CDI had identified could be excluded from any satisfaction of the bail amount. The court would determine when that hearing would take place. It was also Pozuelos' understanding that SBDA was requesting a restraining order, so that those same assets could not be disposed of by Grange or others associated with him, and would be available for possible restitution. | |
| | 34.  On February 27, 2020 at 10:00 am, Supervising DDA William Lee ("SDDA Lee") advised Mikulich, Lopez, and Pozuelos that the criminal complaint against Grange had been submitted electronically to the court that morning, however the court still needed to review the SBDA's submission before filing it. At 10:27 am, Pozuelos was advised by DDA Cantos that he had electronically submitted the criminal complaint to the court, and that his office had also submitted the confidential discovery package supporting the criminal charges and the arrest warrant application. Pozuelos was not given a copy of the confidential discovery package. At 10:32 am, SDDA Lee advised Mikulich, Lopez, and Pozuelos that the court had officially filed the criminal complaint against Grange. | 34.  Pozuelos Decl., ¶ 34. |
| | 35.  On February 27, 2020, at approximately 3:00 pm, CDI personnel met with the DDA | 35.  Pozuelos Decl., ¶ 35, Exhibit 39. |

| | |
|---|---|
| Cantos, DDA Hynds, and SDDA Lee prior to executing the arrest of Grange. Because the case involved substantial fraud allegations, and there was a risk of defendant flight, evidence destruction and witness influencing, the CDI arrest team decided to make the arrest as soon as possible. Between approximately 3:00 pm and 3:30 pm, DDA Hynds and Pozuelos arrived at the San Bernardino Courthouse. The court clerk provided them with a copy of the filed complaint and advised them that Judge Colin Bilash was the signing judge. DDA Hynds and Pozuelos met with Judge Bilash to obtain his approval of the arrest warrant, the 1275.1 Motion, and the 186.11 Application. Judge Bilash immediately signed the arrest warrant and granted the 1275.1 Motion to hold Grange until a bail hearing. A true and correct copy of the signed arrest warrant is at Tab 39 of the Exhibits. DDA Hynds and Judge Bilash further discussed the 186.11 Application, but the judge did not grant it at this time. While they were discussing the 186.11 Application, Pozuelos contacted Sergeant Lopez, using her cell phone, by either calling or texting him, and advised him that the judge had signed the arrest warrant but was still considering other matters. | Hynds Tr. at 41:5-42:10, 42:16-43:3, 44:19-22. |
| 36.  After leaving Judge Bilash, Pozuelos met with the court clerk to provide the signed arrest warrant and the 1275.1 Motion to be filed with the court. Pozuelos was later advised by Sergeant Lopez that he and his team had arrested Grange in the parking lot. Pozuelos asked another CDI Detective to deliver a copy of the signed arrest warrant and 1275.1 Motion to the arrest team, at the parking lot where the arrest occurred, prior to transporting Grange to the San Bernardino County's West Valley Detention Facility. Neumeister first learned that Grange had been | 36.  Pozuelos Decl., ¶ 36; Neumeister Tr. at 4216-24, 43:6-19, 43:6-44:19 |

21

| | |
|---|---|
| arrested from his co-counsel, late in the afternoon of February 27th and was surprised by the news. A hearing was conducted on February 28, 2020, and Judge Michael Smith set the bail at $1,500,000. The hearing was then continued to March 2, 2020, at which point another judge of the Superior Court released Grange from custody on his own recognizance. | |
| 37. DDA Hynds returned to the court on February 28, 2020, at which time the Judge granted the 186.11 Application. Pozuelos participated with DDA Hynds and other CDI detectives in serving notice of the restraining order on affected parties. | 37. Pozuelos Decl., ¶ 37; <br><br> Hynds Tr. at 50:4-51:4, 54:9-16. |
| 38. After the criminal case was filed, Pozuelos continued to meet with DDA Cantos and complete follow-up tasks requested by him. This included obtaining and reviewing transcripts from the trial in the civil litigation. In July of 2021, SBDA dismissed the criminal charges against Grange. Pozuelos was not consulted on this decision, or advised as to the reasons. | 38. Pozuelos Decl., ¶ 38; <br><br> Neumeister Tr. at 53:2-10. |
| 39. After reviewing the investigation reports, Cantos formed the belief that there was probable cause to arrest Grange for fraud. He still believes there was probable cause to arrest Grange for fraud. If Cantos had not personally believed there was probable cause, he would not have filed the criminal complaint. | 39. Cantos Tr. at 82:16-20, 83:3-11, 72:13-21. |
| 40. It is the SBDA's standard practice to file the criminal complaint, obtain the arrest warrant, execute the arrest, and seek any bail or asset orders all on the same day. | 40. Cantos Tr. at 84:19-85:17. |

