# EXHIBIT 38

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

---o0o---

JEFF T. GRANGE, M.D.          )Case No.
                             )5:20-cv-00340 DSF (AGRx)
        Plaintiff,           )
                             )
    vs.                      )
                             )
LORI POZUELOS, in her individual)
and official capacity; JASON  )
WESSELY, in his individual and )
official capacity; CALIFORNIA )
DEPARTMENT OF INSURANCE; and  )
DOES 1-10, individuals.,      )
                             )
        Defendant.           )
_____)


                   ---o0o---

           REMOTE VIDEO DEPOSITION OF

            MITCHELL S. NEUMEISTER

           TUESDAY, JANUARY 9, 2024

              10:00 A.M. PST

              PAGES 1 - 66

              ---o0o---




Reported by:

JULIE RUMSEY, CSR 14144

Job No. 93552

MITCHELL S. NEUMEISTER

January 09, 2024

```
1              ATTORNEY FALSTEIN:  And Ben Falstein with Larson
2     LLP on behalf of Plaintiff.
3              THE VIDEOGRAPHER:  Thank you.
4              Will the court reporter please administer the
5     oath.
6              CERTIFIED STENOGRAPHER:  Good morning.  My name is
7     Julie Rumsey, California Certified Shorthand Reporter
8     Number 14144.  The stenographic record is the official
9     record pursuant to C.C.P. 2025.
10                         ---o0o---
11              MITCHELL S. NEUMEISTER,
12         called as a witness herein, having been
13     administered an oath remotely in accordance with C.C.P.
14     Section 2096, was examined and testified as follows:
15                         ---o0o---
16                         EXAMINATION
17     BY ATTORNEY LAHANA:
18     Q.      Mr. Neumeister, can you please spell your name for
19     the record.
20     A.      It's Mitchell, M-i-t-c-h-e-l-l, Neumeister,
21     N-e-u-m-e-i-s-t-e-r.
22     Q.      Thank you.
23              Mr. Neumeister, you're an attorney and I know
24     you've taken depositions in the past.  Is it fair that you
25     know the rules and procedures and I can skip over the
```

**MITCHELL S. NEUMEISTER**

**January 09, 2024**

```
 1   Q.        Is she still your boss?
 2   A.        She is but not my immediate supervisor.  She's --
 3   she was promoted.  She's now the deputy general counsel of
 4   litigation.
 5   Q.        Are you in the same position that you were in
 6   March of 2022?
 7   A.        Yes.
 8   Q.        And what is that position?
 9   A.        I'm an attorney III with the Fraud Liaison Bureau.
10   Q.        And what was your position between 2016 and 2020?
11   A.        In 2016, I was an attorney I, and then in 2020, I
12   became an attorney -- no.  2019 I became an attorney III.
13   Q.        Was there ever a time were you an attorney II?
14   A.        That position doesn't exist anymore at the state.
15   Q.        Okay.  Odd numbers only.
16             Are you still with the Fraud Liaison Bureau?
17   A.        Yes.
18   Q.        From 2016 until the present day, had you been with
19   the Fraud Liaison Bureau?
20   A.        Yes.
21   Q.        How would you describe the function of the Fraud
22   Liaison Bureau?
23   A.        Fraud Liaison Bureau, it's -- we typically handle
24   civil qui tams that are filed under insurance code 1871.7,
25   and we handle just the civil cases.  We investigate and
```

**MITCHELL S. NEUMEISTER**

1    **litigate when necessary.**

2    Q.        What is your understanding of what the "liaison"

3    in the name of the Fraud Liaison Bureau -- what's the

4    meaning of that?

5    **A.        There are times when if there's like a civil**

6    **matter before the fraud department, the criminal -- like**

7    **the -- I guess the criminal investigation side, that we**

8    **will give them advice when it deals with like a civil**

9    **matter.**

10    Q.        You'll give advice to the criminal side when it

11    involves a civil matter?

12    **A.        Yes.**

13    Q.        And who -- who are your supervisors -- strike

14    that.

15             In 20 -- between 2016 and 2020, did you have the

16    same supervisor?

17    **A.        In 2016, when we first -- it may have been Richard**

18    **Krenz, but then I think, for the most part, it was Scott**

19    **McNamara.**

20    Q.        Do you know what Scott McNamara's position is in

21    the Department of Insurance?

