Stephen G. Larson (SBN 145225)
*slarson@larsonllp.com*
Jerry A. Behnke (SBN 180462)
*jbehnke@larsonllp.com*
Daniel R. Lahana (SBN 305664)
*dlahana@larsonllp.com*
**LARSON LLP**
555 South Flower Street, 30th Floor
Los Angeles, California 90071
Telephone:(213) 436-4888
Facsimile: (213) 623-2000

Attorneys for Plaintiff
JEFF T. GRANGE, M.D.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JEFF T. GRANGE, M.D., | Case No. 5:20-cv-00340 DSF (AGRx) |
| Plaintiff, | Judge: Hon. Dale S. Fischer |
| vs. | **PLAINTIFF JEFF T. GRANGE, M.D.'S STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT** |
| LORI POZUELOS, in her individual and official capacity; JASON WESSELY, in his individual and official capacity; CALIFORNIA DEPARTMENT OF INSURANCE; and DOES 1-10, individuals., | |
| Defendant. | Date:         April 8, 2024 |
| | Time:         1:30 p.m. |
| | Courtroom:  7D |
| | Trial Date:    11/12/2024 |
| | Action Filed:  2/24/2022 |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56-2, Plaintiff, JEFF T. GRANGE, M.D. ("Dr. Grange) hereby submits this Statement of Genuine Disputes and Statement of Additional Material Facts in response to Defendant Pozuelos's Separate Statement of Uncontroverted Facts and Conclusions of Law:

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| 1. Defendant Lori Pozuelos ("Pozuelos") is a Detective with the California Department of Insurance ("CDI"). She has been a Detective with CDI since April 2011 and have been continuously assigned to the CDI's Fraud Division ("Fraud Division").<br><br>(Declaration of Lori Pozuelos "Pozuelos Decl."), ¶ 1-2. | Undisputed. |
| 2. Prior to her current assignment, Pozuelos was an Investigator for the California Department of Alcoholic Beverage Control from July 2001 to March 2011. She obtained a Bachelor of Arts degree from California State University, San Bernardino, in June 1999, majoring in Criminal Justice. Pozuelos has received 640 hours of personalized training and instruction from Peace Officer Standards and Training (P.O.S.T.), Specialized Investigators Basic Course at Golden West College. She receives continual training through P.O.S.T., and has attended fraud symposiums, conferences, meetings, and trainings related to Health Care Fraud.<br><br>Pozuelos Decl., ¶ 2. | Partially disputed as to the statement that Defendant Lori Pozuelos ("Pozuelos") "has attended fraud symposiums, conferences, meetings, and trainings related to Health Care Fraud." Pozuelos testified under oath that she had never received training regarding ambulance billing or ambulance coding and further testified that she had only received "minimal" training regarding insurance coding in general. Additionally, when asked if Pozuelos had received training as to whether exculpatory evidence should be included in an affidavit filed in support of an arrest warrant, Pozuelos testified: "I don't recall."<br><br>Ex. 1 (Deposition Transcript of Lori Pozuelos ("Pozuelos Tr.")) at 122:22- |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | 123:1, 126:20-127:15. |
| 3.    The Fraud Division is within the Enforcement Branch of CDI and is responsible for investigating crimes related to section 550 of the Penal Code, the California Insurance Code, and other related crimes discovered during an investigation. In her position as a Detective within the Fraud Division, Pozuelos conducts criminal investigations related to insurance fraud, which includes worker's compensation, auto insurance fraud, healthcare fraud, disability fraud, provider fraud, and medical billing fraud.  Pozuelos is responsible for gathering and analyzing facts and evidence, interviewing witnesses, making physical arrests, preparing and serving search warrants, preparing detailed reports, referring criminal cases to the local District Attorney's Office or California Attorney General's Office for consideration of filing of criminal charges, and testifying at criminal hearings.

Pozuelos Decl., ¶ 3. | Undisputed. |
| 4.    Beginning in 2014, and throughout the investigation at issue in this case, Pozuelos was assigned to the CDI Fraud Division's Healthcare Provider Task Force, which focuses on healthcare provider fraud. The Task Force was comprised of Detectives from the | Partially disputed as to the statement that Pozuelos "attended numerous meetings related to healthcare fraud, which included various state, federal, and local agencies discussing cases related to health care fraud and current trends of health care fraud. She attended |

3
STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| Fraud Division who were responsible for investigating crimes that generally involved medical billing fraud by healthcare providers such as medical clinics, doctor's offices, chiropractors, and other licensed or unlicensed professionals. As part of the taskforce, Pozuelos worked alongside attorneys and investigators with County District Attorney's offices who were assigned to investigate and prosecute healthcare fraud. She attended numerous meetings related to healthcare fraud, which included various state, federal, and local agencies discussing cases related to health care fraud and current trends of health care fraud. She attended trainings and conferences which focused on health care fraud.<br><br>Pozuelos Decl., ¶ 4. | trainings and conferences which focused on health care fraud." Pozuelos testified under oath that she had never received training regarding ambulance billing or ambulance coding and further testified that she had only received "minimal" training regarding insurance coding in general. Additionally, when asked if Pozuelos had received training as to whether exculpatory evidence should be included in an affidavit filed in support of an arrest warrant, Pozuelos testified: "I don't recall."<br><br>Ex. 1 (Pozuelos Tr.) at 122:22-123:1, 126:20-127:15. |
| 5.    From July 2016 to February of 2020, on behalf of the Fraud Division, Pozuelos was involved in a criminal fraud investigation of Plaintiff Jeff Grange, M.D. ("Grange") and a company with which he was closely associated as an owner, director and officer, Symons Emergency Specialties, Inc., dba Symons Ambulance ("Symons"). Over this period of time, Pozuelos' immediate supervisors were Sergeant Tom Perez, Sergeant Katrina Blake, and | Partially disputed as to the statement that Dr. Grange was the "owner" of Symons. Dr. Grange was merely one of several owners/shareholders of Symons, as acknowledged by Pozuelos. Dr. Grange was one of nine directors, and Symons had between 100 and 200 employees during the relevant time period.<br><br>Declaration of Jeff T. Grange, M.D. ("Grange Decl."), ¶. 3; Ex. 1 (Pozuelos Tr.) at 59:16-8, 61:1-5, 61:14-23. |

4

LARSON
LOS ANGELES

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| Sergeant Joe Lopez. Pozuelos was the only Fraud Division detective permanently assigned to this investigation, and with the exception of some assistance from time to time within the Fraud Division, such as a group review of Symons' emails to screen the criminal investigation from any privileged materials, Pozuelos personally conducted all aspects of the investigation.<br><br>Pozuelos Decl., ¶ 5. | Evid. Obj.: Federal Rules of Evidence ("FRE") 602, 701. |
| 6. Pozuelos performed the criminal fraud investigation of Grange and Symons in partnership with the District Attorney's Office of San Bernardino County ("SBDA"). She initially worked with Deputy District Attorney ("DDA") Diane Harrison, to whom she submitted her initial Report of Investigation ("ROI"), dated October 27, 2017. Thereafter, Pozuelos worked with DDA Lance Cantos, who continued to guide the investigation and who ultimately made the decision to file criminal charges against Grange on February 27, 2020. Pozuelos also worked with DDA Rebeca Hynds ("DDA Hynds"), who made the decision to seek a Temporary Restraining Order with respect to certain assets of Grange and Symons. At all times, Pozuelos took direction from the SBDA with respect to the criminal fraud investigation of Grange and | Disputed. The cited evidence does not support the proffered fact that Pozuelos at all times "took direction from the SBDA with respect to the criminal fraud investigation." Pozuelos conducted her investigation independently. The investigation of Dr. Grange was not a "partnership" between Pozuelos and the SBDA. Pozuelos was the sole source of information relied on by the SBDA, and it did not assign any other investigator to assist in the investigation. DDA Cantos testified that the SBDA's decision to file criminal charges was based solely on the information supplied by Pozuelos. Likewise, the Criminal Complaint, the arrest warrant, the Temporary Restraining Order, the Motion for Examination of Bail, and all of the supporting declarations for those documents were based *solely* on the |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| Symons. The SBDA made the decisions on whether and when to file criminal charges, which statutes and incidents would be used, and what orders would be sought in connection therewith. The SBDA prepared, and filed or submitted, the relevant documents with the San Bernardino County Superior Court pertaining to the charging and arrest of Grange, including the documents that were prepared for Pozuelos' signature and the confidential discovery package for the court that supported her belief in the existence of probable cause.<br><br>Pozuelos Decl., ¶ 6;<br><br>Deposition Transcript of Lance Cantos ("Cantos Tr."), Tab 35 of Exhibits in support of the Motion ("Exhibits") and Declaration of Thomas M. McMahon ("McMahon Decl.") at ¶ 4, pages and lines 8:21-25, 10:6-7, 10:16-17, 10:23-11:24, 12:23-13:13, 13:24-15:21, 16:9-17:2, 26:10-27:7, 31:25-32:14, 32:24-33:7, 35:2-36:1, 36:10-13, 60:17-61:10, 62:19-64:23, 65:4-66:10, 68:11-69:9; 71:16-72:8; 72:13-73:6. | information Pozuelos provided. Further, DDA Cantos did not make the decision to file criminal charges on his own; rather, he was under constant pressure from the Department of Insurance, which wanted to ensure criminal charges would be filed at the same time Dr. Grange was participating in the *qui tam* trial.<br><br>Moreover, the discovery package was *never* "filed or submitted" by the SBDA or anyone else and was thus never presented to the court for review. DDA Cantos testified that the only document he filed or submitted to the Superior Court was the criminal complaint that he electronically filed. The only document filed in connection with the arrest warrant was the Declaration in Support of Arrest Warrant signed by Pozuelos, but this declaration did not include any probable cause showing.<br><br>Also, the "discovery package" purportedly demonstrating probable cause was not prepared by the SBDA or anyone else. Cantos explicitly stated that, if a discovery package is prepared for the purpose of showing probable cause, it would not be prepared by the SBDA's office but would instead "come from the investigation reports" prepared by Pozuelos. Cantos also testified that the SBDA does not file or |

6

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | submit the "discovery package." Instead, the discovery package gets "walked over" by the investigating officer, Pozuelos.<br><br>Ex. 2 (Lance Cantos Deposition Transcript ("Cantos Tr.")) at 14:13-15-6, 16:25-17:14, 92:23-93:1, 39:9-25; Declaration of Raymond Ramirez ("Ramirez Decl."), ¶ 11; Defendants' Ex.[1] 30 (Declaration iso Arrest Warrant).<br><br>Evid. Obj.: FRE 602, 701. |
| 7.  CDI's Fraud Liaison Bureau, within CDI's Legal Branch, handles civil fraud investigations and qui tam litigation. The Fraud Liaison Bureau was not involved in the criminal fraud investigation of Grange and Symons. Accordingly, Pozuelos did not share information about her investigation with CDI counsel, including Mitch Neumeister, who were simultaneously participating in a civil qui tam litigation initiated by an insurance company against Grange and Symons. Nor did CDI counsel share information from their investigation in the civil litigation against Grange and Symons with Pozuelos, prior to the charging and arrest of Grange. At | Disputed. There was no barrier between Pozuelos's criminal investigation and the civil *qui tam* litigation. From the inception of both matters through their conclusion, Pozuelos was communicating with the civil attorneys representing the State in the civil action, Mitch Neumeister, Curtis Leavitt, and Steven J. Green. Pozuelos and Neumeister frequently communicated via telephone. In addition to sharing information with each other verbally, Pozuelos and the civil attorneys also exchanged numerous documents that were obtained from their respective matters. Leavitt provided Pozuelos the discovery file for the relator in the *qui tam* matter. Neumeister supplied |

---

[1] "Defendants' Ex." refers to the exhibits jointly filed by Defendants Pozuelos and Wessely in connection with the instant Motion.

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| all times, CDI maintained a barrier between the criminal and civil fraud investigations concerning Grange and Symons. DDA Diane Harrison and DDA Lance Cantos specifically directed Pozuelos to maintain this barrier, and she did so. DDA Lance Cantos also did not exchange substantive information about the investigations of Grange and Symons with CDI counsel in the civil litigation.<br><br>Pozuelos Decl., ¶ 7;<br><br>Cantos Tr. at 18:11-13, 18:22-20:1, 20:8-23:18, 42:11-43:22, 44:10-14, 45:2-8, 48:5-14, 52:22-54:8, 55:1-5, 55:12-56:3, 56:14-20, 57:7-20, 65:23-66:10, 66:19-22, 67:2-5, 67:24-68:2, 68:11-69:9, 69:10-22;<br><br>Deposition Transcript of Rebecca Hynds ("Hynds Tr."), Tab 36 of Exhibits and McMahon Decl. at ¶ 5, at pages and lines 25:5-13;<br><br>Deposition Transcript of Mitchell S. Neumeister ("Neumeister Tr."), Tab 38 of Exhibits and McMahon Decl. at ¶ 7, at pages and lines 9:21-10:1, 14:4-13, 19:24-20:5, 28:8-15. | Pozuelos with transcripts from the *qui tam* trial, including the testimony of witnesses who were also interviewed by Pozuelos during her criminal investigation. Neumeister asked Pozuelos for contact information for individuals with the San Bernardino Sheriff's Department regarding the air claims submitted by Symons. Neumeister also arranged for one of the private helicopter companies to reach out directly to Pozuelos to provide her with documents regarding air ambulance flights in which Symons was involved. Pozuelos also sent the civil attorneys the names of potential witnesses affiliated with various insurance companies. Green even asked Pozuelos to assist Green and Neumeister in contacting the insurers involved in both matters.<br>DDA Cantos was unaware of the true extent of the overlap between the civil and criminal matters. At one point, however, Pozuelos sent Cantos an email on April 2, 2019 informing him that she had spoken with the civil attorneys and that they wanted an update on the status of the criminal filing. By this point, Pozuelos had been exchanging information and documents with the civil lawyers for approximately two years. Cantos was deeply concerned by this email because it indicated that "there[] [was] contact made" between |

8

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | the civil and criminal teams, and he "thought there was a wall between civil side. This gave the impression to me there was not a wall." Cantos was concerned that the overlap between the two cases would mean that any exculpatory evidence obtained in the civil matter would be part of the prosecution's *Brady* disclosure obligations in the criminal matter. Cantos accordingly asked Pozuelos to make sure she documents her contacts with the civil lawyers going forward. However, while Pozuelos thereafter continued to communicate with the civil lawyers on a constant basis, she never documented her contacts with them, despite Cantos's admonition. None of the evidence cited by Pozuelos demonstrates that she made any effort to document future contacts with the civil lawyers. |
| | Cantos's April 2019 email to Pozuelos was not the first time Pozuelos was instructed about the importance of keeping separation between the civil and criminal cases. Over two years prior, in February 2017, Cantos's predecessor, DDA Harrison, informed Pozuelos that the *qui tam* case "is apparently still sealed" and that "you aren't even supposed to know it exists." Harrison further cautioned Pozuelos that "it will blow our case up if the qui |

9

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | tam aspects don't have a total fence between the two cases." Notwithstanding this admonition, Pozuelos went on to work directly with the *qui tam* lawyers, exchanging documents and information in the process. |
| | Exs. 5 through 13; Ex. 2 (Cantos Tr.) at 18:18-19-5, 19:16-20:7, 52:22-54:25. |
| | Evid. Obj.: FRE 403, 602, 701, 801, 802. |
| 8.    Pozuelos had only a few administrative communications with Mr. Neumeister concerning Grange and Symons. He and other CDI counsel contacted Pozuelos on a few occasions to inquire whether and when criminal charges would be filed against Grange or Symons, because they were preparing for trial. Neumeister thought that the filing of criminal charges could result in a stay of the civil action. Pozuelos responded to those inquiries by stating that she did not know, and that the decision rested with the SBDA. Cantos also told Neumeister that he did not know whether, or when, criminal charges would be filed. In either December of 2019 or January of 2020, CDI counsel advised Pozuelos that the civil litigation trial would begin in February of 2020. Pozuelos also had a few conversations with Mr. Neumeister due to the cross-over of | Disputed. There was pervasive and continuous contact between Pozuelos and Neumeister that went far beyond "a few administrative communications." Pozuelos and Neumeister exchanged numerous emails and phone calls over the several years the civil and criminal matters were pending. They also exchanged documents and witness information relevant to the core allegations in both matters.

Additionally, Pozuelos knew that the criminal filing would occur in February 2020, and she also knew that this timeframe would coincide with the beginning of the civil *qui tam* trial. She sent updates regarding the criminal filing to Neumeister, as well as his supervisor, James Scott McNamara. Likewise, Neumeister was also aware that the criminal filing was imminent |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| some witnesses and document productions related to both the criminal investigation and the civil litigation. After Grange was arrested on February 27, 2020, Mr. Neumeister contacted Pozuelos and asked her to confirm the facts of the arrest. However, Pozuelos had had no prior communications with him about the SBDA's decision to file criminal charges on February 27, 2020, and to seek and execute an arrest warrant on that day. After the verdict in the civil litigation, Pozuelos had communications with Mr. Neumeister in order to obtain copies of the civil litigation trial transcripts for use by the SBDA in the criminal prosecution.<br><br>Pozuelos Decl., ¶ 8;<br><br>Neumeister Tr. at 12:22-10, 21:5-12, 21:20-22:25, 25:18-26:12, 35:9-23, 36:4-22, 37:9-20. | and would impact the civil trial, acknowledging in a text message to a former colleague that the criminal filing is going to "blow this all up." In addition, higher level officials in the Department of Insurance, including Pozuelos's direct supervisor, Sargeant Joe Lopez, as well as Assistant Chief Shawn Conner and Captain Vlad Mikulich were working in concert to coordinate the timing of the civil trial and the criminal filing. These higher ranking officials worked with both Pozuelos and Neumeister. Pozuelos also acknowledged that she and her superiors were also aware of the fact that the criminal filing would have a significant impact on the civil trial in which Grange would be defending himself.<br><br>Exs. 3 through 11, 14 through 15;  Ex. 16 (Mitch Neumeister Deposition Transcript ("Neumeister Tr.")) at 12:3-16; Ex. 1 (Pozuelos Tr.) at 12:15-14:10, 22:15-25.<br><br>Evid. Obj.: FRE 602, 701, 801, 802. |
| 9.    Pozuelos' participation in the criminal fraud investigation of Grange and Symons began on or about July 29, 2016, when the Riverside County District Attorney's Office (RDA) referred a complaint to CDI's Fraud Division that they had received from the Los | Disputed. According to Pozuelos's Report of Investigation (Pozuelos's Ex. 27, p. 12), the claim submitted to Cigna by Symons was for a Specialty Care Transport, routine disposable supplies, and an unlisted ambulance service. The claim therefore does not include any |