| 41. The SBDA dismissed the criminal charges against Grange in July of 2021. Cantos was instructed by his counsel not to reveal who made this decision and why. Generally speaking, a decision to dismiss criminal charges lies within a prosecutor's discretion. Office resources can be a factor in such a decision. Notwithstanding the dismissal of the criminal charges, Cantos believes there was probable cause to arrest Grange for fraud. | 41. Cantos Tr. at 87:15-17, 88:1-89:16, 90:20-91:2. |
|---|---|
| 42. After working with Pozuelos for several years on the Grange case, Cantos believes that Pozuelos was a hardworking, competent and honest investigator, and he had no concerns about her performance of her duties as an investigator on the case. | 42. Cantos Tr. 91:4-21. |
| 43. At the time that DDA Hynds sought the asset freeze order on February 27, 2020, she believed that there was a proper basis for the court to issue such an order. | 43. Hynds Tr. at 55:16-20. |
| 44. Hynds believed that Pozuelos was a competent and honest investigator. She does not believe that Pozuelos had any personal animosity towards Grange, and believes that Pozuelos was acting only on her professional responsibility to investigate crime. | 44. Hynds Tr. at 58:2-59:1. |
| 45. Exhibit Tabs 1 through 33 are from the CDI's Fraud Division's records of the investigation that Pozuelos conducted with respect to Grange, or the criminal proceeding with respect to Grange. They were prepared at or near the time of the events recorded therein, and have been maintained by Pozuelos at the CDI's Fraud Division in the normal course of its official business. | 45. Pozuelos Decl., ¶ 69. |

| | |
|---|---|
| 46. In this action, Grange served responses to written interrogatories propounded by Pozuelos. A true and correct copy of Grange's responses is at Exhibit Tab 34. | 46. Declaration of Thomas M. McMahon ("McMahon Decl.,"), ¶ 3; Exhibit Tab 34. |
| 47. The documents produced by Grange in this action include communications from his counsel to Cantos, after Grange was arrested, concerning the merits of the criminal charges. | 47. McMahon Decl., ¶ 9. |
| 48. In this action, counsel for Grange issued subpoenas to both the San Bernardino County District Attorney's Office ("SBDA") and the San Bernardino County Superior Court ("Superior Court") for the production of documents relating to the arrest or prosecution of Grange. Counsel for Defendants concurred in the service of these subpoenas. The documents produced by both SBDA and the Superior Court did not contain a copy of the confidential discovery package that DDA Cantos testified was put together by his office, and delivered to the Superior Court on the morning of February 27, 2020, to support the filing of the criminal complaint and issuance of an arrest warrant. | 48. McMahon Decl., ¶ 8. |
| 49. True and correct copies of pages excerpted from the certified deposition transcripts of Cantos, Hynds, Grange and Neumeister are set forth at Exhibit Tabs 35, 36, 37 and 38, respectively | 49. McMahon Decl., ¶¶ 4, 5, 6, 7; Exhibit Tabs 35, 36, 37, and 38. |
| 50. Grange is a medical doctor, and at relevant times, was an owner, director and officer of Symons Emergency Specialties, Inc., dba Symons Ambulance ("Symons"). Among other services, Symons | 50. Grange Tr. at 14:23-19:23; Exhibit Tab 37. |

| | | |
|---|---|---|
| | provided medical care at special events. | |
| 51. | The transcripts of the trial in the civil *qui tam* action establish that Grange testified. | 51.  McMahon Decl., ¶ 10. |
| 52. | After the verdict in the civil action, and the dismissal of the criminal charges by the SBDA, Neumeister was upset to learn that the SBDA had evidence that had not been available for him to use in the civil action, such as Grange's emails and the payment to Fish. | 52.  Neumeister Tr. at 60:5-62:3. |

## CONCLUSIONS OF LAW

1.) The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 2 U.S.C. § 1983. Venue is appropriate in this District.

2.) The claims for relief in the First Amended Complaint are for damages pursuant to 42 U.S.C. § 1983. (FAC, Dkt. 14, Claims Two through Seven, ¶¶ 71-111.)

3.) Pursuant to Section 1983, a defendant must be acting under color of state law. 42 U.S.C. Sec. 1983.

4.) A defendant acts under color of state law "when he abuses the position given to him by the state. Thus, generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *Wang v. Toyed,* 944 F.2d 476, 479 (9th Cir. 1991), quoting *West v. Adkins,* 487 U.S. 42, 50 (1988).