22    **A.        He is now -- he's retired.**

23    Q.        What was he when he was your supervisor?

24    **A.        He was the assistant chief counsel.**

25    Q.        Did you work with Scott McNamara on the qui tam

**MITCHELL S. NEUMEISTER**

**January 09, 2024**

```
 1    involving Symons?
 2    A.        No.
 3    Q.        Do you know who Vlad Mikulich -- I might have
 4    mispronounced that -- do you know who that is?
 5    A.        Vlad Mikulich.  He's with fraud department down in
 6    Southern California.
 7    Q.        Have you ever worked with him?
 8    A.        Yes.  On another matter.
 9    Q.        Have you ever worked with him involving the Symons
10    qui tam lawsuit?
11    A.        He had sent -- I had sent him an email about the
12    case before -- on the Symons case.
13    Q.        Do you recall when that email was?
14    A.        In February of 2020.
15    Q.        Do you recall when in February of 2020?
16    A.        I don't remember.
17    Q.        I know -- I know it was a long time ago.  It's
18    just that February of 2020 is a very important month for
19    this lawsuit.
20              Do you know who Eric -- Eric Hood is?
21    A.        No, I don't.
22    Q.        Do you know who Lori Pozuelos is?
23    A.        Yes, I do.
24    Q.        And have you -- how would you describe your
25    professional relationship with her?
```

**MITCHELL S. NEUMEISTER**

**January 09, 2024**

1   A.          Lori was the investigator for the fraud department

2   in our -- in the investigation on Symons.  During the

3   Symons case, when I was doing my civil investigation, I

4   knew that she was the investigator for the fraud detective

5   and was referring the case to the San Bernardino County

6   D.A.'s office.

7            I would call her on occasion to ascertain about if

8   she had any knowledge about if there's going to be a filing

9   by the D.A.'s office and when -- and maybe when a filing

10   would have happened.

11   Q.          You said you would call her on occasion.  Would it

12   be fair to say that she would call you on occasion also?

13   A.          She called me on occasion.

14   Q.          Do you know how the Department of Insurance became

15   involved in the qui tam litigation between SIMNSA and

16   Symons?

17   A.          Yes.

18   Q.          How did it become involved?

19   A.          The Fraud Liaison Bureau became aware of the qui

20   tam as it was filed under the qui tam statute 1871.7, and

21   was served on, I believe, our -- the legal department's

22   agent for service of process.

23   Q.          How did you become involved in that intervention?

24   A.          I was assigned the case.

25   Q.          By who?

**MITCHELL S. NEUMEISTER**

**January 09, 2024**

```
 1    A.        Either Richard Krenz or Scott McNamara.

 2    Q.        Were you involved in the decision to intervene?

 3    A.        Yes.

 4    Q.        Would it be fair to say that you were in charge of

 5    the Department of Insurance's role in the qui tam

 6    litigation against Symons?

 7              ATTORNEY EDSON:  Objection.  Vague.

 8              ATTORNEY McMAHON:  Join.

 9              THE WITNESS:  I was the lead attorney for the

10    legal -- for the Fraud Liaison Bureau on this case.  I

11    handled the day-to-day work on the case for the Fraud

12    Liaison Bureau.  Any decision about -- very high-level

13    decisions would probably be -- need to be run by my bosses.

14    BY ATTORNEY LAHANA:

15    Q.        And that would be Scott McNamara?

16    A.        Correct.

17    Q.        And what -- can you give me an example of what

18    type of a high-level decision would have to be run by

19    Mr. McNamara?

20    A.        The decision to intervene.

21              (Clarification by the certified stenographer.)

22              ATTORNEY EDSON:  That's fine.  You've answered the

23    question.

24    BY ATTORNEY LAHANA:

25    Q.        Are there any other examples?
```

**MITCHELL S. NEUMEISTER**

**January 09, 2024**

1    remember.

2            THE WITNESS:  I don't remember any discussion with

3    Lori and Steve on this.

4    BY ATTORNEY LAHANA:

5    Q.        Do you know -- do you remember if Ms. -- if

6    Detective Pozuelos did reach out to insurers after this

7    email?

8    A.        I don't know.

9    Q.        Did you ever speak with Detective Pozuelos

10    regarding her reaching out to insurers?