11

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| Angeles County Emergency Medical Services Agency. RDA referred the complaint to CDI because they did not have jurisdiction. The complaint alleged that Symons had submitted a fraudulent bill to a medical insurer for an ambulance transport that did not take place. Pozuelos reviewed copies of the relevant billing records and interviewed the complainant, P.H. P.H. stated that at a concert on August 1, 2015, she felt nauseous and dehydrated. At a first aid tent that was staffed by Symons, she received water and an IV drip. P.H. was told the service was provided free of charge by the event's sponsor. However, Symons subsequently billed P.H.'s medical insurer for, among other things, $4,875.00 for ambulance service. After Cigna denied the claim, Symons sent P.H. a bill for the same service. P.H. told Pozuelos she had not been transported anywhere, and that no ambulance had been involved with her care. However, Symons billed her medical insurer for ambulance service by using medical billing code A0434, "Specialty or Critical Care Transport." Pozuelos also interviewed a representative of P.H.'s medical insurer, Cigna, who told Pozuelos that Cigna would not pay a bill based upon the "Specialty or Critical Care Transport" code if no ambulance | code for "ground mileage", as would be the case if an ambulance provider actually transported the patient, thus indicating that P.H. was not in fact transported. Accordingly, Symons never made any representation that P.H. was transported. Pozuelos, however, never conveyed this information to Cigna when asking whether Cigna believed the claims were fraudulent. Cigna therefore lacked the information necessary to provide an accurate review of the claim. Further, the evidence cited to by Pozuelos fails to indicate whether Pozuelos actually discussed the specific billing codes billed or not billed by Symons. Specifically, Pozuelos never addressed the absence of any code for ground mileage. Critically, Pozuelos also admitted that she never interviewed the insurance company claims reviewers who actually processed the claims. These insurance company reviewers would have told Pozuelos that the claim form for P.H. clearly indicates that the patient was not transported anywhere and thus did not misrepresent the services provided.<br><br>Additionally, from examining the claim forms for ground ambulance services that were submitted by Symons, Pozuelos herself was able to tell that the patient was not transported, which she deduced from the fact that "there was |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| service was provided.<br><br>Pozuelos Decl., ¶ 9; Exhibit Tabs 1 through 3; Sealed Exhibit Tabs 4 and 5. | no mileage showing" on the claim forms. Because the claim form accurately reflected no transport, Pozuelos was aware that the claim was not deceptive. In the evidence cited by Pozuelos, it is evident that she never conveyed this information to Cigna when asking whether they would have paid the claim.<br><br>Defendants' Ex. 27, p. 12; Declaration of Kamari Brownlow ("Brownlow Decl.") ¶¶ 7, 14-16, 19; Ex. 1 (Pozuelos Tr.) at 97:4-10, 112:9-14.<br><br>Evid. Obj.: FRE 801, 802. |
| 10. True and correct copies of Symons' patient care record for P.H., the claim form submitted by Symons to Cigna, the denial of coverage letter sent by Cigna to P.H.'s father, Pozuelos' interview note with P.H., and Pozuelos' interview note with the Cigna representative are set forth at Tabs 1 through 3 of the Exhibits ("Exhibits") filed in support of the Motion, and at Tabs 4 and 5 of the Sealed Exhibits ("Sealed Exhibits") filed in support of the Motion. The names and personal identifying information of all patients referenced in the Pozuelos Declaration, and the Exhibits, have been redacted for confidentiality reasons.<br><br>Pozuelos Decl., ¶ 10; Exhibit Tabs | Evid. Obj.: FRE 801, 802, 901, 902. |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| 1 through 3 and Sealed Exhibit Tabs 4 and 5. | |
| 11.  Pozuelos decided to broaden the criminal fraud investigation of Grange and Symons to determine if Symons had a pattern of billing for ambulance service that it had not provided. Pozuelos obtained copies of bills submitted by Symons to other medical insurers during the same time frame for ambulance service at special events where Symons staffed the first aid tent. These bills also used the "Specialty or Critical Care Transport" billing code, A0434, to support charges in the vicinity of $5,000. In most of these additional cases, the medical insurer paid Symons' bill. Once again, Pozuelos contacted the individual patients whose medical insurer had been billed. Each of them advised Pozuelos that they received only minimal care, for minor symptoms, at a medical aid tent. They were not transported anywhere, and no ambulance had been involved in their care. Pozuelos also interviewed the medical insurers' authorized representatives, who stated that they would not have paid the bill submitted by Symons if they had known that Symons provided no ambulance service.<br><br>Pozuelos Decl., ¶ 11. | Disputed. Symons did not simply provide personnel for a "first aid tent." Rather, Symons operated what is essentially a mobile emergency room capable of providing a wide range of medical services. Symons provided these services at concerts and other events to ensure that individuals experiencing medical distress would have immediate access to a higher level of emergency care without having to be transported to a hospital. This was also intended to prevent overburdening local hospitals during large mass gatherings. The mobile care centers operated by Symons were staffed by board-certified emergency physicians and emergency nurses. Accordingly, the bills for certain of the ground claims submitted on behalf of Symons were billed using a code for Specialty Care Transport or Critical Care Transport, which reflected the type of equipment provided by Symons, as well as the level of training of its personnel who provided the services.<br><br>Further, Symons never represented to insurance companies that the patients treated by Symons were actually transported. To the contrary, the claim forms made it clear that the patients were *not* transported because they never |

14

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | included claims for mileage. Additionally, claims forms for certain insurers allow the provider to indicate the pick up and drop off locations for the ambulance transport. In these instances, Symons would provide the same pick up and drop off locations for the patient, further indicating that the patient was not transported. Insurance company representatives who were actually showed the claim forms at issue were immediately able to tell that the patient was not transported simply by looking at the claim form itself. Despite not receiving any training in ambulance coding, even Pozuelos herself was able to determine that the patient was not transported by looking at the claim forms. |
| | Pozuelos's Report of Investigation further indicates that, for these patients, "the claim form reflected the drop off and pick up locations both to be the same address" or that the patient "refused transport." Pozuelos thus stated that the claim forms clearly indicated that the patients were not transported. Yet, inexplicably, in the very same paragraphs in her report where Pozuelos stated that the claim forms indicated the patients were *not* transported—Pozuelos then stated that, for each claim, "the claim form indicated the [patient] *was* transported |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | on [date]." |
| | Lastly, Pozuelos's statement that the insurance companies "would not have paid the bills submitted by Symons had they known that Symons provided no ambulance service" is false for several reasons. First, Symons *did* provide ambulance services—it was an ambulance company providing mobile emergency services at mass gatherings by licensed medical professionals. In Pozuelos's Report of Investigation, Pozuelos states that every patient identified therein received medical care by Symons personnel. Pozuelos made the same misleading statement to the insurance company representatives she interviewed when asking them if they would have paid the claims if they had known that Symons did not provide the service. What Pozuelos failed to communicate to these representatives, however, is that the actual claim forms submitted by Symons did not represent that the patient was transported. Thus, because Pozuelos failed to accurately explain to the representatives how Symons actually billed the claims, their conclusion that they would not have paid the claims is unfounded. Additionally, at least some of the insurance company representatives interviewed by Pozuelos stated that the insurer could still pay the claims |

16

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | submitted by Symons even though the patient was not transported, and notwithstanding the inaccurate information Pozuelos presented to them, which is directly contrary to the statements made by Pozuelos in her investigative reports.

Ex. 17 (Symons Email to Promoter); Brownlow Decl., ¶ 7, 14-16, 19; Ex. 18 (Martella Interview Report); Defendants' Ex. 27 (Report of Investigation) at p. 12-16; Ex. 1 (Pozuelos Tr.), lines 96:19-97:10.

Evid. Obj.: FRE 801, 802. |
| 12. For example, at a concert on August 2, 2015, N.G. was treated at a first aid tent staffed by Symons. N.G. complained of nausea and dehydration. She was given an IV drip and allowed to rest. She was asked to provide her insurance information, but was told she would not be billed for the service. However, Symons then billed N.G.'s medical insurer, United Healthcare, $4,875.00 for ambulance service, using the "Specialty or Critical Care Transport" code. United Healthcare paid the bill. However, N.G. told Pozuelos that no ambulance or transport was involved in the care she received. United Healthcare's representative told Pozuelos that if they had known that Symons had | Disputed. The claim form submitted by Symons did not indicate that N.G. was transported, as even Pozuelos herself was able to discern from the claim form. Pozuelos's statement that United Healthcare would not have paid the claim submitted by Symons had it known that Symons provided no ambulance service is unfounded and misleading. Symons *did* provide ambulance services—it was an ambulance company providing mobile emergency services at mass gatherings by licensed medical professionals. The only service that Symons did not provide is the physical transport of the patient. However, like all the ground claims identified by Pozuelos, Symons did not bill for the physical transport of |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| provided no ambulance service to N.G., they would not have paid Symon's bill. True and correct copies of Symons' patient care record for N.G., the claim form submitted by Symons to United Healthcare, the explanation of benefits from United Healthcare, the payment by United Healthcare to Symons, an email from Grange concerning the billing of N.G.'s insurance, Pozuelos' interview note with N.G. and her father, and Pozuelos' interview note with United Healthcare's representative are at Tabs 6 through 10 of the Exhibits, and Tabs 11 and 12 of the Sealed Exhibits.<br><br>Pozuelos Decl., ¶ 12; Exhibit Tabs 6 through 10; Sealed Exhibit Tabs 11 and 12. | N.G.; nor did it represent to United Healthcare that such a transport took place, as indicated by the claim form.<br><br>In fact, Pozuelos's Report of Investigation discusses the exact claim submitted by Symons for patient N.G. As Pozuelos explained: "The claim reflected the drop off and pick up locations both to be the same address." Pozuelos thus determined that N.G. was not transported—yet Pozuelos inexplicably stated in the same paragraph: "The claim form reflected [N.G.] was transported on 08/01/15."<br><br>Pozuelos made the exact same misleading statement to the United Healthcare representative she interviewed when asking if the insurer would have paid the claims if it had known that Symons did not provide the service. What Pozuelos failed to communicate to this representative, however, is that the actual claim form submitted by Symons for N.G. did not indicate that the patient was transported. Thus, because Pozuelos failed to accurately explain to the representative how Symons actually billed the claims, the representative's conclusion that United Healthcare would not have paid the claim is unfounded.<br><br>Defendants' Exs. 7, 12, 27 at p. 12; Ex. |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | 1 (Pozuelos Tr.) at 97:4-10; Brownlow Decl., ¶¶ 7, 14-16, 19.<br><br>Evid. Obj.: FRE 602, 701, 801, 802, 803, 901, 902. |
| 13.   Pozuelos documented a total of eight cases, with similar facts, in which Symons billed medical insurers for ground ambulance service that it had not provided. Pozuelos concluded that there was probable cause to believe that Grange and Symons had committed medical insurance fraud.<br><br>Pozuelos Decl., ¶ 13 | Disputed. Symons never billed medical insurers for services that were not provided. None of the claims forms submitted on behalf of Symons for these eight cases indicated that the patients were transported. This fact is made clear in the claim forms themselves, which indicate that no mileage was billed—meaning that the patients were not transported anywhere—and several of these claim forms also allowed Symons to indicate the pick up and drop off locations for the patient, which were the same location. Based on these representations, Pozuelos herself was able to determine that the patients were not transported. Pozuelos's Report of Investigation further indicates that, for these patients, "the claim form reflected the drop off and pick up locations both to be the same address." Yet, inexplicably, in the very same paragraphs in her report where Pozuelos stated that the claim forms indicated the patients were *not* transported— Pozuelos then stated that, for each claim, "the claim form indicated the [patient] *was* transported on [date]." And in that same report, Pozuelos also |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
|  | claimed there was probable cause to believe that Dr. Grange committed insurance fraud by intentionally submitting "false or misleading statement[s]" because the ground claim patients were not transported. But this conclusion is unfounded for the incontrovertible reason that the claim forms made no representation that any of the patients were transported, and thus, there was nothing false or misleading about them.

The interviews Pozuelos conducted with various insurance company representatives further undermine her probable cause determination. For instance, John Martella, a Kaiser representative, was the only insurance company representative interviewed by Pozuelos who actually spoke with Dr. Grange. Martella stated that Dr. Grange told him that Symons "want[s] to make sure they are billing these correctly and would like to discuss how they should be billing these claims." In other words, there was no intent to mislead the insurers. Martella further indicated that even he was unsure "how they should bill." Martella's statements undermine any finding of probable cause. Critically, Martella's conversation with Dr. Grange was not documented anywhere in her Report of Investigation. |

20

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | Additionally, Martella, as well as a representative with another insurance company, Aetna, both informed Pozuelos that there is no way for an ambulance provider to bill for the medical services it provides separately from the transport itself. In other words, Symons could not bill for the medical services it provided without also billing for the ambulance transport, and thus there was no other means for Symons to receive reimbursement for its services. This is why Symons would use a billing code for either a Specialty Care Transport, Critical Care Transport, or Basic Life Support, but would be sure to not include a separate bill for mileage and would also indicate the same pick up and drop off locations so as to make clear that the patients were not actually transported. Because this was the only way for Symons to bill for its services, and because Dr. Grange himself told Martella that he wants to ensure Symons's claims are accurate, then there is no basis for Pozuelos to conclude that Dr. Grange intentionally deceived insurers.

Pozuelos's conclusion that there was probable cause to believe that Dr. Grange *himself* committed insurance fraud is also unfounded. None of the claims were submitted by Dr. Grange. |

21

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | The claims were in fact submitted on behalf of Symons, a company with multiple officers, directors, and shareholders, as well as an entire staff of certified healthcare coders. It is these coders who determine how a claim is submitted to insurance companies, not Dr. Grange. Dr. Grange never instructed these coders as to which billing code to use for a particular claim. None of the evidence cited to by Pozuelos suggests that Dr. Grange personally submitted claims to insurance companies or instructed the Symons billing personnel as to which code to use—because there is no such evidence. As the physician who was often on duty at the mobile health centers, Dr. Grange would occasionally provide clarification to the billing department regarding the specific services or level of care provided by Symons to a particular patient, and he would also provide guidance as to whether certain claims should not be billed based on the policies of the event promoter, but that was the extent of his involvement.<br><br>Defendants' Ex. 27 (Report of Investigation), p. 12-13, 33; Ex. 18; Ex. 19 (Cote Interview Report); Brownlow Decl., ¶ 22.<br><br>Evid. Obj.: FRE 403, 704. |
| 14.  On January 17, 2017, Pozuelos met | Disputed. It was not DDA Harrison |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| with DDA Diane Harrison to discuss the findings from her document reviews and interviews. During this meeting, DDA Harrison gave Pozuelos a copy of a complaint regarding the billing of air ambulance transports by Symons. The complaint had been filed in the civil litigation by SIMNSA, a medical insurer to whom Symons had submitted a bill for an air ambulance transport. The civil litigation complaint that Pozuelos was given did not involve the ground ambulance billing that she had been investigating. However, DDA Harrison asked Pozuelos to broaden her criminal investigation of Grange and Symons to include billings for air ambulance transports.<br><br>Pozuelos Decl., ¶ 14. | who first informed Pozuelos as to the existence of the civil action. In fact, it was Pozuelos who first informed DDA Harrison about a "qui tam that our legal is handling." Pozuelos was thus already aware of the civil action before meeting with Harrison. Additionally, the civil action was not the only event that prompted Pozuelos to begin investigating the air ambulance claims. Pozuelos in fact found out about the air ambulance claims because of a complaint submitted to the Department of Insurance by Dr. Grange's ex-wife, who at the time was involved in a contested divorce with Dr. Grange. Pozuelos interviewed Dr. Grange's ex-wife and reported her findings to DDA Harrison. DDA Harrison warned Pozuelos that, given the nature of the divorce proceedings, Dr. Grange's ex-wife is "not a really stable sort." Pozuelos nevertheless continued to use Dr. Grange's ex-wife as a source of information for the investigation, even though her statements were subsequently refuted by the evidence that Pozuelos uncovered thereafter.<br><br>Ex. 13.<br><br>Evid. Obj.: FRE 801, 802. |
| 15.  After meeting with DDA Harrison, Pozuelos contacted various county | Disputed. The aircraft licensing requirements apply only to the |

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| agencies that regulated Symons to determine the type of license under which Symons was operating. Pozuelos was advised that Symons was not a licensed air ambulance provider, and should not be providing such services. Pozuelos also contacted the Federal Aviation Agency to determine if Symons was certified as an air ambulance provider. She was advised Symons did not have the required certification to provide air ambulance transports.

Pozuelos Decl., ¶ 15. | owner/operator of the aircraft and not to the licensed medical professionals on board the aircraft who are actually responsible for extracting, stabilizing, and treating the injured patient during transport. Symons never represented that it owned the helicopter used in the air transports investigated by Pozuelos. Additionally, the FAA official that Pozuelos interviewed stated that, although Symons did not have the certificate required for air ambulance owners (which was not required), the company that actually owned the helicopter that Symons used for certain of the transports, Shier Aviation Corp, dba Corporate Helicopters, did possess the requisite certification. Furthermore, Symons would reimburse the helicopter owners and race promoters for the flight time in connection with the air ambulance transports. Pozuelos interviewed Paul Fish and Dave Vernick, who both confirmed this to her. None of the foregoing information was included in any of the materials submitted by Pozuelos to the court; rather, in Pozuelos's declarations in support of the bail hold motion and the application to free Dr. Grange's assets, Pozuelos simply indicated to the court that Symons was not a licensed air ambulance provider without disclosing that the licensing requirements applied only to the owner of the aircraft. |

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | Evidence: Ex. 20 (FAA Interview); Ex. 21 (Fish Interview Report); Ex. 22 (Vernick Interview Report); Defendants' Exs. 32-33.<br><br>Evid. Obj.: FRE 801, 802. |
| 16. To further investigate Symons' billings for air ambulance transports, Pozuelos reviewed billing records obtained from various insurance companies. She prepared and served search warrants for Symons' bank records and email records, and reviewed the documents produced. Pozuelos also interviewed numerous witnesses regarding Symons' billings for air ambulance transports. During the course of her investigation, Pozuelos learned that Symons did not own, lease or operate any helicopters used for air ambulance transports, and only provided medical care to the patient, whether on the ground or onboard. Symons medical professionals did not always accompany the patient during an air transport. However, on numerous occasions, at special events in Southern California and Mexico where Symons was under contract to provide medical care services, Symons billed the patient's medical insurer for providing an air ambulance transport, using the billing code | Disputed. The statement that Symons did not "provide" the air ambulance transport is the same misleading statement that Pozuelos included in her declarations submitted in court. During her witness interviews, Pozuelos learned that Symons staffed licensed medical professionals on board each helicopter who were responsible for extracting, stabilizing, and treating the patients during the transport. Symons also equipped the helicopters with its own medical supplies and equipment. The only thing Symons did not provide is actual ownership of the helicopter, but Symons never represented to insurance companies that it *did* own the helicopter used in the air transport. Moreover, none of the insurance company representatives interviewed by Pozuelos indicated that ownership or leasing of the helicopter was a prerequisite to billing for air ambulance services. What the insurance company representatives *did* tell Pozuelos is that there is no way for an ambulance provider to bill for the medical services it provides separately from the transport |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| A0431, "Rotary Wing Air Transport." Almost all of the bills were for a six-figure amount. Pozuelos was advised that the air ambulance transports that Symons billed for were actually provided by either the San Bernardino County Sheriff's Department (SBCSD)'s Air Rescue Unit or by a private company under contract with the event promoter.<br><br>Pozuelos Decl., ¶ 16.<br><br>Deposition Transcript of Jeff Grange ("Grange Tr."), Tab 37 of Exhibits and McMahon Decl., ¶ 6, at pages and lines 127:9-14, 128:14-17, 133:25-134:7. | itself. As such, because Symons provided the medical personnel, the emergency medical care, the medical supplies, and equipment that were used on the ambulance flights, it was allowed to bill for its services. In addition, Symons reimbursed the private helicopter owners for the flight time for the air transports. All of this information was omitted from Pozuelos's submissions in the criminal case. It is therefore misleading and/or false to state that Symons did not "provide" the air ambulance services investigated by Pozuelos.<br><br>Lastly, as to the statement that "Symons medical professionals did not always accompany the patient during an air transport," Pozuelos appears to suggest that Symons billed for air transports it did not have any involvement in. The evidence cited to, however, does not support this fact, and Pozuelos has not identified any evidence that Symons billed insurers in these instances—because there is no such evidence.<br><br>Defendants' Exs. 32-33; Ex. 21; Brownlow Decl., ¶¶ 20-21; Ex. 18; Ex. 19; Grange Decl., ¶ 16.<br><br>Evid. Obj.: FRE  602, 701, 801, 802. |
| 17. Personnel from SBCSD Air Rescue Unit advised Pozuelos | Disputed. As to the statement that the air ambulance transports were |

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| that Symons was not authorized to bill medical insurers for air ambulance transports that were actually provided by the SBCSD Air Rescue Unit. Roger Norman, a representative of SCORE, a road race sponsor in Mexico, told Pozuelos that Symons had no permission to bill medical insurers for helicopter transports that had actually been provided by another company under contract with SCORE. Although a representative of the prior ownership of SCORE, Paul Fish, told Pozuelos that Symons could bill medical insurers for services, Pozuelos discovered from Symons' bank records that Symons made an unexplained payment of $29,626.001 to Mr. Fish, which was exactly half of a recent payment received by Symons on an air ambulance transport claim. Because the payment to Mr. Fish strongly suggested that he had financially benefitted from the medical insurer's payment to Symons, Pozuelos discounted his statement that Symons was authorized to bill medical insurers.<br><br>Pozuelos Decl., ¶ 17. | "provided" by the SBCSD or other companies, the only thing "provided" by theses entities was the physical helicopter itself. Symons provided the medical personnel, equipment and supplies, and emergency medical services to the patient and was unable to bill for these services separately from the helicopter transport itself.<br><br>As to the statement that "Symons had no permission to bill medical insurers for helicopter transports," this is directly contradicted by SCORE's former owner, Paul Fish, who explicitly told Pozuelos that he gave Dr. Grange permission to bill the insurers. Fish's statements were documented in an interview report authored by Pozuelos. Additionally, according to that report, Fish told Pozuelos that "Dr. Grange was a doctor providing services and to his knowledge he would be entitled to bill because he provided medical care."<br><br>As to the "unexplained payment" from Symons to Fish, the purpose of the payment was clear—as Fish expressly stated to Pozuelos, the payment was to "compensat[e] Score for the helicopter." Pozuelos repeatedly claimed in the investigative reports and criminal filings she authored that Symons was billing for air ambulance transports it did not provide, yet |

27

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | whenever she came across evidence of Symons paying for the flight time on the helicopters, such as the aforementioned statements by Fish, she omitted such evidence. Pozuelos now claims that the evidence of the reimbursement for the flight time should be "discounted" when it is in fact evidence of proper conduct by Symons that contradicts Pozuelos's allegations. Furthermore, the instant Motion is the first time Pozuelos has ever indicated that Fish's statements should be "discounted." In Pozuelos's interview report for Fish, which she does not cite to in this Motion, she never indicated concern about the reliability of Fish's statements. She similarly made no mention of this concern in any of her investigative reports or criminal filings. Instead, Pozuelos omitted evidence of Symons paying for the flight time altogether.