5.) It is undisputed that Pozuelos was acting under color of state law.

6.) Pursuant to Section 1983, a defendant must also have violated the plaintiff's constitutional or other federally protected right. Section 1983.

/ / /

7.)  Grange alleges that Pozuelos violated his rights under the United States Constitution to be free from unreasonable seizure of his person and property pursuant to the Fourth Amendment (Claims Two and Four), excessive bail pursuant to the Eighth Amendment (Claim Three), fabrication of evidence and malicious prosecution pursuant to the Fourteenth Amendment (Claims Five and Six), and retaliation pursuant to the First Amendment (Claim Seven). (FAC, Dkt 14, Claims Two through Seven, ¶¶ 71-111.)

8.)  With respect to Claim Two, for unreasonable seizure of person, the seizure of Grange's person was pursuant to an arrest warrant sought by the SBDA and issued by the Superior Court. Grange alleges that Pozuelos is liable because she engaged in judicial deception in submitting the results and recommendation of her criminal investigation to the SBDA, which then submitted them to the Superior Court.

9.) To support a Section 1983 claim for judicial deception, a plaintiff must show that the defendant deliberately or recklessly made false statements or omissions that were material to the finding of probable cause. *Galbraith v. County of Santa Clara,* 307 F.3d 1119, 1126 (9th Cir. 2002). A plaintiff's showing of a deliberate falsehood or a reckless disregard of the truth must be substantial. *Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2009). "Omissions or misstatements resulting from negligence or good faith mistakes will not invalidate an affidavit which on its face establishes cause." *Ewing*, 588 F.3d at 1224. The court determines the materiality of alleged false statements or omissions. *KRL v. Moore*, 384 F.3d 1104, 1117 (9th Cir. 2004).

10.)  The uncontroverted facts submitted by Pozuelos in support of the Motion establish that Pozuelos did not make any false statements, or omit any exculpatory information, in her submissions to the SBDA. Accordingly, as a matter of law, Pozuelos did not engage in judicial deception, and is entitled to judgment on the Second Claim.

11.)  The uncontroverted facts submitted by Pozuelos in support of the Motion establish that Pozuelos did not act with deliberation or recklessness with respect to any false statements or omitted exculpatory information. Accordingly, as a matter of law, Pozuelos did not engage in judicial deception, and is entitled to summary judgment on the Second Claim.

12.)  The uncontroverted facts submitted by Pozuelos in support of the Motion establish that none of the allegedly false statements, or omissions of exculpatory information, were material to the existence of probable cause for the arrest of Grange. Accordingly, as a matter of law, Pozuelos did not engage in judicial deception, and is entitled to summary judgment on the Second Claim.

13.)   Even if conduct is found to violate a constitutional right, a state official also has qualified immunity if it was not well established by precedent, at the time, that such conduct would constitute a constitutional violation. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Ashcroft v. al-Kidd*, 562 U.S. 731 (2011). Once invoked, the burden is on the plaintiff to establish that the public official is *not* entitled to qualified immunity. *Smith v. City of Troy, Ohio*, 874 F. 3d 938 (6th Cir. 2017).

14.)  In determining whether an official is entitled to qualified immunity, the court applies a two-part test: (1) was the defendant's conduct a violation of the plaintiff's constitutional rights; and (2) was there clearly established precedent at the time that the defendant's conduct would constitute a violation of the plaintiff's constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A plaintiff must satisfy *both* prongs to disprove qualified immunity. The court has discretion to decide which prong to address first. *Pearson v. Callahan,* 555 U.S. 223 (2009). Whether or not there was clearly established precedent is a question of law for the Court. *Elder v. Holloway*, 510 U.S. 510 (1994).

15.)  An investigating officer has qualified immunity from suit. *Malley,* 475 U.S. at 339-445. The standard is the "objective reasonableness" of the officer's conduct.  *Id.* at 345. "Only when the warrant application is so lacking in indicia of

probable cause as to render official belief in its existence unreasonable… will the
shield of immunity be lost." *Id.* at 344-45, citation omitted. "As the qualified
immunity defense has evolved, it provides ample protection to all but the plainly
incompetent or those who knowingly violate the law." *Id.* at 341. "Defendants will
not be immune if, on an objective basis, it is obvious no reasonably competent
officer would have concluded that a warrant should issue; but if officers of
reasonable competence could disagree on this issue, immunity should be
recognized." *Id.* at 341. This qualified immunity standard can be adjudicated by the
court, as a matter of law, in order to "permit the resolution of insubstantial claims
on summary judgment." *Id.* at 341.