11    A.        No.

12    Q.        Do you recall asking Mr. Green to send this email

13    to Detective Pozuelos?

14    A.        No, I don't.  And I would add that this is in

15    January 2019.  Steve was brought on to handle the case.

16    I -- I already had like insurer witnesses already down, you

17    know, from my own personal work.

18    Q.        I'm sorry.  It cut out a little bit.  You said you

19    had already?

20    A.        Already had my insurers as witnesses before Steve

21    sent this email.

22    Q.        Do you know why Steve sent this email?

23    A.        I don't.

24    Q.        How would you describe Detective Pozuelos' role in

25    the civil qui tam lawsuit against Symons?

**MITCHELL S. NEUMEISTER**

**January 09, 2024**

```
 1              ATTORNEY McMAHON:  Object to the form.  Vague.

 2     Assumes facts not in evidence.

 3              ATTORNEY EDSON:  Join.

 4              THE WITNESS:  She didn't have a role in the civil

 5     investigation of the case.

 6     BY ATTORNEY LAHANA:

 7     Q.       I'm going to stop sharing here.

 8              Did you work on any other cases with Detective

 9     Pozuelos after -- withdrawn.

10              Besides the civil qui tam lawsuit involving

11     Symons, did you have any cases that Detective Pozuelos was

12     involved in?

13              ATTORNEY EDSON:  Objection as to form.  Vague.

14              THE WITNESS:  No.

15     BY ATTORNEY LAHANA:

16     Q.       Okay.  Would it be fair to say that if you were

17     speaking professionally with -- strike that.

18              Would it be fair to say if you were communicating

19     professionally with Detective Pozuelos, it was about either

20     Dr. Grange or Symons?

21              ATTORNEY McMAHON:  Object to the form.  Vague.

22              ATTORNEY EDSON:  Join.

23              THE WITNESS:  No.  I would speak to Lori,

24     Detective Pozuelos, about if she had any information

25     regarding the DA -- if they're going to file criminal
```

**MITCHELL S. NEUMEISTER**

**January 09, 2024**

```
 1    changes against Dr. Grange and his company -- Dr. Grange,

 2    and if they were going to file, did she have any idea as to

 3    when they would be filing.

 4    BY ATTORNEY LAHANA:

 5    Q.        Approximately, how many times would you say you --

 6    you spoke with Detective Pozuelos regarding the status of

 7    the district attorney filing the criminal complaint against

 8    Dr. Grange?

 9    A.        Three to four times.

10    Q.        And was this within a short period of time or over

11    a span of time?

12    A.        It would have been over a span of time.

13    Q.        Do you recall any specific conversations of those

14    three to four times?

15    A.        I recall speaking to Lori about when the time we

16    filed our complaint, the civil Fraud Liaison Bureau

17    intervened in the case and filed our civil case against

18    Dr. Grange and his defendant companies, and that would have

19    been in 2016, early 2017.

20    Q.        Do you recall the most recent time, if you will,

21    of when you spoke with Detective Pozuelos regarding the

22    status of the criminal complaint?

23    A.        It would have been a month or so before the actual

24    trial date.

25    Q.        So just to have this in an actual month and year,
```

**MITCHELL S. NEUMEISTER**

January 09, 2024

```
 1    would that be January, February 2020?

 2    A.        I don't remember like if it was January or

 3    February.

 4    Q.        Would that be fair?  Around January or February of

 5    2020?

 6    A.        Yes.

 7    Q.        And during those -- those -- well, withdrawn.

 8              Besides the three to four times that you

 9    approximated that you spoke with Detective Pozuelos about

10    the status of the criminal filing with the DA, did you --

11    did you have any other conversations with her that you

12    recall?

13    A.        Yes.

14    Q.        Approximately, how many times would you say?

15    A.        Two to three.

16    Q.        And what would -- what was the subject of those

17    conversations?

18    A.        One was going to be -- I remember speaking to Lori

19    in person when I was down at the Rancho Cucamonga office

20    when this -- we were doing a civil deposition in the civil

21    case.

22              And then I spoke to her again regarding a witness

23    issue because it looked like we had the same witness in our

24    cases.  One -- we had, I think, one overlapping witness in

25    our case.
```