Ex. 21; Exs. 18-19; Ex. 22; Defendants' Ex. 27.

Evid. Obj.: FRE 801, 802. |
| 18.  Pozuelos also spoke with representatives of approximately 10 medical insurers about Symons' practice of billing for air ambulance transport services. In most cases, Pozuelos was directed to an authorized spokesperson who was best qualified to respond to her | Disputed. Pozuelos states here that, according to the insurance company representatives, "[i]f they had known that Symons only provided medical care to the patient, whether on the ground or on board, and did not provide the helicopter transport, they would not |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| questions. Pozuelos did not interview the actual employees who had processed Symons' bills for air ambulance transport service, because the bills are submitted and paid electronically, making it difficult to identify such an employee, and unlikely that such an employee would have recalled the claim or been authorized to speak for the medical insurer about its policies. The medical insurer representatives Pozuelos spoke with told her that Symons' use of the "Rotary Wing Transport" code, and submission of bills that were in the six-figures, meant that Symons had actually provided the air ambulance transport, i.e., the helicopter. If they had known that Symons only provided medical care to the patient, whether on the ground or on board, and did not provide the helicopter transport, they would not have paid Symons' bill for air ambulance transport.

Pozuelos Decl., ¶ 18. | have paid Symons' bill for air ambulance transport." But this is not the question that Pozuelos actually posed to the insurance company representatives when they were interviewed. Rather, as documented in her Report of Investigation, Pozuelos simply asked the representative: "had [the insurer] known Symons did not provide the transports billed in the claims submitted" if it would have still paid the claims. Pozuelos failed to inform the insurance company representatives that Symons had actually provided the medical equipment, licensed medical personnel, and the emergency medical services to each patient.

Furthermore, it is false that each insurance company representative told her they would not have paid the claims. For instance, Pozuelos submitted questionnaires to each insurance company representative asking for information regarding the claims submitted by Symons. In one such questionnaire Pozuelos sent to a Health Net representative, Pozuelos asked whether "Symons can properly bill for air ambulance services if they are not an air ambulance provider." The representative indicated that: "Generally, such claims are not denied if they are ordered by an emergency paramedic." Yet, Pozuelos stated the |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | exact opposite in her Report of Investigation, in which she indicated that Health Net would not have paid the claims, which is directly contrary to the response the Health Net representative actually provided her.<br><br>Defendants' Ex. 27, p. 7-8; Ex. 23 (Pozuelos Questionnaire to Insurers)<br><br>Evid. Obj.: FRE 602, 701, 801, 802. |
| 19.  For example, L.H. was injured on April 26, 2016 while participating in a road race in Baja California, Mexico. Symons was under contract with the event sponsor to provide medical services. L.H. was treated at the scene by Symons' personnel, and then transported to a hospital in a helicopter that was not owned, leased or operated by Symons. However, Symons subsequently billed L.H.'s medical insurer, Blue Shield of California ("BSC"), $247,000 for air ambulance transport, using the billing code A0431, "Rotary Wing Air Transport." After an initial rejection, BSC ultimately paid Symons' bill. A representative of BSC told Pozuelos, however, that they would not have paid this bill if they had known that Symons had not provided the helicopter transport. The $247,000 payment was deposited into a Symons' bank account, but was then transferred into a Grange bank account. True | Disputed. Symons treated L.H. both on the ground and in the air. Additionally, the question Pozuelos posed to the insurer (Defendants' Ex. 18) did not accurately convey the particular circumstances of the air ambulance transport and thus does not support the stated conclusion that BSC would not have paid the claim. Pozuelos failed to indicate to the BSC representative that the only thing Symons did not provide was ownership of the helicopter and further failed to inform the representative that Symons paid for the flight time in connection with the air ambulance services it provided. Had Pozuelos accurately conveyed the circumstances, then the BSC representative's response would have been different. This is demonstrated by the fact that a different BSC representative was called as a witness in the *qui tam* trial and testified that: (1) there was no law, statute, rule or |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| and correct copies of Symons' patient care record for L.H., Symons' claim form submitted to BSC, emails with Grange concerning the billing of L.H.'s insurance, Pozuelos' two interview noted with L.H. and his wife, and Pozuelos' interview note with BSC's representative are at Tabs 13 through 15 of the Exhibits, and Tabs 16 through 18 of the United Exhibits.<br><br>Pozuelos Decl., ¶ 19; Exhibit Tabs 13 through 15; Sealed Exhibit Tabs 16 through 18. | regulation that requires ownership or leasing of the helicopter in order to bill for air ambulance services; and (2) by using the code A0431, the provider is not representing that it owns or leases the helicopter used in the air ambulance transport.<br><br>Defendants; Ex. 18; Ex. 21; Ex. 22; Ex. 24 (BSC Testimony) at 46:14-47:3.<br><br>Evid. Obj.: FRE 602, 701, 801, 802, 901, 902. |
| 20.    In another example, C.M. was injured on March 21, 2015 while attending a concert in San Bernardino County. Symons was under contract with the event sponsor to provide medical services at the venue. C.M. was treated at the scene by Symons' personnel. Symons' personnel then transferred care of C.M. to the SBCSD Air Rescue unit, which transported C.M. to a hospital in a helicopter that was not owned, leased or operated by Symons, but rather, by the SBCSD Air Rescue Unit. The patient care records do not establish that any Symons personnel was onboard the flight. Symons subsequently billed C.M.'s medical insurer, Kaiser, $140,525 for an air ambulance transport, using the billing codes A0431 ("Rotary Wing Air Transport") and | Disputed. The statement that Symmons personnel were not on the flight is incorrect. First, Captain Rose confirmed to Pozuelos that Dr. Grange was a volunteer air medic with the SBCSD and flew on board the helicopters. Second, Pozuelos does not cite to any evidence that Symons personnel was *not* on the flight. Pozuelos made her own conclusion that Symons personnel were not involved in the transport, and she then conveyed this information to the Kaiser representative. Pozuelos's interview report for the Kaiser representative indicated that Symons provided trip notes in the claim, which detailed the medical services rendered by the provider to the patient. The Kaiser representative further indicated that, from reviewing the claim materials, there were no red flags or any |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| A0436 ("Rotary Wing Air Mileage"). Kaiser paid Symons' bill. A representative of Kaiser told Pozuelos that they would not have paid this bill if they had known that Symons had not provided the air ambulance transport. The $140,525 payment was deposited into a Symons' bank account, but was then transferred into a Grange bank account. True and correct copies of Symons' patient care record for C.M., the SBCSD Air Rescue Unit's patient care record for C.M., emails with Grange concerning the billing of C.M.'s insurance, the claim form submitted by Symons to Kaiser, Kaiser's payment to Symons, Pozuelos' interview notes with Captain Rose of the SBCSD Air Rescue Unit, and Pozuelos' interview note with Kaiser's representative are at Tabs 19 through 23 of the Exhibits and Tabs 24 and 25 of the Sealed Exhibits.<br><br>Pozuelos Decl., ¶ 20; Exhibit Tabs 19 through 23; Sealed Exhibit Tabs 24 and 25. | reason to question the validity of the claim. Thus, if Symons only provided medical care on the ground, then the representative would have flagged the claim for an air ambulance transport as suspicious, which the representative did not do. The Kaiser representative concluded that the claim submitted by Symons was improper only because it failed to indicate that the services provided by Symons were limited to treating C.M. prior to the transport, but not during the transport itself. But the only reason that the Kaiser representative had the impression that Symons personnel were not on the flight was because that is what was explained to the representative by Pozuelos. The representative's conclusion that the claim was improper was therefore based only on the false information provided by Pozuelos.<br><br>In reality, Symons has never generated patient care records for services it did not provide.<br><br>Finally, the Kaiser representative did not say it was improper for Symons to bill for the air ambulance transport based solely on the fact that Symons did not own or lease the helicopter. Rather, the representative's conclusion was based on the fact that Pozuelos told him that Symons' involvement was limited |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | to providing treatment to C.M. prior to the transport, which was not the case.<br><br>Defendants' Ex. 25; Defendants' Ex. 27, p. 21-22; Grange Decl., ¶ 16.<br><br>Evid. Obj.: FRE 602, 701, 801, 802, 901, 902. |
| 21. Pozuelos documented a total of 16 cases, with similar facts, in which Symons billed a medical insurer a six-figure amount for an air ambulance transport that Symons was not licensed to provide, and had not in fact provided. These cases provided additional probable cause for Pozuelos to believe that Grange and Symons had committed medical insurance fraud.<br><br>Pozuelos Decl., ¶ 21. | Disputed. There was no probable cause. In an email to DDA Harrison, Pozuelos explained that "Symons does not have a helicopter licensed in any of the local counties nor are they certified with the FAA so they legally cannot provide air ambulance services" and that "Grange has stated . . . that he does not have a helicopter nor does he lease one." Pozuelos then asked Harrison: "Can we base the charges on the fact that Symons does not even have the ability to provide the service therefore how can [he] bill for the service?" In response, Harrison told her: "That would be a rather convoluted way of providing [sic] a positive by a large number of negatives." Harrison thereafter left the case and a new DDA was assigned. Yet Pozuelos's theory never changed despite Harrison telling her the theory was insufficient.<br><br>Additionally, none of the evidence uncovered by Pozuelos or cited to here indicates that an ambulance provider must have an *air* ambulance license in |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | order to bill for air ambulance services. The evidence identified by Pozuelos indicates that only the owner of the aircraft is required to have this certification. But even then, the license is only a prerequisite to *operating* the helicopter, not billing for air ambulance services and thus applies only to the owner of the helicopter. Symons never represented that it owned the helicopters that were used to conduct the air ambulance transports. The private owners of the helicopters used by Symons did possess the licensing required for owning the aircraft, and Symons reimbursed these companies for the flight time.<br><br>The statement that Symons did not "provide" the air ambulance transport is the same misleading statement that Pozuelos included in her declarations submitted in court. Symons staffed licensed medical professionals on board each helicopter who were responsible for extracting, stabilizing, and treating the patients during the transport. Symons also equipped the helicopters with its own medical supplies and equipment. The only thing Symons did not provide is actual ownership of the helicopter, but Symons never represented to insurance companies that it *did* own the helicopter used in the air transport. Moreover, none of the |

LARSON
LOS ANGELES

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | insurance company representatives interviewed by Pozuelos indicated that ownership or leasing of the helicopter was a prerequisite to billing for air ambulance services. Indeed, there is no statute, rule, regulation, or insurance company policy requiring the ownership or leasing of the helicopter in order to bill for air ambulance services. What the insurance company representatives *did* tell Pozuelos is that there is no way for an ambulance provider to bill for the medical services it provides separately from the transport itself. As such, because Symons provided the medical personnel, the emergency medical care, the medical supplies, and equipment that were used on the ambulance flights, it was allowed to bill for its services. In addition, Symons reimbursed the private helicopter owners for the flight time for the air transports. It is therefore misleading and/or false to state that Symons did not "provide" the air ambulance services investigated by Pozuelos.<br><br>Nor was there probable cause to believe that Dr. Grange himself committed insurance fraud. The allegedly fraudulent claims identified by Pozuelos were submitted on behalf of Symons by certified health insurance coders, not Dr. Grange. Dr. Grange never instructed |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | the billing personnel as to which billing codes to use for the air ambulance services provided by Symons. Additionally, although Pozuelos indicated in the criminal filings that Dr. Grange was the owner of Symons, this was demonstrably false—he was merely one of several shareholders, officers, and directors of Symons.<br><br>Ex. 25 (Pozuelos Email to DDA Harrison); Ex. 20; Ex. 21; Ex. 22; Brownlow Decl., ¶ 20-22; Ex. 24 (BSC Testimony) at 24:15-26:3, 46:14-47:3; Ex. 18; Ex. 19; Grange Decl., ¶ 3.<br><br>Evid. Obj.: FRE 403, 704. |
| 22.  The Symons company emails that Pozuelos obtained pursuant to a search warrant revealed that Grange was personally involved in the billing of medical insurers for ground and air ambulance transports. Although the bills were physically submitted to the medical insurers by other employees of Symons, the emails established that Grange was directing this activity. For example, as noted above, Grange provided L.H.'s information to the Symons' biller via email in order to bill the claim. There was an additional email discussion about the amount that should be billed for L.H.'s claim. Another example, as noted above, was for the claim submitted for | Disputed. Dr. Grange was not "directing" the submission of claims. How the claims were submitted by Symons' billing personnel was dependent on the level of the care provided by the Symons medical professionals. For example, for the ground claims, if the services rendered were beyond the scope of a paramedic and therefore required treatment by a registered nurse or physician, then Symons would bill the claim at the CCT level. To ensure claims were properly submitted and accurately reflected the services rendered, the Symons medical professional who provided the service would occasionally provide clarification to the billing personnel detailing the |

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| C.M. Grange provided C.M.'s information to the biller and the biller asked Grange to review the records before she sent them to Kaiser. Additional examples of Grange's personal involvement in the billing process are in the emails that Pozuelos obtained and reviewed, at Tab 26 of the Exhibits. Among other things, these emails reveal that Jeff Grange needed to "feel better about what we just billed for our helicopter transport! :-)." Grange was also involved in a discussion about a $247,000 "magic number" for air transport bills, after a $520,000 claim "stirred the pot at Blue Cross" and put Symons' billings "on their radar screen." Grange also discussed an "air transport bonus" for a Symons' biller. He specifically directed another biller to "just do CCT (Critical Care Transport) for now" on a patient's bill.<br><br>Pozuelos Decl., ¶ 22; Exhibit Tab 26;<br><br>Grange Tr. at 181:9-182:21. | level of treatment, who provided the service, and what equipment was used. Because Dr. Grange was often the Symons medical professional rendering services, he would sometimes communicate this information to the billing department. The emails cited to by Pozuelos are examples of this occurring. For instance, the email quoted by Pozuelos in which Grange states to "just do CCT for now" is simply an indication as to the level of care provided to the patient, which allowed the billing personnel to ensure the accuracy of the claim.<br><br>But Dr. Grange never told the billing personnel which code to use, and it is by using these billing codes that an ambulance provider represents what services were rendered. Dr. Grange would always defer to the billing personnel's judgment in determining how a claim should be billed, and he repeatedly emphasized the compliance and ethical billing took priority. This was documented in numerous internal emails that were seized by Pozuelos. For instance, in an email to Symons' billing manager, Dr. Grange stated: "I want to make sure we are very careful to make sure we are fully compliant with any rules and regulations." Moreover, the emails cited to by Pozuelos further indicate that Dr. |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | Grange was not the person dictating how the claims were submitted.<br><br>Brownlow Decl., ¶¶ 7, 15, 22; Grange Decl., ¶ 16; Ex. 27 (Symons Email re: Compliance).<br><br>Evid. Obj.: FRE 602, 701, 801, 802, 901. |
| 23.  After reviewing Symons' billings and bank records, Pozuelos determined that the fraudulent bills submitted by Symons to medical insurers, for both ground and air ambulance transports, had resulted in fraudulent billings by Symons that totaled approximately $3,628,826.76, and fraudulent payments to Symons that totaled approximately $2,005,210.<br><br>Pozuelos Decl., ¶ 23. | Partially disputed. The claims submitted on behalf of Symons were not fraudulent but instead accurately represented the services provided.<br><br>Brownlow Decl., ¶¶ 7, 12, 14-16, 20-21; Grange Decl., ¶ 16. |
| 24.  After the additional ten months of investigating Symons' billings for air ambulance transports, on November 8, 2017, Pozuelos submitted her initial Report of Investigation ("ROI") to DDA Harrison. A true and correct copy of the ROI is at Tab 27 of the Sealed Exhibits. Pozuelos recommended that, with respect to the eight ground ambulance examples and sixteen air ambulance examples described in the ROI, SBDA should file criminal insurance fraud charges against the following officers | Undisputed.<br><br>Evid. Obj.: FRE 801, 802, 1002. |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| and/or directors of Symons: Jeff Grange, Judd Symons, and Dawn Downs. Pozuelos told DDA Harrison that she was still reviewing email records obtained for Grange and Symons' accounts, and that a supplemental report would follow. DDA Harrison told Pozuelos that she would need to review the supplemental report before deciding on the filing of criminal charges.<br><br>Pozuelos Decl., ¶ 24; Sealed Exhibit Tab 27. | |
| 25. On June 22, 2018, Pozuelos submitted a supplemental report to DDA Harrison concerning the email review referenced above ("Supplemental Report"). A true and correct copy of the Supplemental Report is at Tab 28 of Sealed Exhibits. Over the course of the investigation, she regularly supplied the SBDA with additional reports, interview notes and supporting documentation, in further evidence of the medical insurance fraud. For example, after submitting the initial Report of Investigation, Pozuelos documented additional examples of the ground transport fraud referenced in paragraphs 11 and 13, above. Eight of them, involving Kaiser, were eventually included in the criminal complaint filed by the SBDA. | Partially disputed. The claims submitted on behalf of Symons were not fraudulent but instead accurately represented the services provided. As to the additional Kaiser claims, by the time Pozuelos identified these claims, she had already communicated with the Kaiser representative John Martella, who was the only representative interviewed by Pozuelos who had actually spoken with Dr. Grange regarding the claims in question. Martella confirmed to Pozuelos that simply by looking at the ground claims submitted by Symmons, it was obvious that the patients were not transported anywhere. As such, there was nothing fraudulent about the claims because they accurately reflected that the patients were not transported. In a separate email from September 2017, |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| Pozuelos Decl., ¶ 25; Sealed Exhibit Tab 28;<br><br>Cantos Tr. at 69:23-70:11, 71:10-15. | Martella further informed Pozuelos that: (1) Dr. Grange told Martella that he wants to make sure the claims are accurate, thus further undermining the allegation that Symons or Dr. Grange intended to deceive the insurers; and (2) Martella himself was unsure how the claims should be billed, thus further undermining the allegation that insurers would have denied the ground claims. Pozuelos was accordingly aware of this information as of September 2017—well before she submitted her Report of Investigation or Supplemental Report. Yet, in neither of these reports did Pozuelos include the information relayed to her by Martella, meaning that this blatantly exculpatory information was never communicated to the SBDA and was further omitted from Pozuelos's declarations in connection with the criminal filings.<br><br>Ex. 18; Ex. 27 (Martella Email to Pozuelos); Ex. 1 (Pozuelos Tr.) at 85:1-87:3; Defendants' Exs. 27-28; Brownlow Decl., ¶¶ 7, 12, 14-16, 20-21; Grange Decl., ¶ 16. |
| 26.   In August of 2018, the case was transferred from DDA Harrison to DDA Lance Cantos. From August of 2018 to February 2020, Pozuelos met and communicated with DDA Cantos on multiple occasions to discuss the case and complete any follow-up tasks that he requested. | Partially disputed as to the statement that "[b]efore February of 2020, DDA Cantos did not communicate to Pozuelos any decision as to whether or not SBDA would file criminal charges." Pozuelos was aware that charges were going to be filed well before then, |