16.)   The uncontroverted facts submitted by Pozuelos in support of the
Motion establish that Pozuelos belief in the existence of probable cause for the
arrest of Grange was objectively reasonable. Her supervisor, the SBDA and the
Superior Court all reviewed and approved of her submissions. Grange has
submitted no evidence which establishes that no reasonable law enforcement officer
could have believed that probable cause existed. There was also no clear and
specific precedent, at the time of Pozuelos' conduct, that would have advised her
that the conduct would violate Grange's Constitutional right. Accordingly,
Pozuelos is entitled to qualified immunity.

17.)   As a matter of law, Pozuelos and is entitled to summary judgment on the
Second Claim for unreasonable seizure of person.

18.)   With respect to the Third Claim, for excessive bail, a plaintiff alleging
that a law enforcement officer violated the excessive bail clause must prove that the
defendant actually and proximately caused the imposition of an excessive bail
amount. *Baker v. McCollan,* 443 U.S. 137, 142, (1979); *Galen v. County of Los
Angeles*, 477 F.3d 652, 663 (9th Cir. 2007) ("*Galen*"). In California, bail
determinations are made by a judicial officer, whose exercise of independent
judgment in the course of official duties is a superseding cause that breaks any

chain of causation linking the law enforcement officer to the bail determination. *Galen* at 663, citing *Hoffman v. Halden*, 268 F.2d 280, 296-97 (9th Cir. 1959) and *Walden v. Carmack*, 156 F.3d 861, 874 (8th Cir. 1998). A law enforcement officer can only be liable if he/she prevented the judicial officer from exercising his/her independent judgment. *Galen, supra* at 663-64. The law enforcement officer must have deliberately or recklessly misled the judicial officer, and that conduct must have been essential to the bail determination. *Id.* at 663-64 (granting summary judgment for law enforcement officers because there was no evidence that they deliberately or recklessly misled the judicial officer); *Collins v. Sacramento*, 2007 U.S. Dist. LEXIS 75231 (E. D. Cal. 2007) (same).

19.)   The uncontroverted facts submitted by Pozuelos in support of the Motion establish that she only submitted a declaration in support of the SBDA's Motion for a Bail Hearing, that probable cause existed for the bail hearing, and that none of the allegedly false statements, or omissions of exculpatory information, were material to the existence of probable cause for the bail hearing. Accordingly, as a matter of law, Pozuelos did not engage in judicial deception.

20.)   Pozuelos is also entitled to qualified immunity because her belief in the existence of probable cause for the bail hearing was objectively reasonable, and there was no clear and specific precedent at the time that her conduct would violate Grange's constitutional right.

21.)   Accordingly, as a matter of law, Pozuelos is entitled to summary judgment on the Third Claim for excessive bail.

22.)   With respect to the Fourth Claim, for unreasonable seizure of property, Grange must prove Pozuelos engaged in judicial deception. *Galbraith*, 307 F.3d at 1126. The proof of a deliberate falsehood or a reckless disregard of the truth must be substantial, and negligent conduct will not suffice. *Ewing,* 588 F.3d at 1224. The materiality of any alleged false statement or omission is determined by this Court, as a matter of law. *KRL*, 384 F.3d at 1117.

23.)  The uncontroverted facts submitted by Pozuelos in support of the
Motion establish that she only submitted a declaration in support of the SBDA's
Application for a Freeze Order, that probable cause existed for the freeze order, and
that none of the allegedly false statements, or omissions of exculpatory information,
were material to the existence of probable cause for the freeze order. Accordingly,
as a matter of law, Pozuelos did not engage in judicial deception.

24.)  Pozuelos is also entitled to qualified immunity because her belief in the
existence of probable cause for the freeze order was objectively reasonable, and
there was no clear and specific precedent at the time that her conduct would violate
Grange's constitutional right.

25.)  Accordingly, as a matter of law, Pozuelos is entitled to summary
judgment on the Fourth Claim for unreasonable seizure of property.

26.)  With respect to the Fifth Claim, for deliberate fabrication of evidence
and withholding of material information, there is a clearly established constitutional
due process right not to be subjected to criminal charges on the basis of false
evidence that was deliberately fabricated by the government." *Devereaux v. Abbey*,
263 F.3d 1070, 1074-75 (9th Cir. 2001) ("*Devereaux*"). In order to prevail on a
Section 1983 claim based upon a deliberate fabrication of evidence, a plaintiff must
establish that: "(1) Defendants continued their investigation of [the plaintiff] despite
the fact that they knew or should have known that he was innocent; or (2)
Defendants used investigative techniques that were so coercive and abusive that
they knew or should have known that those techniques would yield false
information." *Id.* at 1076.