**MITCHELL S. NEUMEISTER**

```
 1                He said the communication happened 30 minutes

 2   before the deposition.

 3                ATTORNEY LAHANA:  I stand corrected.  I apologize.

 4   BY ATTORNEY LAHANA:

 5   Q.        How long did you speak with Detective Pozuelos

 6   for?

 7   A.        Five minutes.

 8   Q.        Okay.  What -- what else did you talk about with

 9   her?

10   A.        Just saying hello, pleasantries, and then telling

11   her that we were doing a deposition of the deponent that

12   day and that she was going to use -- you know, make sure

13   she didn't use like an entrance where she would have the

14   risk of running into to either Mr. Garcia or whoever the

15   deponent was.

16   Q.        And then you testified that you met with Detective

17   Pozuelos -- I'm sorry.  Strike that.

18                You had spoken or communicated with Detective

19   Pozuelos about witness issues that you both had at a

20   separate time?

21   A.        Yes.

22   Q.        And approximately, when was that?

23   A.        I don't remember the year.

24   Q.        Was it before or after this deposition meeting --

25   or this meeting before the deposition of this witness?
```

**MITCHELL S. NEUMEISTER**

**January 09, 2024**

1    A.        I don't know.

2    Q.        Was it in person or over the phone?

3    A.        Over the phone.

4    Q.        What was the witness issue?

5    A.        She had gotten pushback from, I believe, Deann

6    Shier -- Shier, who I believe -- the pushback was Deann

7    Shier -- I guess, she -- I had already spoken to her, and I

8    had sent her a subpoena during the investigative stage of

9    the case asking for documents.  And I believe Lori was

10   getting -- Deann was not cooperating with Lori, because

11   Deann had said, well, I don't need to talk to you.  I've

12   already talked to Mitch.

13   Q.        And so what did Detective Pozuelos tell you?

14   A.        I don't remember.

15   Q.        Do you recall the substance of what -- why she

16   spoke with you on that day?

17   A.        She was asking -- she was asking about if there's

18   a way to, you know, reach out to her to inform Deann that I

19   was -- you know, it's a separate investigation.

20   Q.        And did you do so?

21   A.        I don't remember.

22             ATTORNEY LAHANA:  I'm going to show another

23   document.  We'll mark it as Exhibit 2.  This is DEF --

24   Bates number DEF0208293.

25   /////

**MITCHELL S. NEUMEISTER**

1  either the Symons qui tam lawsuit or Detective Pozuelos'

2  criminal investigation with Detective Pozuelos?

3         ATTORNEY McMAHON:  Object to the form.  Vague.

4         ATTORNEY EDSON:  Join.

5         Can you repeat it just so I can hear it again?

6         ATTORNEY LAHANA:  Yeah.  Let me break it up.

7  BY ATTORNEY LAHANA:

8  Q.        Did you ever exchange documents from the Symons

9  civil litigation with Detective Pozuelos?

10         ATTORNEY McMAHON:  Object to the form.  Vague.

11         THE WITNESS:  No.

12  BY ATTORNEY LAHANA:

13  Q.        Did Detective Pozuelos ever provide you documents

14  related to the criminal investigation of Dr. Grange?

15  A.        No.

16  Q.        Do you know who Lance Cantos is?

17  A.        He was the deputy district attorney who was

18  handling the criminal charges against Dr. Grange.

19  Q.        Have you ever communicated with him?

20  A.        Yes.

21  Q.        Before your involvement in the Symons qui tam

22  case, had you ever communicated with Mr. Cantos?

23  A.        No.

24  Q.        Approximately, how many times had you communicated

25  with Mr. Cantos?