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| DDA Cantos had many other case responsibilities, was not experienced in medical insurance fraud issues and needed additional time to become familiar with the Symons and Grange investigation. The approximate volume of all the reports, interview notes, emails, bank records and other supporting documents that Pozuelos had prepared or obtained, and had submitted to SBDA, was several hundred thousand pages or 140 gigabytes of data. Before February of 2020, DDA Cantos did not communicate to Pozuelos any decision as to whether or not SBDA would file criminal charges based upon the information that she had obtained, analyzed and submitted.<br><br>Pozuelos Decl., ¶ 26;<br><br>Cantos Tr. at 70:22-71:15, 47:10-15. | thereby allowing Pozuelos and the civil attorneys to ensure the civil *qui tam* trial and criminal filing would coincide with one another. An internal Department of Insurance email chain from *August 2017*, in which Pozuelos was copied, Pozuelos's colleague indicated that "[t]he SBDA's office has agreed to executing arrest warrants, 186.11 [asset freeze], and search warrants on the same day. We tentatively would like to reschedule for some time in September or potentially October." Additionally, Pozuelos sent an email in *January* 2020 to the attorneys handling the civil case informing them that the SBDA was formally filing charges, which would occur just as the civil trial was ready to begin. Pozuelos thus was not awaiting a decision as to *whether* charges would be filed; rather, it was only a matter of *when* charges would be filed. Additionally, Cantos testified that he made the decision to proceed with the filing "in 2019."<br><br>Ex. 28 (2017 Email re Arrest Dates); Ex. 14; Ex. 2 (Cantos Tr.) at 72:22-73:2. |
| 27.  In April of 2019, DDA Hynds was assigned to assist the SBDA's criminal investigation with a potential filing of an application for a temporary restraining order with respect to certain assets of Symons | Disputed. Pozuelos was already aware of this procedure and had been discussing filing the 186.11 Application with DDA Harrison back in 2017. This statement is misleading to the extent it |

LARSON
LOS ANGELES

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| and Grange pursuant to Penal Code section 186.11 ("186.11 Application"). SBDA advised Pozuelos that if they decided to file criminal charges, this procedure would be used to place a hold upon assets for possible restitution.<br><br>Pozuelos Decl., ¶ 27;<br><br>Hynds Tr. at 8:20-9:3, 9:9-14, 9:17-24, 11:9-18, 12:4-13:3,13:18-14:10, 14:21-16:8. | suggests that the asset seizure was orchestrated solely by DDA Hynds. First, Hynds testified that the 186.11 Application was based entirely on information supplied by Pozuelos. Hynds also relied on Pozuelos to identify Dr. Grange's assets, to investigate the bank accounts belonging to Symons and Dr. Grange, to record the lis pendens, and to serve the seizure documents on all banks.<br><br>Ex. 29 (Hynds Tr.) at 20:6-21, 23:3-15; Ex. 30 (Email from Pozuelos to Hynds re 186.11).<br><br>Evid. Obj.: FRE 602, 701, 801, 802. |
| 28.  During her investigation, Pozuelos learned that with respect to several of the six-figure air ambulance transport payments deposited into a Symons bank account, including the L.H. and C.M. claims referenced above, the bank records also revealed that a similar sum was subsequently transferred from the Symons bank account into a Grange bank account, and was then transferred into an escrow for the acquisition of real property by Grange and/or Dawn Downs (Grange's spouse). Pozuelos asked Marshall Wesson ("Wesson"), a CDI Forensic Auditor experienced in the forensic analysis of financial records, to review the Symons and Grange bank records and prepare | Disputed. Dr. Grange receiving payments from Symons—a company for which he serves as medical director—is not "proof" that Dr. Grange was involved in committing insurance fraud. Dr. Grange never directly deposited payments from insurers into his personal accounts. Nor was Dr. Grange "personally involved in causing the fraudulent billing in question." The claims submitted by Symmons were prepared and submitted by certified healthcare coders in Symons' billing department, not by Dr. Grange.<br><br>Defendants' Ex. 29; Grange Decl., ¶ 5, 16; Brownlow Decl., ¶ 3, 22. |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| an audit report ("Audit Report") that traced air ambulance transport payments from medical insurers, to Symons' bank accounts, to Grange bank accounts, to escrows for property acquisitions related to Grange. A true and correct copy of the Audit Report that Wesson prepared is at Tab 29 of the Sealed Exhibits. These numerous examples of Grange deriving a direct personal financial benefit from a medical insurer's six-figure payment to Symons for "rotary wing air transport" bill provided Pozuelos with further proof that Grange was personally involved in causing the fraudulent billing in question. Pozuelos provided a copy of the Audit Report to DDA Hynds.<br><br>Pozuelos Decl., ¶ 28, Sealed Exhibit Tab 29. | Evid. Obj.: FRE 801, 802, 901. |
| 29.  On February 10, 2020, CDI Captain Vladimir Mikulich ("Mikulich") told Pozuelos and Lopez that he had learned that SBDA was going to file the criminal charges against Grange. Mikulich and Lopez decided that CDI detectives would arrest Grange after the issuance of an arrest warrant by the court. This was the first time that Pozuelos learned that SBDA had decided to file criminal charges against Grange and arrest him. Pozuelos later learned that the timing of this | Disputed. Pozuelos was aware that charges were going to be filed well before then, thereby allowing Pozuelos and the civil attorneys to ensure the civil *qui tam* trial and criminal filing would coincide with one another. An internal Department of Insurance email chain from *August 2017*, in which Pozuelos was copied, Pozuelos's colleague indicated that "[t]he SBDA's office has agreed to executing arrest warrants, 186.11 [asset freeze], and search warrants on the same day. We |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| decision by SBDA was related to their concern about the statute of limitation potentially expiring with respect to some of the incidents referenced in the ROI. The timing of the criminal charges was not designed to prejudice Grange in the civil litigation.<br><br>Pozuelos Decl., ¶ 29.<br><br>Cantos Tr. at 27:20-30:10, 38:15-22, 73:14-74:5. | tentatively would like to reschedule for some time in September or potentially October." The original plan was accordingly to arrest Dr. Grange back in 2017. Pozuelos thus was not awaiting a decision as to *whether* charges would be filed; rather, it was only a matter of *when* charges would be filed. The timing of the criminal filings was not based on the statute of limitations because the decision to file had already been made years earlier.<br><br>Furthermore, Pozuelos sent an email on January 14, 2020 to James Scott McNamarra—the senior attorney representing the Department of Insurance in the civil case—on February 3, 2020—advising him that she learned the SBDA "was working on inputting the charges for this case and anticipates filing by the end of January," and Pozuelos promised to keep him updated. Pozuelos's assertion that she only found out about the criminal filing on February 10, 2020 is thus patently false.<br><br>There is also substantial evidence demonstrating that Pozuelos and her colleagues were coordinating the criminal filing in order to interfere with the qui tam trial. First, Pozuelos and Neumeister—with whom Pozuelos was in constant contact—were both |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | frequently asking Cantos for updates regarding the timing of the criminal case, as were Pozuelos's superiors. Pozuelos would send updates to Neumeister and his superior, McNamara, regarding the timing of the criminal filing. The frequent inquiries to Cantos regarding the timing of the criminal filing became so pervasive that Cantos indicated that he felt pressured by the Department of Insurance to file.<br><br>Second, Pozuelos was actively monitoring the civil trial and knew Dr. Grange would be in court. In one email from February 25, 2020, shortly before Grange was arrested, Pozuelos wrote: "I just reviewed the court records from today and it shows court is scheduled again tomorrow at 10. I planned on scouting out the court to see if Grange shows up."<br><br>Third, Neumeister was hoping that Dr. Grange would be held in jail and unable to post bail—even though Dr. Grange was set to testify in the civil case the next court day. In an email from February 29, 2020—two days after Grange was arrested—Neumeister reached out to Vlad Mikulich and Shawn Conner and asked: "Do you know what the result of the arraignment was? Hopefully remanded." This was precisely the result Pozuelos had hoped |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | for, having previously submitted a declaration in support of a bail hold to keep Dr. Grange in custody.

Fourth, the clear intent to interfere with the civil trial is further supported by the fact that, by the time Dr. Grange was arrested, the state's own witnesses in the civil trial, who were insurance company representatives, had already provided testimony fatal to the state's case. These witnesses confirmed that there is no requirement that an air ambulance provider own or lease a helicopter in order to bill for those services. Neumeister was even aware of the weakness of the civil case before the trial even started, as demonstrated by a text message to a former colleague in which Neumeister acknowledged that these same insurance company witnesses were "bad ones." Neumeister also acknowledged in that same message that the criminal filing is going "to blow this all up."

Lastly, after Dr. Grange was arrested, Neumeister and other attorneys representing the Department of Insurance approached Dr. Grange's civil counsel and stated that they would arrange for the SBDA to drop the criminal charges against Dr. Grange if he would agree to accept liability in the civil trial and pay a monetary |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | settlement. Neumeister then approached DDA Cantos to ask if he would agree to this arrangement. When DDA Cantos was asked during his deposition what he thought about this, DDA Cantos said: "[I]t's unethical. It's just wrong. I mean I couldn't do that. I have an obligation. . . . [I]n my mind, it was using the criminal case as leverage in a civil case." Cantos then told Pozuelos that he refused to accept the arrangement proposed by the Department of Insurance, explaining that: "I needed to tell her it can't – it can't be done." The Department of Insurance was thus attempting to use Dr. Grange's arrest to prevent him from participating in the civil trial or from otherwise reaching a verdict in that case. |
| | Ex. 28; Ex. 14; Ex. 5; Ex. 16 (Neumeister Tr.) at 12:3-16; Ex. 1 (Pozuelos Tr.) at 12:15-14:10, 22:15-25; Ramirez Decl., ¶ 10-11; Ex. 31 (Pozuelos email re Scouting Courthouse); Ex. 15; Ex. 32; Ex. 24 (BSC Testimony) at 24:15-26:3, 46:14-47:3; Ex. 2 (Cantos Tr.) at 24:7-25, 25:23-26:6; Garcia Decl., ¶ 13-14. |
| | Evid. Obj.: FRE 602, 701, 801, 802. |
| 30. Pozuelos' supervisor, Sergeant Lopez, formed a CDI arrest team consisting of himself, Detective | Disputed. The timing, location, and manner of Dr. Grange's arrest were orchestrated for the purpose of |

47

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| Jason Wessely and Detective Anthony Camacho. Pozuelos advised them of information she had received that Grange had multiple weapons and a secured home, as well as upcoming travel plans. Pozuelos learned from the San Bernardino County Superior Court's online docket of the civil litigation against Symons that the trial of that matter was underway, and Pozuelos confirmed Grange's attendance at the trial through a visit to the Court's parking lot and observing his vehicle on February 26, 2020. Pozuelos did not know whether, or when, Grange might testify. For reasons of officer safety, the CDI arrest team decided to make the arrest of Grange in the Court's parking lot after he had attended trial for the day, and had been screened for weapons at court. Because the case involved major fraud allegations, and a risk of flight existed, they did not consider a self-surrender option.<br><br>Pozuelos Decl., ¶ 30. | interfering with the civil trial, retaliating against Dr. Grange for his participation in the same, and obtaining a mistrial in light of the demonstrable weaknesses of the state's case in the civil trial. This is evident from the evidence set forth in paragraph 29, incorporated herein.<br><br>Additionally, Dr. Grange having upcoming travel plans does not make him a flight risk. Nor does it explain why Dr. Grange needed to be arrested in front of the courthouse, rather than at some other location. Similarly, Dr. Grange's lawful possession of firearms does not explain why Dr. Grange needed to be arrested at court rather than some other public place.<br><br>Ex. 28; Ex. 14; Ex. 5; Ex. 16 (Neumeister Tr.) at 12:3-16; Ex. 1 (Pozuelos Tr.) at 12:15-14:10, 22:15-25; Ramirez Decl., ¶ 10-11; Ex. 31 (Pozuelos email re Scouting Courthouse); Ex. 15; Ex. 32; Ex. 24 (BSC Testimony) at 24:15-26:3, 46:14-47:3; Ex. 2 (Cantos Tr.) at 24:7-25, 25:23-26:6; Garcia Decl., ¶ 13-14;<br><br>Evid. Obj.: FRE 602, 701. |
| 31. On February 26, 2020, Pozuelos met with DDA Rebeca Hynds and on February 27, 2020, she met with DDA Lance Cantos to review and sign declarations that the SBDA had prepared for her with respect to | Partially disputed. First, the statement improperly suggests that Pozuelos's involvement in submitting these filings was limited to reviewing and signing the declarations. In reality, as testified |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| (i) the SBDA's application for an arrest warrant, (ii) the SBDA's Motion for a Bail Hearing pursuant to Penal Code section 1275.1 to screen the fruits of the fraud from use in posting bail, and (iii) the SBDA's 186.11 Application. True and correct copies of the declarations that Pozuelos reviewed and signed are at Tabs 30 through 33 of the Exhibits.<br><br>Pozuelos Decl., ¶ 31, Exhibit Tabs 30 through 33;<br><br>Cantos Tr. at 38:23-25, 39:3-13; Hynds Tr. at 17:22-18:4, 21:5-19, 23:3-24, 31:22-32:1, 32:19-33:20, 34:4-18, 35:22-36:5. | to by Hynds and Cantos, the declarations—as well as every other submission submitted in connection with the criminal filing—were based solely on information supplied by Pozuelos. Hynds and Cantos did not conduct their own independent investigation, they did not conduct any witness interviews, and they did not collect their own evidence. Cantos and Hynds merely drafted the declarations based on information provided by Pozuelos, and at all times, Cantos and Hynds were relying on Pozuelos for the accuracy of the statements contained therein. Hynds and Cantos did not independently confirm the veracity of these statements. Additionally, the declaration in support of the arrest warrant stated that evidence demonstrating the existence of probable cause would be "attached hereto and incorporated herein by reference." However, no such evidence of probable cause was included in the declaration. Even if there were such a showing of probable cause, Cantos testified that this would not have been prepared by the SBDA but would instead consist of a summary of the investigation prepared by the investigating officer, Pozuelos.<br><br>Furthermore, the declaration that Pozuelos signed pursuant to Penal Code |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | section 1275.1 was not merely "to screen the fruits of the fraud from use in posting bail." Rather, the declaration, titled "Probable Cause Declaration in Support of Motion to Place a Hold on the Release of Defendant From Custody," was intended to ensure that Dr. Grange was kept in jail. The declaration was submitted in support of a motion that expressly requested that "no bail shall be accepted until a hearing has been conducted to determine whether any portion of the proffered bail was feloniously obtained" and also "to ensure that the defendant makes future court appearances." The bail declaration and motion were filed on Thursday, February 27, 2020 thereby ensuring that Dr. Grange would remain in jail.<br><br>Ex. 1 (Cantos Tr.), at 14:13-15-6, 16:25-17:14, 92:23-93:1; Ex. 29 (Hynds Tr.) at 23:3-15, 27:8-19; Defendants' Exs. 30-32. |
| 32.  With respect to the copy of Pozuelos' declaration that was electronically submitted by the SBDA to the Superior Court in support of the felony arrest warrant (Exhibit Tab 31), it states that probable cause is supported by "the official law enforcement reports prepared regarding this matter, a true copy of the pertinent parts of which is submitted in conjunction | Disputed. The version of the declaration that Pozuelos cites here (Defendants' Ex. 31) is not the version of the declaration that was actually filed in the Superior Court by Pozuelos. The version that *was* actually filed by Pozuelos (Defendants' Ex. 30) is the only version that bears a file stamp from the Superior Court clerk. It is also the only version that bears Pozuelos's |

LARSON
LOS ANGELES

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| with this declaration and incorporated by reference." The SBDA determined which law enforcement reports would be submitted to the Superior Court in the confidential discovery package that supported the filing of the criminal complaint and the issuance of the arrest warrant, submitted that discovery package to the court, and advised Pozuelos by email on the morning of February 27, 2020 that the discovery package had been submitted. It was Pozuelos' understanding that the ROI she had prepared was included in the discovery package submitted to the court.<br><br>Pozuelos Decl., ¶ 32, Exhibit Tab 31.<br><br>Cantos Tr. at 11:10-24, 12:23-13:13, 13:24-15:21, 31:25-32:14, 32:24-33:7, 60:17-61:10, 62:19-64:23, 65:4-22;<br><br>Hynds Tr. at 38:13-22, 57:8-58. | wet signature. Pozuelos also testified that she was not familiar with the version of the declaration that Pozuelos cites to here (Defendants' Ex. 31). Thus, the version of the declaration that was actually signed and filed by Pozuelos and presented to the judge is the operative version. Unlike the version that Pozuelos cites to here—which states that the probable cause showing was submitted "in conjunction with this declaration"—the operative version of the declaration states that the probable cause showing "is attached hereto." Thus, it could not have been Pozuelos's understanding that the discovery package would have been separately submitted to the court because the operative declaration she signed expressly states that the probable cause showing was attached to the declaration itself.<br><br>Additionally, the discovery package purportedly demonstrating probable cause was not prepared by the SBDA. The probable cause showing was *supposed* to consist of a summary of the investigation prepared by Pozuelos and was to be attached to Pozuelos's declaration in support of the arrest warrant, as Cantos explained. Cantos explicitly stated that, if a discovery package is prepared for the purpose of showing probable cause, it would not be |

51

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | prepared by the SBDA's office but would instead "come from the investigation reports" prepared by Pozuelos. However, Pozuelos failed to attach any summary of her investigation or probable cause showing to her declaration.<br><br>Moreover, the discovery package was *never* "filed or submitted" by the SBDA or anyone else and was thus never presented to the court for review. The only document filed in connection with the arrest warrant was the Declaration in Support of Arrest Warrant signed by Pozuelos, but this declaration did not include any probable cause showing. Cantos also testified that the SBDA does not file or submit the "discovery package." Instead, the discovery package gets "walked over" by the investigating officer, Pozuelos.<br><br>Lastly, Pozuelos's statement in this paragraph that she was "advised . . . by email on the morning of February 27, 2020 that the discovery package had been submitted" is also false. DDA Cantos testified that the only document that he submitted on the morning of February 27, 2020 was the criminal complaint. Additionally, Pozuelos was not "advised . . . by email" that the documents establishing probable cause had been filed. To the contrary, it was |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | Pozuelos herself who took her declaration into the judge's chambers. After the judge signed the arrest warrant, Pozuelos testified that "DDA Hynds and I went downstairs to file the arrest warrant and the documents with the court clerk." Ex. 2 (Cantos Tr.) at 14:13-15-6, 16:25-17:14, 92:23-93:1, 39:9-25; Defendants' Exs. 30-31; Ex. 1 (Pozuelos Tr.) at 43:10-44:10, 55:24-56:4. Evid. Obj.: FRE 402, 602, 701, 801, 802. |
| 33.  With respect to Pozuelos' declarations in support of the 1275.1 Motion and the 186.11 Application (Exhibit Tabs 32 and 33), she summarized the facts concerning the tracing of certain fraudulently induced medical insurance payments to certain assets that were related to Grange. It was her understanding that a copy of the more detailed Audit Report was also included in the discovery package that SBDA was delivering to the court in support of the filing of the criminal complaint. In her declarations, Pozuelos made no recommendation concerning whether the court should set bail, or if so, in what amount. It was her understanding that SBDA was requesting that Grange be held | Disputed. First, Pozuelos's 1275.1 declaration does not contain any summary "concerning the tracing of certain fraudulently induced medical payments to certain assets that were related to Grange." Instead, it simply states that "Defendant billed more than $3,000,000.00 for transports and was paid more than $2,000,000.00 from such billings." This does not "trace" any payments to Dr. Grange. The bills were submitted by Symons, not Dr. Grange, and the 1275.1 declaration does not connect any payments to Dr. Grange. Moreover, even if the Audit Report referred to by Pozuelos was actually submitted to the court, which it was not, it nevertheless fails to indicate that Dr. Grange *personally* received the |