27.)  The uncontroverted facts submitted by Pozuelos in support of the Motion
establish that Pozuelos did not deliberately or recklessly make any false statements,
or omit any exculpatory information, in her submissions to the SBDA, that were
material to the existence of probable cause. Accordingly, as a matter of law,
Pozuelos did not engage in judicial deception.

28.)   Pozuelos is also entitled to qualified immunity because her belief in the existence of probable cause was objectively reasonable, and there was no clear and specific precedent at the time that her conduct would violate Grange's constitutional right.

29.)   Accordingly, as a matter of law, Pozuelos is entitled to summary judgment on the Fifth Claim for deliberate fabrication of evidence or withholding of material information.

30.)   With respect to the Sixth Claim, for malicious prosecution, a claim for malicious prosecution is cognizable under Section 1983 as a violation of the Fourteenth Amendment right to substantive due process of law. To establish malicious prosecution, a plaintiff must prove that the defendant "prosecuted him with malice, and without probable cause and … did so for the purpose of denying him equal protection or another specific constitutional right." *Lacey v. Maricopa County*, 693 F.3d 896, 919 (9th Cir. 2012); *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995).

31.)   The uncontroverted facts submitted by Pozuelos in support of the Motion establish that Pozuelos did not deliberately or recklessly make any false statements, or omit any exculpatory information, in her submissions to the SBDA, that were material to the existence of probable cause. Accordingly, as a matter of law, Pozuelos did not engage in judicial deception.

32.)   Pozuelos is also entitled to qualified immunity because her belief in the existence of probable cause was objectively reasonable, and there was no clear and specific precedent at the time that her conduct would violate Grange's constitutional right.

33.)   Accordingly, as a matter of law, Pozuelos is entitled to summary judgment on the Sixth Claim for malicious prosecution.

34.)   With respect to the Seventh Claim, for retaliation, a person who suffers retaliation for speech protected by the First Amendment can seek relief under 42

U.S.C. section 1983. *Bennett v. Hendrix*, 423 F.3d 1247, 1249-50 (11th Cir. 2005). The person must show, among other things, that there was a causal connection between the retaliatory action and the protected speech. *Smith v. Mosely*, 532 F.3d 1270, 1276 (11th Cir. 2008). To meet this element, "a plaintiff must establish a causal connection between the government's retaliatory animus and the plaintiff's subsequent injury." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) ("*Nieves*"). In cases involving criminal charges, if there was probable cause for bringing them, the retaliation claim will usually fail as a matter of law. *Id.* at 1728. *See also Hartman v. Moore*, 547 U.S. 250, 259-61 (2006) and *O'Boyle v. Commerce Group Inc.,* 2023 U.S. App. Lexis 6665, 2023 WL 2579134 (11th Cir 2023).

35.)   The uncontroverted facts submitted by Pozuelos in support of the Motion establish that there was no causal connection between a retaliatory animus on the part of Pozuelos and injury to Grange. Pozuelos had no such animus, and Grange was not prevented from testifying in the civil action. Pozuelos also engaged in no conduct designed to prevent Grange from testifying.

36.)   Pozuelos is also entitled to qualified immunity because there was no clear and specific precedent at the time that her conduct would violate Grange's constitutional right.

37.)   Accordingly, as a matter of law, Pozuelos is entitled to summary judgment on the Seventh Claim for retaliation.

38.)   An award of punitive damages in a Section 1983 case requires proof that the officer acted with reckless disregard or callous indifference to the plaintiff's Constitutional rights. *Smith v. Wade*, 461 U.S. 30 (1983).

39.)   There is no evidence that either Pozuelos acted with reckless disregard or callous indifference to Plaintiff's constitutional rights.

/ / /

/ / /

/ / /

1    40.)  For the foregoing reasons, Pozuelos is entitled to judgment as a matter of

2    law on the First Amended Complaint pursuant to Rule 56(c) of the Federal Rules of

3    Civil Procedure.

4

5    Dated:  March 11, 2024                    Respectfully submitted,

6                                              ROB BONTA
                                              Attorney General of California
7                                              DONNA M. DEAN
                                              Supervising Deputy Attorney General
8

9

10                                             /s/ Thomas M. McMahon

                                              THOMAS M. MCMAHON
11                                             Deputy Attorney General
                                              *Attorneys for Defendants*
12                                             *Lori Pozuelos and Jason Wessely*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28