**MITCHELL S. NEUMEISTER**

**January 09, 2024**

```
1    Q.        Do you know if Mr. McNamara attempted to speak
2    with Mr. Cantos about filing the criminal complaint against
3    Dr. Grange?
4    A.        No.  I don't know.
5    Q.        Do you know if anybody else at the Department of
6    Insurance contacted Mr. Cantos regarding filing the
7    criminal complaint against Dr. Grange?
8    A.        No.  I don't know.
9    Q.        Did Detective Pozuelos tell you about her
10   communications with Mr. Cantos or anyone else at the
11   district attorney's office about filing a criminal
12   complaint against Dr. Grange?
13   A.        Just to the extent that when I asked her if she
14   had any idea as to whether there's going to be charges
15   filed, I didn't -- I didn't hear anything else from Lori
16   about that.
17   Q.        When you had that conversation, what did -- what
18   did she say?
19   A.        When I would ask her when Lance would be filing
20   criminal charges against Dr. Grange, she had told me she
21   really didn't have any information for me.  And another
22   time, she would tell me that was going -- a decision -- you
23   know, they're still working on a decision.
24   Q.        Did she -- did she tell you that she had spoken
25   with anyone at the D.A.'s office about it?
```

**MITCHELL S. NEUMEISTER**

**January 09, 2024**

```
 1   A.        No.

 2   Q.        Before Dr. Grange was arrested, did you -- did

 3   you -- strike that.

 4            Was it your expectation that Dr. Grange would be

 5   arrested before the qui tam lawsuit?

 6            ATTORNEY McMAHON:  Object to the form.  Vague.

 7            ATTORNEY EDSON:  Join.

 8            Before the qui tam lawsuit was filed?

 9            ATTORNEY LAHANA:  No.  Before the qui tam trial.

10            ATTORNEY EDSON:  Oh.

11            THE WITNESS:  No.  It wasn't my expectation that

12   it was going to happen then.

13   BY ATTORNEY LAHANA:

14   Q.        Did you have an expectation regarding the filing

15   of the criminal complaint against Dr. Grange?

16   A.        I didn't have an expectation.  I only hoped that

17   it would be filed -- if the DA was going to be filing

18   charges, it happened before or after the civil qui tam

19   trial.

20   Q.        Why?

21   A.        Because if the civil -- if the DA filed criminal

22   charges against Dr. Grange, it would have stayed the case.

23   Q.        Did you express that concern to Detective Pozuelos

24   at any time?

25   A.        No.
```

**MITCHELL S. NEUMEISTER**

**January 09, 2024**

1    Q.        Why?

2              ATTORNEY EDSON:  Objection.  Argumentative.

3              ATTORNEY McMAHON:  Join.

4              THE WITNESS:  I was in charge of the civil qui tam

5    case.  She was in charge of the criminal case.  You know,

6    if the DA filed a criminal case, then it would have stayed

7    our case.  So I just never brought it up to her.

8    BY ATTORNEY LAHANA:

9    Q.        Did you discuss that with Mr. Cantos the times

10   that you spoke with him?

11   A.        No.

12   Q.        Why?

13             ATTORNEY EDSON:  Objection.  Argumentative.

14             ATTORNEY McMAHON:  Join.

15             THE WITNESS:  I was focused on the civil case, and

16   I just wanted to know if his office was going to be filing

17   criminal charges, and if so, when.

18   BY ATTORNEY LAHANA:

19   Q.        And he never told you when?

20   A.        No.

21             ATTORNEY LAHANA:  Okay.  I'm going to show you

22   another exhibit.

23             This is -- we'll mark this as Exhibit 4.  It's

24   Bates-numbered as MN 000209.

25   /////

**MITCHELL S. NEUMEISTER**

**January 09, 2024**

1   because this was involving a previous unrelated litigation.

2   Doesn't apply.

3          ATTORNEY EDSON:  What do you mean it's a previous

4   unrelated litigation?

5          ATTORNEY LAHANA:  I'm not asking him about this

6   case.  I'm not asking about, you know, what's on your notes

7   here.  I'm asking him about a previous lawsuit that is

8   done, it's terminated, and it's not at issue now.

9          ATTORNEY EDSON:  Well, it's still his attorney

10   work product.  Privilege.

11          ATTORNEY LAHANA:  All right.  If that's your

12   position, then we'll deal with that in due course.

13   BY ATTORNEY LAHANA:

14   Q.      Are you going to follow your attorney's advice?

15   A.      Yes.

16   Q.      Okay.  When did you first learn that Dr. Grange

17   was arrested?

18   A.      On February 27th.

19   Q.      Do you -- do you recall how you learned he was

20   arrested?