53

LARSON
LOS ANGELES

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| until a bail hearing, so that any fraudulently obtained assets that CDI had identified could be excluded from any satisfaction of the bail amount. The court would determine when that hearing would take place. It was also Pozuelos' understanding that SBDA was requesting a restraining order, so that those same assets could not be disposed of by Grange or others associated with him, and would be available for possible restitution.<br><br>Pozuelos Decl., ¶ 33, Exhibit Tabs 32 and 33. | $2 million in insurance proceeds. It merely identifies certain payments to Dr. Grange from Symons that do not even come close to $2 million.<br><br>Furthermore, the statement that it was Pozuelos's "understanding" that the Audit Report was included in the discovery package is false. Pozuelos herself testified that she was the one who filed the documents with the court clerk, and no Audit Report was included in these filings. It therefore could not be her "understanding" that the Audit Report was presented to the judge.<br><br>Lastly, Pozuelos's statement that she "made no recommendation concerning whether the court should set bail, or if so, in what amount" is false. The 1275.1 Declaration she signed was titled: "Probable Cause Declaration in Support of Motion to Place a Hold on the Release of Defendant From Custody" and was thus submitted for the sole purpose of ensuring the Dr. Grange would be kept in jail and unable to post bail notwithstanding his upcoming testimony in the civil trial on the next court day after the 1275.1 Declaration was filed.<br><br>Defendants' Exs. 32, 29; Ex. 1 (Pozuelos Tr.) at 55:24-56:4. |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
|  | Evid. Obj.: FRE 602, 701. |
| 34. On February 27, 2020 at 10:00 am, Supervising DDA William Lee ("SDDA Lee") advised Mikulich, Lopez, and Pozuelos that the criminal complaint against Grange had been submitted electronically to the court that morning, however the court still needed to review the SBDA's submission before filing it. At 10:27 am, Pozuelos was advised by DDA Cantos that he had electronically submitted the criminal complaint to the court, and that his office had also submitted the confidential discovery package supporting the criminal charges and the arrest warrant application. Pozuelos was not given a copy of the confidential discovery package. At 10:32 am, SDDA Lee advised Mikulich, Lopez, and Pozuelos that the court had officially filed the criminal complaint against Grange.<br><br>Pozuelos Decl., ¶ 34. | Disputed. The discovery package was *never* "submitted" by the SBDA or anyone else and was thus never presented to the court for review. The only document filed in connection with the arrest warrant was the Declaration in Support of Arrest Warrant signed by Pozuelos, but this declaration did not include any probable cause showing.<br><br>Additionally, it was not Cantos who was supposed to submit the discovery package, it is up to the investigating officer. Cantos testified that he did not electronically submit the discovery package; rather, "[t]he warrant and the discovery . . . physically get walked over." It was up to Pozuelos to file these documents in court in person. Indeed, Pozuelos testified that she herself took her declaration in support of the arrest warrant into the judge's chambers. After the judge signed the arrest warrant, Pozuelos testified that "DDA Hynds and I went downstairs to file the arrest warrant and the documents with the court clerk."<br><br>Defendants' Ex. 30; Ex. 2 (Cantos Tr.), at 39:14-25; Ex. 1 (Pozuelos Tr.) at 55:24-56:4.<br><br>Evid. Obj.: FRE 801, 802. |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| 35. On February 27, 2020, at approximately 3:00 pm, CDI personnel met with the DDA Cantos, DDA Hynds, and SDDA Lee prior to executing the arrest of Grange. Because the case involved substantial fraud allegations, and there was a risk of defendant flight, evidence destruction and witness influencing, the CDI arrest team decided to make the arrest as soon as possible. Between approximately 3:00 pm and 3:30 pm, DDA Hynds and Pozuelos arrived at the San Bernardino Courthouse. The court clerk provided them with a copy of the filed complaint and advised them that Judge Colin Bilash was the signing judge. DDA Hynds and Pozuelos met with Judge Bilash to obtain his approval of the arrest warrant, the 1275.1 Motion, and the 186.11 Application. Judge Bilash immediately signed the arrest warrant and granted the 1275.1 Motion to hold Grange until a bail hearing. A true and correct copy of the signed arrest warrant is at Tab 39 of the Exhibits. DDA Hynds and Judge Bilash further discussed the 186.11 Application, but the judge did not grant it at this time. While they were discussing the 186.11 Application, Pozuelos contacted Sergeant Lopez, using her cell phone, by either calling or texting him, and advised him that the judge had signed the arrest | Disputed. First, there was no basis to conclude that Dr. Grange was a flight risk, that evidence would be destroyed, or that witnesses would be influenced. Pozuelos was asked during her deposition why Dr. Grange needed to be arrested rather than permitting him to self-surrender. Pozuelos did not mention any of these factors. When asked whether she thought Dr. Grange was a flight risk, Pozuelos testified that she "wasn't certain." When asked if she had any evidence that Dr. Grange was a flight risk, Pozuelos admitted that she had "[n]o specific evidence" but then clarified that she had "seen an e-mail" indicating that "he would be leaving the country to go on vacation within the month." Pozuelos then admitted that the fact Dr. Grange had plans to leave the country does not make him a flight risk.<br><br>Nor was there any risk of evidence destruction because Pozuelos had already obtained all of the evidence— she seized Symons' emails and bank records, she interviewed insurance company representatives, and she obtained all of the claims submitted by Symons that were included in the criminal complaint. Accordingly, and as explained in Dr. Grange's response to paragraph 29 above, the true reason for the timing of Dr. Grange's arrest was to ensure he was arrested in the middle of |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| warrant but was still considering other matters.<br><br>Pozuelos Decl., ¶ 35, Exhibit 39.<br><br>Hynds Tr. at 41:5-42:10, 42:16-43:3, 44:19-22. | the civil trial.<br><br>Ex. 1 (Pozuelos Tr.) at 38:2-4, 39:23-41:1.<br><br>Evid. Obj.: FRE 602, 701, 801, 802. |
| 36. After leaving Judge Bilash, Pozuelos met with the court clerk to provide the signed arrest warrant and the 1275.1 Motion to be filed with the court. Pozuelos was later advised by Sergeant Lopez that he and his team had arrested Grange in the parking lot. Pozuelos asked another CDI Detective to deliver a copy of the signed arrest warrant and 1275.1 Motion to the arrest team, at the parking lot where the arrest occurred, prior to transporting Grange to the San Bernardino County's West Valley Detention Facility. Neumeister first learned that Grange had been arrested from his co-counsel, late in the afternoon of February 27th and was surprised by the news. A hearing was conducted on February 28, 2020, and Judge Michael Smith set the bail at $1,500,000. The hearing was then continued to March 2, 2020, at which point another judge of the Superior Court released Grange from custody on his own recognizance.<br><br>Pozuelos Decl., ¶ 36;<br><br>Neumeister Tr. at 4216-24, 43:6- | Partially disputed as to the statement that "Pozuelos was later advised by Sergeant Lopez" that Dr. Grange had been arrested. By the time Pozuelos went to file the arrest warrant and 1275.1 Motion with the court clerk, Pozuelos was already aware that Grange had been taken into custody. Dr. Grange was arrested by Wessely, Lopez, and Camacho slightly before 3:46 pm. This is proven by the fact that the audio recording of Dr. Grange's arrest, which was recorded on Wessely's body-worn recorder, captures the arrest. On that recording, Dr. Grange's civil attorney, Raul Garcia, can be heard speaking with the arresting officers. Mr. Garcia states on the recording that he is going to call a colleague of his, Raymond Ramirez, who practices criminal law. Portions of Mr. Garcia's phone conversation with Mr. Ramirez can be heard on the audio recording of Dr. Grange's arrest. Thus, the exact time at which Mr. Garcia made the phone call to Mr. Ramirez would also indicate the exact time that Dr. Grange was taken into custody. Mr. Ramirez obtained a copy of his phone |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| 19, 43:6-44:19 | records from the date of Dr. Grange's arrest on February 27, 2020, which indicate that Mr. Garcia called Mr. Ramirez at 3:46 pm. Thus, Dr. Grange was arrested at, or slightly before, 3:46 pm.

Conversely, Pozuelos testified that she called Sargeant Lopez immediately once the arrest warrant had been signed by the judge while she was still in chambers. Pozuelos's phone records were produced in this action and indicate that her phone call to Lopez occurred at 4:11 pm. By this time, Dr. Grange had already been taken into custody. Thus, Pozuelos was not "later advised" by Lopez that Dr. Grange had been arrested. Rather, she became aware of the arrest as soon as she spoke with Lopez at 4:11 pm to inform him that the warrant had been signed.

Ex. 33 (Audio Recording of Arrest); Garcia Decl., ¶¶ 2-8; Ramirez Decl., ¶¶ 3-5, 7-8;  Ex. 34 (Ramirez Phone Records); Ex. 1 (Pozuelos Tr.) at 53:22-54:1, 54:7-9; Ex. 35 (Pozuelos Phone Records).

Evid. Obj.: FRE 602, 701, 801, 802. |
| 37.  DDA Hynds returned to the court on February 28, 2020, at which time the Judge granted the 186.11 Application. Pozuelos participated | Undisputed. |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| with DDA Hynds and other CDI detectives in serving notice of the restraining order on affected parties.<br><br>Pozuelos Decl., ¶ 37;<br><br>Hynds Tr. at 50:4-51:4, 54:9-16. | |
| 38. After the criminal case was filed, Pozuelos continued to meet with DDA Cantos and complete follow-up tasks requested by him. This included obtaining and reviewing transcripts from the trial in the civil litigation. In July of 2021, SBDA dismissed the criminal charges against Grange. Pozuelos was not consulted on this decision, or advised as to the reasons.<br><br>Pozuelos Decl., ¶ 38;<br><br>Neumeister Tr. at 53:2-10. | Disputed. Pozuelos was not merely completing "follow-up tasks" requested by Cantos. In truth, Pozuelos had substantial involvement in the case, and continued to obtain additional evidence to assist the prosecution. In fact, the additional investigating done by Pozuelos yielded additional exculpatory evidence and also further confirmed that Pozuelos lacked probable cause to conclude that Dr. Grange had committed insurance fraud. For example, Pozuelos contacted every single insurance company representative she had previously interviewed in order to obtain critical information that she should have obtained *before* Dr. Grange was arrested. Pozuelos sent these representatives a list of identical questions regarding their policies. In one such question, Pozuelos asked: "Does [the insurer] have a specific guideline, definition, or policy related to Ambulance Services." This information would be critical to a determination as to whether Symons' claims were fraudulent because the |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
|  | policies would indicate how ambulance services are defined by the insurer and what the requirements are in order to bill for that service; yet Pozuelos waited until *after* criminal charges were filed to obtain this information. If Pozuelos had requested these policies beforehand, she would have learned that none of the insurance companies had a policy requiring an air ambulance provider to own or lease the helicopter used in the transport. These post-arrest follow-up questions also yielded further exculpatory evidence. For example, in another question, Pozuelos asked: "Does the air ambulance need to be designated as an air ambulance?" A representative from Health Net responded: "Health Net does not require an 'air ambulance' designation in order to pay claims for air ambulance services." |
|  | Additionally, the statement that Pozuelos was not "advised as to the reasons" the criminal charges were dropped is also not true. On July 9, 2021, Pozuelos's captain sent her an email advising her that SBDA would be dropping the charges. Pozuelos's captain explained: "they [SBDA] just want to cut their losses and move on. . . they seem hesitant to proceed and don't seem to understand how to prosecute it." Pozuelos responded to her captain |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | stating: "I figured this was going to happen." |
| | Ex. 36 (Pozuelos Post-Arrest Investigation – Health Net); Ex. 37 (Pozuelos email re Dismissal). |
| 39. After reviewing the investigation reports, Cantos formed the belief that there was probable cause to arrest Grange for fraud. He still believes there was probable cause to arrest Grange for fraud. If Cantos had not personally believed there was probable cause, he would not have filed the criminal complaint.<br><br>Cantos Tr. at 82:16-20, 83:3-11, 72:13-21. | Disputed. As Cantos testified, his belief in the existence of probable cause was based solely on the information supplied by Pozuelos in her reports, which contained numerous material false statements and omissions, including but not limited to: (1) the ground claims submitted by Symons accurately represented that the patients were not transported anywhere; (2) there is no requirement that an air ambulance provider own or lease a helicopter in order to bill for air ambulance services; (3) there is no way for an ambulance provider to bill for the medical services it provides separately from the transport itself; and (4) insurance company representatives told Pozuelos that they could still pay claims to Symons even though the ground patients were not transported and even though Symons did not own or lease the helicopter used in the air transports, which directly contradicted the statements in Pozuelos's Report of Investigation.<br><br>Ex. 2 (Cantos Tr.) at 92:23-93:1; Ex. 18; Ex. 27; Ex. 24 (BSC Testimony) at |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | 24:15-26:3, 46:14-47:3; Ex. 19; Ex. 23. |
| 40.  It is the SBDA's standard practice to file the criminal complaint, obtain the arrest warrant, execute the arrest, and seek any bail or asset orders all on the same day.<br><br>Cantos Tr. at 84:19-85:17. | Undisputed. |
| 41.  The SBDA dismissed the criminal charges against Grange in July of 2021. Cantos was instructed by his counsel not to reveal who made this decision and why. Generally speaking, a decision to dismiss criminal charges lies within a prosecutor's discretion. Office resources can be a factor in such a decision. Notwithstanding the dismissal of the criminal charges, Cantos believes there was probable cause to arrest Grange for fraud.<br><br>Cantos Tr. at 87:15-17, 88:1-89:16, 90:20-91:2. | Disputed. The reason the SBDA dropped the criminal charges against Dr. Grange was communicated to the Department of Insurance, and that reason was a lack of evidence indicating that Dr. Grange did anything wrong. On July 9, 2021, Pozuelos's captain sent her an email advising her that the SBDA would be dropping the charges. Pozuelos's captain explained: "they [the SBDA] just want to cut their losses and move on. . . they seem hesitant to proceed and don't seem to understand how to prosecute it." Pozuelos responded to her captain stating: "I figured this was going to happen."<br><br>Additionally, the civil attorney, Neumeister, produced his text messages in this action in response to a subpoena issued by Dr. Grange's counsel. Among the communications produced was a text message from Neumeister to the other civil attorney, Curtis Leavitt, sent on July 16, 2021. Neumeister tells Leavitt: "DA dropped the charges against Grange." Leavitt then responds: "Disappointing, but not surprising." |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | As to the statement that Cantos believed there was probable cause, this belief was not based on his own independent investigation or collection of evidence but was instead based solely on the reports provided to him by Pozuelos. Such reports contained numerous materially false statements and omissions, as described in Dr. Grange's response to paragraph 39 above. <br><br> Ex. 37; Ex. 42. <br><br> Evid. Obj.: FRE 402. |
| 42. After working with Pozuelos for several years on the Grange case, Cantos believes that Pozuelos was a hardworking, competent and honest investigator, and he had no concerns about her performance of her duties as an investigator on the case. <br><br> Cantos Tr. 91:4-21. | Disputed. Cantos became deeply concerned with Pozuelos's conduct upon learning that she was communicating with the lawyers representing the Department of Insurance in the civil case. Cantos, however, was only aware of one such instance in which Pozuelos was communicating with the civil lawyers. Cantos was entirely unaware of the true extent to which Pozuelos and the civil lawyers were exchanging information and documents, as set forth in Dr. Grange's response to paragraph 7, above. <br><br> Ex. 2 (Cantos Tr.) at 18:18-19-5, 19:16-20:7, 52:22-54:25. <br><br> Evid. Obj.: FRE 402, 403, 602, 701. |

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| 43. At the time that DDA Hynds sought the asset freeze order on February 27, 2020, she believed that there was a proper basis for the court to issue such an order.<br><br>Hynds Tr. at 55:16-20. | Disputed. As Hynds testified, her belief in the existence of probable cause was based solely on the information supplied by Pozuelos in her reports, which contained numerous material false statements and omissions, including but not limited to: (1) Dr. Grange was not the "owner" of Symons but was instead one of numerous shareholders, officers, and directors; (2) Dr. Grange did not personally submit bills to insurance companies; (3) the bills were prepared and submitted by certified healthcare coders whom Dr. Grange never instructed as to which billing code to use; and (4) Dr. Grange never personally deposited payments from insurance companies into his personal accounts.<br><br>Ex. 29 (Hynds Tr.) at 23:3-15; Grange Decl., ¶ 3; Brownlow Decl., ¶ 3, 22. |
| 44. Hynds believed that Pozuelos was a competent and honest investigator. She does not believe that Pozuelos had any personal animosity towards Grange, and believes that Pozuelos was acting only on her professional responsibility to investigate crime.<br><br>Hynds Tr. at 58:2-59:1. | Undisputed. |
| 45. Exhibit Tabs 1 through 33 are from the CDI's Fraud Division's records of the investigation that Pozuelos conducted with respect to Grange, | Undisputed.<br><br>Evid. Obj.: FRE 803, 901, 902. |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| or the criminal proceeding with respect to Grange. They were prepared at or near the time of the events recorded therein, and have been maintained by Pozuelos at the CDI's Fraud Division in the normal course of its official business.<br><br>Pozuelos Decl., ¶ 69. | |
| 46.  In this action, Grange served responses to written interrogatories propounded by Pozuelos. A true and correct copy of Grange's responses is at Exhibit Tab 34.<br><br>Declaration of Thomas M. McMahon ("McMahon Decl.,"), ¶ 3; Exhibit Tab 34. | Undisputed. |
| 47.  The documents produced by Grange in this action include communications from his counsel to Cantos, after Grange was arrested, concerning the merits of the criminal charges.<br><br>McMahon Decl., ¶ 9. | Undisputed. |
| 48.  In this action, counsel for Grange issued subpoenas to both the San Bernardino County District Attorney's Office ("SBDA") and the San Bernardino County Superior Court ("Superior Court") for the production of documents relating to the arrest or prosecution of Grange. Counsel for Defendants concurred in the service of these subpoenas. The documents produced by both SBDA and the Superior Court did not contain a | Partially disputed. The "discovery package" was never included in the documents produced by the Superior Court because the "discovery package" was never filed, submitted, or delivered to the court. The Superior Court produced *all* documents that were filed in the criminal case against Dr. Grange, as attested to in a declaration by the Custodian of Records that was produced along with the Superior Court's production in response to the |

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| copy of the confidential discovery package that DDA Cantos testified was put together by his office, and delivered to the Superior Court on the morning of February 27, 2020, to support the filing of the criminal complaint and issuance of an arrest warrant.

McMahon Decl., ¶ 8. | subpoena (filed as Ex. 38). The "discovery package" was not included in this production.

The discovery package purportedly demonstrating probable cause was not prepared by the SBDA and was not delivered to the court. The only document Cantos submitted to the court was the criminal complaint. The probable cause showing was *supposed* to consist of a summary of the investigation prepared by Pozuelos and was to be attached to Pozuelos's declaration in support of the arrest warrant, as Cantos explained. Cantos explicitly stated that, if a discovery package is prepared for the purpose of showing probable cause, it would not be prepared by the SBDA's office but would instead "come from the investigation reports" prepared by Pozuelos.