21   A.      Yes.

22   Q.      How -- how did you learn?

23   A.      Curtis Leavitt called me and told me that

24   Dr. Grange had been arrested.

25          ATTORNEY LAHANA:  I'd like to show you another

**MITCHELL S. NEUMEISTER**

January 09, 2024

```
 1    exhibit.  We'll mark this as Exhibit 5, I believe.  Bates

 2    number is MN 000210.

 3              (Exhibit 5 was presented and subsequently marked

 4              for identification.)

 5    BY ATTORNEY LAHANA:

 6    Q.       Do you see this is a text message exchange that

 7    you had produced?  Does it -- does it look familiar to you,

 8    Mr. Neumeister?

 9    A.       Yes, it does.

10    Q.       Do you see on February 27th, 2020, at 4:49 p.m.,

11    Curtis Leavitt says, "Mitch, call me," ex -- exclamation

12    point?

13    A.       Yes.  I see that.

14    Q.       Do you recall why Mr. Leavitt called you --

15    Mr. Leavitt -- strike that.

16              Do you recall -- did you call Mr. Leavitt in

17    response to this text message?

18    A.       Yes, I did.

19    Q.       And what did you -- what did he tell you?

20    A.       Right after I received this text message, I called

21    Curtis Leavitt, and he told me that Dr. Grange had been

22    arrested, and he told me that he found out through Raul

23    Garcia.

24    Q.       And what did you do?

25    A.       At that point, Curtis and I talked about next
```

**MITCHELL S. NEUMEISTER**

**January 09, 2024**

```
 1    steps.  And after that, I made phone calls to Ms. Pozuelos
 2    and to my boss Scott McNamara.
 3    Q.        Who did you call first?
 4    A.        I don't recall.
 5    Q.        Did you call -- withdrawn.
 6              You said you called Detective Pozuelos?
 7    A.        Correct.
 8    Q.        And what did you tell her?
 9    A.        I was asking if I could -- I was calling her to
10    get more information about the arrest.
11    Q.        What information did you want about the arrest?
12    A.        Trying to figure out what had happened because
13    this came as a surprise to us that Dr. Grange had been
14    arrested, and that trying to -- just find out any
15    information I could, because this was a surprise to me.
16    Q.        What did she tell you?
17    A.        She had told me that Dr. Grange had been arrested,
18    and, you know, that was pretty much the extent of the phone
19    call.
20    Q.        Did she give you any other information?
21    A.        I don't -- I don't recall.
22    Q.        Then you said you had called your boss Scott
23    McNamara.  What --
24    A.        Yes.
25    Q.        Why did you call him?
```

**MITCHELL S. NEUMEISTER**

**January 09, 2024**

```
 1   civil verdict.
 2   Q.        Do you recall Detective Pozuelos asking you for
 3   the transcripts of the qui tam trial after the verdict came
 4   down?
 5   A.        Yes.
 6   Q.        Did detective -- did you, in fact, send Detective
 7   Pozuelos the transcripts of that case?
 8   A.        Yes, I did.
 9   Q.        And why?
10   A.        She had asked for them.
11   Q.        Had you ever not sent Detective Pozuelos documents
12   that she asked you for regarding the Symons case?
13             ATTORNEY EDSON:  Objection.  Vague.  Assumes facts
14   not in evidence.
15             ATTORNEY McMAHON:  Join.
16             THE WITNESS:  I don't recall her asking for
17   documents other than the transcripts.
18   BY ATTORNEY LAHANA:
19   Q.        Let me rephrase it.
20             Was there ever an instance where Detective
21   Pozuelos asked you for documents and you said no?
22   A.        I don't recall if that ever...
23             No.  I don't recall that.
24   Q.        And after you sent the qui tam trial transcripts
25   to Detective Pozuelos, did you have any follow-up questions
```

**MITCHELL S. NEUMEISTER**

**January 09, 2024**

```
 1   This is Bates number MN 000211.

 2           (Exhibit 8 was presented and subsequently marked

 3           for identification.)

 4   BY ATTORNEY LAHANA:

 5   Q.      This is a text message chain that you had produced

 6   in response to the subpoena.  Does it look -- between you

 7   and Curtis Leavitt.

 8           Does it look familiar to you?

 9   A.      Yes, it does.

10   Q.      Do you see on July 16th, it doesn't say the year,

11   but you had -- you had said (as read):

12           DA dropped the charges against Grange.

13   A.      Yes.  I see that.

14   Q.      And Mr. Leavitt responds (as read):

15           Disappointing but not surprising.

16           And then you respond (as read):

17           Yeah.  There was some real BS too.  I'll tell

18   you about it next week.

19           What -- what did you -- what did you mean by

20   "there was some real BS too"?

21   A.      So what I meant that "There some real BS too," it

22   was in regards to a conversation that I had with Lori

23   Pozuelos in -- that day or the day before.  And this was

24   2021.

25           That the BS was Lori had told me that the DA
```