Lastly, if the discovery package was actually intended to demonstrate probable cause, then it was Pozuelos's obligation to submit this information to the court. Cantos testified that "[t]he warrant and the discovery . . . physically get walked over." It was up to Pozuelos to file these documents in court in person. Indeed, Pozuelos testified that she herself took her declaration in support of the arrest |

66

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| | warrant into the judge's chambers. After the judge signed the arrest warrant, Pozuelos testified that "DDA Hynds and I went downstairs to file the arrest warrant and the documents with the court clerk."<br><br>Ex. 38; Ex. 2 (Cantos Tr.) at 14:13-15-6, 16:25-17:14, 92:23-93:1, 39:14-25; Defendants' Ex. 30; Ex. 1 (Pozuelos Tr.) at 55:24-56:4.<br><br>Evid. Obj.: FRE 602, 701. |
| 49.  True and correct copies of pages excerpted from the certified deposition transcripts of Cantos, Hynds, Grange and Neumeister are set forth at Exhibit Tabs 35, 36, 37 and 38, respectively<br><br>McMahon Decl., ¶¶ 4, 5, 6, 7; Exhibit Tabs 35, 36, 37, and 38 | Undisputed. |
| 50.  Grange is a medical doctor, and at relevant times, was an owner, director and officer of Symons Emergency Specialties, Inc., dba Symons Ambulance ("Symons"). Among other services, Symons provided medical care at special events.<br><br>Grange Tr. at 14:23-19:23; Exhibit Tab 37. | Partially disputed. Grange was one of several shareholders, officers, and directors of Symons.<br><br>Grange Decl., ¶ 3. |
| 51.  The transcripts of the trial in the civil *qui tam* action establish that Grange testified. | Undisputed. |

LARSON
LOS ANGELES

| Moving Party's Uncontroverted Facts and Supporting Evidence | Statement of Genuine Disputes |
|---|---|
| McMahon Decl., ¶ 10. | |
| 52.  After the verdict in the civil action, and the dismissal of the criminal charges by the SBDA, Neumeister was upset to learn that the SBDA had evidence that had not been available for him to use in the civil action, such as Grange's emails and the payment to Fish. | Partially disputed. Neumeister had access to a substantial volume of evidence from Pozuelos's criminal investigation that was provided to him by Pozuelos, as explained in Dr. Grange's response to paragraph 7 above, incorporated herein. |
| Neumeister Tr. At 60:5-62:3. | Exs. 5-11. |

## **PLAINTIFF'S ADDITIONAL MATERIAL FACTS**

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| 1.  In health insurance billing, medical providers indicate the services performed by using a standardized set of billing codes. There are two types of billing codes: Current Procedural Terminology (CPT) or Healthcare Common Procedure Coding System (HCPCS) Codes. In the ambulance billing context, only HCPCS codes are utilized. HCPCS codes are alphanumeric codes that identify the products, procedures, supplies, and services rendered by a healthcare provider. Generally speaking, there is a specific HCPCS code that corresponds with the type of service rendered by an ambulance provider. | Brownlow Decl., ¶ 10. |
| 2.  The HCPCS codes are how providers represent to insurers the specific services they provide. | Brownlow Decl., ¶ 11. |
| 3.  There are three main components to billing for ambulance services, each of | Brownlow Decl., ¶ 14. |

68
STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| which is denoted by specific HCPCS codes indicated in the claim form submitted on behalf of the provider. The first component is the level of care rendered to the patient, which would include either basic life support (codes A0428 and A0429), advanced life support (codes A0426, A0427, and A0433), and Specialty Care (code A0434). The second component is ground mileage, which reflects the distance traveled by the ambulance (code A0425). The third component reflects the specific medical supplies used (e.g., codes A0382, A0392, A0394, A0396, A0398). | |
| 4.    If a patient is physically transported via ambulance, then the provider would submit a claim to an insurance company using the billing code for mileage, and the charge would be based on the miles traveled. Conversely, if the patient was not physically transported, then a mileage billing code would not be used. | Brownlow Decl., ¶ 16. |
| 5.    Certain of the ground claims identified by Pozuelos were billed using a Specialty Care code (code A0434). This code is used to indicate that the services rendered to the patient were beyond the scope of a paramedic and required a higher level of medical training, such as a physician or registered nurse. Because Symons frequently staffed the medical centers at the public events with physicians and emergency nurses, and because patients would occasionally require a higher level of medical intervention in an emergency room setting, Symons would bill using code | Brownlow Decl., ¶ 15. |

69

LARSON
LOS ANGELES

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| A0434. | |
| 6. Pozuelos investigated Dr. Grange in connection with claims for both ground and air ambulance services submitted by Symons. With respect to the ground claims investigated by Pozuelos, none of the patients treated by Symons were physically transported but were instead treated on site and then released. This is evident based on the claim forms themselves, which accurately represent the services provided to each patient. Specifically, none of the claim forms included the HCPCS code for ground mileage (code A0425). Also, the claim forms for certain insurers allow the ambulance provider to indicate the pick up and drop off location for the patient. Accordingly, for certain of the claims identified in Pozuelos's report, the pick up and drop off locations are identical, thus further indicating that the patient was not transported anywhere. | Defendants' Ex. 27, p. 12-13; Brownlow Decl., ¶ 16. |
| 7. Anyone with a general knowledge of ambulance coding would be able to discern from the ground claim forms identified by Pozuelos that the patients were not transported anywhere. Pozuelos's Report of Investigation acknowledges that the claim forms submitted by Symons indicated that the patients were not transported. | Brownlow Decl., ¶ 14, 16; Defendants' Ex. 27, p. 12-13. |
| 8. Pozuelos herself was able to tell by looking at the ground claim forms that the patient was not transported. | Ex. 1 (Pozuelos Tr.) at 97:4-10. |
| 9. On the rare occasions in which Pozuelos would actually show the insurance company representatives the specific claims submitted by Symons, the | Ex. 1 (Pozuelos Tr.) at 96:19-24. |

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| representatives were able to tell simply by looking at the claim form that the patient was not transported anywhere. | |
| 10.  The fact that the claim forms accurately reflected that the patient was not transported was not included in the declarations Pozuelos signed in support of the arrest warrant for Dr. Grange, the motion to freeze his assets ("186.11 Application), and the motion to prevent Dr. Grange from posting bail ("1275.1 Motion"). | Defendants' Exs. 30-33. |
| 11.  Yet, in Pozuelos's Report of Investigation, as well as in her declarations in support of the arrest warrant, the 186.11 Application, and the 1275.1 Motion, Pozuelos alleged that "ground transports that were billed, did not occur." This allegation is directly contradicted by Pozuelos's own admission that the ground claim forms never represented that the patients were transported. | Defendants' Exs. 27, 30-33; Ex. 1 (Pozuelos Tr.) at 97:4-10. |
| 12.  In addition to the ground claims, Symons also submitted claims to insurers for emergency medical services performed by Symons on air ambulances. The helicopters were staffed by Symons medical professionals, and the medical equipment used on these flights were selected and supplied by Symons. Symons personnel would fly on board the helicopters and would respond to injured patients in remote areas of the desert in California and Mexico. Symons personnel would assess and stabilize the injured patient at the scene and would then load the patient into the | Ex. 21; Brownlow Decl., ¶ 21. |

71

LARSON
LOS ANGELES

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| helicopter. Symons personnel would thereafter provide emergency medical treatment to the patient while the helicopter was enroute. Providing such services while on board a helicopter is different from providing those services on the ground because the provider has to adapt to providing medical care in an air ambulance setting, thereby requiring additional training and experience. Symons was therefore providing air ambulance services. | |
| 13. For the air ambulance transports identified by Pozuelos that were included in the criminal complaint against Dr. Grange, Symons medical personnel provided emergency medical care and equipment in connection with each of the transports. | Brownlow Decl., ¶ 20-21; Ex. 21. |
| 14. Symons did not own or lease the helicopters used in the air ambulance transports. But for the purposes of billing for air ambulance transports, however, ownership or leasing of the helicopters is not required. Licensed medical professionals employed by Symons responded to, stabilized, and treated the patients while on board the helicopters using equipment selected and supplied by Symons. Symons therefore provided air ambulance services. There is no statute, regulation, rule, or insurance company policy requiring an ambulance provider to own or lease the helicopter in order to bill for air ambulance services, and by using billing code A0431 a provider does not make any representation that it owns or leases the helicopter used in the air | Brownlow Decl., ¶ 20-21; Ex. 24 (BSC Testimony) at 24:15-26:3, 46:14-47:3. |

LARSON
LOS ANGELES

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| ambulance transport. This was explained by representatives of the same insurance companies interviewed by Detective Pozuelos, Blue Shield and Anthem. | |
| 15. Yet, Pozuelos alleged in her Report of Investigation that "Symons is also billing for air ambulance services however they did not provide the service." This allegation was repeated in Pozuelos's declarations in support of the arrest warrant, the 186.11 Application, and the 1275.1 Motion. This is directly contrary to the fact that Symons did in fact provide air ambulance services. | Defendants' Exs. 27, 30-33; Brownlow Decl., ¶ 20. |
| 16. Pozuelos's Report of Investigation details her findings from various interviews she conducted with insurance company representatives. For each insurer, Pozuelos concluded that "had [the insurer] known Symons did not provide the transports billed in the claims submitted [the insurer] would not have paid the claims." But what Pozuelos failed to indicate is that Symons did in fact provide the air ambulance service. Whether Symons owned or leased the helicopters used in the air transports does not impact whether it provided the service. | Defendants' Ex. 27, p. 7-8; Brownlow Decl., ¶ 20-21. |
| 17. The criminal filings against Dr. Grange, including Pozuelos's declarations in support of the arrest warrant, the 186.11 Application, and the 1275.1 Motion, were based solely on information supplied by Pozuelos to the SBDA. | Ex. 2 (Cantos Tr.) at 16:25-17:14, 92:23-93:1; Ex. 29 (Hynds Tr.) at 20:6-21, 23:3-15. |
| 18. In addition to the false statements identified in Additional Material Facts | Defendants' Exs. 32-33; Brownlow Decl., ¶ 3, 22. |

73

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| 11 and 15 above regarding the ground and air claims, the declarations signed by Pozuelos—as well as her Report of Investigation, upon which those declarations were based—contained numerous additional false statements. For instance, Pozuelos's declaration in support of the 186.11 Application states that "Jeff Grange committed insurance fraud by submitting billing for ground and air transports he did not provide." Pozuelos's declaration in support of the 1275.1 Motion makes the same allegation. In truth, Dr. Grange did not personally submit any bills to insurance companies. The bills were prepared and submitted by a staff of healthcare coders employed by Symons. Dr. Grange never instructed the billers as to which billing code to use; nor did Dr. Grange insist that a particular claim must be submitted. Dr. Grange would always defer to the judgment of the billing professionals. | |
| 19. During her deposition, Pozuelos was asked if Dr. Grange "present[ed] any claims to insurance companies." Pozuelos responded: "Not that I'm aware specifically." Pozuelos's admission directly contradicts her statements in her declarations in support of the 186.11 Application and the 1275.1 Motion that Dr. Grange submitted bills to insurance companies. | Ex. 1 (Pozuelos Tr.) at 78:22-79:1; Defendants' Exs. 32-33. |
| 20. Another instance of a false statement made by Pozuelos is her representation in the declaration in support of arrest warrant in which Pozuelos stated: "I believe that the conduct of the accused | Defendants' Ex. 30; Ex. 1 (Pozuelos Tr.) at 49:9-20, 112:9-14. |

LARSON
LOS ANGELES

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| and the circumstances that give probable cause to believe that the accused committed the crime(s) listed . . . above, were personally observed by the person(s) whose statements regarding such crimes are contained in the referenced incorporated reports." However, Pozuelos was asked during her deposition if any of the individuals she interviewed during her investigation personally observed Dr. Grange committing the crimes alleged in her declaration, to which Pozuelos responded: "No." Indeed, Pozuelos never interviewed any of the insurance company personnel who had actually processed the claims submitted by Symons. | |
| 21. Another example of a false statement made by Pozuelos is her representation in the declaration in support of the 1275.1 Motion in which she stated: "Defendant billed more than $3,000,000.00 for transports and was paid more than $2,000,000.00 from such billings." In addition to falsely stating that Dr. Grange personally billed insurance companies, as set forth in Additional Material Fact 19, this statement is additionally false for the reason that Dr. Grange did not receive $2 million from insurance companies. Any money billed to insurance companies was paid directly to Symons, not Dr. Grange. Pozuelos arranged for a forensic audit of bank accounts belonging to Symons and Dr. Grange. The report understandably revealed that certain payments were made from | Defendants' Exs. 32, 29. |

LARSON
LOS ANGELES

75
STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| Symons to Dr. Grange, given his status as Symons's medical director. But such payments were nowhere near the $2 million amount alleged by Pozuelos. | |
| 22. Pozuelos also fabricated alleged statements of insurance company representatives in her Report of Investigation. For instance, the Report of Investigation states that Pozuelos interviewed John Martella, a representative with Kaiser. According to the Report of Investigation, "Martella stated that had [Kaiser] known Symons did not provide the transports billed in the claims submitted [Kaiser] would not have paid the claims." In the actual interview report, however, Pozuelos indicated that she "asked Martella had Kaiser known [the patient] was not transported by Symons would Kaiser have paid the claim. Martella stated 'potentially yes, however it is an incorrect bill.'" Martella further told Pozuelos that "Kaiser does routinely pay for what is called 'treat no transport' type situation." Additionally, in a separate email to Pozuelos, Martella stated that he has "no real idea how they should bill." | Defendants' Ex. 27, p. 8;<br><br>Ex. 18 (Martella Interview Report); Ex. 27 (Martella Email to Pozuelos). |
| 23. Pozuelos also interviewed a representative from Aetna, Linda Cote, regarding ground and air ambulance claims submitted by Symons. In her Report of Investigation, Pozuelos stated that the representative told her: "had Aetna known Symons did not provide the transports billed in the claims submitted Aetna would not have paid the claims." In the actual interview | Pozuelos Ex. 27, p. 7;<br><br>Ex. 19 (Cote Interview Report). |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| report, however, Pozuelos "asked Cote if Dr. Grange could bill for the medical services he provided on the flight. Cote stated if the claim is for an air ambulance transport the claim would include any medical services and supplies as part of the total charge." Cote never told Pozuelos that Aetna would not have paid the claim. Cote also explained that "[t]he claim would not have been denied just based on the fact the services provided took place in Mexico." Cote also added that there was no way for an ambulance provider to bill for the medical services it provides separately from the transport itself, thus indicating that the only way Symons could bill would be through the code for the air ambulance transport. | |
| 24.  In another example, Pozuelos also interviewed a representative from Health Net regarding air claims submitted by Symons. In her Report of Investigation, Pozuelos stated: "had Healthnet known Symons did not provide the transports billed in the claims submitted Healthnet would not have paid the claims." In truth, however, Pozuelos submitted a questionnaire to Health Net regarding Symons' air claims in which Pozuelos asked: "Can Symons properly bill for air ambulance services if they are not an air ambulance provider?" The Health Net representative answered as follows: "Generally, such claims are not denied if they are ordered by an emergency paramedic." The representative's answer is directly contrary to Pozuelos's | Pozuelos Ex. 27, p. 7;  Ex. 23 (Health Net Questionnaire). |

LARSON
LOS ANGELES

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| representation in her Report of Investigation. | |
| 25.  Pozuelos also falsely stated in her declaration in support of the 186.11 Application that Dr. Grange "intentionally deceived health care insurance providers." In truth, Pozuelos's investigation revealed that there was no intent to deceive any insurer. As explained in Additional Material Facts 7 and 8, the ground claim forms accurately represented that the patients were not transported anywhere. And with respect to the air claims, the billing code used by Symons (code A0431) does not contain any representation that the provider owns or leases the helicopter used in the transport. Additionally, John Martella, the Kaiser representative, explained to Pozuelos that he spoke with Dr. Grange about the ground claims, and Dr. Grange stated that Symons "want[s] to make sure they are billing these correctly and would like to discuss how they should be billing these claims." Pozuelos also reviewed Symons' internal emails, including emails to and from Dr. Grange. In one such email from August 2017 to the Symons billing manager, Dr. Grange discussed a *qui tam* complaint filed by SIMNSA, explaining that: "One of the primary issues that came up is whether Symons would have to actually own the helicopter in order to bill commercial insurance. It is my impression . . . that this is not required." Dr. Grange then added: "however, I want to make sure | Brownlow Decl., ¶ 16, 21; Ex. 24 (BSC Testimony) at 24:15-26:3, 46:14-47:3; Ex. 1 (Pozuelos Tr.) at 97:4-10; Ex. 27 (Martella Email); Ex. 26 (Symons Email re Compliance). |

LARSON
LOS ANGELES

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| we are very careful to make sure we are fully compliant with any rules and regulations." | |
| 26.  In addition to the false statements Pozuelos made in her investigative reports and criminal filings, Pozuelos also omitted critical exculpatory information. Much of this information was revealed in the civil *qui tam* action brought by SIMNSA and the Department of Insurance against Symons and Dr. Grange. Pozuelos was in frequent communication with the civil attorneys representing the Department of Insurance, Mitch Neumeister, Curtis Leavitt, Steven J. Green, and James Scott McNamara. Pozuelos and Neumeister frequently communicated via telephone. In addition to sharing information with each other verbally, Pozuelos and the civil attorneys also exchanged numerous documents that were obtained from their respective matters. Leavitt provided Pozuelos the entire discovery file for the relator in the *qui tam* matter. Neumeister supplied Pozuelos with all of the transcripts from the *qui tam* trial, including the testimony of witnesses who were also interviewed by Pozuelos during her criminal investigation. Neumeister asked Pozuelos for contact information for individuals in the San Bernardino Sherriff's Department regarding the air claims submitted by Symons. Neumeister also arranged for one of the private helicopter companies to reach out directly to Pozuelos to provide her with documents regarding | Exs. 5 through 12; Ex. 14. |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| air ambulance flights in which Symons was involved. Pozuelos also sent the civil attorneys the names of potential witnesses affiliated with various insurance companies. Green even asked Pozuelos to assist Green and Neumeister in contacting the insurers involved in both matters. | |
| 27. Pozuelos was also made aware that, because of her involvement in the civil action, materials from that case would fall within her *Brady* disclosure obligations. In an email dated August 27, 2019, Pozuelos's supervisor, Katrina Blake, explained to DDA Lance Cantos: "One question Lori [Pozuelos] said you would [sic] answered, is what our authority is to hand over the unsealed Qui Tam in relation to Jeff Grange." Blake said that "after discussing with my Captain" it was determined that "if we withhold the Qui Tam from discovery, we are in violation of the law." | Ex. 39. |
| 28. DDA Cantos intended to keep the civil case entirely separate from the criminal investigation because he was concerned that any overlap would expand the *Brady* obligations of the criminal prosecution team, including Pozuelos. This obligation, Cantos explained, "extends to agencies that we have – that we have control over or that are somehow associated with us." | Ex. 2 (Cantos Tr.) at 52:22-54:25, 19:13-15. |
| 29. DDA Cantos was unaware of the true extent of the overlap between the civil and criminal matters. At one point, however, Pozuelos sent Cantos an email on April 2, 2019 informing him that she | Ex. 12; Ex. 2 (Cantos Tr.) at 52:22-54:25. |

LARSON
LOS ANGELES

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| had spoken with the civil attorneys and that they wanted an update on the status of the criminal filing. By this point, Pozuelos had been exchanging information and documents with the civil lawyers for approximately two years. Cantos was deeply concerned by this email because it indicated that "there[] [was] contact made" between the civil and criminal teams, and he "thought there was a wall between civil side. This gave the impression to me there was not a wall." Cantos accordingly asked Pozuelos to make sure she documents her contacts with the civil lawyers going forward. | |
| 30. Cantos's instruction to Pozuelos was not the first time Pozuelos was warned about the importance of keeping separation between the civil and criminal cases. Over two years prior, in February 2017, Cantos's predecessor, DDA Harrison, informed Pozuelos that the *qui tam* case "is apparently still sealed" and that "you aren't even supposed to know it exists." Harrison further cautioned Pozuelos that "it will blow our case up if the qui tam aspects don't have a total fence between the two cases." | Ex. 13. |
| 31. However, notwithstanding the admonitions of DDA Harrison and DDA Cantos, and notwithstanding Pozuelos's knowledge of her *Brady* obligation to document and disclose exculpatory information from the civil trial, Pozuelos continued to communicate and | Exs. 5 through 12; Ex. 14; Ex. 1 (Pozuelos Tr.) at 25:16-22. |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| exchange documents and information with the civil lawyers. | |
| 32. Pozuelos obtained deposition transcripts from the civil trial. The transcripts contained a substantial volume of exculpatory evidence demonstrating that Symons' claims were not fraudulent. For instance, Douglas Wolfberg, a healthcare coding expert for the defense, testified in his deposition that: (1) HCPCS codes do not contain standardized definitions for the various services they describe; (2) there is not an express requirement of ownership or leasing of an aircraft as a precondition of billing; and (3) he was aware of arrangements where ambulance providers do not own or lease vehicles and are still able to bill for services to commercial payors. | Ex. 1 (Pozuelos Tr.) at 26:10-24; Ex. 40 (Wolfberg Tr.) at 22:1-6, 34:19-6, 35:22-36:3. |
| 33. Additionally, representatives from the same insurance companies interviewed by Pozuelos were called by the Department of Insurance in the civil trial and testified that: (1) there is no statute, regulation, or insurance company policy requiring a provider to own or lease a helicopter in order to bill for air ambulance services; and (2) using the billing code A0431 does contain any representation that the provider owns or leases the helicopter used in the air ambulance transport. | Ex. 24 (BSC Testimony) at 24:15-26:3, 46:14-47:3; Brownlow Decl., ¶ 21. |
| 34. Symons' billing manager was also deposed as part of the *qui tam* litigation and testified that: (1) claims submitted by Symons for ambulance services were prepared by coders, not Dr. Grange; and (2) by staffing helicopters with licensed | Brownlow Decl., ¶ 23. |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| medical professionals who responded and provided emergency medical care to patients, Symons was entitled to bill for air ambulance services irrespective of whether it owned or leased the helicopter. | |
| 35.  Dr. Grange's counsel in this action issued a subpoena to the San Bernardino County Superior Court and obtained a certified copy of Pozuelos's declaration filed in support of the warrant for the arrest of Dr. Grange, signed by Pozuelos. The arrest warrant declaration contains a certification stamp from the Superior Court clerk on the last page and a file stamp on the first page, thus indicating that this was the exact same document filed in the Superior Court on February 27, 2020. The declaration was filed as Defendants' Exhibit 30 in connection with the instant motion. | Behnke Decl., ¶ 37; Defendants' Ex. 30. |
| 36.  The declaration in support of arrest warrant signed by Pozuelos was intended to establish the existence of probable cause to arrest Dr. Grange. Pozuelos's declaration states that: "The said probably [sic] cause is exhibited in the official law enforcement reports prepared regarding the matter, a true copy of the pertinent parts of which is attached hereto and incorporated herein by reference." | Defendants' Ex. 30. |
| 37.  However, no reports or any other documents were attached to the declaration in support of arrest warrant. The declaration therefore lacks any showing of probable cause. | Defendants' Ex. 30. |
| 38.  There was no other document separately filed in the Superior Court that | Behnke Decl., ¶ 37. |