**MITCHELL S. NEUMEISTER**

**January 09, 2024**

1    dropped charges or was planning on dropping charges.  And

2    at that time, Lori had told me, you know, for the first

3    time that she had, you know, some of the evidence that she

4    had and -- including like emails from Dr. Grange to

5    internal Symons staff, the fact that there was a --

6              (Clarification by the certified stenographer.)

7              THE WITNESS:  -- payment from Dr. Grange or Symons

8    to Paul Fish for about $20,000.  I felt that was

9    information -- and that there were some other emails.  I

10   thought it was -- when I said that there was some real BS,

11   I thought that was information that CDI -- or I was

12   entitled to as part of the discovery in the case.  And the

13   fact that we didn't get it just kind of rubbed me the wrong

14   way, because, you know, we had a motion in limine right

15   before the trial regarding this very issue of Dr. Grange

16   and his companies not producing responsive emails to civil

17   discovery, and I thought, you know, when I found out that

18   there was this evidence that Lori had and she told me what

19   existed, I thought it was BS.

20   BY ATTORNEY LAHANA:

21   Q.       And is that what you expressed to Mr. Leavitt

22   after you spoke -- let me rephrase that.

23            Did you speak with Mr. Leavitt after sending this

24   text message?

25   A.       Yes.

**MITCHELL S. NEUMEISTER**

**January 09, 2024**

```
1    Q.        Is that -- is that -- is what you just told me

2    what you told him when you spoke with him afterwards?

3    A.        Yes.  Yes.

4    Q.        You had produced approximately 280 pages of

5    documents in response to our subpoena.  Are you -- are you

6    aware of any other documents that you intend to produce?

7    A.        No, I am not.

8    Q.        Where -- where -- were you the one who searched

9    for documents that were responsive to the subpoena?

10   A.        Yes, I did.

11   Q.        And how did you search for them?

12   A.        Through my emails.  I looked for, you know,

13   specifics -- you know, with emails with handles, like Lori

14   Pozuelos' email handles, the relevant names from the fraud

15   department, which was Hood and Lopez, I believe.  And then

16   I looked for key terms, such as Symons, Grange, SIMNSA.

17   Emails with -- you know, with Curtis and his firm, and then

18   internal, and then, again, emails with Symons, SIMNSA,

19   Grange as the search terms.

20   Q.        And did you discuss these documents with anybody

21   besides your attorneys?

22   A.        No.

23   Q.        Did anybody review these documents besides your

24   attorneys -- setting aside your attorneys?

25   A.        No.
```

**MITCHELL S. NEUMEISTER**

January 09, 2024

```
 1                    CERTIFICATE OF REPORTER
                            ---o0o---
 2            I, the undersigned, a Certified Shorthand

 3   Reporter, Licensed by the State of California, being

 4   empowered to administer oaths and affirmations remotely

 5   pursuant to Section 2093(b) of the Code of Civil Procedure,

 6   do hereby certify:

 7               That the foregoing proceedings were taken remotely

 8   before me at the time and place herein set forth; that any

 9   witness in the foregoing proceedings, prior to testifying,

10   were placed under oath; that a verbatim record of the

11   proceedings was made by me using machine shorthand which

12   was thereafter transcribed under my direction; further,

13   that the foregoing is an accurate transcription thereof.

14               I further certify that I am neither financially

15   interested in the action nor a relative or employee of any

16   attorney or any of the parties.

17               Further, that if the foregoing pertains to the

18   original transcript of a deposition in a Federal Case,

19   before completion of the proceedings, review of the

20   transcript [ ] was [X] was not requested.

21               IN WITNESS WHEREOF, I have this date subscribed my

22   name.

23   DATED:  January 29, 2024

24

25                          JULIE RUMSEY,  CSR No. 14144
```