LARSON
LOS ANGELES

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| demonstrated the existence of probable cause to support the issuance of an arrest warrant for Dr. Grange. | |
| 39.  DDA Cantos electronically filed the criminal complaint against Dr. Grange on the morning of February 27, 2020. The only document filed or submitted by Cantos that day was the criminal complaint. As for the arrest warrant and the declaration in support of the arrest warrant, those documents were not filed electronically with the complaint but were instead physically walked over to court by the investigating officer, Pozuelos, to be presented to the judge for signature. | Ex. 1 (Pozuelos Tr.) at 9:3-8; Ex. 2 (Cantos Tr.) at 39:9-25. |
| 40.  As stated in Pozuelos's declaration in support of the arrest warrant, the declaration is supposed to contain a statement establishing the existence of probable cause. Cantos testified that this probable cause showing would consist of a brief summary of the case that is "one to two pages, up to ten pages" long. This summary demonstrating probable cause would not be prepared by Cantos or anyone with the SBDA but would instead be prepared by the investigating officer, Pozuelos. | Defendants' Ex. 30; Ex. 2 (Cantos Tr.) at 14:13-15:6. |
| 41.  On February 27, 2020, Pozuelos and DDA Hynds walked into the Superior Court. Because Hynds was not the prosecuting attorney but was just handling the 186.11 Motion for the asset freeze, the only documents Hynds brought with her to court were those related to the 186.11 Motion, such as the 186.11 Motion itself, a proposed order, a petition for criminal forfeiture and | Ex. 29 (Hynds Tr.) at 36:6-16, 37:1-9; 37:21-25. |

LARSON
LOS ANGELES

84
STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| "possibly other documents relating to lis pendens." Conversely, the documents related to the arrest warrant and the 1275.1 Motion, as well as Pozuelos's supporting declarations, were not prepared or handled by Hynds. Instead, those documents were walked into the Superior Court by Pozuelos. | |
| 42. Pozuelos testified that Hynds had a packet of various papers that she brought with her to court. This packet was not the "discovery package" or any other document establishing probable cause for the issuance of an arrest warrant. Had it actually been the probable cause showing, it would have only been "one to two pages, up to ten pages" long as explained by Cantos. Pozuelos, however, testified that the packet was "a few inches thick." Additionally, as explained in Additional Material Fact 41 above, Hynds testified that the only documents brought with her were the materials for the 186.11 Motion. | Ex. 1 (Pozuelos Tr.) at 50:6-14, 132:17-133:2; Ex. 2 (Cantos Tr.) at 14:13-15:6; Ex. 29 (Hynds Tr.) at 36:6-16, 37:1-9; 37:21-25. |
| 43. Pozuelos testified that, with respect to the packet of documents Hynds brought with her, the judge never even opened it or otherwise examined its contents. | Ex. 1 (Pozuelos Tr.) at 132:24-133:2. |
| 44. After leaving the judge's chambers, Pozuelos then went to the court clerk to file the arrest warrant materials. | Ex. 1 (Pozuelos Tr.) at 55:24-56:4. |
| 45. There was accordingly no reasonable basis for Pozuelos to believe that her declaration in support of the arrest warrant was supported by a showing of probable cause based on the facts that: (1) the declaration expressly stated that the evidence supporting probable cause | Defendants' Ex. 30; Ex. 2 (Cantos Tr.) at 39:9-25, 14:13-15:6; Ex. 29 (Hynds Tr.) at 36:6-16, 37:1-9; 37:21-25; Ex. 1 (Pozuelos Tr.) at 132:24-133:2, 55:24-56:4. |

LARSON
LOS ANGELES

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| was attached to the declaration itself, even though no such evidence was attached; (2) the only document that Cantos filed was the criminal complaint; (3) the document establishing probable cause was to be prepared by Pozuelos, not Cantos; (4) the probable cause showing would only consist of a brief summary of no more than ten pages whereas the documents Hynds brought with her were in a separate folder several inches thick; (5) the only documents Hynds brought with her were those related to the 186.11 Motion, not the arrest warrant; (6) the judge never opened or reviewed the contents of the packet Hynds had with her; and (7) Pozuelos personally filed the arrest warrant materials with the clerk and would have thus been aware that no probable cause showing was filed therewith. The arrest warrant was therefore not supported by any showing of probable cause. | |
| 46.  At the time Dr. Grange was arrested on February 27, 2020, Pozuelos knew that he was defending himself in the civil trial. Additionally, Pozuelos was actively monitoring the civil trial and knew Dr. Grange would be in court. In one email from February 25, 2020, shortly before Grange was arrested, Pozuelos wrote: "I just reviewed the court records from today and it shows court is scheduled again tomorrow at 10. I planned on scouting out the court to see if Grange shows up." | Ex. 1 (Pozuelos Tr.) at 8:13-16; Ex. 31. |
| 47.  Prior to Dr. Grange's arrest, Pozuelos was also aware that criminal charges | Ex. 28. |

86

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| would be filed as early as 2017. Pozuelos and her colleagues had initially planned on arresting Dr. Grange at that time. | |
| 48. In the weeks before Dr. Grange's arrest, Pozuelos was also involved in coordinating the timing of Dr. Grange's arrest, which Pozuelos and her colleagues knew would coincide with the civil trial. Pozuelos and the civil attorney, Neumeister—with whom Pozuelos was in constant contact—were both frequently asking Cantos for updates regarding the timing of the criminal case, as were Pozuelos's superiors. The frequent inquiries to Cantos regarding the timing of the criminal filing became so pervasive that Cantos indicated that he felt pressured by the Department of Insurance to file. | Ex. 1 (Pozuelos Tr.) at 12:15-14:10; Ex. 2 (Cantos Tr.) at 22:8-24; Ex. 12; Ex. 3; Ex. 4; Ramirez Decl., ¶ 11. |
| 49. On February 3, 2020—a week before Pozuelos claims she first found out about the criminal filing—Pozuelos's superior, Shawn Conner, sent an email to Lopez inquiring about the status of the criminal filing. According to Conner, DDA Cantos had already informed him the previous month that the case will be filed in February, the same month the *qui tam* trial was set to commence. Lopez responded to Conner that same day and stated that: "Last I spoke with Detective Pozuelos, San Bernardino county was close to a filing." The email communication also discusses the fact that the Department of Insurance was simultaneously handling the qui tam case. A week later, on February 10, 2020, Pozuelos was copied | Ex. 3; Ex. 4. |

LARSON
LOS ANGELES

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| on another email communication discussing the fact that the criminal filing would be imminent and further discussing the plan for executing the arrest of Dr. Grange. | |
| 50.  Pozuelos and Neumeister were also aware that the filing of the criminal case and the arrest of Dr. Grange would interfere with the civil trial. In a text message to a former colleague, Neumeister acknowledged that "the DA is going to blow this all up with a criminal filing soon." | Ex. 1 (Pozuelos Tr.) at 12:15-14:10; Ex. 15. |
| 51.  Pozuelos's declaration in support of the 1275.1 Motion requested that the court "place a hold on the release of [Dr. Grange] from custody." The 1275.1 Motion sought to "assure that [Dr. Grange] makes future court appearances." However, when asked whether she thought Dr. Grange was a flight risk, Pozuelos testified that she "wasn't certain." When asked if she had any evidence that Dr. Grange was a flight risk, Pozuelos admitted that she had "[n]o specific evidence" but then clarified that she had "seen an e-mail" indicating that "he would be leaving the country to go on vacation within the month." Pozuelos then admitted that the fact that Dr. Grange had plans to leave the country does not make him a flight risk. | Defendants' Ex. 32; Ex. 1 (Pozuelos Tr.) at 38:2-4, 39:23-41:1. |
| 52.  Given the lack of evidence demonstrating that Dr. Grange was a flight risk, higher ranking officials in the Department of Insurance did not mandate that Dr. Grange needed to be arrested. On February 10, 2020, | Ex. 4; Ex. 1 (Pozuelos Tr.) at 53:22-54:1. |

LARSON
LOS ANGELES

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| Pozuelos's captain, Vlad Mikulich, asked whether Dr. Grange needed to be arrested or if Dr. Grange should be permitted to self-surrender. However, Pozuelos's direct superior, Joe Lopez, responded: "I am all for arresting him when the warrant drops." But even once it was determined that Dr. Grange was arrested, Pozuelos's other supervisor, Katrina Blake, never suggested that the arrest needed to occur at the courthouse where Dr. Grange was attending the civil trial. Instead, Blake suggested that Dr. Grange should be arrested either "at work" or "on his way back to the US at the airport." Nevertheless, Pozuelos coordinated with Lopez to have Dr. Grange arrested as he was leaving the courthouse on February 27, 2020. | |
| 53. Neumeister, the Department of Insurance attorney handling the civil case, was in frequent communication with Pozuelos leading up to, and on the day of the arrest. Neumeister wanted to ensure that, once Dr. Grange was arrested, he would remain in custody so that he would not be able to testify in the civil trial, as he was set to do the next court day. Dr. Grange appeared for his arraignment on February 29, 2020, two days after the arrest. That same day, Neumeister emailed Pozuelos's superiors the following message: "Do you know what the result of the arraignment was? Hopefully remanded." | Ex. 32. |
| 54. By the time Dr. Grange was arrested, it was already apparent that the trial was going poorly for the Department of Insurance and that Symons and Dr. | Ex. 15; Ex. 24 (BSC Testimony) at 24:15-26:3, 46:14-47:3; Garcia Decl., ¶ 12. |

89

LARSON
LOS ANGELES

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| Grange would ultimately prevail. Even before the civil trial began, Neumeister acknowledged that his own witnesses—insurance company representatives—would not help the state's case, and he confided to a former colleague that some of those insurance company witnesses were "bad ones." Those same witnesses ultimately testified at the civil trial that: (1) there is no statute, regulation, or insurance company policy requiring a provider to own or lease a helicopter in order to bill for air ambulance services; and (2) using the billing code A0431 does contain any representation that the provider owns or leases the helicopter used in the air ambulance transport. | |
| 55. After Dr. Grange was arrested, Neumeister and other attorneys representing the Department of Insurance approached Dr. Grange's civil counsel and stated that they would arrange for the SBDA to drop the criminal charges against Dr. Grange if he would agree to accept liability in the civil trial and pay a monetary settlement. | Garcia Decl., ¶ 13-14. |
| 56. Neumeister then approached DDA Cantos and asked him if he would consider dismissing the criminal case if Dr. Grange agreed to settle the civil case. When DDA Cantos was asked during his deposition what he thought about the Department of Insurance's proposed settlement arrangement, DDA Cantos said: "it's unethical. It's just wrong. I mean I couldn't do that. I have an obligation. . . . [I]n my mind, it was | Ex. 2 (Cantos Tr.) at 24:7-25, 25:23-26:6. |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| using the criminal case as leverage in a civil case." Cantos then told Pozuelos that he refused to accept the arrangement proposed by the Department of Insurance, explaining that: "I needed to tell her it can't – it can't be done." | |
| 57. After the criminal case was filed, Pozuelos continued to have significant involvement and contacted each of the insurance company representatives she had previously interviewed. Pozuelos sent these representatives a list of questions asking for additional documents and information related to Symons' billing practices. | Ex. 36. |
| 58. The post-arrest investigation conducted by Pozuelos yielded additional exculpatory evidence demonstrating the propriety of Symons' billing practices. Among the questions Pozuelos asked to each insurer is whether the insurer has "a specific guideline, definition, or policy related to Ambulance Services." Pozuelos also asked each insurer to provide their "policies related to using CPT codes and HCPCS codes for billing of services." These policies, guidelines and definitions would have been critical evidence for Pozuelos to obtain *before* recommending that Dr. Grange be criminally charged. Such policies, guidelines and definitions would have revealed that: (1) there is no statute, regulation, or insurance company policy requiring a provider to own or lease a helicopter in order to bill for air ambulance services; and (2) using the billing code A0431 does contain any | Ex. 36; Ex. 24 (BSC Testimony) at 24:15-26:3, 46:14-47:3. |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| representation that the provider owns or leases the helicopter used in the air ambulance transport. | |
| 59. The SBDA ultimately dropped the charges against Dr. Grange in July 2021. The SBDA dropped the charges after it became evident that there was insufficient evidence to conclude that Dr. Grange had committed insurance fraud, as Pozuelos had alleged. On July 9, 2021, Pozuelos's captain sent her an email advising her that the SBDA would be dropping the charges. Pozuelos's captain explained: "they [the SBDA] just want to cut their losses and move on. . . they seem hesitant to proceed and don't seem to understand how to prosecute it." Pozuelos was not surprised by this decision. Pozuelos responded to her captain stating: "I figured this was going to happen."<br><br>Additionally, the civil attorney, Neumeister, produced his text messages in this action in response to a subpoena issued by Dr. Grange's counsel. Among the communications produced was a text message from Neumeister to the other civil attorney, Curtis Leavitt, sent on July 16, 2021. Neumeister tells Leavitt: "DA dropped the charges against Grange." Leavitt then responds: "Disappointing, but not surprising." | Ex. 37; Ex. 42. |
| 60. Dr. Grange is certified by the American Board of Emergency Medicine in Emergency Medical Services and Emergency Medicine. Symons Emergency Specialties, Inc. dba Symons Ambulance was incorporated in | Grange Decl., ¶ 2-3. |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| California in 1995. Symons is engaged in the business of providing emergency medical services, interfacility and critical care transport, and special event services, including medical care at mass gathering events. Symons operates throughout Southern California and in Bishop, California. Symons' corporate office is located in San Bernardino County, California. Since approximately 2010, Dr. Grange has been one of several shareholders and a member of the Board of Directors of Symons, which had nine directors at one point. Symons also employed between 100 and 200 employees during the relevant time period. During Between approximately 2010 and 2019, Dr. Grange also served as the President of Symons. | |
| 61. Between June 5 and 8, 2014, as it had done for many years, Symons provided medical staff and equipment to be on standby during an off-road race known as the "Baja 500." The Baja 500 took place in the Baja California, Mexico desert. The race promotors provided a helicopter and pilot for Symons to use for air rescue operations during the race. Symons equipped the helicopter with medical equipment and medical staff. | Grange Decl., ¶ 6. |
| 62. On June 7, 2014, Dr. Grange and a nurse from Symons (collectively, the "Symons personnel") responded to a request for emergency medical assistance after a driver, J.M., had gone off the race course, down an embankment, and crashed. The Symons personnel and their emergency medical | Grange Decl., ¶ 7. |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| equipment traveled by helicopter to the crash site in the desert of Baja California, Mexico.  There was no place to land near the crash site other than on the racecourse.  The helicopter landed on the racecourse, the Symons personnel got out, and the helicopter lifted off again to avoid being struck by race vehicles. | |
| 63.  Dr. Grange climbed down the embankment to the crash site.  J.M. was bleeding from his airway and had severe lower extremity pain.  Dr. Grange placed J.M. on a backboard and stabilized him for transport.  With the assistance of bystanders, the Symons personnel then lifted J.M. up the embankment and loaded him onto the helicopter. | Grange Decl., ¶ 8. |
| 64.  The Symons personnel treated J.M. on the helicopter during the flight to the airport at Ensenada, Mexico.  At the Ensenada airport, the Symons personnel transferred J.M. to another ambulance, operated by a different company, that then transported J.M. to San Diego, California. | Grange Decl., ¶ 9. |
| 65.  On or about July 9, 2014, an ambulance billing specialist prepared a Health Insurance Claim form that was submitted to J.M.'s health insurance carrier, Sistemas Medicos Nacionales S.A. de C.V. dba SIMNSA ("SIMNSA") for the services Symons provided to J.M. in Baja California, Mexico, on June 7, 2014.  Among other things, the claim sought payment for the air ambulance service Symons provided to J.M. | Grange Decl., ¶ 10. |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| 66. On May 18, 2016, while the *Symons v. SIMNSA* lawsuit was pending in San Diego County and unbeknownst to Dr. Grange or Symons, SIMNSA, as a Relator and on behalf of the State of California, filed a civil *qui tam* complaint against Symons and Dr. Grange in San Bernardino County Superior Court, Case No. CIVDS1607744 ("*qui tam* complaint" or "*qui tam* matter"). | Grange Decl., ¶ 11. |
| 67. The *qui tam* complaint alleged that bills Symons had submitted to insurance companies for air ambulance services were fraudulent because Symons did not own or lease the helicopters used in the transports. | Grange Decl., ¶ 4. |
| 68. Pozuelos did not attempt to interview Dr. Grange. | Grange Decl., ¶ 20. |
| 69. On or about February 19, 2020, a jury trial in the *qui tam* matter began in San Bernardino County Superior Court. I was represented by counsel and I also personally attended every day of the trial. | Grange Decl., ¶ 12. |
| 70. Dr. Grange had lived in Southern California since 1990. He had lived in the same home in Riverside County since 2017. He had attended trial every day and intended to attend the entire trial. He had also been deposed in the *qui tam* trial and to my understanding, produced documents to the government in relation to that case. He had also never been arrested or charged with any crime before. | Grange Decl., ¶ 14. |
| 71. Detective Pozuelos failed to take investigative steps that would have been expected of a reasonably prudent | Laser Decl., ¶ 2, Ex. 51. |

95

LARSON
LOS ANGELES

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Plaintiff's Additional Material Facts | Plaintiff's Supporting Evidence |
|---|---|
| investigator, and deliberately or recklessly omitted material and exculpatory information from her Investigative Report. | |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

**PLAINTIFF'S RESPONSE TO DEFENDANTS' CONCLUSIONS OF LAW**

| Defendant's Conclusion of Law | Plaintiff's Response |
|---|---|
| 1) The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 2 U.S.C. § 1983. Venue is appropriate in this District. | Undisputed. |
| 2.) The claims for relief in the First Amended Complaint are for damages pursuant to 42 U.S.C. § 1983. (FAC, Dkt. 14, Claims Two through Seven, ¶¶ 71-111.) | Undisputed. |
| 3.) Pursuant to Section 1983, a defendant must be acting under color of state law. 42 U.S.C. Sec. 1983. | Undisputed. |
| 4.) A defendant acts under color of state law "when he abuses the position given to him by the state. Thus, generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *Wang v. Toyed,* 944 F.2d 476, 479 (9th Cir. 1991), quoting *West v. Adkins,* 487 U.S. 42, 50 (1988). | Disputed. Defendant is also being sued in her individual capacity. (FAC ¶ 1.) |
| 5.) It is undisputed that Pozuelos was acting under color of state law. | Undisputed. |
| 6.) Pursuant to Section 1983, a defendant must also have violated the plaintiff's constitutional or other federally protected right. Section 1983. | Undisputed. |
| 7.) Grange alleges that Pozuelos violated his rights under the United States Constitution to be free from unreasonable seizure of his person and property pursuant to the Fourth Amendment (Claims Two and Four), excessive bail pursuant to the Eighth Amendment (Claim Three), fabrication of evidence and malicious prosecution pursuant to the Fourteenth Amendment (Claims Five and Six), and retaliation pursuant to the First Amendment (Claim Seven). (FAC, Dkt 14, | Undisputed. |

97

| Defendant's Conclusion of Law | Plaintiff's Response |
|---|---|
| Claims Two through Seven, ¶¶ 71-111.) | |
| 8.) With respect to Claim Two, for unreasonable seizure of person, the seizure of Grange's person was pursuant to an arrest warrant sought by the SBDA and issued by the Superior Court. Grange alleges that Pozuelos is liable because she engaged in judicial deception in submitting the results and recommendation of her criminal investigation to the SBDA, which then submitted them to the Superior Court. | Disputed. Dr. Grange alleges that Pozuelos engaged in judicial deception with regards to her declaration in support of the arrest warrant by fabricating evidence, omitting material exculpatory evidence, and failing to conduct a reasonable investigation that would have yielded exculpatory evidence. |
| 9.) To support a Section 1983 claim for judicial deception, a plaintiff must show that the defendant deliberately or recklessly made false statements or omissions that were material to the finding of probable cause. *Galbraith v. County of Santa Clara,* 307 F.3d 1119, 1126 (9th Cir. 2002). A plaintiff's showing of a deliberate falsehood or a reckless disregard of the truth must be substantial. *Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2009). "Omissions or misstatements resulting from negligence or good faith mistakes will not invalidate an affidavit which on its face establishes cause." *Ewing*, 588 F.3d at 1224. The court determines the materiality of alleged false statements or omissions. *KRL v. Moore*, 384 F.3d 1104, 1117 (9th Cir. 2004). | Disputed as incomplete.<br><br>To survive summary judgment, the plaintiff must 1) make a "substantial showing" of deliberate falsehood or reckless disregard for the truth and 2) establish that, but for the dishonesty, the challenged action would not have occurred. *Hervey v. Estes*, 65 F.3d 784, 788-789 (9th Cir.1995). If a plaintiff satisfies these requirements, "the matter should go to trial." *Id*.<br><br>"Judicial deception" consists of either "deliberate omission or affirmative misrepresentation." A statement can also be misleading if, although technically true, it has been so wrenched from its context that the judicial officer will not comprehend how it fits into the |

LARSON
LOS ANGELES

| Defendant's Conclusion of Law | Plaintiff's Response |
|---|---|
| | larger puzzle. *Scanlon v. Cnty. of Los Angeles*, 92 F.4th 781, 799 (9th Cir. 2024) |
| 10.) The uncontroverted facts submitted by Pozuelos in support of the Motion establish that Pozuelos did not make any false statements, or omit any exculpatory information, in her submissions to the SBDA. Accordingly, as a matter of law, Pozuelos did not engage in judicial deception, and is entitled to judgment on the Second Claim. | Disputed. Pozuelos made a number of false statements, including that Dr. Grange did not provide services billed for; that she spoke with people who had personally witnessed Dr. Grange commit the offenses alleged; and that Dr. Grange personally received $2,000,000 from the billed offenses. |
| 11.) The uncontroverted facts submitted by Pozuelos in support of the Motion establish that Pozuelos did not act with deliberation or recklessness with respect to any false statements or omitted exculpatory information. Accordingly, as a matter of law, Pozuelos did not engage in judicial deception, and is entitled to summary judgment on the Second Claim. | Disputed. Pozuelos admitted that she chose to "discount" certain statements and thus did not include their exculpatory statements in the declarations at issue. Pozuelos Decl. ¶¶ 17, 53, 64. |
| 12.) The uncontroverted facts submitted by Pozuelos in support of the Motion establish that none of the allegedly false statements, or omissions of exculpatory information, were material to the existence of probable cause for the arrest of Grange. Accordingly, as a matter of law, Pozuelos did not engage in judicial deception, and is entitled to summary judgment on the Second Claim. | Disputed. The false statements—that Symons and Dr. Grange did not provide the services when they really did—were material to negate the probable cause Pozuelos claimed. The same is true for the omitted and exculpatory information. |
| 13.) Even if conduct is found to violate a constitutional right, a state official also has qualified immunity if it was not well established by precedent, at the time, that such conduct would constitute a constitutional | Disputed as incomplete. The Ninth Circuit has held that "summary judgment on the ground |

LARSON
LOS ANGELES

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Defendant's Conclusion of Law | Plaintiff's Response |
|---|---|
| violation. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Ashcroft v. al-Kidd*, 562 U.S. 731 (2011). Once invoked, the burden is on the plaintiff to establish that the public official is *not* entitled to qualified immunity. *Smith v. City of Troy, Ohio*, 874 F. 3d 938 (6th Cir. 2017). | of qualified immunity is not appropriate once a plaintiff has made out a judicial deception claim." *Chism v. Washington State*, 661 F.3d 380, 386 (9th Cir. 2011). "[G]overnmental employees are not entitled to qualified immunity on judicial deception claims." *Id.* at 393. |
| 14.) In determining whether an official is entitled to qualified immunity, the court applies a two-part test: (1) was the defendant's conduct a violation of the plaintiff's constitutional rights; and (2) was there clearly established precedent at the time that the defendant's conduct would constitute a violation of the plaintiff's constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A plaintiff must satisfy *both* prongs to disprove qualified immunity. The court has discretion to decide which prong to address first. *Pearson v. Callahan,* 555 U.S. 223 (2009). Whether or not there was clearly established precedent is a question of law for the Court. *Elder v. Holloway*, 510 U.S. 510 (1994). | Disputed as incomplete. "Summary judgment [based] on qualified immunity is not proper unless the evidence permits only one reasonable conclusion." *Munger v. City of Glasgow Police Dep't* , 227 F.3d 1082, 1087 (9th Cir. 2000). *Ballentine v. Tucker*, 28 F.4th 54, 61 (9th Cir. 2022). Where conflicting inferences may be drawn from the facts, the case must go to the jury." *LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir.2000).<br><br>The Ninth Circuit has held that "summary judgment on the ground of qualified immunity is not appropriate once a plaintiff has made out a judicial deception claim." *Chism v. Washington State*, 661 F.3d 380, 386 (9th Cir. 2011). "[G]overnmental employees are not entitled to qualified immunity on judicial |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Defendant's Conclusion of Law | Plaintiff's Response |
|---|---|
| | deception claims." *Id.* at 393. |
| 15.) An investigating officer has qualified immunity from suit. *Malley,* 475 U.S. at 339-445. The standard is the "objective reasonableness" of the officer's conduct. *Id.* at 345. "Only when the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable… will the shield of immunity be lost." *Id.* at 344-45, citation omitted. "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Id.* at 341. "Defendants will not be immune if, on an objective basis, it is obvious no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Id.* at 341. This qualified immunity standard can be adjudicated by the court, as a matter of law, in order to "permit the resolution of insubstantial claims on summary judgment." *Id.* at 341. | Disputed as incomplete. "Summary judgment [based] on qualified immunity is not proper unless the evidence permits only one reasonable conclusion." *Munger v. City of Glasgow Police Dep't* , 227 F.3d 1082, 1087 (9th Cir. 2000). *Ballentine v. Tucker*, 28 F.4th 54, 61 (9th Cir. 2022). Where conflicting inferences may be drawn from the facts, the case must go to the jury." *LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir.2000). Ninth Circuit has held that "summary judgment on the ground of qualified immunity is not appropriate once a plaintiff has made out a judicial deception claim." *Chism v. Washington State*, 661 F.3d 380, 386 (9th Cir. 2011). "[G]overnmental employees are not entitled to qualified immunity on judicial deception claims." *Id.* at 393. |
| 16.) The uncontroverted facts submitted by Pozuelos in support of the Motion establish that Pozuelos belief in the existence of probable cause for the arrest of Grange was objectively reasonable. Her supervisor, the SBDA and the Superior Court all reviewed | Disputed. When the false statements and material omissions are factored into the analysis, there was no probable cause. If an officer submitted false statements, the court purges those statements |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Defendant's Conclusion of Law | Plaintiff's Response |
|---|---|
| and approved of her submissions. Grange has submitted no evidence which establishes that no reasonable law enforcement officer could have believed that probable cause existed. There was also no clear and specific precedent, at the time of Pozuelos' conduct, that would have advised her that the conduct would violate Grange's Constitutional right. Accordingly, Pozuelos is entitled to qualified immunity. | and determines whether what is left justifies issuance of the warrant. *See, e.g., Baldwin v. Placer County,* 418 F.3d 966, 971 (9th Cir.2005). If the officer omitted facts required to prevent technically true statements in the affidavit from being misleading, the court determines whether the affidavit, once corrected and supplemented, establishes probable cause. *See, e.g., Liston v. County of Riverside,* 120 F.3d 965, 973–74 (9th Cir.1997).<br><br>That Pozuelos' supervisor and the signing judge believed there was probable cause only shows the success of the judicial deception. |
| 17.) As a matter of law, Pozuelos and is entitled to summary judgment on the Second Claim for unreasonable seizure of person. | Disputed. |
| 18.) With respect to the Third Claim, for excessive bail, a plaintiff alleging that a law enforcement officer violated the excessive bail clause must prove that the defendant actually and proximately caused the imposition of an excessive bail amount. *Baker v. McCollan,* 443 U.S. 137, 142, (1979); *Galen v. County of Los Angeles*, 477 F.3d 652, 663 (9th Cir. 2007) ("*Galen*"). In California, bail determinations are made by a judicial officer, whose exercise of independent judgment in the course of official duties is a superseding cause that breaks any chain of causation linking the law | Disputed as incomplete.<br><br>The presumption of prosecutorial independence does not bar a subsequent section 1983 claim against state or local officials who improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Defendant's Conclusion of Law | Plaintiff's Response |
|---|---|
| enforcement officer to the bail determination. *Galen* at 663, citing *Hoffman v. Halden*, 268 F.2d 280, 296-97 (9th Cir. 1959) and *Walden v. Carmack*, 156 F.3d 861, 874 (8th Cir. 1998). A law enforcement officer can only be liable if he/she prevented the judicial officer from exercising his/her independent judgment. *Galen, supra* at 663-64. The law enforcement officer must have deliberately or recklessly misled the judicial officer, and that conduct must have been essential to the bail determination. *Id.* at 663-64 (granting summary judgment for law enforcement officers because there was no evidence that they deliberately or recklessly misled the judicial officer); *Collins v. Sacramento*, 2007 U.S. Dist. LEXIS 75231 (E. D. Cal. 2007) (same). | initiation of legal proceedings. *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004); See also 5 Witkin, Summary of Cal. Law, Torts § 418 (9th ed. 1998) ("One who procures a third person to institute a malicious prosecution is liable, just as if he instituted it himself.") |
| 19.) The uncontroverted facts submitted by Pozuelos in support of the Motion establish that she only submitted a declaration in support of the SBDA's Motion for a Bail Hearing, that probable cause existed for the bail hearing, and that none of the allegedly false statements, or omissions of exculpatory information, were material to the existence of probable cause for the bail hearing. Accordingly, as a matter of law, Pozuelos did not engage in judicial deception. | Disputed. The false statements—that Symons and Dr. Grange did not provide the services when they really did—were material to negate the probable cause Pozuelos claimed. The same is true for the omitted and exculpatory information. |
| 20.) Pozuelos is also entitled to qualified immunity because her belief in the existence of probable cause for the bail hearing was objectively reasonable, and there was no clear and specific precedent at the time that her conduct would violate Grange's constitutional right. | Disputed.<br><br>The Ninth Circuit has held that "summary judgment on the ground of qualified immunity is not appropriate once a plaintiff has made out a judicial deception claim." *Chism v. Washington* |

LARSON
LOS ANGELES

103
STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Defendant's Conclusion of Law | Plaintiff's Response |
|---|---|
| | *State*, 661 F.3d 380, 386 (9th Cir. 2011). "[G]overnmental employees are not entitled to qualified immunity on judicial deception claims." *Id.* at 393. |
| 21.) Accordingly, as a matter of law, Pozuelos is entitled to summary judgment on the Third Claim for excessive bail. | Disputed. |
| 22.) With respect to the Fourth Claim, for unreasonable seizure of property, Grange must prove Pozuelos engaged in judicial deception. *Galbraith*, 307 F.3d at 1126. The proof of a deliberate falsehood or a reckless disregard of the truth must be substantial, and negligent conduct will not suffice. *Ewing,* 588 F.3d at 1224. The materiality of any alleged false statement or omission is determined by this Court, as a matter of law. *KRL*, 384 F.3d at 1117. | Disputed as incomplete.

To survive summary judgment, the plaintiff must 1) make a "substantial showing" of deliberate falsehood or reckless disregard for the truth and 2) establish that, but for the dishonesty, the challenged action would not have occurred. *Hervey v. Estes*, 65 F.3d 784, 788-789 (9th Cir.1995). If a plaintiff satisfies these requirements, "the matter should go to trial." *Id*.

"Judicial deception" consists of either "deliberate omission or affirmative misrepresentation." A statement can also be misleading if, although technically true, it has been so wrenched from its context that the judicial officer will not comprehend how it fits into the larger puzzle. *Scanlon v. Cnty. of Los Angeles*, 92 F.4th 781, 799 (9th Cir. 2024) |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Defendant's Conclusion of Law | Plaintiff's Response |
|---|---|
| 23.) The uncontroverted facts submitted by Pozuelos in support of the Motion establish that she only submitted a declaration in support of the SBDA's Application for a Freeze Order, that probable cause existed for the freeze order, and that none of the allegedly false statements, or omissions of exculpatory information, were material to the existence of probable cause for the freeze order. Accordingly, as a matter of law, Pozuelos did not engage in judicial deception. | Disputed.<br><br>The false statements—that Symons and Dr. Grange did not provide the services when they really did—were material to negate the probable cause Pozuelos claimed. The same is true for the omitted and exculpatory information. |
| 24.) Pozuelos is also entitled to qualified immunity because her belief in the existence of probable cause for the freeze order was objectively reasonable, and there was no clear and specific precedent at the time that her conduct would violate Grange's constitutional right. | Disputed.<br><br>The Ninth Circuit has held that "summary judgment on the ground of qualified immunity is not appropriate once a plaintiff has made out a judicial deception claim." *Chism v. Washington State*, 661 F.3d 380, 386 (9th Cir. 2011). "[G]overnmental employees are not entitled to qualified immunity on judicial deception claims." *Id.* at 393. |
| 25.) Accordingly, as a matter of law, Pozuelos is entitled to summary judgment on the Fourth Claim for unreasonable seizure of property. | Disputed. |
| 26.) With respect to the Fifth Claim, for deliberate fabrication of evidence and withholding of material information, there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) ("*Devereaux*"). In order to | Disputed as incomplete.<br><br>If there is direct evidence of deliberate fabrication, a plaintiff need not prove that the officer knew or should have known that he was innocent. *Spencer v. Peters*, 857 F.3d 789, 799 (9th Cir. 2017). |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Defendant's Conclusion of Law | Plaintiff's Response |
|---|---|
| prevail on a Section 1983 claim based upon a deliberate fabrication of evidence, a plaintiff must establish that: "(1) Defendants continued their investigation of [the plaintiff] despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." *Id.* at 1076. | |
| 27.) The uncontroverted facts submitted by Pozuelos in support of the Motion establish that Pozuelos did not deliberately or recklessly make any false statements, or omit any exculpatory information, in her submissions to the SBDA, that were material to the existence of probable cause. Accordingly, as a matter of law, Pozuelos did not engage in judicial deception. | Disputed.<br><br>Pozuelos made a number of false and fabricated statements, including that Dr. Grange did not provide services billed for; that she spoke with people who had personally witnessed Dr. Grange commit the offenses alleged; and that Dr. Grange personally received $2,000,000 from the billed offenses. |
| 28.) Pozuelos is also entitled to qualified immunity because her belief in the existence of probable cause was objectively reasonable, and there was no clear and specific precedent at the time that her conduct would violate Grange's constitutional right. | Disputed. There is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government. *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) |
| 29.) Accordingly, as a matter of law, Pozuelos is entitled to summary judgment on the Fifth Claim for deliberate fabrication of evidence or withholding of material information. | Disputed. |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Defendant's Conclusion of Law | Plaintiff's Response |
|---|---|
| 30.) With respect to the Sixth Claim, for malicious prosecution, a claim for malicious prosecution is cognizable under Section 1983 as a violation of the Fourteenth Amendment right to substantive due process of law. To establish malicious prosecution, a plaintiff must prove that the defendant "prosecuted him with malice, and without probable cause and … did so for the purpose of denying him equal protection or another specific constitutional right." *Lacey v. Maricopa County*, 693 F.3d 896, 919 (9th Cir. 2012); *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995). | Undisputed. |
| 31.) The uncontroverted facts submitted by Pozuelos in support of the Motion establish that Pozuelos did not deliberately or recklessly make any false statements, or omit any exculpatory information, in her submissions to the SBDA, that were material to the existence of probable cause. Accordingly, as a matter of law, Pozuelos did not engage in judicial deception. | Disputed.<br><br>Pozuelos made a number of false and fabricated statements, including that Dr. Grange did not provide services billed for; that she spoke with people who had personally witnessed Dr. Grange commit the offenses alleged; and that Dr. Grange personally received $2,000,000 from the billed offenses.<br><br>Pozuelos also admitted that she chose to "discount" certain statements and thus did not include their exculpatory statements in the declarations at issue. Pozuelos Decl. ¶¶ 17, 53, 64. |
| 32.) Pozuelos is also entitled to qualified immunity because her belief in the existence of probable cause was objectively reasonable, | Disputed.<br><br>There is a clearly established right |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

| Defendant's Conclusion of Law | Plaintiff's Response |
|---|---|
| and there was no clear and specific precedent at the time that her conduct would violate Grange's constitutional right. | to be free from malicious prosecution. *Thompson v. Clark*, 142 S. Ct. 1332, 1337 (2022)<br><br>Pozuelos' conduct was not objectively reasonable. "[G]overnmental employees are not entitled to qualified immunity on judicial deception claims." *Chism v. Washington State*, 661 F.3d 380, 386 (9th Cir. 2011). |
| 33.) Accordingly, as a matter of law, Pozuelos is entitled to summary judgment on the Sixth Claim for malicious prosecution. | Disputed. |
| 34.) With respect to the Seventh Claim, for retaliation, a person who suffers retaliation for speech protected by the First Amendment can seek relief under 42 U.S.C. section 1983. *Bennett v. Hendrix*, 423 F.3d 1247, 1249-50 (11th Cir. 2005). The person must show, among other things, that there was a causal connection between the retaliatory action and the protected speech. *Smith v. Mosely*, 532 F.3d 1270, 1276 (11th Cir. 2008). To meet this element, "a plaintiff must establish a causal connection between the government's retaliatory animus and the plaintiff's subsequent injury." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) ("*Nieves*"). In cases involving criminal charges, if there was probable cause for bringing them, the retaliation claim will usually fail as a matter of law. *Id.* at 1728. *See also Hartman v. Moore*, 547 U.S. 250, 259-61 (2006) and *O'Boyle v. Commerce Group Inc.,* 2023 U.S. App. Lexis 6665, 2023 WL 2579134 (11th Cir 2023). | Disputed as incomplete.<br><br>The existence of probable cause is not an absolute bar to a First Amendment retaliatory arrest claim. *Lozman v. City of Riviera Beach, Fla.*, 585 U.S. 87 (2018). |

LARSON
LOS ANGELES

108
STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

| Defendant's Conclusion of Law | Plaintiff's Response |
|---|---|
| 35.) The uncontroverted facts submitted by Pozuelos in support of the Motion establish that there was no causal connection between a retaliatory animus on the part of Pozuelos and injury to Grange. Pozuelos had no such animus, and Grange was not prevented from testifying in the civil action. Pozuelos also engaged in no conduct designed to prevent Grange from testifying. | Disputed. The timing of the arrest the court-day before Dr. Grange's testimony, Pozuelos' admitted discussions with CDI's civil lawyer, the CDI civil lawyer's attempt to settle the criminal case and *qui tam* case together; all coupled with Pozuelos' fabricated statements in her declarations support showing a causal connection. |
| 36.) Pozuelos is also entitled to qualified immunity because there was no clear and specific precedent at the time that her conduct would violate Grange's constitutional right. | Disputed. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) [clearly established right that government officials are prohibited from subjecting an individual to retaliatory actions for engaging in First Amendment activities]. |
| 37.) Accordingly, as a matter of law, Pozuelos is entitled to summary judgment on the Seventh Claim for retaliation. | Disputed. |
| 38.) An award of punitive damages in a Section 1983 case requires proof that the officer acted with reckless disregard or callous indifference to the plaintiff's Constitutional rights. *Smith v. Wade*, 461 U.S. 30 (1983). | Undisputed. |
| 39.) There is no evidence that either Pozuelos acted with reckless disregard or callous indifference to Plaintiff's constitutional rights. | Disputed. |
| 40.) For the foregoing reasons, Pozuelos is entitled to judgment as a matter of law on the First Amended Complaint pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. | Disputed. |

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

1

2

3    Dated:  March 18, 2024          LARSON LLP

4

5

6                                   By:   /s/ Jerry A. Behnke
                                         _____
7                                        Stephen G. Larson
                                         Jerry A. Behnke
8                                        Daniel R. Lahana
                                   Attorneys for Plaintiff Jeff T. Grange, M.D.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of March, 2024, I electronically filed the foregoing **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF JEFF T. GRANGE, M.D.'S OPPOSITION TO POZUELOS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Thomas M. McMahon          Attorney for Defendants
Deputy Attorney General     Lori Pozuelos and Jason Wessely
                            Thomas.mcmahon@doj.ca.gov


                            /s/ Yvonne M. Gutierrez
                            Yvonne M. Gutierrez

STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT LORI POZUELOS'S MOTION FOR SUMMARY JUDGMENT

LARSON
LOS ANGELES