# EXHIBIT 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION


JEFF T. GRANGE, M.D.,              )
                                   )
          Plaintiff,               )
                                   )   Case No. 5:20-cv-
     vs.                           )   00340 DSF(AGRx)
                                   )
LORI POZUELOS, in her individual)
and official capacity; JASON       )
WESSELY, in his individual and     )
official capacity; CALIFORNIA      )
DEPARTMENT OF INSURANCE; and       )
DOES 1-10, individuals,            )
                                   )
               Defendants.         )
_____)


VIDEOTAPED DEPOSITION OF LORI POZUELOS

Los Angeles, California

November 3, 2023


Reported by:

Michael A. Solorzano

RPR, CRR, CSR No. 14230

JOB NO. 92097

**LORI POZUELOS**

November 03, 2023

```
 1                    UNITED STATES DISTRICT COURT

 2           CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4     JEFF T. GRANGE, M.D.,          )
                                      )
 5              Plaintiff,            )
                                      )  Case No. 5:20-cv-
 6       vs.                          )  00340 DSF(AGRx)
                                      )
 7     LORI POZUELOS, in her individual)
       and official capacity; JASON   )
 8     WESSELY, in his individual and )
       official capacity; CALIFORNIA  )
 9     DEPARTMENT OF INSURANCE; and   )
       DOES 1-10, individuals,        )
10                                    )
                      Defendants.     )
11     _____)

12

13

14

15              THE VIDEOTAPED DEPOSITION OF LORI POZUELOS,

16     taken at 555 South Flower Street, 30th Floor, Los

17     Angeles, California, beginning at 10:07 a.m., and ending

18     at 3:13 p.m., on Friday, November 3, 2023, before

19     Michael A. Solorzano, Certified Shorthand Reporter, in

20     and for the State of California.

21

22

23

24

25
```

**LORI POZUELOS**

**November 03, 2023**

```
 1     APPEARANCES:

 2     For the Plaintiff:

 3              LARSON LLP
                BY:   JERRY A. BEHNKE, ESQ.
 4                    DANIEL R. LAHANA, ESQ.
                      BENJAMIN FALSTEIN, ESQ. (via Zoom)
 5              555 South Flower Street
                30th Floor
 6              Los Angeles, California 90071
                Telephone:  213.436.4888
 7              jbehnke@larsonllp.com
                dlahana@larsonllp.com
 8              bfalstein@larsonllp.com

 9

10     For the Defendants Lori Pozuelos and Jason Wessely,
       individually and in their official capacity:
11              CAAG - OFFICE OF THE ATTORNEY GENERAL
                BY:   THOMAS M. MCMAHON, ESQ.
12              300 South Spring Street
                Room 1702
13              Los Angeles, California 90013
                Telephone:  213.269.6616
14              thomas.mcmahon@doi.ca.gov

15     For the California Department of Insurance:

16              CALIFORNIA DEPARTMENT OF INSURANCE
                BY:   CHERIE EDSON, ESQ. (via Zoom)
17              1901 Harrison Street
                6th Floor
18              Oakland, California 94612
                Telephone:  415.538.4462
19              cherie.edson@insurance.ca.gov

20     Also Present:

21              Sam Waguespack, Videographer

22

23

24

25
```

LORI POZUELOS

**November 03, 2023**

```
1                            INDEX

2    Witness:  Lori Pozuelos

3

4    EXAMINATION                                    PAGE

5    By Mr. Behnke                              6, 132

6    By Mr. McMahon                                 129

7

8

9                          EXHIBITS

10   EXHIBIT                                       PAGE

11   Exhibit 1    Declaration in Support of Arrest Warrant    43
                  and/or Misdemeanor Pretrial Confinement
12
     Exhibit 2    Declaration in Support of Arrest Warrant    43
13                and/or Felony Pretrial Confinement

14   Exhibit 3    Ex Parte Motion for Examination of Bail     56
                  Under Penal Code Section 1275.1
15
     Exhibit 4    Declaration of Lori Pozuelos in Support of  75
16                Temporary Restraining Order and Preliminary
                  Injunction
17
     Exhibit 5    E-mail chain between Lori Pozuelos and Eric 80
18                Hood

19   Exhibit 6    E-mail exchange with John Martella          83

20   Exhibit 7    Two e-mails from Thomas Perez               88

21   Exhibit 8    Health Insurance Claim Form                 95

22   Exhibit 9    Handwritten notes                          115

23   Exhibit 10   Notes from Lance Cantos                    119

24   Exhibit 11   Warrant of Arrest for Jeff Grange          125

25
```

**LORI POZUELOS**

```
 1              Friday, November 3, 2023, 10:07 a.m.
 2                   Los Angeles, California
 3
 4          THE VIDEOGRAPHER:  We are on the record.
 5     This is the beginning of Media Number 1 in the
 6     deposition of Lori Pozuelos in the matter of Jeff T.
 7     Grange, MD, versus Lori Pozuelos, et al., Case
 8     Number 5:20-cv-00340DSF(AGRx) held at 555 South
 9     Flower Street, Los Angeles, California 90071.  This
10     deposition is being taken on behalf of the plaintiff
11     on November 3rd, 2023, at 10:07 a.m. Pacific
12     daylight time.  The court reporter is
13     Michael Solorzano.  I'm Sam Waguespack, the
14     videographer, on behalf of First Legal Depositions
15     located in Los Angeles, California.  This deposition
16     is being videotaped at all times unless specified to
17     go off the video record.
18          Will all present please identify themselves
19     beginning with the noticing attorney.
20          MR. BEHNKE:  Jerry Behnke from Larson LLP
21     for plaintiff.
22          MR. LAHANA:  Daniel Lahana with Larson LLP
23     for plaintiff.
24          MR. GRANGE:  Jeff Grange.
25          MR. MCMAHON:  And Thomas McMahon, deputy
```

LORI POZUELOS

November 03, 2023

1       attorney general on behalf of the defendant, the

2       witness.

3                    THE WITNESS:  Detective Lori Pozuelos --

4                    MS. EDSON:  I'm sorry.  Good morning.

5       Cherie Edson with the California

6       Department of Insurance appearing via Zoom.

7                    THE WITNESS:  Detective Lori Pozuelos with

8       the California Department of Insurance.

9                    THE VIDEOGRAPHER:  And we have a Mr. Ben

10      Falstein.

11                   Will the court reporter please swear in the

12      witness.

13

14                           LORI POZUELOS,

15      the witness herein, having been first duly sworn,

16      was examined and testified as follows:

17

18                              EXAMINATION

19      BY MR. BEHNKE:

20         Q.   If you could start by stating and spelling

21      your name for the record.

22         A.   Lori Pozuelos, L-o-r-i, P-o-z-u-e-l-o-s.

23         Q.   Do you understand that you're providing

24      testimony today under oath?

25         A.   I do.

LORI POZUELOS

November 03, 2023

1        Q.   So you understand that you have the same

2    obligation to tell the truth today as you would if

3    we were in trial in front of a judge; correct?

4        A.   I do.

5        Q.   Did you do anything to prepare for your

6    deposition today?

7        A.   Yes, I did.

8        Q.   What did you do?

9        A.   I reviewed my reports and exhibits as part

10   of the case.

11       Q.   Did you speak to anybody to prepare for

12   your deposition other than your counsel?

13       A.   No.

14       Q.   The filing of the criminal case and arrest

15   of Dr. Grange took place on February 27th, 2020;

16   correct?

17       A.   Correct.

18       Q.   And that was in the middle of the civil qui

19   tam trial that was ongoing involving the

20   Department of Insurance; correct?

21            MR. MCMAHON:  Object to the form.  Vague.

22            THE WITNESS:  Correct.

23   BY MR. BEHNKE:

24       Q.   And whose idea was it to execute the arrest

25   of Dr. Grange in the middle of the civil trial?

**LORI POZUELOS**

**November 03, 2023**

1      A.   It was discussed with my supervision and

2    the district attorney's office.

3      Q.   Who in your supervision did you discuss

4    this with?

5      A.   My sergeant, Joe Lopez.

6      Q.   Anyone else?

7      A.   No.

8      Q.   Who in the district attorney's office did

9    you talk to?

10      A.   Attorney Lance Cantos and attorney Rebeca

11    Hynds.

12      Q.   Did you discuss -- first with Joe Lopez.

13           Did you discuss with Mr. Lopez the fact

14    that the civil trial was ongoing at the time of the

15    planned arrest?

16      A.   Yes.

17      Q.   And was there any concern by either you or

18    Mr. Lopez about the fact that the civil trial was

19    going on?

20      A.   No.

21      Q.   Did you discuss with Mr. Lopez whether or

22    not executing the arrest in the middle of the civil

23    trial would have any effect on the civil trial?

24      A.   Not that I recall.

25      Q.   Your investigation by that point had been

**LORI POZUELOS**

**November 03, 2023**

```
1          ongoing for more than three years; correct?
2          A.   Correct.
3               Q.   So how did it come about that on that
4          particular day the arrest would take place?
5               A.   We were contacted by the district
6          attorney's office that morning letting us know that
7          the case had been filed and the arrest warrant would
8          be issued.
9               Q.   That was the morning of February 27th?
10         A.   Correct.
11              Q.   Did you speak to the district attorney's
12         office prior to the morning of February 27th about
13         getting the case filed?
14         A.   Yes.
15              Q.   You had actually submitted your case to the
16         district attorney's office for filing some years
17         prior, hadn't you?
18         A.   Correct.
19              Q.   And why was it not filed at that time, to
20         your knowledge?
21              MR. MCMAHON:  Object to the form.  Calls
22         for speculation.
23              THE WITNESS:  I don't know.
24         BY MR. BEHNKE:
25              Q.   Did the district attorney say anything to
```

LORI POZUELOS

November 03, 2023

```
1    you about why it was not filed when you initially
2    submitted it?
3         A.   They had just advised me they were
4    reviewing my case and the information that I
5    provided to them.
6         Q.   Do you recall when you first submitted your
7    case to the district attorney's office?
8         A.   Yes.
9         Q.   When?
10        A.   In November of 2017.
11        Q.   When you submitted the case to the district
12   attorney in November 2017, did you feel it was ready
13   for filing at that point?
14        A.   No.
15        Q.   Why did you submit it to the DA's office?
16        A.   Because I had done -- submitted what I had
17   initially, but I had also done search warrants for
18   e-mail records and I needed to get through those
19   completely, which I later turned in a report for
20   those records.
21        Q.   When did you do that?
22        A.   In 2018.  I believe June 2018.
23        Q.   When you submitted it -- when you submitted
24   it to the district attorney in June 2018, did you
25   request that they file charges at that point?
```

**LORI POZUELOS**

**November 03, 2023**

```
1              A.    Yes.

2              Q.    Did they tell you why they did not file

3       charges at that time?

4              A.    Only that they were reviewing all the

5       records that I provided.

6              Q.    Moving back forward to February 2020, you

7       were aware when the civil trial started; correct?

8              A.    Yes.

9              MR. MCMAHON:  Object to the form.  Vague as

10      to time.

11             THE WITNESS:  Yes.

12      BY MR. BEHNKE:

13             Q.    Do you recall when the civil trial began?

14             A.    The exact date?

15             Q.    Yes.

16             A.    No.

17             Q.    How did you learn that the civil trial had

18      started?

19             A.    Through court records.

20             Q.    So were you just monitoring the case, or

21      how did you learn through court records?

22             MR. MCMAHON:  Object to the form.

23             THE WITNESS:  I was advised by the civil

24      attorney with the Department of Insurance that the

25      case would be going to trial in February sometime.
```

**LORI POZUELOS**

**November 03, 2023**

1          So I had looked at the records on the court.

2       BY MR. BEHNKE:

3              Q.   Was that Mitch Neumeister?

4              A.   Yes.

5              Q.   When did he tell you that the trial was

6       expected to start in February?

7              A.   I don't recall the exact date.

8              Q.   Do you recall about how far before trial he

9       told you that?

10             A.   Either the end of December 2019 or January

11      2020.

12             Q.   You also checked the court records and

13      verified when the trial start date was?

14             A.   Yes.

15             Q.   Did you have any conversations with either

16      Lance Cantos or Rebeca Hynds about the fact that the

17      civil trial was starting?

18             A.   Yes.

19             Q.   When did you first talk to them about the

20      fact that the civil trial was starting?

21             A.   Probably around the same time, December

22      2019 to January 2020.

23             Q.   Do you recall whether you spoke to

24      Mr. Cantos, Ms. Hynds, or both?

25             A.   Both.

**LORI POZUELOS**

**November 03, 2023**

```
 1          Q.   When you spoke to them about the civil
 2     trial starting, what did you tell them?
 3          A.   I told them that I was advised that the
 4     civil trial was starting.
 5          Q.   Did you tell them when?
 6          A.   Yes.
 7          Q.   When the civil trial was starting?
 8          A.   Yes.
 9          Q.   And what did they say?
10          A.   Just -- I just made them aware of it 'cause
11     there was some questions about the criminal case
12     versus the civil case.
13          Q.   What do you mean there were questions about
14     the criminal case versus the civil case?
15          A.   I was contacted by another attorney with
16     our department questioning if criminal charges were
17     going to be filed.
18          Q.   You say "another attorney."
19               You mean someone other than Mr. Neumeister?
20          A.   Correct.
21          Q.   Who was that attorney?
22          A.   Scott McNamara.
23          Q.   When did he contact you?
24          A.   At the end of December 2019.
25          Q.   And he asked you if criminal charges were
```

**LORI POZUELOS**

**November 03, 2023**

```
 1        going to be filed?
 2             A.   Correct.
 3             Q.   Did he say anything else?
 4             A.   They were trying to determine if they were
 5        going to go with the civil case; so along with that
 6        call was our deputy commissioner George Mueller,
 7        both of them asking me if the civil case -- excuse
 8        me -- the criminal case was going to be filed
 9        because they were determining if they were going to
10        move forward with the civil case.
11             Q.   When they asked you whether criminal
12        charges were going to be filed, what did you say?
13             A.   That I didn't know.
14             Q.   They indicated or -- not they.
15                  Mr. McNamara indicated that they were
16        deciding whether or not to proceed with the civil
17        trial?
18             A.   Correct.
19             Q.   Did he say why?
20             A.   They had stated that if the criminal
21        charges were going to be filed that they'd have to
22        decide if they'd move forward with the civil case.
23             Q.   Did he say why they would have to make that
24        decision?
25             A.   No.
```

**LORI POZUELOS**

**November 03, 2023**

1      Q.   Did you have any other discussion with

2   Mr. McNamara during that conversation about the

3   civil and criminal case?

4      A.   No.

5      Q.   Did you have any conversations with

6   Mr. McNamara after that?

7      A.   Just an e-mail to him.

8      Q.   What was that e-mail?

9      A.   It was letting him know that the district

10  attorney stated that they were working on the

11  criminal filing documents.

12     Q.   Do you recall when you sent that e-mail?

13     A.   Mid January 2020.

14     Q.   Did he respond to you?  Mr. McNamara?

15     A.   He just thanked me for providing the

16  update.

17     Q.   When you e-mailed Mr. McNamara in January

18  2020 to let him know that the district attorney's

19  office was working on the criminal filing, how did

20  you know that the district attorney was working on

21  it?

22     A.   From an update from the district attorney's

23  office.

24     Q.   Was that by telephone or by e-mail?

25     A.   I don't recall.

LORI POZUELOS
November 03, 2023

```
 1          Q.   Who gave you that update?
 2          A.   I believe it was my captain at the time.
 3          Q.   You didn't receive the update directly from
 4     the district attorney?
 5          A.   No.
 6          Q.   To your knowledge at that time, was your
 7     captain also in communication with the DA's
 8     office?
 9          A.   Yes.
10          Q.   Do you know what the substance of those
11     communications were between your captain and the
12     DA?
13          MR. MCMAHON:  Objection.  Calls for
14     speculation.
15          THE WITNESS:  It was the -- my office
16     communicated with the DA's office to get a status on
17     the criminal filing for this case.
18     BY MR. BEHNKE:
19          Q.   Was your office encouraging the district
20     attorney to file?
21          A.   I don't know.
22          Q.   Did you have any communications with Mitch
23     Neumeister during that December 2019/January 2020
24     time frame?
25          A.   I don't remember speaking specifically to
```

**LORI POZUELOS**

November 03, 2023

```
 1        him.
 2              Q.   During December 2019 and January 2020 how
 3        many times did you have contact with the district
 4        attorney's office?
 5              A.   I don't know how many times.
 6              Q.   Were you in regular communication during
 7        that time?
 8                   MR. MCMAHON:  Object to the form.  Vague.
 9                   THE WITNESS:  Yes.
10        BY MR. BEHNKE:
11              Q.   Approximately how often do you speak to
12        them?
13              A.   If I had to approximate --
14              Q.   Yes.
15              A.   -- I would say at least once a week.
16              Q.   Prior to the December 2019/January 2020
17        time frame, how often were you in contact with the
18        DA's office about this case?
19                   MR. MCMAHON:  Object to the form.  Vague.
20                   THE WITNESS:  Just on a regular basis.  I
21        couldn't give a number to it.
22        BY MR. BEHNKE:
23              Q.   Would you say it was even before that
24        period a weekly basis?
25              A.   Maybe weekly or biweekly.
```

**LORI POZUELOS**

**November 03, 2023**

1      Q.   During any of those conversations with the
2      district attorney's office focused on, again,
3      December 2019/January 2020 time frame, did you talk
4      to them about the civil case?
5      **A.   Yes.**
6      Q.   Approximately how many times did the civil
7      case come up?
8      **A.   I don't recall.**
9      Q.   What was the substance of the discussion
10     you had with the DA's office about the civil case?
11     **A.   I was letting him, Lance Cantos, know that**
12     **I was contacted by the deputy commissioner and the**
13     **attorneys asking if there was going to be a criminal**
14     **filing.**
15     Q.   And how did -- you said that was with Lance
16     Cantos?
17     **A.   Correct.**
18     Q.   And how did Mr. Cantos respond?
19     **A.   He just stated he was still processing the**
20     **case.**
21     Q.   Did that conversation happen before the
22     civil trial had actually started?
23     **A.   Correct.**
24     Q.   Other than saying he was still processing
25     the case, did Mr. Cantos say anything else?

LORI POZUELOS

November 03, 2023

```
1          A.   He had stated we really can't discuss a lot
2     with the civil case because we were two separate
3     cases, and he would base his filing on the civil
4     case.
5          Q.   So you had made him aware at that point
6     that the civil case was going to be going forward
7     soon?
8          A.   Yes.
9          Q.   Other than saying that he wasn't going to
10    base his filing decision on the civil case, did he
11    say anything else about the civil case?
12         A.   No, not that I recall.
13         Q.   Did any of your supervisors at
14    Department of Insurance express to you any concern
15    about the civil case and criminal case proceeding at
16    the same time?
17         A.   Not that I recall.
18         Q.   And did anyone in the district attorney's
19    office express any concern about that?
20         A.   Not that I recall.
21         Q.   When the civil trial actually started, did
22    you go to court during the civil trial at all?
23         A.   No.
24         Q.   You never attended the civil trial?
25         A.   No.
```

LORI POZUELOS

November 03, 2023

1        Q.   Did you send an e-mail to the district

2    attorney's office letting them know that you were

3    scoping out the civil case?

4        **A.   We had gone to the outside of the**

5    **courthouse because we were trying to determine if**

6    **that's where we were going to be doing the arrest,**

7    **and we did do surveillance to see if Dr. Grange was**

8    **there, his vehicle.**

9        Q.   So when you referred to scoping it out, I

10   believe, was the language you used, you were

11   referring to the outside of the courthouse?

12       **A.   Correct.**

13       Q.   Did you ever go inside the courthouse to

14   verify if Dr. Grange was present?

15       **A.   No.**

16       Q.   While the civil case was actually -- strike

17   that.

18            While the civil trial was actually

19   proceeding, did you have any correspondence with

20   Mitch Neumeister?

21       **A.   No.**

22       Q.   Did you have any correspondence with

23   Mr. Levitt, the private attorney that was

24   prosecuting the civil case?

25       **A.   You mean during the civil trial?**

**LORI POZUELOS**

November 03, 2023

1          Q.   During the trial.

2          **A.   No.**

3          Q.   You had had communication with Mr. Levitt

4     before the civil trial; correct?

5          **A.   Yes.**

6          Q.   When did you first meet Mr. Levitt?

7          **A.   I never met Mr. Levitt.**

8          Q.   How did you have contact with him?

9          **A.   There was some confusion with the insurance**

10    **company he was representing on some documents that I**

11    **had requested, and the insurance company referred my**

12    **request for documents to Mr. Levitt.**

13         Q.   Do you recall about when that happened?

14         **A.   No, I don't.**

15         Q.   Is it fair to say that was likely more than

16    a year or two before the civil trial started?

17         **A.   I don't remember.**

18         Q.   Did you communicate with Mr. Levitt by

19    e-mail or by phone regarding these documents?

20         **A.   I believe e-mail, and we may have spoken on**

21    **the phone once.**

22         Q.   Other than corresponding with Mr. Levitt

23    about the insurance documents you were trying to

24    get, did you have any other contact with

25    Mr. Levitt?

**LORI POZUELOS**

**November 03, 2023**

1        A.    No.  Can I correct something?  I don't know

2    if I'm able to do that.  You said if I had spoke to

3    Mr. Neumeister during the time.

4        Q.    Yes.

5        A.     I did speak to him.  After the arrest had

6    happened, he did give me a call.

7        Q.    Before the arrest did you have any contact

8    with him during the trial?

9        A.    No.

10        Q.    So prior to the arrest you didn't reach out

11    to either Mr. Neumeister or Mr. Levitt to find out

12    if arresting Dr. Grange in the middle of trial was

13    going to impact their case?

14        A.    No.

15        Q.    Did you speak to any of your supervisors

16    about whether that was going to have any impact on

17    the civil case?

18        A.    Yes.

19        Q.    Who did you talk to?

20        A.    It would be my sergeant, Joe Lopez.

21        Q.    When did you talk to Mr. Lopez about

22    that?

23        A.    When we were advised by the district

24    attorney's office that they were working on

25    filing.

**LORI POZUELOS**

**November 03, 2023**

```
 1            Q.   How long before the actual arrest did the
 2       DA's office -- excuse me -- did the DA's office tell
 3       you they were working on the filing?
 4            A.   We were advised in January 2020 that they
 5       were working on inputting the charges into their
 6       system, and then we were advised the morning of and
 7       I believe even the day before because we were trying
 8       to determine when we would do the arrest that the
 9       filing would be done the next day.
10            Q.   When you spoke to Mr. Lopez about whether
11       the criminal filing would have any impact on the
12       civil case, what did he say?
13            A.   We just had determined they were two
14       separate cases so we would have to proceed with the
15       criminal case as if the civil wasn't going on.
16            Q.   There was a reason why the criminal case
17       had to go forward at that point?
18            MR. MCMAHON:  Object to the form.  Calls
19       for speculation.
20            THE WITNESS:  We just did it on the
21       district attorney's timing.  They had advised us
22       that they were going to be doing the filing, and
23       they advised us the morning of that they had
24       electronically filed the case with the court.
25       ///
```

**LORI POZUELOS**

November 03, 2023

```
 1     BY MR. BEHNKE:
 2          Q.   Did you have any concerns prior to the
 3     arrest about whether or not the
 4     Department of Insurance attorneys were obtaining
 5     exculpatory information during the trial?
 6               MR. MCMAHON:  Object to the form.  Assumes
 7     facts not in evidence.  Vague.  Calls for
 8     speculation.
 9               THE WITNESS:  I don't understand what
10     you're asking.
11     BY MR. BEHNKE:
12          Q.   Well, you knew that there was a trial going
13     on at the time you made the arrest; correct?
14          A.   Yes.
15          Q.   And you knew that at that point it had been
16     going on for at least several days; correct?
17          A.   Yes.
18          Q.   So you knew that witnesses were testifying
19     during the civil trial; correct?
20          A.   Yes.
21          Q.   Did you have any concerns about what the
22     witnesses in the civil trial may be testifying to
23     under oath and how that might impact the criminal
24     case?
25          A.   No.
```

**LORI POZUELOS**

**November 03, 2023**

1    Q.    Why not?

2    **A.    Because it was a separate case from mine.**

3    Q.    But it was the same witnesses; correct?

4    MR. MCMAHON:  Object to the form.  Assumes

5    facts not in evidence.

6    **THE WITNESS:  I don't know.  I didn't have**

7    **access to the witness information.**

8    BY MR. BEHNKE:

9    Q.    You knew that the civil trial was

10   proceeding based on allegations of fraud related to

11   air transport claims submitted to SIMNSA; correct?

12   **A.    Yes.**

13   Q.    That was one of the same allegations you

14   were investigating; correct?

15   **A.    Correct.**

16   Q.    Did you have any concerns about what the

17   witnesses in the civil case may have been testifying

18   regarding those claims?

19   **A.    No.**

20   Q.    You didn't do anything to try to find out

21   what the witnesses had been testifying to?

22   **A.    No.**

23   Q.    You obtained Dr. Grange's deposition

24   transcript; correct?

25   **A.    Which deposition are you speaking of?**

**LORI POZUELOS**

1          Q.    The deposition that he gave related to the

2     civil case.

3          **A.    I was provided that, yes.**

4          Q.    Who provided that to you?

5          **A.    The district attorney Dianne Harrison.**

6          Q.    Did she tell you how she got it?

7          **A.    She stated that there was a referral to the**

8     **district attorney's office as it related to the qui**

9     **tam case.**

10          Q.    So you obtained Dr. Grange's deposition

11     transcript through the district attorney?

12          **A.    Correct.**

13          Q.    Did you obtain any other deposition

14     transcripts from the civil case?

15          **A.    I believe there was a couple of depositions**

16     **within the package that she provided me.**

17          Q.    Other than what the district attorney

18     provided you, did you on your own or from any other

19     source obtain any deposition transcripts from the

20     civil case?

21          **A.    There was a deposition package that I**

22     **received through my captain, but there was some**

23     **question of whether I should have it or not.    I**

24     **don't remember whose deposition it was, though.**

25          Q.    As the civil case was proceeding prior to

**LORI POZUELOS**

November 03, 2023

```
1       trial, didn't you have any concerns about the
2       possibility that the civil attorneys might be
3       developing exculpatory evidence?
4               MR. MCMAHON:  Object to the form.  Vague.
5               THE WITNESS:  They were separate from me.
6       So I didn't know what they had.
7       BY MR. BEHNKE:
8           Q.   You didn't have any concerns that the
9       Department of Insurance --
10              (Indiscernible cross-talk.)
11              MS. EDSON:  I don't hear anything.  It
12      seems you-all are frozen, and I can't hear you.
13              MR. MCMAHON:  Can you hear us now?
14              THE VIDEOGRAPHER:  It's not detecting us.
15              MR. LAHANA:  Hello?
16              MR. MCMAHON:  Cherie, can you hear us now?
17              THE VIDEOGRAPHER:  Would you like to go off
18      the record?
19              MR. BEHNKE:  Yes, please.
20              THE VIDEOGRAPHER:  Off the record.  The
21      time is now 10:39 a.m.
22              (Recess taken.)
23              THE VIDEOGRAPHER:  Back on the record.
24      This is the beginning of Media Number 2.  The time
25      is now 10:47 a.m.
```

LORI POZUELOS

**November 03, 2023**

```
 1                    MR. MCMAHON:  And, Cherie, can you hear us?
 2                    MS. EDSON:  Yes.  Thank you.
 3                    MR. MCMAHON:  Okay.
 4       BY MR. BEHNKE:
 5            Q.   Before the criminal charges were filed, did
 6       you have any concerns about whether or not the civil
 7       proceedings were uncovering evidence that might
 8       undermine the criminal case?
 9            A.   No.
10            Q.   Did you know that Dr. Grange had an expert
11       witness for the civil case before the criminal case
12       was filed?
13            A.   No.
14            Q.   Why not?
15                    MR. MCMAHON:  Object to the form.
16       Argumentative.
17       BY MR. BEHNKE:
18            Q.   Why -- why didn't you have concerns about
19       evidence that the civil litigation may have been
20       uncovering before you -- the criminal case was
21       filed?
22                    MR. MCMAHON:  Objection.  Asked and
23       answered.
24                    THE WITNESS:  Because I was doing a
25       separate investigation, and I was basing my
```

LORI POZUELOS

November 03, 2023

```
 1        investigation on what I was discovering.
 2    BY MR. BEHNKE:
 3        Q.   Whether it was a supervisor or the district
 4    attorney, at the time criminal charges were actually
 5    being filed, did anybody raise a concern about
 6    whether or not that was going to disrupt the civil
 7    case?
 8             MR. MCMAHON:  Object to the form.  Vague.
 9             THE WITNESS:  Not that I'm aware of.
10    BY MR. BEHNKE:
11        Q.   Were you aware of anyone in the
12    Department of Insurance raising a concern at the
13    time the criminal case was being filed about whether
14    or not that should be done in the middle of a civil
15    trial?
16             MR. MCMAHON:  Object to the form.  Calls
17    for speculation.  Vague.
18             THE WITNESS:  Not that I'm aware.
19    BY MR. BEHNKE:
20        Q.   Did you have any concerns about that?
21        A.   No.
22        Q.   Prior to February 27, 2020, when the
23    criminal case was actually filed -- strike that.
24             In January, February 2020, during that time
25    period right before the criminal case was filed,
```

LORI POZUELOS

November 03, 2023

1      were you doing anything to encourage the district

2      attorney to file the case?

3          A.    No.

4          Q.    I believe you said earlier you were in

5      approximately weekly contact with them during that

6      period; is that correct?

7          A.    Correct.

8          Q.    What was the substance of those weekly

9      contacts?

10         A.    I had been doing follow-up for the district

11     attorney's request on some interviews and some

12     insurance company information prior to the filing.

13     We also discussed making sure that the correct

14     numbers as far as what was paid out on the claims he

15     had me reviewing -- or him and Rebeca Hynds had me

16     reviewing spreadsheets making sure the numbers were

17     correct according to the information I had.

18         Q.    Who made the decision to arrest Dr. Grange

19     on a Thursday evening?

20         A.    It was the department and the district

21     attorney's office.

22         Q.    Who in the department?

23         A.    My -- Sergeant Lopez and then because that

24     morning our captain was advised by Bill Lee at the

25     district attorney's office of the filing and he

November 03, 2023

```
 1        forwarded the e-mail to my sergeant, who then told
 2        me that we would be doing the arrest or walking or
 3        taking the arrest warrant to the judge, and if
 4        Dr. Grange was there, we were going to execute the
 5        arrest.
 6            Q.   Was the arrest on Thursday evening planned
 7        to ensure that he would spend the weekend in jail?
 8            A.   No.
 9            Q.   Was there any reason you're aware of why
10        you couldn't have waited until after the civil trial
11        concluded to execute the arrest warrant?
12            A.   We didn't take that into account.
13            Q.   Was there any reason you're aware of why
14        you had to arrest him and could not just summon him
15        into court since he was in court every day
16        already?
17            MR. MCMAHON:  Object to the form.  Vague.
18        Calls for speculation.
19            THE WITNESS:  I don't understand what
20        you're asking.
21        BY MR. BEHNKE:
22            Q.   Well, criminal charges were filed;
23        correct?
24            A.   Correct.
25            Q.   And I believe you said that the morning of
```

LORI POZUELOS

November 03, 2023

```
1      the 27th either you or it might have been your
2      captain received word from the district attorney's
3      office that they were filing; is that correct?
4          A.   Correct.
5          Q.   Once criminal charges are filed, you have
6      multiple options in terms of how to get the
7      individual into court; correct?
8               MR. MCMAHON:  Object to the form.  Calls
9      for speculation.  Calls for a legal conclusion.
10     Vague.
11              THE WITNESS:  Correct.
12     BY MR. BEHNKE:
13         Q.   One option is to go to the court and apply
14     for an arrest warrant; correct?
15         A.   Correct.
16         Q.   And then execute the arrest warrant and
17     arrest the individual?
18         A.   Correct.
19         Q.   Another option is to summons the
20     individual, send them a notice that charges have
21     been filed and direct them to come to court; is that
22     correct?
23              MR. MCMAHON:  Object to the form.  Calls
24     for a legal conclusion.  Calls for speculation.
25     Vague.
```

**LORI POZUELOS**

**November 03, 2023**

```
 1              THE WITNESS:  Correct.
 2    BY MR. BEHNKE:
 3         Q.   Have you ever been involved in a situation
 4    where you had obtained an arrest warrant and gave
 5    the individual an opportunity to self-surrender?
 6         A.   Yes.
 7         Q.   And as of Thursday, February 27th, 2020,
 8    you were aware that Dr. Grange had been attending
 9    the civil trial every day in the San Bernardino
10    courthouse; correct?
11              MR. MCMAHON:  Object to the form.  Vague.
12    Mischaracterizes testimony.  Asked and answered.
13              THE WITNESS:  Yes.
14    BY MR. BEHNKE:
15         Q.   So of the options available once the
16    district attorney's office informed your office that
17    charges were being filed, who made the decision to
18    execute an arrest warrant on Dr. Grange that
19    evening?
20         A.   It would have been my sergeant, Lopez, and
21    then the arrest team, and myself, and in
22    communication with the district attorney's office.
23         Q.   What was the basis for that decision?
24         A.   Officer safety.
25         Q.   How would officer safety have been
```

**LORI POZUELOS**

**November 03, 2023**

1    threatened by issuing a summons directing him to

2    appear?

3         A.   We didn't even discuss issuing a summons.

4         Q.   How would officer safety have been

5    threatened by waiting until after the civil trial

6    had completed?

7         A.   Because it was discussed we would know

8    where he was the day that the arrest warrant was

9    signed.  So we decided because of officer safety

10    because of some intel that we had regarding

11    Dr. Grange that it was safe to do there.

12         Q.   What intel did you have that caused you to

13    believe that there was cause for safety concerns?

14         A.   He has access to many weapons, and that is

15    something we do take account into when we are

16    serving arrest warrants.  His home was gated up on a

17    hill.  We had no access to see up into his home; so

18    we figured he was removed away from the weapons that

19    we were aware of as well as we had a clear view of

20    him.

21         Q.   So wouldn't it have been safer to issue him

22    a summons and not execute an arrest warrant at

23    all?

24              MR. MCMAHON:  Object to the form.

25              THE WITNESS:  We don't normally issue

**LORI POZUELOS**

November 03, 2023

```
 1       summons.
 2       BY MR. BEHNKE:
 3            Q.   Or was there a safety concern that
 4       prevented you from allowing him to self-surrender?
 5                 MR. MCMAHON:  Object to the form.  Vague.
 6                 THE WITNESS:  It wasn't discussed.
 7       BY MR. BEHNKE:
 8            Q.   Was it discussed at all that he was at that
 9       time in the middle of defending himself in a civil
10       lawsuit that was being pursued by your agency?
11                 MR. MCMAHON:  Object -- object to the form.
12       Vague.  Asked and answered.
13                 THE WITNESS:  We did discuss that the civil
14       trial was going on.
15       BY MR. BEHNKE:
16            Q.   And who did you have those discussions
17       with?
18            A.   With my sergeant.
19            Q.   And what was the substance of the
20       discussion?
21                 MR. MCMAHON:  Asked and answered.
22                 THE WITNESS:  It was decided these are two
23       separate cases so we have to proceed with the
24       criminal as the civil didn't exist because we were a
25       separate investigation.
```

**LORI POZUELOS**

November 03, 2023

1    BY MR. BEHNKE:

2        Q.   Did you discuss whether or not the arrest

3    had to happen that day as opposed to at some future

4    day?

5        **A.   We just would -- decided because the arrest**

6    **warrant was being issued that day that we would do**

7    **the arrest because we walked it through the court.**

8        Q.   And you didn't discuss that at all with

9    Mitch Neumeister before the arrest?

10       **A.   No.**

11       Q.   When you executed the arrest warrant on

12   Thursday evening, February 27th, were you aware that

13   the Department of Insurance was planning to call

14   Dr. Grange in the civil trial the next trial day?

15           MR. MCMAHON:  Object to the form.

16           When you say "you," do you mean her

17   personally executing the arrest warrant?

18   BY MR. BEHNKE:

19       Q.   Well, when Department of Insurance executed

20   the arrest warrant.

21           I understand you didn't execute the arrest

22   warrant; correct?

23       **A.   Correct.  I didn't.**

24       Q.   Let me rephrase it:  On Thursday evening,

25   February 27th, 2020, were you aware that Dr. Grange

**LORI POZUELOS**

**November 03, 2023**

```
 1    was slated to be called by the Department of
 2    Insurance as a witness in the civil case on the next
 3    trial day?
 4         A.   No.
 5         Q.   Were you aware that by arresting him on
 6    Thursday evening, February 27th, he was held in jail
 7    every day right up to the point when he was supposed
 8    to testify as a witness in the civil trial?
 9              MR. MCMAHON:   Object to the form.   Vague.
10    Calls for speculation.   Assumes facts not in
11    evidence.
12              THE WITNESS:   I knew that he was in
13    custody, but I didn't know when he was going to be
14    testifying.
15    BY MR. BEHNKE:
16         Q.   When did you determine that you were going
17    to obtain and review his jail calls?
18              MR. MCMAHON:   I'm sorry.   Could I have that
19    back?
20    BY MR. BEHNKE:
21         Q.   When did you determine that you were going
22    to obtain and review his jail calls?
23         A.   I don't remember the exact date.
24         Q.   Was that something that you decided before
25    you arrested him?
```

**LORI POZUELOS**

**November 03, 2023**

```
 1          A.   No.

 2          Q.   On February 27th, 2020, did you have any

 3     reason to think Dr. Grange was a flight risk?

 4          A.   I wasn't certain.

 5          Q.   You knew that he had been in court for

 6     every day of the civil trial, though; correct?

 7               MR. MCMAHON:   Object to the form.

 8               THE WITNESS:   I don't know that every

 9     day.

10     BY MR. BEHNKE:

11          Q.   Well, I believe you had indicated in

12     communication with the DA's office that you were at

13     the civil case on February 25th and February 26th.

14               Does that sound correct?

15          A.   I wasn't at the civil case.

16          Q.   You were outside?

17          A.   Outside.  Either the 25th or the 26th I did

18     go outside the court to see if his vehicle was

19     there.

20          Q.   Okay.  Did you review court records to see

21     if he had been attending trial?

22          A.   After the day was over, I did see the court

23     records seeing that he showed up on those particular

24     days after the fact.

25          Q.   You knew that they had been litigating the
```

**LORI POZUELOS**

**November 03, 2023**

```
 1        civil case prior to that; correct?
 2             A.   I don't understand your question.
 3             Q.   Well, you knew that they had engaged in
 4        discovery in the civil case, for instance,
 5        correct?
 6             A.   What do you mean by that?
 7             Q.   Well, you knew they took Dr. Grange's
 8        deposition?
 9             A.   Yes.
10             Q.   Did you know that they took his deposition
11        twice in connection with the civil case?
12             A.   Not that I recall.
13             Q.   Were you aware that Dr. Grange had produced
14        discovery to the Department of Insurance in the
15        civil case?
16             A.   No.
17             Q.   Were you aware that he had answered
18        interrogatories and requests for admissions?
19             A.   No.
20             Q.   Were you aware that he had produced
21        documents to the Department of Insurance?
22             A.   No.
23             Q.   You had no evidence on February 27th, 2020,
24        indicating that he is a flight risk; correct?
25                  MR. MCMAHON:   I'm sorry.  Could I have that
```

**LORI POZUELOS**

**November 03, 2023**

```
 1        back again?
 2                 (Record read.)
 3                 MR. MCMAHON:  Object to the form.
 4                 THE WITNESS:  No specific evidence.
 5        Actually, could I correct myself on that?  There was
 6        an issue where I'd seen an e-mail that he would be
 7        leaving the country to go on vacation within the
 8        month.
 9        BY MR. BEHNKE:
10             Q.   When did you see that e-mail?
11             A.   I don't recall the exact date.
12             Q.   When you say "within the month," what time
13        frame are you talking about?
14             A.   I want to say it was March 2020 that he had
15        plans to go out of the country.
16             Q.   On vacation?
17             A.   I don't know.
18             Q.   Did you have any reason to think he was
19        never coming back?
20             A.   I mean, I don't know what the plans were.
21             Q.   Have you ever left the country?
22             A.   Yes.
23             Q.   So the fact that someone may have plans to
24        leave the country, in your mind, does that make them
25        a flight risk?
```

LORI POZUELOS

November 03, 2023

| | |
|---|---|
| 1 | **A.   No.** |
| 2 | Q.   In addition to arresting Dr. Grange, you |
| 3 | also applied for and obtained a court order freezing |
| 4 | his assets; correct? |
| 5 | MR. MCMAHON:  Object to the form.  Assumes |
| 6 | facts not in evidence.  She didn't apply for |
| 7 | anything. |
| 8 | BY MR. BEHNKE: |
| 9 | Q.   You signed a declaration to support an |
| 10 | application for a seizure of his assets; correct? |
| 11 | MR. MCMAHON:  Object to form. |
| 12 | **THE WITNESS:  Correct.** |
| 13 | BY MR. BEHNKE: |
| 14 | Q.   Did you have any discussions with anyone |
| 15 | about how that might impact his ability to defend |
| 16 | himself in the civil case? |
| 17 | **A.   No.** |
| 18 | Q.   When was the first time you spoke with |
| 19 | Mitch Neumeister about Dr. Grange's arrest? |
| 20 | **A.   After his arrest.** |
| 21 | Q.   Do you recall when? |
| 22 | **A.   Mitch had called me shortly after the** |
| 23 | **arrest and left me a message asking that I call him** |
| 24 | **because he wanted to know what was going on.** |
| 25 | Q.   When did you actually speak to him? |

**LORI POZUELOS**

**November 03, 2023**

1       A.    Later that evening.  Not too late after the

2    arrest, though.

3       Q.    Do you think it was the same day?

4       A.    It was the same day, yes.

5       Q.    And -- so he wanted to know what was going

6    on.

7             What did you tell him?

8       A.    I explained that the arrest warrant was

9    issued, and we arrested him based on the criminal

10   filing.

11      Q.    How did he respond?

12      A.    He asked or I believe he wanted to speak

13   with Lance Cantos.  We didn't discuss it further.

14   All I stated is that the arrest warrant was issued,

15   and we arrested him.

16      Q.    Did you have any other conversations after

17   that with Mr. Neumeister?

18      A.    After the civil trial was over.

19      Q.    Any other conversations with him after the

20   arrest and before the end of the civil trial?

21      A.    Not that I recall.

22      Q.    Do you know whether or not he spoke to

23   Lance Cantos?

24      A.    I don't know.

25      Q.    I've got a document titled "Declaration in

**LORI POZUELOS**

**November 03, 2023**

1    Support of Arrest Warrant and/or Misdemeanor

2    Pretrial Confinement" we'll mark as Exhibit 1.  And

3    another document also titled "Declaration in Support

4    of Arrest Warrant and/or Felony Pretrial

5    Confinement."  We'll mark this as Exhibit 2.

6             Do you recognize both of these documents?

7             (Exhibits 1 and 2 were marked.)

8             **THE WITNESS:  Yes.**

9    BY MR. BEHNKE:

10        Q.   Do you know why two different declarations

11   were prepared in connection with this arrest

12   warrant?

13        **A.   Actually, let me correct myself because I'm**

14   **looking at the second one, and that one does not**

15   **look familiar to me.  I'd need to look through it.**

16        Q.   Yeah.  Go ahead and look through it.

17        **A.   Okay.**

18        Q.   I believe on this one -- yeah.  The

19   signature on this is just typed in.

20        **A.   Uh-huh.**

21        Q.   And then -- yeah.  Also, take a look at

22   Exhibit 1.  Exhibit 1 appears to have a handwritten

23   signature.

24        **A.   Yeah.  And that's my signature.**

25        Q.   Focus on Exhibit 1.

**LORI POZUELOS**

November 03, 2023

1                    The signature on page 2 -- that's your

2         signature?

3         A.    Correct.

4              Q.    Put that to the side then.  Turning to

5         Exhibit 2.

6                    Do you recognize Exhibit 2?

7         A.    I recognize the type of document, but I'm

8         not 100 percent certain that I've seen this one.

9              Q.    Do you know who prepared Exhibit 2?

10        A.    No.

11             Q.    Okay.  Let's go back to Exhibit 1.  First

12        on page 1, the first line under "Declaration," it

13        reads, "Lori Pozuelos."  Lori Pozuelos is

14        handwritten.

15                   Do you see that?

16        A.    Yes.

17             Q.    Is that your writing?

18        A.    Yes.

19             Q.    Did you type this document out, or is this

20        a form you used?

21        A.    I did not.

22             Q.    Who prepared this?

23        A.    I was given to this by the district

24        attorney's office.

25             Q.    How did they provide this to you?

LORI POZUELOS

November 03, 2023

1         A.    They handed it to me.

2         Q.    When?

3         A.    It would have been the day that we found

4    out of the filing.  So February 27th, 2020.

5         Q.    Let's walk through that day.

6               So I believe you already indicated that the

7    morning of February 27th your captain got word from

8    the DA's office that they were filing; is that

9    correct?

10        A.    Correct.

11        Q.    After then presumably he shared that with

12   you; is that correct?

13        A.    Yes.

14        Q.    After you found out that the DA's office

15   was filing, what did you do?

16        A.    I got in contact with the DA's office to

17   arrange a meeting at their office.

18        Q.    Who did you get in contact with?

19        A.    I don't recall specifically if it was Lance

20   Cantos or Rebeca Hynds.

21        Q.    It would have been one of the two deputy

22   district attorneys?

23        A.    Yes.

24        Q.    Did you actually go to the district

25   attorney's office that day?

LORI POZUELOS

**November 03, 2023**

```
 1              A.   I did.
 2              Q.   Who did you meet with at the district
 3      attorney's office?
 4              A.   Lance Cantos was there.  Rebeca Hynds and
 5      Bill Lee.
 6              Q.   Approximately when did you arrive at the
 7      district attorney's office?
 8              A.   Approximately 3:00, 3:30.  That
 9      afternoon.
10              Q.   When you arrived at the district attorney's
11      office, had you already seen a criminal complaint?
12              A.   Yes.
13              Q.   How did you receive the criminal
14      complaint?
15              A.   I received it via e-mail.
16              Q.   From the DA's office?
17              A.   Yes.
18              Q.   When did you receive the complaint?
19              A.   That afternoon.
20              Q.   When you arrived at the district attorney's
21      office the afternoon of February 27th, was -- was
22      that the time that they handed you this declaration,
23      Exhibit 1?
24              A.   I believe so.
25              Q.   When they handed you Exhibit 1, did you
```

**LORI POZUELOS**

**November 03, 2023**

1    read it before you signed it?

2    　　A.　　I looked over it.

3    　　Q.　　If you turn to page 2, it states, "I

4    declare under penalty of perjury that the above is

5    true and correct and that this declaration was

6    executed on 2/27/20 in San Bernardino, California";

7    is that correct?

8    　　A.　　Yes.

9    　　Q.　　So you knew you were signing this under

10   penalty of perjury when you signed it?

11   　　A.　　Yes.

12   　　Q.　　Did you read the document or just look it

13   over?

14   　　A.　　I looked over the charges and then signed

15   it.

16   　　Q.　　I want to direct your attention to

17   Paragraph 3.　Paragraph 3 reads, "The said probably

18   [sic] cause is exhibited in the official law

19   enforcement reports prepared regarding the matter.

20   A true copy of the pertinent parts of which is

21   attached hereto and incorporated herein by

22   reference."

23   　　　　Do you see that?

24   　　A.　　Yes.

25   　　Q.　　So which reports were attached to this?

**LORI POZUELOS**

November 03, 2023

1        A.    There wasn't.

2        Q.    When they presented this to you, it was

3    just the declaration that they gave you?

4        A.    Correct.

5        Q.    Did you ask them about that when you saw

6    that there were no reports attached?

7        A.    No.

8        Q.    And then I'm going to direct your attention

9    to Paragraph 4.  Paragraph 4 reads, "I am informed,

10    and on the basis of such information I believe that

11    the conduct of the accused" -- the accused here is

12    Jeff Grange; correct?

13        A.    Correct.

14        Q.    -- "and the circumstances which I give

15    probable cause to believe that the accused committed

16    the crimes listed in Paragraph Number 2 thereof were

17    personally observed by the persons whose statements

18    regarding such crimes are contained in the said

19    incorporated reports."

20            Do you see that?

21        A.    Yes.

22        Q.    But, again, when you signed this, there

23    were no reports with it; correct?

24        A.    No.

25        Q.    Are you aware of any witnesses in the

**LORI POZUELOS**

November 03, 2023

```
 1    reports you prepared who told you they personally

 2    observed Jeff Grange committing the crimes listed in

 3    Paragraph 2?

 4              MR. MCMAHON:  Object to the form.  Vague.

 5    Calls for a legal conclusion.

 6              THE WITNESS:  I don't understand what

 7    you're asking.

 8    BY MR. BEHNKE:

 9        Q.   Well, the -- Paragraph 4 says that "Jeff

10    Grange was personally observed by the persons whose

11    statements regarding such crimes are contained in

12    said incorporated reports."

13              My question is in any of the reports you

14    prepared in this investigation, did you include

15    statements from any witnesses who reported that they

16    personally observed Jeff Grange committing the

17    crimes listed here?

18              MR. MCMAHON:  Object to the form.  Vague.

19    Calls for a legal conclusion.

20              THE WITNESS:  No.

21    BY MR. BEHNKE:

22        Q.   After you signed the declaration that's

23    marked as Exhibit 1, what happened to the

24    declaration?

25        A.   It was put with a pile of other paperwork,
```

**LORI POZUELOS**

**November 03, 2023**

```
1        and Rebeca Hynds and I went over to the
2        courthouse.
3             Q.   You and the deputy district attorney walked
4        to the courthouse?
5             A.   Correct.
6             Q.   When you got to the courthouse, what did
7        you do?
8             A.   We went to the clerk's office.
9             Q.   Who actually had the packet of papers?
10                 Was it you or Deputy DA Hynds?
11            A.   Deputy DA Hynds.
12            Q.   Did you review the packet that she had?
13                 Do you know what was in there?
14            A.   No.
15            Q.   So you went to the clerk's office, and then
16       what happened after you went to the clerk's
17       office?
18            A.   We had to get some documents from the
19       clerk's office to include to bring up to the
20       judge.
21            Q.   Okay.  After you got documents from the
22       clerk, did you and Ms. Hynds actually go up to see
23       the judge?
24            A.   Yes.
25            Q.   Do you recall which judge that was?
```

**LORI POZUELOS**

November 03, 2023

1          A.    Colin Bilash.

2          Q.    When you went to see the judge, what

3    happened?

4          A.    We gave him the package that included the

5    documents from the DA's office as well as the

6    documents I had signed.

7          Q.    And there were other documents you signed

8    besides this declaration; correct?

9          A.    Correct.

10         Q.    Did you actually meet with the judge, or

11   did you give the documents to his court clerk?

12         A.    We met with the judge.

13         Q.    That was in chambers?

14         A.    Correct.

15         Q.    Did you have any conversation with the

16   judge?

17         A.    Just letting him know we were looking to

18   have an arrest warrant signed.

19         Q.    Did he sign the paperwork there in front of

20   you, or how did that work?

21         A.    He signed it in front of me.

22         Q.    Did he ask you any questions?

23         A.    Not that I recall.

24         Q.    Do you recall about what time that was?

25         A.    It was between 3:30 and maybe 4:15-ish.

**LORI POZUELOS**

**November 03, 2023**

1    Q.   I think you said earlier that you got to

2    the DA's office I believe you said 3:00 or 3:30?

3    **A.   Around 3:00 o'clock.**

4    Q.   How long did the process take at the DA's

5    office to review and sign the documents that they

6    had prepared?

7    **A.   I don't recall the exact amount of time.**

8    Q.   How far was the walk from the DA's office

9    to the courthouse?

10   **A.   Right across the street.**

11   Q.   Did you have to wait at the clerk's

12   window?

13   **A.   Yes.**

14   Q.   Approximately how long?

15   **A.   Maybe 15, 20 minutes.**

16   Q.   Then after the clerk's window you went to

17   the courtroom.

18         Did you have to wait to see the judge, or

19   did he take you right in?

20   **A.   I don't remember.**

21   Q.   When the judge actually signed the

22   paperwork, did you note the time, or are you

23   estimating?

24   **A.   Estimating.**

25   Q.   After the judge signed the paperwork, did

**LORI POZUELOS**

**November 03, 2023**

```
 1     you do anything to communicate --
 2               MR. MCMAHON:  Let me just object.  Go
 3     ahead.  Finish your question.
 4     BY MR. BEHNKE:
 5         Q.   After the judge had signed the paperwork,
 6     did you do anything to communicate to the
 7     investigators doing the arrest?
 8               MR. MCMAHON:  Let me object to the form as
 9     vague.  When you say "paperwork," there may be
10     different times the paperwork was signed.
11               MR. BEHNKE:  Yeah.  Let's -- yeah.  Let me
12     back that up.
13               MR. MCMAHON:  Okay.
14     BY MR. BEHNKE:
15         Q.   You went into chambers.
16               You said the judge signed paperwork;
17     correct?
18         A.   Yes.
19         Q.   After the judge signed, did you get a copy
20     of anything back that he had signed?
21         A.   Not immediately after.
22         Q.   Okay.  After you saw him and he signed
23     something, what happened?
24         A.   He had reviewed the arrest warrant and once
25     he signed that, I did contact Sergeant Lopez and let
```

LORI POZUELOS

November 03, 2023

1        him know that the arrest warrant was signed.

2        Q.   Okay.  Did you -- did you read the arrest

3    warrant before you called Sergeant Lopez, or did you

4    call Sergeant Lopez based on the fact that you saw

5    the judge signing?

6        A.   I don't recall.

7        Q.   Did you call Sergeant Lopez while you were

8    still there in chambers?

9        A.   Yes.

10       Q.   After you called Sergeant Lopez, what

11   happened with the paperwork that the judge reviewed

12   and signed?

13       A.   I don't remember.

14       Q.   You said at some point you got a copy of

15   the warrant?

16       A.   Yes.

17       Q.   When did that happen?

18       A.   Before we left the judge's chambers.

19       Q.   Did you get a copy of anything else?

20       A.   There was a lot of documents.  I don't

21   remember everything that was in with the

22   documents.

23       Q.   Did you personally get a copy of anything

24   that the judge had signed, or was it the DA that got

25   it?

LORI POZUELOS

November 03, 2023

1          A.    I don't remember who he handed it to.

2          Q.    After the judge signed, then what did you

3     do?

4          A.    The judge had told us that he would sign

5     the arrest warrant, but there was some remaining

6     issues as it pertained to the 186.11 that the judge

7     and DDA Hynds continued to discuss.

8          Q.    Did you overhear any of that discussion?

9          A.    I was getting ahold of Sergeant Lopez at

10    the time.

11         Q.    So you didn't hear what the judge's

12    concerns were with the 186.11?

13              MR. MCMAHON:  Object to the form.  Assumes

14    facts not in evidence.

15              THE WITNESS:  I don't remember what he was

16    saying.

17              (Cell phone buzzing.)

18              THE WITNESS:  Sorry.  That might be me.  I

19    apologize.

20    BY MR. BEHNKE:

21         Q.    That's okay.

22         A.    I put it on "Do not disturb."  That didn't

23    work too well.

24         Q.    After you finished with the judge at his

25    chambers, what did you do?

**LORI POZUELOS**

**November 03, 2023**

1          A.    Rebeca and I went downstairs, or DDA Hynds

2     and I went downstairs to file the arrest warrant and

3     the documents with the court clerk.

4          Q.    Approximately how long did that take?

5          A.    Maybe ten minutes.

6          Q.    I got another document titled "Ex Parte

7     Motion for Examination of Bail Under Penal Code

8     Section 1275.1" that we'll mark Exhibit 3.  If you

9     turn to page 6 of the document, there appear to be

10    two signatures on this page.  The first line is

11    "Declarant - Peace Officer" and the signature above

12    that.

13          Do you see that?

14          (Exhibit 3 was marked.)

15          THE WITNESS:  Yes.

16    BY MR. BEHNKE:

17          Q.    Is that your signature?

18          A.    Yes.

19          Q.    If you could just take a moment and just

20    look through this document.  My question is whether

21    you prepared this.

22          A.    No, I didn't.

23          Q.    Is this one of the documents that the

24    district attorneys provided to you when you went to

25    their office on the afternoon of February 27th?

**LORI POZUELOS**

November 03, 2023

```
1              A.   Yes.

2              Q.   Did you review this document before you

3        signed it?

4              A.   Yes.

5              Q.   You were aware then of what this document

6        was when you signed it?

7              A.   Yes.

8              Q.   What was this document for?

9              A.   This document is -- a 1275 motion as I

10       understand it is when you request someone who is

11       posting bail to explain where their money is coming

12       from.  So if it's a hold on the bail until they can

13       prove where the funds come from.

14             Q.   Okay.  And going back to page 6, the second

15       signature on there it says, "Declarant -

16       Prosecutor."

17                  Do you know whose signature that is?

18             A.   It appears to be Lance Cantos.

19             Q.   Are you familiar with his signature, or are

20       you saying that because that's what's written

21       there?

22             A.   I don't know his exact signature.

23             Q.   Okay.  So you wouldn't be able to recognize

24       his signature?

25             A.   Correct.
```

**LORI POZUELOS**

November 03, 2023

```
1              Q.   Okay.  And to the right of what appears to
2         be Lance Cantos's signature is an address on
3         "Archibald Avenue, Rancho Cuc."
4              Do you see that?
5         A.   Yes.
6              Q.   Is that your office address?
7         A.   Yes.
8              Q.   You actually signed this, though, at the
9         district attorney's office; is that correct?
10        A.   Correct.
11             Q.   That's just your work address?
12        A.   Correct.
13             Q.   And, again, at the top of page 6 it says,
14        "The undersigned declares under penalty of perjury
15        that the foregoing is true and correct."
16             Do you see that?
17        A.   Yes.
18             Q.   So you knew you were signing this document
19        under penalty of perjury?
20        A.   Yes.
21             Q.   I want to direct your attention back to
22        page 5 of this document.
23             Did you review this document for accuracy
24        before you signed it?
25        A.   Yes.
```

LORI POZUELOS

November 03, 2023

| | |
|---|---|
| 1 | Q. First I want to focus on Paragraph 4, |
| 2 | line 16 of the document. It states, "Defendant owns |
| 3 | and operates an ambulance transport company." |
| 4 | Do you see that? |
| 5 | **A. Yes.** |
| 6 | Q. Were you aware of what Jeff Grange's |
| 7 | ownership status was with the ambulance company at |
| 8 | the time? |
| 9 | **A. On this exact date, no, but I had done** |
| 10 | **research on the ownership of the business.** |
| 11 | Q. And what was your understanding of the |
| 12 | ownership of the business? |
| 13 | **A. That it operated under Symons Emergency** |
| 14 | **Specialties, Inc. Dr. Grange was an officer and a** |
| 15 | **director of the company.** |
| 16 | Q. And did the -- were you aware that the |
| 17 | company had shareholders? |
| 18 | **A. Yes.** |
| 19 | Q. As part of your investigation did you |
| 20 | obtain copies of any of the corporate documents for |
| 21 | Symons Emergency Specialties? |
| 22 | **A. Yes.** |
| 23 | Q. What did you obtain during your |
| 24 | investigation? |
| 25 | **A. I obtained certified copies of documents** |

LORI POZUELOS

November 03, 2023

```
 1        from the California Secretary of State.
 2            Q.   Did you obtain any of the minutes of
 3        meetings of the board of directors from the
 4        company?
 5            A.   From the Secretary of State, no.
 6            Q.   Did you obtain any of the minutes of
 7        meetings of the board of directors from anyone else
 8        in the Department of Insurance?
 9            A.   No.
10            Q.   Were you aware that that information was
11        produced in the civil case?
12                MR. MCMAHON:  Object to the form.
13                THE WITNESS:  No.
14    BY MR. BEHNKE:
15            Q.   Okay.  Were you aware of whether or not the
16        company had shareholders?
17            A.   Yes.
18            Q.   Do you know how many?
19            A.   I don't recall.
20            Q.   Do you know what Jeff Grange's ownership
21        interest was in the company?
22                MR. MCMAHON:  Object to the form.  Vague as
23        to time.
24                THE WITNESS:  I don't remember.
25    BY MR. BEHNKE:
```

**LORI POZUELOS**

**November 03, 2023**

```
 1              Q.   How many directors did the company have?
 2                   MR. MCMAHON:  Object to the form.  Vague as
 3         to time.
 4                   THE WITNESS:  I don't remember the exact
 5         number.
 6    BY MR. BEHNKE:
 7         Q.   Would your answer be the same if we went
 8    through each year that is related to the charges in
 9    the criminal case?
10              So, for instance, how many directors there
11    were in 2011, 2012, 2013?
12         A.   I could refer back to my records that I
13    obtained and determine that.
14         Q.   Would you be surprised if during a large
15    portion of that time period there was as many as
16    nine directors?
17         A.   I mean, surprised -- I don't know if I
18    would be surprised.
19         Q.   And was -- how many officers did the
20    company have?
21         A.   The last I remember?
22         Q.   Yes.
23         A.   Three.
24         Q.   And do you recall what time period that
25    covered?
```

LORI POZUELOS

November 03, 2023

```
 1        A.   No, not specific time period.

 2        Q.   Do you recall who the officers were?

 3        A.   It was Jeff Grange, Don Downs, and Judd

 4   Symons.

 5             (Reporter request for clarification.)

 6   BY MR. BEHNKE:

 7        Q.   At the time you signed Exhibit 3, did you

 8   have an understanding of what his ownership interest

 9   was in the company?  I'm referring to Jeff Grange.

10        A.   Yes.

11        Q.   What was his ownership interest?

12        A.   Or -- can you clarify?

13             Do you mean by stock ownership or --

14        Q.   Well --

15        A.   -- officer positions?

16        Q.   Let me ask it this way:  You signed this

17   document asserting that Jeff Grange owns and

18   operates an ambulance transport company.

19             The ambulance transport company you're

20   referring to was Symons; correct?

21        A.   Correct.

22        Q.   What do you mean by "Jeff Grange owned and

23   operated the company"?

24        A.   He was an officer, and he was part of the

25   business from the information that I saw.
```

LORI POZUELOS

```
1          Q.   Okay.  But you didn't include in this
2     declaration an explanation that there were other
3     officers and directors; correct?
4          A.   I didn't write this declaration.  So it was
5     not included on the declaration.
6          Q.   This declaration does not include an
7     explanation that there were other shareholders with
8     ownership interest; correct?
9               MR. MCMAHON:  Object to the form.  The
10    document speaks for itself.
11              THE WITNESS:  No, it doesn't.
12    BY MR. BEHNKE:
13         Q.   Did you say anything to the district
14    attorney about that when they presented this to
15    you?
16         A.   No.
17         Q.   And then the next sentence says, "Defendant
18    has improperly billed or caused to be billed many
19    insurance companies for ground and air ambulance
20    transports."
21              (Reporter request for clarification.)
22    BY MR. BEHNKE:
23         Q.   Sorry.  I was mumbling.
24              What evidence did you have at the time you
25    signed this that Dr. Grange billed any insurance
```

**LORI POZUELOS**

```
 1    companies?
 2         A.   I had e-mails --
 3              MR. MCMAHON:  Let me object to the form.
 4    Strike that.  I'll withdraw that.  Go ahead.
 5              THE WITNESS:  I reviewed e-mail records
 6    that I obtained via search warrant that showed him
 7    involved in the billing or providing information for
 8    a bill to be created.
 9    BY MR. BEHNKE:
10         Q.   Were you aware of who actually prepared and
11    submitted bills for Symons?
12         A.   Like who specifically submitted the bill?
13         Q.   Yes.
14         A.   There were some names on the bills that
15    were submitted.
16         Q.   Did you determine during your investigation
17    what billing companies Symons used?
18         A.   From what I read, it was Symons billing
19    directly.
20         Q.   When you say you reviewed e-mails
21    suggesting that Jeff Grange was involved in billing,
22    did you review any e-mails showing that he submitted
23    any bills to insurance companies?
24         A.   There were some e-mails where he discussed
25    that he inputted some bills.
```

LORI POZUELOS

November 03, 2023

```
1              Q.   How many?
2              A.   I don't know the exact number.
3              Q.   So during your investigation did you
4         attempt to interview anybody from Wittman
5         Enterprises?
6              A.   No.
7              Q.   Were you aware that Wittman Enterprises was
8         doing the billing for Symons up to sometime in
9         2012?
10             MR. MCMAHON:  Object to the form.  Vague.
11        Assumes facts not in evidence.  Calls for
12        speculation.
13             THE WITNESS:  I did see that name and
14        researched that it was a billing company.
15        BY MR. BEHNKE:
16             Q.   But you didn't interview anybody from that
17        company; correct?
18             A.   No.
19             Q.   Did you interview anybody from David Isaac
20        Consultants, LLC?
21             A.   No.
22             Q.   Were you aware that David Isaac Consultants
23        was doing billing for Symons between approximately
24        2012 to 2014?
25             MR. MCMAHON:  Object to the form.  Vague.
```

**LORI POZUELOS**

**November 03, 2023**

```
1       Assumes facts not in evidence.  Calls for
2       speculation.
3                    THE WITNESS:  No.
4       BY MR. BEHNKE:
5            Q.   Did you at any point interview Pam Miles?
6            A.   No.
7            Q.   Were you aware that Pam Miles was doing
8       billing for Symons from about 2013 to 2016
9       roughly?
10           A.   I didn't know the time frame, but I have
11      seen that name as a biller.
12           Q.   During your investigation did you interview
13      Kamari Brownloe?
14           A.   No.
15           Q.   Do you know who she was?
16           A.   She was listed as the billing manager.
17                    MR. MCMAHON:  Counsel, we've been going for
18      another hour.
19                    MR. BEHNKE:  Oh, yeah.
20                    MR. MCMAHON:  Is it okay if we do a
21      five-minute break?
22                    MR. BEHNKE:  Yes.
23                    MR. MCMAHON:  Off the record.
24                    MR. BEHNKE:  Off the record.
25                    THE VIDEOGRAPHER:  Off the record.  The
```

**LORI POZUELOS**

November 03, 2023

```
 1      time is 11:45 a.m.
 2              (Recess taken.)
 3              THE VIDEOGRAPHER:  Back on the record.
 4      This is the beginning of Media Number 3.  The time
 5      is now 11:59 a.m.
 6              MR. MCMAHON:  Do you need any water?
 7              THE WITNESS:  Oh, I have some.  Thank you.
 8      BY MR. BEHNKE:
 9         Q.   Before the break we had reviewed some of
10      the billers and billing companies related to Symons.
11              Why did you not interview any persons from
12      any of these entities?
13         A.   Because we were still continuing the
14      investigation and determining who would have charges
15      filed against them.
16         Q.   Was -- let me ask you this:  Was a decision
17      made to not interview billers?
18              MR. MCMAHON:  Object to the form.  Vague.
19              THE WITNESS:  It was discussed.
20      BY MR. BEHNKE:
21         Q.   Among whom?
22         A.   Myself and the DA.
23         Q.   When did you talk to the DA about
24      interviewing billers?
25         A.   I don't recall the date.
```

**LORI POZUELOS**

**November 03, 2023**

1        Q.   Was it before the criminal case was filed

2    or after?

3        **A.   I don't recall.**

4        Q.   Did you believe that if you interviewed a

5    biller that would preclude filing criminal charges

6    later if the DA thought it was appropriate?

7             MR. MCMAHON:  Object to the form.  Vague.

8             **THE WITNESS:  I don't understand what**

9    **you're asking.**

10   BY MR. BEHNKE:

11       Q.   You said that it was discussed and there

12   was concern about interviewing the billers because

13   you didn't know who was going to be charged.

14            Am I paraphrasing that correctly?

15       **A.   Correct, yes.**

16       Q.   Okay.  Why did that present a problem with

17   interviewing billers?

18       **A.   Because we had reviewed some e-mails that**

19   **made me concerned that maybe the billers could**

20   **potentially be defendants as well.**

21       Q.   Is there some prohibition against

22   interviewing people who might be defendants?

23       **A.   It just hadn't -- excuse me -- been decided**

24   **where we were -- where we were going with that;**

25   **so...**

LORI POZUELOS

**November 03, 2023**

1    Q.   When you say "we," are you talking about

2    the you and the district attorney or you and the

3    other people of the Department of Insurance?

4    **A.   District attorney as well as maybe my**

5    **sergeant.  I don't know 100 percent.**

6    Q.   You never attempted to interview Jeff

7    Grange; correct?

8    **A.   No.**

9    Q.   I want to turn back to Exhibit 3.  I

10   believe that's the 1275 motion.  Page 5 line -- it

11   looks like it starts between 23 and 24.  The

12   document states, "Defendant billed more than

13   $3,000,000 for transports and was paid more than

14   $2,000,000 from such billings."

15        Do you see that?

16   **A.   Yes.**

17   Q.   What evidence did you have that Jeff Grange

18   had received more than $2,000,000 from the billings

19   at issue?

20   **A.   I had seen bank records.  As far as the**

21   **exact dollar figure that he received directly, I**

22   **don't know.**

23   Q.   When you say you had seen bank records,

24   what are you referring to?

25   **A.   I obtained search warrants for bank records**

LORI POZUELOS

November 03, 2023

1        on the business as well as any other accounts that

2        were within that bank and found accounts that

3        belonged to Jeff Grange as well.

4             Q.   Did you subpoena or execute search warrants

5        for his personal bank accounts also?

6             A.   They were included.  There were some.

7             Q.   Of the -- let me back up.

8                  The $2,000,000 referenced in Exhibit 3 --

9        is that an approximation of the total amount of

10       money that the insurance companies paid out on the

11       claims you're investigating?

12            A.   Correct.

13            Q.   And the 3,000,000 figure -- that's the

14       amount or an approximation of the amount that was

15       actually on the claim form submitted by Symons; is

16       that correct?

17            A.   Correct.

18            Q.   So they might be oversimplifying it, but

19       Symons billed about 3,000,000, and insurance

20       companies paid out about 2,000,000?

21            A.   Correct.

22            Q.   Is that what that means?

23            A.   Yes.

24            Q.   When the insurance companies paid out the

25       $2,000,000, who did the insurance company pay the

**LORI POZUELOS**

November 03, 2023

```
 1     money to?
 2          A.   Various entities under Symons.
 3          Q.   And did any of the insurance companies pay
 4     any of the claims directly to Jeff Grange?
 5          A.   No.
 6          Q.   Of the $2,000,000 that the insurance
 7     companies paid to the -- to Symons, how much of that
 8     money went to Jeff Grange?
 9          A.   I don't know the exact figure.
10          Q.   Do you believe that Jeff Grange received
11     more than $2,000,000 of the insurance money?
12          A.   I don't know the exact figure.
13          Q.   Did you do an analysis of the bank
14     accounts, or is that someone else?
15          A.   Someone else.
16          Q.   Someone else within the
17     Department of Insurance?
18          A.   Correct.
19          Q.   Did you have any discussion with the deputy
20     district attorneys about Exhibit 3 before you signed
21     it?
22          A.   Not that I recall.
23          Q.   On February 27th, 2020, what evidence did
24     you have that any funds or property that Dr. Grange
25     might use to post bail was obtained from the
```

1       insurance claims you had investigated?

2           A.    There were several of the air transport

3       payments that were made into a Symons account that

4       were transferred to accounts belonging to Jeff

5       Grange or his businesses owned by Jeff Grange.

6           Q.    When?

7           A.    I don't recall the exact date, but it was

8       shortly after the deposits were made from the

9       insurance companies.

10          Q.    The last insurance claims you indicated

11      were claims that happened in -- was it late 2017?

12          A.    I believe so.

13          Q.    So to the extent Symons paid any money

14      related to any of these claims to Dr. Grange, that

15      would have happened more than two years before you

16      signed this declaration; correct?

17          A.    I don't know the exact date.

18          Q.    Other than the evidence you just described,

19      which I believe you said was bank account

20      information showing deposit of insurance claim into

21      a Symons account and then money getting transferred

22      to Dr. Grange's account; is that correct?

23          A.    Correct.

24          Q.    Other than that evidence, did you have any

25      other evidence on February 27th, 2020, that any

LORI POZUELOS

```
1     money or property Dr. Grange would use to post bail
2     was derived from the insurance claims you
3     investigated?
4         A.   There were purchases of properties that
5     we'd seen escrow money being transferred shortly
6     after money was deposited into his accounts.  Then
7     there was purchases of a couple of properties.
8         Q.   Okay.  Did Symons engage in business other
9     than the insurance claims that you were
10    investigating?
11        A.   Yes.
12             MR. MCMAHON:  Object to the form.  Calls
13    for speculation.
14             THE WITNESS:  Yes.
15    BY MR. BEHNKE:
16        Q.   So to the extent Symons transferred any
17    money to Dr. Grange, how did you know that that was
18    money from the insurance claims you're investigating
19    as opposed to other business Symons was engaged
20    in?
21        A.   There was an e-mail between Grange and his
22    CPA, and the CPA was asking about an amount that was
23    transferred into his account, and he explained to
24    the CPA that was for an air transport.
25        Q.   Do you recall when that happened?
```

**LORI POZUELOS**

**November 03, 2023**

1        A.    Not the exact date.

2        Q.    But it would have been at least two years

3    before you signed this declaration; correct?

4        A.    I don't know.

5        Q.    When was the last time that you obtained

6    records from any of Jeff Grange's bank accounts?

7        A.    It would have been through my initial

8    search warrants.

9        Q.    When did you execute those warrants?

10       A.    It would be a guesstimate in 2017.

11       Q.    I understand that's an estimate.

12       A.    Uh-huh.

13       Q.    So you did execute search warrants for the

14    bank records; correct?

15       A.    Yes, I did.

16       Q.    You only did that once?

17       A.    There were subsequent search warrants done

18    when I determined other bank accounts.

19       Q.    But you only obtained records from each

20    account you were looking at one time; is that

21    correct?

22       A.    I don't remember.

23       Q.    After approximately 2017 did you obtain

24    bank records from any of Jeff Grange's accounts?

25       A.    I don't think so.

**LORI POZUELOS**

**November 03, 2023**

1           Q.   Approximately when was the last time an

2     insurance company paid a claim to Symons for one of

3     the claims you investigated?

4                MR. MCMAHON:  I'm sorry.  Could I have that

5     back.

6                (Record read.)

7                **THE WITNESS:  It would have been 2017**

8     **sometime.**

9     BY MR. BEHNKE:

10          Q.   I'm going to hand you another declaration.

11    We'll mark this one Exhibit 4.  First, just turn to

12    the last page of the document.  Actually, second to

13    the last page.  The number of the page is ten.

14               Is that your signature?

15               (Exhibit 4 was marked.)

16               **THE WITNESS:  Yes.**

17    BY MR. BEHNKE:

18          Q.   Above your signature it states, "Executed

19    this February 26th, 2020"?

20          **A.   Yes.**

21          Q.   So did you sign this the day before the

22    complaint was filed or --

23          **A.   Yes.**

24          Q.   On February 26th, 2020, how did you go

25    about signing this document?

LORI POZUELOS

```
1                 MR. MCMAHON:  Object to the form.  Vague.
2                 THE WITNESS:  I went to the district
3       attorney's office and met with Attorney Hynds, and
4       we discussed the document and the information.
5       BY MR. BEHNKE:
6           Q.   When you went to the DA's office on
7       February 26th, 2020, did you know that at that point
8       they were filing a criminal case?
9           A.   Yes.
10          Q.   This particular declaration, Exhibit 4, was
11      a declaration that you signed in support of an
12      application for a restraining order seizing
13      assets -- correct? -- or freezing assets?
14          A.   Yes.
15          Q.   Had you seen the criminal complaint before
16      you signed this declaration?
17          A.   I don't remember if they sent it before
18      then.
19          Q.   I'm going to direct your attention to
20      page 8, Paragraph 21.  This paragraph references
21      work done by auditor Marshall Wesson.
22               Do you see that?
23          A.   Yes.
24          Q.   Is he the person who did the analysis of
25      the bank records that you described earlier?
```

LORI POZUELOS

November 03, 2023

```
1           A.   Yes.
2           Q.   Directing your attention to the last couple
3      of sentences beginning at line 12.
4                It states, "Wesson tracked the fraudulently
5      obtained money once it was deposited into those bank
6      accounts," and "those bank accounts" is a reference
7      to Symons bank accounts; correct?
8           A.   I don't know if it's specific to just
9      Symons bank accounts.
10          Q.   And then it continues, "After Wesson's
11     review he established that the checks for those
12     fraudulent claims were deposited into those
13     accounts.  After the initial deposit of the checks,
14     money was transferred throughout those accounts, and
15     also money was transferred to additional accounts."
16               Do you know what accounts he was referring
17     to there or what you're referring to since you
18     signed this?
19          A.   It would be the accounts that we obtained
20     via the search warrants, the various accounts we
21     obtained.
22          Q.   So do these statements mean that money from
23     the insurance companies was received and then
24     transferred throughout various bank accounts?
25          A.   Yes.
```

**LORI POZUELOS**

November 03, 2023

```
1              Q.   It didn't all just flow to Jeff Grange;
2       correct?
3              A.   Correct.
4              Q.   Turn now to page 9, Paragraph 23.
5       Paragraph 23 states, "Based on the above listed
6       facts and findings presented during my
7       investigation, Jeff Grange committed fraud by
8       submitting billing for ground and air transports he
9       did not provide."
10             Again, as we already discussed, other than
11      the e-mails that you referenced, you don't have any
12      evidence that Jeff Grange actually submitted bills
13      to insurance companies; correct?
14             MR. MCMAHON:  Object to the form.  Vague.
15      Assumes facts not in evidence.
16             THE WITNESS:  No.
17      BY MR. BEHNKE:
18             Q.   And then the next sentence reads, "Grange
19      presented what appeared to be a legitimate medical
20      billing for ambulance transports that did not
21      occur."
22             Grange didn't present any claims to
23      insurance companies, did he?
24             MR. MCMAHON:  Object to form.
25             THE WITNESS:  Not that I'm aware
```

**LORI POZUELOS**

November 03, 2023

1        **specifically.**

2    BY MR. BEHNKE:

3        Q.   Then line 6 you start some bullets.  The

4    bullet point starting at line 6 reads -- well,

5    beginning at line 5, it reads, "Grange intentionally

6    deceived health insurance providers by submitting

7    claims for ambulance transports that did not

8    occur."

9            Do you have any evidence that Dr. Grange

10   filled out the claim forms that were submitted to

11   the insurance companies that were part of your

12   investigation?

13           MR. MCMAHON:  Object to the form.  Vague.

14           **THE WITNESS:  Just by his statement in an**

15   **e-mail to his billers stating he started completing**

16   **the claims.**

17   BY MR. BEHNKE:

18       Q.   You reviewed the claim forms that went to

19   the insurance companies; correct?

20       **A.   Yes.**

21       Q.   And the claim forms have the name of the

22   billers included on the bottom of the claim forms;

23   correct?

24       **A.   Not all of them.**

25       Q.   Many of them do; correct?

LORI POZUELOS

**November 03, 2023**

```
1            A.   I don't recall how many.

2            Q.   How many of the claims that you

3    investigated were prepared and submitted by Jeff

4    Grange?

5                 MR. MCMAHON:  Objection to the form.

6    Vague.  Calls for a legal conclusion.

7                 THE WITNESS:  I don't know.

8    BY MR. BEHNKE:

9            Q.   I'm now handing you an e-mail that's

10   Bates-stamped DEF0198552.  Mark this Exhibit 5.

11                Is this a e-mail chain between you and Eric

12   Hood?

13                (Exhibit 5 was marked.)

14                THE WITNESS:  Yes.

15   BY MR. BEHNKE:

16           Q.   Who is Eric Hood?

17           A.   My current captain.

18           Q.   And was he your captain in July of 2021?

19           A.   Yes.

20           Q.   The -- in the first e-mail on this page

21   dated July 9, 2021, at 9:27 a.m., it looks like Eric

22   Hood wrote to you -- I want to focus your attention

23   on the third sentence.

24                He wrote, "I encourage them," and when he

25   wrote "them," did you understand him to be referring
```

LORI POZUELOS

November 03, 2023

```
1        to the district attorney's office?
2            A.   Yes.
3            Q.   "I encourage them to offer the billers use
4        immunity to at least hear what they have to say."
5                 Do you see that?
6            A.   Yes.
7            Q.   As we discussed earlier, up to this point
8        in the case, July 2021, the billers had not been
9        interviewed; correct?
10           A.   Correct.
11           Q.   And in your reply to him, you wrote, "Thank
12       you for the update.  I figured this was going to
13       happen."
14                What did you mean by that?
15           A.   Because I had spoke with Lance Cantos prior
16       to them dismissing the charges, and he had told me
17       that was a possibility.
18           Q.   So this e-mail from Eric Hood was not the
19       first information you had obtained that the district
20       attorney's office was contemplating dismissing the
21       case?
22           A.   No.
23           Q.   When you spoke to Lance Cantos before this
24       e-mail about that, what did he tell you?
25           A.   I had met with him to drop off some
```

LORI POZUELOS

November 03, 2023

1    reports, and he told me there was going to be a

2    meeting with Dr. Grange's attorneys and Lance along

3    with his superiors to discuss the case.

4         Q.   Did he say anything at that time that

5    caused you to figure the dismissal was going to

6    happen?

7         A.   He said they were considering it.

8         Q.   Did you ever talk to Lance Cantos about

9    interviewing billers?

10        A.   I don't remember.

11        Q.   I've got another set of e-mails Bates

12   number -- two-page document.  First Bates number is

13   DEF0207047.  We'll mark Exhibit 6, I think we're on.

14   Before we get to this, I want to go back to

15   Exhibit 4, I think it is, the declaration for the

16   temporary restraining order.  I want to direct your

17   attention again back to page 8 or -- excuse me --

18   page 9, Paragraph 23.  Paragraph 23, line 6 that

19   first bullet point -- this states, "Grange

20   intentionally deceived health insurance providers by

21   submitting claims for ambulance transports that did

22   not occur."

23             Were you referring there to the ground

24   transport claims where the patients were treated

25   on-site and there was not a transport to a hospital?

**LORI POZUELOS**

**November 03, 2023**

```
 1                    (Exhibit 6 was marked.)
 2               THE WITNESS:  Correct.
 3    BY MR. BEHNKE:
 4        Q.  I want to go back to the e-mail that we
 5    just marked as Exhibit 6, I believe it is,
 6    DEF0207047.  On the first page a little less than
 7    halfway down there's a dash.  It says, "Original
 8    message," and below that it says, "From:  John
 9    Martella"; "Sent:  Wednesday, September 13, 2017";
10    "To:  Pozuelos, Lori."
11               Do you see that?
12        A.  Yes.
13        Q.  Was this a message that -- an e-mail
14    message from John Martella to you?
15        A.  Yes.
16        Q.  And who is John Martella?
17        A.  John Martella was -- worked for Ascensions
18    insurance.  There was a third-party provider for
19    billing that handled ambulance claims for Kaiser.
20        Q.  Was Ascension the company that processed
21    claims for Kaiser?
22        A.  Yes.
23        Q.  And do you recall what John Martella's
24    position was at Ascension?
25        A.  He was either the president or vice
```

LORI POZUELOS

1    president.  I don't recall the exact.

2        Q.   Okay.  And then it looks like he forwarded

3    to you an e-mail from him to a Telena Berry on

4    January 9, 2016.

5            Do you see that?

6        A.   Yes.

7        Q.   Do you know who Telena Berry was?

8        A.   She was an employee at Kaiser.

9        Q.   So the message the e-mail message from John

10   Martella to Telena Berry reads in its subject,

11   "Private Symons claims."

12           Do you see that?

13       A.   Yes.

14       Q.   And then John Martella wrote, "I spoke to

15   their medical director yesterday about the claims

16   they are billing.  I reiterated that billing as CCT

17   level transports doesn't seem to be the correct way

18   to bill these claims, especially since no actual

19   transport takes place."

20           Do you see that?

21       A.   Yes.

22       Q.   And when he referred to speaking to their

23   medical director, you understood that to be Jeff

24   Grange; correct?

25       A.   Correct.

**LORI POZUELOS**

November 03, 2023

1          Q.   So at least as of January 9, 2016,

2     Mr. Martella knew that no actual transports were

3     taking place based on this conversation with Jeff

4     Grange; correct?

5               MR. MCMAHON:  Object to form.  Assumes

6     facts not in evidence.  Vague.  Calls for

7     speculation.

8               **THE WITNESS:  It appears that way.**

9     BY MR. BEHNKE:

10         Q.   And did you actually interview Mr. Martella

11    as well?

12         **A.   Yes, I did.**

13         Q.   Did he tell you about his discussion with

14    Jeff Grange?

15         **A.   Yes, he did.**

16         Q.   And in Mr. Martella's discussion with Jeff

17    Grange, Jeff Grange confirmed for him that there

18    were not actual transports of the patients;

19    correct?

20         **A.   Correct.**

21         Q.   And as he explained in this e-mail, Jeff

22    Grange told Mr. Martella that they wanted to make

23    sure that they were billing these claims correctly;

24    correct?

25               MR. MCMAHON:  Object to the form.

**LORI POZUELOS**

November 03, 2023

```
 1              THE WITNESS:  I'll need to read it, if
 2      that's okay.
 3      BY MR. BEHNKE:
 4          Q.   Go ahead.
 5          A.   He did tell him that they wanted to make
 6      sure they were billing correctly and would like to
 7      discuss it.
 8          Q.   And then a little farther down the message
 9      from John Martella to Telena Berry -- he wrote, "I
10      indicate that I'd have to circle back with KP."
11      Then he wrote, "How do we proceed with this issue?
12      I don't think they should be billing these as
13      ambulance trips but have no real idea how they
14      should bill."
15              Do you see that?
16          A.   Yes.
17          Q.   So I want to go back to your declaration,
18      Exhibit 4, Paragraph 23 where you wrote, "Did Jeff
19      Grange intentionally deceive health insurance
20      providers by submitting claims for ambulance
21      transports that did not occur?"
22              You did not include reference to the fact
23      that he told Mr. Martella at Ascension in a
24      telephone call that there were no transports;
25      correct?
```

**LORI POZUELOS**

November 03, 2023

```
 1                    MR. MCMAHON:  Object to the form.
 2              THE WITNESS:  It's not on the
 3      declaration.
 4      BY MR. BEHNKE:
 5          Q.   Did you type this declaration, or did the
 6      DA?
 7          A.   The DA.
 8          Q.   Did you point out to the DA when you
 9      reviewed -- strike that.  Let me back up.
10              Did you read this declaration before you
11      signed it?
12          A.   I skimmed through it.  Yes.
13          Q.   When you got to Paragraph 23, did you say
14      anything to the district attorney about the fact
15      that you had evidence that Jeff Grange had
16      personally told the representative from an insurance
17      company that there were no transports?
18              MR. MCMAHON:  Object to the form.
19              THE WITNESS:  No, I didn't.
20      BY MR. BEHNKE:
21          Q.   When you signed the various declarations
22      we've been reviewing, this one on the 26th of
23      February and the other two on February 27th, 2020,
24      at the time you signed these, were you aware of what
25      testimony witnesses had been providing in the
```

**LORI POZUELOS**

**November 03, 2023**

```
 1       ongoing civil lawsuit?
 2            A.   No.
 3            Q.   I have another one-page document of
 4       e-mails.  This one is Bates-stamped DEF027944.
 5                 MR. BEHNKE:  We'll mark this -- I believe
 6       we're on Exhibit 8 or Exhibit 7?
 7                 (Exhibit 7 was marked.)
 8                 THE COURT REPORTER:  7.
 9                 MR. BEHNKE:  7.
10       BY MR. BEHNKE:
11            Q.   This document includes two e-mails.
12                 The bottom e-mail appears to be from Thomas
13       Perez to several individuals with cc to Joe Chavez
14       and you; correct?
15            A.   Correct.
16            Q.   This is dated August 3rd, 2017?
17            A.   Yes.
18            Q.   And then the e-mail above from Thomas Perez
19       again to a number of individuals with cc to Joe
20       Chavez and you.
21                 Do you see that?
22            A.   Yes.
23            Q.   Who was Thomas Perez?
24            A.   He was my sergeant at that time.
25            Q.   I want to focus on the top e-mail.
```

**LORI POZUELOS**

**November 03, 2023**

```
 1               It says that it was sent August 8, 2017;

 2      correct?

 3           A.   Yes.

 4           Q.   Second sentence here reads, "The SBDA's

 5      office has agreed to executing arrest warrants

 6      186.11 and search warrants on the same day," and

 7      then he says, "We tentatively would like to

 8      reschedule for sometime in September or potentially

 9      October."

10               Do you see that?

11           A.   Yes.

12           Q.   I believe you already had indicated this

13      earlier, but does this suggest that in August 2017

14      at least Department of Insurance believed that the

15      case was ready to proceed to filing and executing

16      arrest warrants?

17               MR. MCMAHON:  Object to the form.  Vague.

18      Assumes facts not in evidence.  Go ahead.

19               THE WITNESS:  At the time we were going to

20      do the arrest warrants and search warrants -- excuse

21      me -- and 186.11 search warrants all at the same

22      time.

23      BY MR. BEHNKE:

24           Q.   Why did the filing and arrest warrants and

25      search warrants not happen in this August-through-
```

LORI POZUELOS

November 03, 2023

```
1        October-2017 time frame as reflected in this

2        e-mail?

3                MR. MCMAHON:  Object to the form.  Calls

4        for speculation.  Lacks foundation.

5                THE WITNESS:  I don't remember the exact

6        reasoning of the delay.

7        BY MR. BEHNKE:

8            Q.   Do you remember who caused the delay?

9            A.   No.

10           Q.   Do you remember whether it was a decision

11       of the district attorney's office or in

12       Department of Insurance?

13           A.   I don't remember.

14           Q.   By this point is it fair to say you had

15       submitted your report to the district attorney's

16       office?

17           A.   No, I had not.

18           Q.   How was it that Department of Insurance was

19       planning the execution of arrest warrants if the

20       DA's office had not even seen the reports yet?

21           A.   We were trying to determine if we were

22       going to do search warrants at the business

23       locations and that would let him know he was being

24       investigated at that time.  So we didn't want money

25       to be transferred in the process.  So all of it had
```

LORI POZUELOS

November 03, 2023

```
1          to fall into place at the exact time.
2               Q.   In order to execute the plan as discussed
3          in this e-mail, you would have had to submit your
4          reports to the district attorney's office before
5          doing so; correct?
6               A.   Correct.  If we were going to do it in that
7          order.
8               Q.   So you were -- at this point you were
9          planning and trying to come up with a day, but you
10         had not actually submitted your reports yet?
11              A.   No.
12              Q.   Did you believe as of August 2017 that your
13         investigation was ready for filing of criminal
14         charges?
15              A.   No.
16              Q.   Why not?
17              A.   Because we still had evidence to get
18         through.
19              Q.   Did you anticipate getting that completed
20         by October 2017?
21              A.   That was the hope to get it through -- get
22         through all the evidence that we had as well as we
23         were doing location checks trying to secure what
24         locations we would be doing the search warrants at,
25         and I do recall that being a delay.
```

**LORI POZUELOS**

**November 03, 2023**

```
 1                Q.   Did you -- was one of the locations you

 2         were evaluating in 2017 Dr. Grange's residence?

 3                A.   Yes.

 4                Q.   Where did he live?

 5                A.   At that time it would have been Loma

 6         Linda.

 7                Q.   You said "at that time."

 8                     You are aware that soon after this time

 9         period they moved; correct?

10                A.   Yes.

11                Q.   And that was to Temecula?

12                A.   Yes.  From what I know.  That's what I

13         found.

14                Q.   You never went to his house; correct?

15                A.   As part of his case --

16                     (Indiscernible cross-talk.)

17         BY MR. BEHNKE:

18                Q.   The Temecula house?

19                A.   Oh, Temecula.  We did go to the house,

20         not -- we were never in the house, though.

21                Q.   When did you go to the house?

22                A.   I don't remember the exact date.

23                Q.   You didn't actually go inside?

24                A.   No.

25                     MR. BEHNKE:  You want to take a lunch break
```

LORI POZUELOS

November 03, 2023

```
 1      at this time?

 2                  MR. MCMAHON:  Sure.

 3                  MR. BEHNKE:  Can we go off the record?

 4                  MR. MCMAHON:  Off the record.

 5                  THE VIDEOGRAPHER:  Off the record.  The

 6      time is 12:44 p.m.

 7                  (Lunch recess.)

 8                  THE VIDEOGRAPHER:  Back on the record.

 9      This is the beginning of Media Number 4.  The time

10      is now 1:36 p.m.

11                  MR. BEHNKE:  Are we still off the record?

12                  THE COURT REPORTER:  We're on.  He read us

13      on.

14                  MR. BEHNKE:  Can we go off the record?

15                  THE VIDEOGRAPHER:  Off the record at

16      1:41 p.m.

17                  (Recess taken.)

18                  THE VIDEOGRAPHER:  Back on the record.

19      This is the beginning of Media Number 5.  The time

20      is 1:44 p.m.

21      BY MR. BEHNKE:

22         Q.  Before the break we spoke briefly about

23      John Martella from Ascension.

24                  Do you recall that?

25         A.  Yes.
```

**LORI POZUELOS**

1      Q.   I believe you said you interviewed him as

2      part of your investigation; correct?

3      **A.   Yes.**

4      Q.   And did that interview take place

5      September 13, 2017?

6      **A.   I don't recall the exact date.  There were**

7      **several interviews or discussions with him.**

8      Q.   In your interviews with Mr. Martella, did

9      he at any point tell you that Kaiser does routinely

10     pay ground ambulance claims where the patient was

11     not transported which he called a "treat/no

12     transport" situation?

13            MR. MCMAHON:  Object to the form.  Vague.

14            **THE WITNESS:  We did discuss that.**

15     BY MR. BEHNKE:

16     Q.   And the -- did he refer to ambulance claims

17     where the patient was not transported as treat/no

18     transport situations?

19     **A.   I don't know if there was specifically to**

20     **that.**

21     Q.   Did --

22            MR. BEHNKE:  Do you have --

23            MR. LAHANA:  Yeah.  They are in there.

24     ///

25     BY MR. BEHNKE:

LORI POZUELOS

November 03, 2023

```
 1            Q.   One-page claim form.  Mark this next in
 2       order.
 3                 MR. BEHNKE:  What are we on?  8?
 4                 (Exhibit 8 was marked.)
 5                 THE COURT REPORTER:  Yes.
 6                 MR. BEHNKE:  We've redacted the information
 7       on it.
 8                 MR. MCMAHON:  Uh-huh.
 9                 MR. BEHNKE:  For counsel's sake so you know
10       what we're referring to because this was from the
11       criminal case and it wasn't Bates numbered, I'll
12       give you the -- so you have a copy, a whole
13       unredacted one.
14                 MR. MCMAHON:  All right.  Thank you.
15       BY MR. BEHNKE:
16            Q.   Looking at Exhibit 8, which we've just
17       placed in front of you, does this appear to be a
18       claims form for a ground ambulance claim?
19            A.   Yes.
20                 MR. MCMAHON:  With the personal identifying
21       information of the patient redacted?
22                 MR. BEHNKE:  Yes.
23       BY MR. BEHNKE:
24            Q.   At the top of the page where the patient's
25       name and personal identifying information would be
```

**LORI POZUELOS**

**November 03, 2023**

```
1        filled in, that has been redacted; correct?

2            A.   Correct.

3            Q.   The insurance plan that this was submitted

4        to is reflected in the right column is Anthem

5        Blue Cross; correct?

6            A.   Correct.

7            Q.   And was this form submitted on behalf of

8        Symons?

9            A.   Yes.

10           Q.   And that's indicated in the lower right

11       corner -- correct? -- under "Billing Provider"?

12           A.   Correct.

13           Q.   Now, directing your attention back to the

14       claim form, Exhibit 8, I believe, it is?

15               MR. BEHNKE:  This has the patient --

16       BY MR. BEHNKE:

17           Q.   Let's put the claim form to the side for a

18       second.

19               When you spoke to Mr. Martella at

20       Ascension, did he indicate to you that he was able

21       to tell from insurance claim forms that had been

22       submitted by Symons that the patient in some of the

23       claims had not been transported?

24           A.   Yes, he did.

25           Q.   How was he able to make that
```

**LORI POZUELOS**

**November 03, 2023**

```
 1        determination?
 2            A.   I'd have to look at my report for a
 3        specific way he told me.
 4            Q.   Were you able to make that determination
 5        from looking at claim forms yourself as part of your
 6        investigation?
 7            A.   Yes.
 8            Q.   How did you make that determination?
 9            A.   On some of the bills there was no mileage
10        showing.
11            Q.   So going back to Exhibit 8 on the lower
12        half of the page, there are columns for date of
13        service; procedure, service, or supplies; and
14        charges.
15                 For ground ambulance claims, is there a
16        code that a provider would use to bill mileage?
17            A.   Yes.
18            Q.   Okay.  And so when you say there was no
19        mileage claim, do you mean that you saw claim forms
20        that there was no charge for mileage?
21            A.   Correct.
22            Q.   Did you also see that in claim forms where
23        there's reference to pickup and drop-off location
24        that those were the same?
25            A.   Yes.
```

LORI POZUELOS

November 03, 2023

```
1          Q.   Did you form the opinion in your
2    investigation where claim forms for ground ambulance
3    claims were submitted to insurance companies that
4    did not include a claim for mileage and that
5    reflected the pickup and drop-off locations to be
6    the same that the insurance companies were deceived
7    by those forms?
8               MR. MCMAHON:  Object to the form.  Vague.
9               THE WITNESS:  Yes.
10   BY MR. BEHNKE:
11         Q.   How?
12         A.   Because when you read the code, it appears
13   that there was an ambulance involved in the
14   treatment that was provided.
15         Q.   How do you mean?
16         A.   The code that they are using is for ground
17   ambulance transport whether it be in ALS, advanced
18   life support, basic life support, or critical care
19   transport.  Oh.
20              THE VIDEOGRAPHER:  You're scratching your
21   mike.
22              MR. MCMAHON:  Sorry.
23              THE WITNESS:  Critical care transport.  So
24   when I'm looking at the bill, it would appear there
25   was an ambulance involved in the care that was
```

LORI POZUELOS

November 03, 2023

1    provided, but in speaking with the witnesses, they

2    advised that there was no ambulance provided.  They

3    went into a medical tent.  But when you look at the

4    claim form, it appears that an ambulance was part of

5    the care.

6    BY MR. BEHNKE:

7        Q.   So in your assessment would the claims have

8    been appropriate if instead of a medical aid tent

9    they put the individual in the back of an ambulance

10   and treated them there?

11       A.   That's one scenario that would make me look

12   at it differently.

13       Q.   Did you make a determination during your

14   investigation about whether or not there was an

15   ambulance at the site where these people were

16   treated?

17       A.   No.

18       Q.   Other than the fact that you believe the

19   claim forms suggested that an ambulance was involved

20   in the treatment, was there anything else about the

21   ground ambulance claims form -- claim forms.

22   Sorry -- that you thought was deceptive?

23            MR. MCMAHON:  Object to the form.  Vague.

24            THE WITNESS:  There were some forms where

25   you saw the to and from.  It would have the same

LORI POZUELOS

November 03, 2023

1        physical address, but then it would note "event" and

2        then another location, but it's actually the same

3        address.  They just changed the word of the to and

4        from as far as, like -- I can't remember the exact

5        words that were on there, but "main event" and

6        "medical tent."  And I felt like they are the same

7        location, but they changed the wording to it.

8    BY MR. BEHNKE:

9        Q.   In the example you just described, did the

10       claim form you're thinking of indicate that the

11       patient was transported by ambulance?

12       A.   I don't recall specifically what was on the

13       claim form.

14       Q.   I believe you said that the claim form

15       you're thinking of had the same address for the

16       location, but it indicated one location was main

17       event; the other location was I think you said

18       tent?

19       A.   Yes.

20       Q.   And on the claim form you're thinking of

21       that had that designation there, did you determine

22       whether or not the patient was or was not moved from

23       the main event to a tent?

24       A.   I interviewed the patients, and I don't

25       know specific to that particular claim, but in

LORI POZUELOS

November 03, 2023

1   everyone that I interviewed, they said they went to

2   the medical tent.  There was one that stated she

3   went via piggyback ride, and the other one said they

4   walked to the tent.

5        Q.   Did you interview any insurance company

6   representatives that reviewed the ground ambulance

7   claim forms and told you that they believed based on

8   those forms that the patient had, in fact, been

9   transported by ambulance?

10       A.   Not that I recall.

11       Q.   In your own reports, didn't you also

12  indicate that the claim form submitted on behalf of

13  Symons in and of themselves showed that there was no

14  transport in the ground ambulance claims?

15       A.   I did summarize what I saw on each claim.

16       Q.   And there were at least some claims as you

17  just described did not include a mileage claim and

18  had the same address for the pickup and drop-off

19  location; correct?

20       A.   Correct.

21       Q.   And you reviewed claim forms for the air

22  ambulance claims also; correct?

23       A.   Correct.

24       Q.   And in your assessment what information

25  contained on claim forms for air ambulance claims

**LORI POZUELOS**

November 03, 2023

```
 1      was deceptive to the insurance companies?
 2           A.   The true provider that provided the air
 3      ambulance transport was not listed on the forms.
 4           Q.   And what do you mean when you refer to the
 5      provider of an air ambulance transport?
 6           A.   For instance, the San Bernardino County
 7      Sheriff's air rescue units that responded to provide
 8      the air ambulance transport.  It does not state
 9      anything about San Bernardino County sheriffs
10      providing the air transport.
11           Q.   What -- during the course of your
12      investigation of this matter, what was your
13      interpretation of what constitutes an air
14      ambulance?
15           A.   The helicopter responding on scene and
16      picking up the patient and transporting the patient
17      to hospitals.
18           Q.   In your assessment during this
19      investigation if a private helicopter company like I
20      think Icon was one of the ones involved in this case
21      with no medical personnel or medical equipment on
22      the helicopter transported a patient, would that be
23      an air ambulance?
24                MR. MCMAHON:  Object to the form.  Vague.
25      Incomplete hypothetical.
```

LORI POZUELOS

November 03, 2023

```
 1                  THE WITNESS:  I don't know.
 2      BY MR. BEHNKE:
 3          Q.   When you say "provide the air ambulance,"
 4      what do you mean?
 5          A.   Provide the helicopter that provided --
 6      that they transported in.
 7          Q.   If I have a helicopter and I loan my
 8      helicopter to another person and then that person
 9      uses the helicopter as an air ambulance to transport
10      a patient, in your assessment who provided the
11      service?
12                  MR. MCMAHON:  Object to the form.  Vague.
13      Incomplete hypothetical.  Calls for speculation.
14      Calls for a legal conclusion.
15                  THE WITNESS:  There would be a lot of
16      factors I'd have to take into that, whether they are
17      licensed, if they are an air ambulance provider
18      through the County, through the FAA.
19      BY MR. BEHNKE:
20          Q.   So if a fully equipped -- when I say "fully
21      equipped," I say fully equipped with medical
22      equipment and medical personnel -- helicopter
23      transports an individual but they don't have a FAA
24      certificate, is it your assessment that they are not
25      providing a air ambulance transport?
```

**LORI POZUELOS**

**November 03, 2023**

1                    MR. MCMAHON:  Object to the form.

2                    THE WITNESS:  There's other factors that go

3          into that.

4          BY MR. BEHNKE:

5                Q.   One of the factors you listed is licensing;

6          right?

7                A.   Yes.

8                Q.   When you say "licensing," are you referring

9          to FAA certification?

10               A.   That is one of the requirements.

11               Q.   What are the other requirements?

12               A.   You -- wherever you're providing, the

13         service the county that you're in, you have to have

14         an air ambulance license within that county to be an

15         air ambulance provider as well.

16               Q.   So, again, my question is in your

17         assessment if a fully equipped staffed with medical

18         personnel helicopter transports an injured patient

19         but they are not licensed in the county where that

20         transport happens, are they not providing an air

21         ambulance service?

22                    MR. MCMAHON:  Object to the form.

23                    THE WITNESS:  They are providing a service,

24         but I wouldn't consider it an air ambulance.

25         BY MR. BEHNKE:

LORI POZUELOS

November 03, 2023

1          Q.   So when you -- I believe we already looked
2      at the declaration that you submitted, but in your
3      declaration that you submitted to the court where
4      you indicated that Dr. Grange deceived insurance
5      company, with respect to air ambulance claims, how
6      do you think that happened?
7          A.   There are several instances; so I don't
8      know -- is it one specific?
9          Q.   Well, you grouped it all and made one claim
10     in your declaration.  So I'm just trying to get at
11     what you meant when you said that Dr. Grange
12     deceived the insurance companies.
13             What about the claims that were submitted
14     do you think deceived insurance companies?
15         A.   I felt that the claims submitted for the
16     air transports didn't fully explain who provided
17     that air ambulance transport.
18         Q.   In what factors did you consider in
19     determining who provided the air ambulance
20     transport?
21         A.   I interviewed the sheriff's department, and
22     they gave me documentation showing who they provided
23     air ambulance transports for, then looked at the
24     claims involving the Mexico transports and
25     determined who actually provided that air ambulance

**LORI POZUELOS**

November 03, 2023

1        transport.

2            Q.   And what factors about the particular

3        transports did you look to to determine who the

4        provider was?

5            **A.   Who actually the helicopter belonged to,**

6        **who was on that flight, and the details that were**

7        **provided versus, you know, what I found versus what**

8        **was put on the claim form.**

9            Q.   And what were those details?

10               MR. MCMAHON:  Object to the form.  Vague.

11       Calls for a narrative.

12               **THE WITNESS:  That it was, in fact, a**

13       **different company other than Symons as it was billed**

14       **that provided the service.**

15       BY MR. BEHNKE:

16           Q.   Again, what do you mean when you say it was

17       a different company that provided the service?  Let

18       me ask it this way.  In every one of these

19       situations that you investigated -- again, focused

20       on the air ambulance claims.

21               In every one of the claims that you

22       investigated, who provided medical care on the

23       flight?

24           **A.   For instance, the sheriff's department for**

25       **those flights, it was the sheriff department's**

LORI POZUELOS

November 03, 2023

1    personnel that was on that flight to provide medical

2    care and flew them from the location to the

3    hospital.  For the -- Mexico there was doctors on

4    the flight that provided the care.

5        Q.    The doctors on the flight were Symons

6    personnel; correct?

7        A.    I don't know if they were specifically

8    working for Symons.  I was told they weren't.

9        Q.    Who told you that the doctors on the Mexico

10   flights were not Symons personnel?

11       A.    The promoters or shall I say one

12   promoter.

13       Q.    Yeah.  Who?

14       A.    That would be Roger Norman.

15       Q.    In those situations -- the situation you

16   just described, the sheriff's department, and then

17   the information you got from Roger Norman, what, if

18   any, involvement did you understand Symons had with

19   those transports?

20       A.    For the sheriff's department Symons was the

21   medical care provider at the medical tent event at

22   the venue.  They were providing the treatment to

23   people at the event at their medical aid tent, and

24   then the sheriff's department was contacted because

25   they needed to fly the patient to a hospital and

LORI POZUELOS

November 03, 2023

1    then for the promoters Symons as part of the

2    agreement that they explained to me is Dr. Grange

3    was going to be there as the medical director in

4    providing care on the helicopters, and in exchange

5    for his services they were going to promote Symons

6    on their banners.

7        Q.   And did you interview anyone else connected

8    with the Baja races that provided different

9    information about Symons' role with regard to

10   helicopter transports?

11       A.   I did interview Paul Fish, who was the vice

12   president of --

13           THE COURT REPORTER:   "The vice president

14   of"?

15           THE WITNESS:  -- Score prior to Roger

16   Norman taking over.

17   BY MR. BEHNKE:

18       Q.   And what did he tell you that was

19   different?

20       A.   He had stated that Dr. Grange was -- I

21   don't know that it was a medical director, but

22   working on the helicopters as well as providing a

23   service as a doctor on the flights.

24       Q.   Did he tell you that Dr. Grange provided

25   medical equipment as well as medical personnel to be

**LORI POZUELOS**

November 03, 2023

```
1        used on the helicopters?
2             A.    I believe so.
3             Q.    And did he explain that Dr. Grange or other
4        Symons personnel were responsible for stabilizing
5        and treating the injured racers during the
6        helicopter transports?
7             A.    I don't recall exactly what he told me.
8             Q.    Did he tell you that he gave Dr. Grange
9        permission to bill insurance companies for the
10       services?
11            A.    Yes, he did.
12            Q.    And was, to your understanding, that for
13       those race events the ones in Mexico, that the --
14       well, let me rephrase that.
15                  What was your understanding about who paid
16       for the helicopters that were used for the race
17       events in Mexico?
18            A.    The promoters paid for it.
19            Q.    Did you learn any information during your
20       investigation that for at least some of the
21       transports Symons had paid the fee for the
22       helicopter?
23            A.    Yes.
24            Q.    That was from an interview of -- was it the
25       owner of the helicopter company?
```

LORI POZUELOS

November 03, 2023

1          A.    For one of the helicopter companies.

2          Q.    Do you recall which one that was?

3          A.    I believe it was Icon.

4          Q.    And getting back to the air transports that

5    involved sheriff helicopters, was it your

6    understanding that Symons medical personnel were not

7    on those helicopters treating the patients during

8    the transports?

9          A.    There was a couple flights where the

10   patient care report noted that one of the doctors

11   was on the flight.

12               (Reporter request for clarification.)

13   BY MR. BEHNKE:

14         Q.    Was it your understanding that there were

15   some flights where there was no Symons personnel on

16   the flight?

17         A.    It was not documented.  There were some

18   flights.

19         Q.    Getting beyond the documents, though.

20               Did you interview anyone to confirm whether

21   or not Symons personnel were on the flights where

22   there was no indication in the documents?

23         A.    Yes, I did.

24         Q.    Who did you talk to?

25         A.    It was Lieutenant Al Daniel.

LORI POZUELOS

November 03, 2023

1          Q.   And was he on the flights?

2          A.   No.

3          Q.   What did he tell you about whether or not

4     Symons personnel were on the flights?

5          A.   I had asked specifically why that would be

6     documented on a patient care report, and he stated

7     they have to document who's on the flights.  So the

8     ones that showed the doctor on the flight -- that's

9     why it's documented and some even said per

10    Dr. Grange's request to put them on the flight, and

11    they are required to document who is on the

12    flight.

13         Q.   You didn't interview persons who were on

14    the flights in question; correct?

15         A.   No.

16         Q.   Were you aware that Dr. Grange -- strike

17    that.

18              Were you aware that a expert witness

19    testified in the civil trial on behalf of Dr. Grange

20    before he was arrested?

21              MR. MCMAHON:  Object to the form.

22              THE WITNESS:  No.

23    BY MR. BEHNKE:

24         Q.   Did you become aware of that later?

25         A.   Yes.

**LORI POZUELOS**

**November 03, 2023**

1        Q.   Were you curious at all about what evidence

2    was going to be offered in defense of the

3    allegations in the civil lawsuit before you arrested

4    Dr. Grange?

5        A.   Yeah.  Yes.

6        Q.   Did you do anything to try to find out what

7    that was?

8        A.   No.

9        Q.   When you conducted your investigation

10   focusing on the insurance companies, did you

11   interview any of the employees who actually received

12   and processed the claims for the insurance

13   companies?

14       A.   No.

15       Q.   Why not?

16       A.   Because as I was explained, it's done

17   through the computer.  They are initially processed

18   through a computer system.

19       Q.   At some point in the process, though, at

20   least in some instances, humans become involved;

21   correct?

22       A.   Yes.

23       Q.   For instance, if there's a question on a

24   claim, a human would have to review it and make a

25   determination; correct?

LORI POZUELOS

November 03, 2023

```
1           A.   Yes.
2           Q.   And in doing that, the insurance company
3    employee or third-party employee like Ascension that
4    you mentioned earlier, they may have to contact the
5    provider; correct?
6           A.   Yes.
7           Q.   Other than Mr. Martella as you explained
8    earlier, who told you about contact he had with
9    Dr. Grange, did you interview any other insurance
10   company employees handling these claims who spoke to
11   representatives at Symons about the claims?
12          A.   Yes.
13          Q.   Who else did you talk to?
14          A.   There were representatives with Kaiser as
15   well as I believe it was Signa who had a complaint
16   from one of their customers, I guess you would say,
17   who had an issue with a bill she received.
18          Q.   And focusing first on Kaiser, who at Kaiser
19   did you talk to that communicated with Symons about
20   a claim?
21          A.   It was with their clinical review team.
22   I'd have to -- there were several people on the
23   interview.  I believe her last name was Berry that
24   was part of that interview, who explained that she
25   had spoke with or had been reviewing claims that
```

LORI POZUELOS

November 03, 2023

1      they had some concerns with.

2          Q.   Who at Symons did they tell you they spoke

3      to?

4          A.   I don't recall.

5          Q.   Do you recall what they told you about what

6      they learned from Symons?

7          A.   I recall what they told me the issue was,

8      but specific to speaking to Symons, I don't know.

9          Q.   In that interview did those representatives

10     from Kaiser tell you that Kaiser will pay ground

11     ambulance claims when the patient is not transported

12     but in those cases bills are submitted as a basic

13     response code with the lowest level for transport?

14         A.   Yes.

15         Q.   Such as I believe it's BLS, basic life

16     support transport?

17         A.   Yes.

18         Q.   And the other company you said that

19     contacted Symons was?

20         A.   Signa.

21         Q.   Signa.  And what did they tell you about

22     their contact with Symons?

23         A.   I don't recall.

24         Q.   Do you recall who at Symons they spoke

25     to?

**LORI POZUELOS**

November 03, 2023

```
 1              A.   No.
 2              Q.   Would that be documented in your report of
 3         the interview?
 4              A.   Yeah.  Whatever they told me would be in my
 5         interview report.
 6              Q.   On that point to the extent you wrote
 7         reports of your interviews, would you have any
 8         reason to think that any of the information written
 9         in your reports was not accurate?
10              A.   No.
11              Q.   You would not have written something in
12         your report that did not happen, would you?
13              A.   No, I wouldn't.
14              Q.   I'm going to mark this next in order.
15                   MR. BEHNKE:  Are we on 10 yet, or is it 9?
16                   (Exhibit 9 was marked.)
17                   THE COURT REPORTER:  9.
18                   MR. BEHNKE:  9.
19         BY MR. BEHNKE:
20              Q.   This is a one-page document.  It's got the
21         Bates number on the bottom, DEF0224674.
22                   Do you recognize this writing?
23              A.   Yes.
24              Q.   Are these your notes?
25              A.   Yes.
```

LORI POZUELOS

November 03, 2023

1          Q.   Now, up at the top it says, "4/18/19."
2               Do you see that?
3          A.   Yes.
4          Q.   Is that the date for all of the notes on
5     this page?
6          A.   I'm not certain it's for all the notes.
7          Q.   Would it have been at least around that
8     time frame?
9               Did you keep notes kind of in chronological
10    order going through your notebook?
11         A.   Yeah.
12         Q.   At the bottom of the page, it looks like it
13    was highlighted.  It looks like it says, "Ask
14    lawyers handling what the basis is for allowing
15    civil to provide info for criminal."
16              Do you see that?
17         A.   Yes.
18         Q.   What does that refer to?
19         A.   That refers to my captain got a copy of
20    some transcripts for the civil case, and we didn't
21    know what to do with it.  Like, do we -- do I have
22    access to it, or do I not?  So I wanted to check
23    with the attorney to see what I should do with the
24    information I received.  So where I have "lawyers
25    handling," it's 'cause I asked the questions and

LORI POZUELOS

November 03, 2023

1      decided to let the lawyers handle if that was

2      something that we could use as part of our case.

3          Q.   When you say you asked about it, who did

4      you ask?

5          A.   It would have been -- looks like I

6      contacted Mitch for them to check on it, and I also

7      spoke to Lance Cantos about it.

8          Q.   And would Mitch have been a reference to

9      Mitch Neumeister, or was there another Mitch?

10         A.   That would be to Mitch Neumeister.

11         Q.   And that notation says, "4/19."

12              So is that the day you talked to Mitch

13     Neumeister?

14         A.   Correct.

15         Q.   And then a couple lines down you wrote,

16     "Brady issues - other obligations with changes in

17     Brady."

18              Do you see that?

19         A.   Yes.

20         Q.   What does that refer to?

21         A.   There was just some changes in the Brady

22     loss and making sure that, you know, whatever has

23     been turned over to us that we make sure that they

24     know we have it, I believe.

25         Q.   Was it your understanding that if you had

LORI POZUELOS

November 03, 2023

1      exculpatory information, there was an obligation to

2      provide that to the defendant?

3                  MR. MCMAHON:  Object to the form.  Vague.

4      Calls for a legal conclusion.  Calls for

5      speculation.

6                  **THE WITNESS:  How I understand it is**

7      **anything we have, whether it's exculpatory or not,**

8      **that we have to turn it over.**

9      BY MR. BEHNKE:

10          Q.   When you say "we," was there some question

11     in your mind about whether we would have included

12     Mitch Neumeister and the people handling the civil

13     case?

14          **A.   No.  "We" as in, like, me being the**

15     **investigator and anything I had that had to do with**

16     **the criminal case.**

17          Q.   At that time focused on April 2019, was it

18     your understanding that you would not have had an

19     obligation to turn over information favorable to the

20     accused that was possessed by the civil lawyers?

21                 MR. MCMAHON:  Object to the form.  Vague.

22     Assumes facts not in evidence.  Calls for a legal

23     conclusion.  Calls for speculation.

24                 **THE WITNESS:  I didn't have access to it.**

25     **So I didn't feel that it was my obligation.  I**

LORI POZUELOS

November 03, 2023

1        didn't even know what existed.

2    BY MR. BEHNKE:

3        Q.   Focusing on the period prior to the arrest,

4    during that period prior to the arrest, at any point

5    did you make any inquiry of Mitch Neumeister or

6    anyone else affiliated with the civil case to

7    determine whether or not they had developed evidence

8    that would be favorable to Dr. Grange?

9        A.   No.

10       Q.   Handing you another page that we'll mark

11   next in order.

12            MR. BEHNKE:  10; right?

13            (Exhibit 10 was marked.)

14            MR. MCMAHON:  Yeah.  Thank you.

15   BY MR. BEHNKE:

16       Q.   This Exhibit 10 has a Bates number in the

17   lower right, DEF0224705; correct?

18       A.   Yes.

19       Q.   And this -- do you recognize this

20   document?

21       A.   Yes.

22       Q.   What is this?

23       A.   These are the notes that Lance Cantos

24   made.

25       Q.   He provided these to you?

**LORI POZUELOS**

**November 03, 2023**

1       A.    Yes.

2       Q.    When did he send you these notes?

3       A.    **I don't recall the exact date.**

4       Q.    Would this have been information you got

5    from Lance Cantos during the investigation?

6       A.    Yes.

7       Q.    Okay.  And I don't see any date on this

8    document; right?

9       A.    No.

10      Q.    Well, it -- in the lower middle part of the

11   page under the heading "To-dos," it says, "Brady -

12   are all parts of the DOI a part of the prosecution

13   team for purposes of Brady."

14            Do you see that?

15      A.    Yes.

16      Q.    Was that a question Lance Cantos was posing

17   to you, or what is that?

18      A.    **I took it as questions he needed to answer**

19   **for himself.**

20      Q.    So that's not something you looked into and

21   then got back to him with an answer?

22      A.    No.

23      Q.    Then he wrote, "Qui tam case/investigation

24   involved the DOI; my investigator does not seem to

25   have access."

**LORI POZUELOS**

**November 03, 2023**

1                    Do you know what he was referring to there?

2          A.    That I don't have access.

3          Q.    So "my investigator" you understood to be

4     you?

5          A.    Yes.

6          Q.    And then last line:  "Do I need to get this

7     information from DOI."

8                    Did you talk to Lance Cantos about this?

9          A.    That was the question we had of the

10    information; the only -- shall I rephrase it.  The

11    only time we really discussed that was when we had a

12    question of the deposition that was sent to us.

13         Q.    Do you recall what deposition transcript

14    that was?

15         A.    I don't.

16         Q.    Was it someone -- deposition of someone

17    other than Dr. Grange?

18         A.    I don't know.

19         Q.    Did Lance Cantos ever report back to you

20    whether he got answers to any of these questions?

21         A.    Not that I recall.

22         Q.    At any point did he tell you, "We do need

23    to get access to this information.  Contact the

24    civil people and get their information"?

25         A.    No.

LORI POZUELOS

November 03, 2023

1           Q.   He never gave you any kind of direction

2      like that?

3           A.   No.

4           Q.   None of your supervisors gave you that kind

5      of direction either?

6           A.   No.

7           Q.   As part of your training to work as an

8      investigator with the Department of Insurance, did

9      you receive training regarding obtaining an arrest

10     warrant?

11          A.   Just general training.

12          Q.   What do you mean by "general training"?

13               Like did you -- was there any classroom

14     training or anything like that?

15          A.   Specific to getting an arrest warrant, I

16     wouldn't say I had a specific class.

17          Q.   Did you ever receive any training about

18     what information needs to be provided in an

19     application for an arrest warrant?

20          A.   Yeah.  I would say yes.

21          Q.   Were you -- strike that.

22               Did you ever receive training that in

23     applying for an arrest warrant, you should provide

24     exculpatory information to the judge?

25               MR. MCMAHON:  Object to the form.  Vague.

LORI POZUELOS

November 03, 2023

```
 1              THE WITNESS:  I don't recall.
 2    BY MR. BEHNKE:
 3         Q.   Did you understand that information you
 4    provide to the judge in applying for an arrest
 5    warrant should be complete and accurate?
 6         A.   Yes.  Oh, sorry.
 7              MR. MCMAHON:  Go ahead.  Go ahead.
 8    BY MR. BEHNKE:
 9         Q.   When you -- focusing on February 27th,
10    2020, the date of the arrest, you said earlier that
11    you went with Rebeca Hynds -- was it? -- to court?
12         A.   Correct.
13         Q.   And you went up to the judge's chambers;
14    correct?
15         A.   Correct.
16         Q.   I believe you said after the judge signed
17    the warrant, you called to let -- was it Lopez?
18              Was he the one you said you let know the
19    judge has signed the warrant?
20         A.   Yes.
21         Q.   Other than making the call to Sergeant
22    Lopez, did you have any other communication while
23    you were at court with any of the arresting
24    officers?
25         A.   Yes.
```

LORI POZUELOS

November 03, 2023

1          Q.    And how were you communicating with them?

2          A.    Through an investigator who was at the DA's

3     office who was going to assist with some other stuff

4     dealing with the case.

5          Q.    Was that by telephone or by text message?

6          A.    By text, I believe.

7          Q.    Do you still have those text messages?

8          A.    No, we don't.

9          Q.    Did you delete them at some point?

10         A.    We wiped the entire phone.  We had to turn

11    the phones over.

12         Q.    Your phone?

13         A.    The whole division's phones.  We got new

14    cell phones; so they required us to wipe the phones

15    when we turned them in.

16         Q.    That's not something related to the case.

17               That was a department issue?

18         A.    Correct.

19               MR. MCMAHON:  Before you filed the lawsuit?

20               MR. BEHNKE:  That was my next question.

21    BY MR. BEHNKE:

22         Q.    When did that happen?

23         A.    Yeah.  I don't recall the exact date, but

24    we didn't have those phones when I was advised of

25    the lawsuit.

LORI POZUELOS

November 03, 2023

1          Q.   Okay.  How did you find out that the

2     warrant ended up being a no-bail warrant?

3          **A.   It actually wasn't a no-bail warrant.**

4     **There was a hold on the warrant, a 1275 to show**

5     **where the money was coming from, but when I look at**

6     **the documents, there's a $1.5 million bail.**

7          Q.   Let me check something real quick.

8          **A.   Okay.**

9          Q.   Handing you what's going to be marked next

10    in order.

11             MR. BEHNKE:  I believe we're on 11.

12             (Exhibit 11 was marked.)

13             THE COURT REPORTER:  Yes.

14             **THE WITNESS:  Oh.**

15    BY MR. BEHNKE:

16         Q.   Showing you Exhibit 11.

17             Do you recognize this?

18         **A.   Yes, I do.**

19         Q.   Is this the arrest warrant for Jeff

20    Grange?

21         **A.   Yes.**

22         Q.   And you see down at the bottom it --

23    there's written, "Defendant is to be admitted to

24    bail on the sum of no bail"?

25         **A.   I misstated then.**

**LORI POZUELOS**

**November 03, 2023**

1              Q.    Do you know who wrote that in?

2              **A.    The -- I don't know.  It looks like the**

3       **judge's handwriting.**

4              Q.    That's not your writing?

5              **A.    No, it's not.**

6              Q.    When you were in chambers with him, did he

7       say anything to you about the amount of bail?

8                    Did you have any conversation with him

9       about it?

10             **A.    I don't recall.**

11                   MR. BEHNKE:  Let's take five and go off the

12      record.

13                   THE VIDEOGRAPHER:  Off the record.  The

14      time is 2:39 p.m.

15                   (Recess taken.)

16                   THE VIDEOGRAPHER:  Back on the record.

17      This is the beginning of Media Number 6.  The time

18      is now 3:00 p.m.

19      BY MR. BEHNKE:

20             Q.    Before your work on this investigation, had

21      you received any training regarding ambulance

22      billing?

23             **A.    No.**

24             Q.    Before this investigation had you conducted

25      any other investigations of ambulance billing?

**LORI POZUELOS**

November 03, 2023

```
1          A.    No.
2          Q.    Before conducting this investigation, had
3    you received any training regarding insurance
4    coding?
5          A.    Minimal.
6          Q.    What do you mean by that?
7                What training did you receive?
8          A.    We would do health care training that you
9    would have someone come in as part of a conference
10   maybe for an hour or two and explain, you know, what
11   CPT codes were or different billing codes and give a
12   general knowledge of billing codes.
13         Q.    But you had not received any training
14   specific to ambulance billing; correct?
15         A.    No.
16         Q.    Earlier you explained that Mr. Martella
17   told you that he had spoken to Dr. Grange about
18   Symons bills.
19               Do you recall that?
20         A.    Yes.
21         Q.    Did you speak to any other representative
22   from any of the insurance companies who reported to
23   you that they had spoken directly to Dr. Grange?
24         A.    I believe the other Kaiser
25   representative.
```

**LORI POZUELOS**

**November 03, 2023**

```
 1          Q.   Do you recall who that was?
 2          A.   The last name Berry.  I don't remember her
 3     first name.  And she may not have even -- now that I
 4     think about it, may not have spoken to him directly
 5     but had looked into the billing.  I'm not certain if
 6     she spoke to him directly.
 7          Q.   Other than possibly Ms. Berry from Kaiser,
 8     do you recall any other insurance company
 9     representative telling you about conversations they
10     had with Dr. Grange?
11          A.   Not that I recall.
12          Q.   If you received information like that from
13     an insurance company representative, would you have
14     recorded that in a report?
15          A.   Yes.
16          Q.   That's something that would be important to
17     your investigation, and you would document it;
18     correct?
19          A.   Yes.
20          Q.   Okay.  I don't have any other questions.
21     Hold on.  Maybe I do.  Oh, yes.
22               Other than Dr. Grange have you in any of
23     your other investigations had no-bail warrants
24     issued?
25          A.   Not that I recall.  I have had 1275 motions
```

**LORI POZUELOS**

**November 03, 2023**

1          if that's what you're speaking to.

2               Q.   Okay.  Is your understanding of 1275 hold

3          meaning that the individual is not allowed to post

4          bail until they convince the court that the bail

5          proceeds are not feloniously obtained?

6               A.   Yes.

7               Q.   Okay.  In those situations there is a bail

8          amount.  They just have to convince the court that

9          the bail proceeds, for lack of a better term, are

10         clean before they can post the bail; is that

11         correct?

12              A.   From what I recall.

13              Q.   My question is whether you've had any other

14         cases like this one where the judge did not even set

15         the bail amount?  Made it a no-bail warrant?

16              A.   I don't remember.

17                   MR. BEHNKE:  Now I think I'm done.

18                   MR. MCMAHON:  Okay.  I have just a few

19         clarifying questions.

20                   MR. BEHNKE:  Okay.

21

22                            EXAMINATION

23         BY MR. MCMAHON:

24              Q.   Ms. Pozuelos, if you can take a look at

25         Exhibit 4 again.

**LORI POZUELOS**

November 03, 2023

1          A.    Oh, sorry.

2          Q.    And Paragraph 23 Mr. Behnke asked you some

3     questions about where it says, "Grange presented";

4     Grange also billed for.

5                Do you recall those questions?

6          A.    Yes.

7          Q.    When you reviewed and signed this

8     declaration, did you mean that Grange personally

9     mailed or e-mailed or faxed something to the

10    insurance companies?

11         A.    No.

12         Q.    What did you mean?

13         A.    Caused for the bill to be submitted.

14         Q.    Okay.  And what do you mean by caused for

15    it to be submitted?

16         A.    Dr. Grange was supplying information for

17    the claims to be processed to the billers.

18         Q.    Okay.  If you could take a look at

19    Exhibit 1 again, and do you recall Mr. Behnke asking

20    you questions about Paragraph 3 where it says, "The

21    said probably cause is exhibited in the official law

22    enforcement reports prepared regarding the matter, a

23    true copy of the pertinent parts of which is

24    attached hereto and incorporated herein by

25    reference."

**LORI POZUELOS**

November 03, 2023

```
 1                Do you see that?
 2        A.   Yes.
 3        Q.   Did you formulate the verbiage that we see
 4   there in Paragraph 3?
 5        A.   No.
 6        Q.   Who did?
 7        A.   The DA's office.
 8        Q.   When you reviewed this and signed the
 9   declaration, what did you take the phrase "law
10   enforcement's reports" to mean?
11        A.   The reports that I supplied to the district
12   attorney's office.
13        Q.   So you had supplied your law enforcement
14   reports to the district attorney's office prior to
15   your signing this?
16        A.   Yes.
17        Q.   And you testified that when you were with
18   the district attorney at the time that you signed
19   this, there were documents in the room in a manila
20   envelope I believe you said?
21        A.   Yes.
22        Q.   Did you assume that your law enforcement
23   reports were in that envelope?
24        A.   Yes.
25        Q.   Was that envelope brought with the
```

**LORI POZUELOS**

**November 03, 2023**

```
1      declaration to court?
2           A.   Yes.
3           Q.   Did you assume that that satisfied the
4      meaning of this Paragraph 3, as far as you were
5      concerned?
6           A.   Yes.
7                MR. MCMAHON:   That's all I have.
8
9                     FURTHER EXAMINATION
10     BY MR. BEHNKE:
11          Q.   How did you make the determination that the
12     documents in the manila envelope satisfied
13     Paragraph 3 of Exhibit 1 if you did not see them?
14          A.   Because they said -- excuse me -- that it
15     was their discovery package that they had to provide
16     the court.
17          Q.   How thick was this manila envelope?
18          A.   I mean, I don't know.  Estimate maybe a few
19     inches thick.
20          Q.   Did that appear to you to be your entire
21     file?
22          A.   I don't know everything that was in
23     there.
24          Q.   Did the judge open the manila envelope and
25     read all those documents before he signed the
```

**LORI POZUELOS**

**November 03, 2023**

1    paperwork?

2        A.    Not that I recall.

3        Q.    And the manila envelope you're referring to

4    was separate from the declaration marked as

5    Exhibit 1; is that correct?

6        A.    It was all put together and handed to the

7    judge.

8        Q.    When you say "all put together," what are

9    you referring to?

10        A.    The documents for the arrest warrant, the

11    1275, the 186.11, and then that manila folder.

12        Q.    You didn't review the contents of the

13    manila envelope; correct?

14        A.    No, I didn't.

15        Q.    When you say that in Paragraph 23 of

16    Exhibit 4, you meant that Dr. Grange caused bills to

17    be submitted?

18        A.    Let me find it.  Okay.  Yes.

19        Q.    What was your basis for asserting that

20    Dr. Grange caused these bills to be submitted?

21        A.    He was providing me patient information for

22    the different claims, specific air transport claims

23    as well as discussing the billing, the -- on some of

24    the air transport claims he actually talked about

25    amounts to be billed and how they should be billed

LORI POZUELOS

November 03, 2023

1          to the insurance companies.

2               Q.   So of the claims that form the basis of the

3     criminal complaint, how many of them did Dr. Grange

4     specifically discuss with billers?

5               **A.   I don't know how many.**

6               Q.   How many of those claims did Dr. Grange

7     provide the billing information for?

8               **A.   I don't know the specific number.**

9               Q.   When you say provided the information, are

10    you referring to the fact that he filled out some --

11    I believe they were PCR forms, the patient

12    records?

13              **A.   There were some patient care forms with his**

14    **name on it as well as in the e-mails he would**

15    **provide the patients' information and if they had**

16    **insurance information, their insurance information**

17    **to bill as well.**

18              Q.   What evidence did you have that Dr. Grange

19    had actually seen any of the claim forms that were

20    submitted to the insurance companies?

21              **A.   I don't know what claim forms he would have**

22    **seen.**

23              Q.   And before you -- strike that.

24                   Before the district attorney's office filed

25    the case on February 27th and CDI agents arrested

**LORI POZUELOS**

**November 03, 2023**

1    Dr. Grange, prior to that date were you aware that

2    the billing manager for Symons at that time had

3    testified under oath that while providers like

4    Dr. Grange provide information to them about work

5    that they did and care they performed, it was up to

6    the billers to decide what to bill and how to bill

7    it?

8              MR. MCMAHON:  Object to the form.  Assumes

9    facts not in evidence.  Vague.  Calls for

10   speculation.    Incomplete hypothetical.

11             **THE WITNESS:  I was not aware of what she**

12   **testified to.**

13   BY MR. BEHNKE:

14      Q.   Were you aware -- I understand you don't

15   know what she testified to.

16             Were you aware that she was even a witness

17   in the civil trial?

18      **A.   I was advised that she was going to be**

19   **coming to our office to give a deposition by Mitch**

20   **Neumeister because they were coming to my office,**

21   **but that's all I was told.**

22      Q.   How far before -- strike that.

23             Was that before trial?

24      **A.   Yes.**

25      Q.   Do you recall about when that was?

**LORI POZUELOS**

November 03, 2023

1          A.    No, I don't.

2               MR. BEHNKE:  I think I have nothing else.

3               MR. MCMAHON:  Okay.

4               THE VIDEOGRAPHER:  Mr. Reporter?

5               THE COURT REPORTER:  Would you like to get

6     a copy?

7               MR. MCMAHON:  Yes.  Expedited.

8               THE VIDEOGRAPHER:  This concludes the

9     deposition of Lisa Pozuelos on -- excuse me -- Lori

10    Pozuelos on November 3rd, 2023.  Off the record at

11    3:13 p.m.

12              (The deposition concluded at 3:13 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

**LORI POZUELOS**

**November 03, 2023**

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2

 3          I, LORI POZUELOS, hereby declare that I am the

 4   witness in the within matter, that I have read the

 5   foregoing deposition and know the contents thereof, and

 6   I declare that the same is true of my own knowledge

 7   except as to those matters which are therein stated upon

 8   my information and belief, and as to those matters, I

 9   believe them to be true.

10          I declare under penalty of perjury that the

11   foregoing is true and correct.

12              Executed on this _____ day of _____,

13   2023, at _____, California.

14

15

16

17

18

19

20

21                      _____

22                              LORI POZUELOS

23

24

25
```

**LORI POZUELOS**

**November 03, 2023**

```
 1                    DEPOSITION ERRATA SHEET

 2     Case Name:  Grange vs. Pozuelos et al.
       Name of Witness:  LORI POZUELOS
 3     Date of Deposition:  November 3, 2023

 4     Reason Codes:  1. To clarify the record.
                      2. To conform to the facts.
 5                    3. To correct transcription errors.

 6     Page _____ Line _____ Reason _____

 7     From _____ to _____

 8     Page _____ Line _____ Reason _____

 9     From _____ to _____

10     Page _____ Line _____ Reason _____

11     From _____ to _____

12     Page _____ Line _____ Reason _____

13     From _____ to _____

14     Page _____ Line _____ Reason _____

15     From _____ to _____

16     Page _____ Line _____ Reason _____

17     From _____ to _____

18     Page _____ Line _____ Reason _____

19     From _____ to _____

20     Page _____ Line _____ Reason _____

21     From _____ to _____

22     Page _____ Line _____ Reason _____

23     From _____ to _____

24     Page _____ Line _____ Reason _____

25     From _____ to _____
```

**LORI POZUELOS**

**November 03, 2023**

```
 1   DEPOSITION ERRATA SHEET

 2   Page _____ Line _____ Reason _____

 3   From _____ to _____

 4   Page _____ Line _____ Reason _____

 5   From _____ to _____

 6   Page _____ Line _____ Reason _____

 7   From _____ to _____

 8   Page _____ Line _____ Reason _____

 9   From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   _____ Subject to the above changes, I certify that the
              transcript is true and correct.
23   _____ No changes have been made. I certify that the
              transcript is true and correct.
24            _____

25                         LORI POZUELOS
```

**LORI POZUELOS**

November 03, 2023

```
 1   COUNTY OF LOS ANGELES, )

 2   STATE OF CALIFORNIA,   )

 3        I, Michael A. Solorzano, Certified Shorthand

 4   Reporter licensed in the State of California, License

 5   No. 14230, hereby certify that the deponent was by me

 6   first duly sworn and the foregoing testimony was

 7   reported by me and was thereafter transcribed with

 8   Computer-Aided Transcription; that the foregoing is a

 9   full, complete, and true record of said proceeding.

10        I further certify that I am not of counsel or

11   attorney for either or any of the parties in the

12   foregoing proceeding and caption named or in any way

13   interested in the outcome of the cause in said caption.

14   The dismantling, unsealing, or unbinding of the

15   transcript will render the reporter's certificates null

16   and void.

17        In witness whereof, I have hereunto set my hand

18   this day:  3rd of November, 2023.

19        __X__  Reading and Signing was requested.

20        _____  Reading and Signing was waived.

21        _____  Reading and Signing was not requested.

22

23

24

25        MICHAEL A. SOLORZANO, RPR, CRR, CSR No. 14230
```

**LORI POZUELOS**

November 03, 2023

| Exhibits | $ |
|---|---|

**Exhibit 1**
4:11 43:2,22, 25 44:11 46:23,25 49:23 130:19 132:13 133:5

**Exhibit 2**
4:12 43:5 44:5,6,9

**Exhibit 3**
4:14 56:8,14 62:7 69:9 70:8 71:20

**Exhibit 4**
4:15 75:11,15 76:10 82:15 86:18 129:25 133:16

**Exhibit 5**
4:17 80:10,13

**Exhibit 6**
4:19 82:13 83:1,5

**Exhibit 7**
4:20 88:6,7

**Exhibit 8**
4:21 88:6 95:4,16 96:14 97:11

**Exhibit 9**
4:22 115:16

**Exhibit 10**
4:23 119:13, 16

**Exhibit 11**
4:24 125:12, 16

**$1.5**
125:6

**$2,000,000**
69:14,18 70:8,25 71:6, 11

**$3,000,000**
69:13

---

**1**

**1**
5:5 43:2,7,22, 25 44:11,12 46:23,25 49:23 130:19 132:13 133:5

**10**
115:15 119:12,13,16

**100**
44:8 69:5

**10:07**
5:1,11

**10:39**
27:21

**10:47**
27:25

**11**
125:11,12,16

**11:45**
67:1

**11:59**
67:5

**12**
77:3

**1275**
57:9 69:10 125:4 128:25 129:2 133:11

**1275.1**
56:8

**12:44**
93:6

**13**
83:9 94:5

**15**
52:15

**16**
59:2

**186.11**
55:6,12 89:6, 21 133:11

**1:36**
93:10

**1:41**
93:16

**1:44**
93:20

---

**2**

**2**
27:24 43:5,7 44:1,5,6,9 47:3 48:16 49:3

**2,000,000**
70:20

**2/27/20**
47:6

**20**
52:15

**2011**
61:11

**2012**
61:11 65:9,24

**2013**
61:11 66:8

**2014**
65:24

**2016**
66:8 84:4 85:1

**2017**
10:10,12 72:11 74:10, 23 75:7 83:9 88:16 89:1,13 91:12,20 92:2 94:5

**2018**
10:22,24

**2019**
12:10,22 13:24 17:2 118:17

**2019/january**
16:23 17:16 18:3

**2020**
7:15 11:6 12:11,22 15:13,18 16:23 17:2,16 18:3 23:4 29:22,24 33:7 36:25 38:2 39:23 40:14 45:4 71:23 72:25 75:19, 24 76:7 87:23 123:10

**2021**
80:18,21 81:8

**2023**
5:1,11 136:10

**21**
76:20

**23**
69:11 78:4,5 82:18 86:18 87:13 130:2 133:15

**24**
69:11

**25th**
38:13,17

**26th**
38:13,17 75:19,24 76:7 87:22

**27**
29:22

**27th**
7:15 9:9,12 32:1 33:7 36:12,25 37:6 38:2 39:23 45:4,7 46:21 56:25 71:23 72:25 87:23 123:9 134:25

**2:39**
126:14

---

**3**

**3**
5:1 47:17 56:8,14 62:7 67:4 69:9 70:8 71:20

130:20 131:4
132:4,13

**3,000,000**
70:13,19

**3:00**
46:8 52:2,3
126:18

**3:13**
136:11,12

**3:30**
46:8 51:25
52:2

**3rd**
5:11 88:16
136:10

---

**4**

**4**
48:9 49:9
59:1 75:11,15
76:10 82:15
86:18 93:9
129:25
133:16

**4/18/19**
116:1

**4/19**
117:11

**4:15-ish**
51:25

---

**5**

**5**
58:22 69:10
79:5 80:10,13
93:19

**555**

5:8

**5:20-cv-
00340dsf(
agrx)**
5:8

---

**6**

**6**
56:9 57:14
58:13 79:3,4
82:13,18
83:1,5 126:17

---

**7**

**7**
88:6,7,8,9

---

**8**

**8**
76:20 82:17
88:6 89:1
95:3,4,16
96:14 97:11

---

**9**

**9**
78:4 80:21
82:18 84:4
85:1 115:15,
16,17,18

**90071**
5:9

**9:27**
80:21

---

**A**

**a.m.**
5:1,11 27:21,
25 67:1,5
80:21

**ability**
41:15

**access**
25:7 34:14,17
116:22
118:24
120:25 121:2,
23

**account**
31:12 34:15
72:3,19,21,22
73:23 74:20

**accounts**
70:1,2,5
71:14 72:4
73:6 74:6,18,
24 77:6,7,9,
13,14,15,16,
19,20,24

**accuracy**
58:23

**accurate**
115:9 123:5

**accused**
48:11,15
118:20

**actual**
23:1 84:18
85:2,18

**addition**
41:2

**additional**
77:15

**address**
58:2,6,11
100:1,3,15
101:18

**admissions**
39:18

**admitted**
125:23

**advanced**
98:17

**advised**
10:3 11:23
13:3 22:23
23:4,6,21,23
30:24 99:2
124:24
135:18

**affiliated**
119:6

**afternoon**
46:9,19,21
56:25

**agency**
35:10

**agents**
134:25

**agreed**
89:5

**agreement**
108:2

**ahead**
43:16 53:3
64:4 86:4
89:18 123:7

**ahold**
55:9

**aid**
99:8 107:23

**air**
25:11 63:19
72:2 73:24
78:8 101:21,
25 102:2,5,7,
8,10,13,23
103:3,9,17,25
104:14,15,20,
24 105:5,16,
17,19,23,25
106:20 110:4
133:22,24

**allegations**
25:10,13
112:3

**allowed**
129:3

**allowing**
35:4 116:14

**ALS**
98:17

**ambulance**
59:3,7 62:18,
19 63:19
78:20 79:7
82:21 83:19
86:13,20
94:10,16
95:18 97:15
98:2,13,17,25
99:2,4,9,15,
19,21 100:11
101:6,9,14,
22,25 102:3,
5,8,14,23
103:3,9,17,25
104:14,15,21,
24 105:5,17,
19,23,25
106:20
114:11

126:21,25
127:14

amount
52:7 70:9,14
73:22 126:7
129:8,15

amounts
133:25

analysis
71:13 76:24

and/or
43:1,4

Angeles
5:2,9,15

answers
121:20

Anthem
96:4

anticipate
91:19

apologize
55:19

appeared
78:19

appearing
6:6

appears
43:22 57:18
58:1 85:8
88:12 98:12
99:4

application
41:10 76:12
122:19

applied
41:3

apply

32:13 41:6

applying
122:23 123:4

approximate
17:13

approximately
17:11 18:6
30:5 46:6,8
52:14 56:4
65:23 74:23
75:1

approximation
70:9,14

April
118:17

Archibald
58:3

Argumentative
28:16

arrange
45:17

arrest
7:14,24 8:15,
22 9:4,7 20:6
22:5,7,10
23:1,8 24:3,
13 30:18
31:2,3,5,6,11,
14 32:14,16,
17 33:4,18,21
34:8,16,22
36:2,5,7,9,11,
17,20,21
41:19,20,23
42:2,8,14,20
43:1,4,11
51:18 53:7,24

54:1,2 55:5
56:2 89:5,16,
20,24 90:19
119:3,4
122:9,15,19,
23 123:4,10
125:19
133:10

arrested
37:25 42:9,15
111:20 112:3
134:25

arresting
22:12 37:5
41:2 123:23

arrive
46:6

arrived
46:10,20

Ascension
83:20,24
86:23 93:23
96:20 113:3

Ascensions
83:17

asserting
62:17 133:19

assessment
99:7 101:24
102:18
103:10,24
104:17

assets
41:4,10 76:13

assist
124:3

assume
131:22 132:3

Assumes
24:6 25:4
37:10 41:5
55:13 65:11
66:1 78:15
85:5 89:18
118:22 135:8

attached
47:21,25 48:6
130:24

attempt
65:4

attempted
69:6

attended
19:24

attending
33:8 38:21

attention
47:16 48:8
58:21 76:19
77:2 80:22
82:17 96:13

attorney
5:19 6:1 8:10
9:25 10:12,24
11:24 13:15,
18,21 15:10,
20 16:4,20
20:23 26:5,
11,17 29:4
30:2 50:3
63:14 69:2,4
76:3 87:14
116:23
131:18

attorney's
8:2,8 9:6,11,
16 10:7
15:18,22 17:4

18:2 19:18
20:2 22:24
23:21 26:8
30:11,21,25
32:2 33:16,22
44:24 45:25
46:3,7,10,20
58:9 76:3
81:1,20
90:11,15 91:4
131:12,14
134:24

attorneys
18:13 24:4
27:2 45:22
56:24 71:20
82:2

auditor
76:21

August
88:16 89:1,13
91:12

August-
through-
89:25

Avenue
58:3

aware
11:7 13:10
19:5 29:9,11,
18 31:9,13
33:8 34:19
36:12,25 37:5
39:13,17,20
48:25 57:5
59:6,16
60:10,15
64:10 65:7,22
66:7 78:25
87:24 92:8
111:16,18,24

135:1,11,14,
16

**B**

**back**
11:6 27:23
37:19 40:1,19
44:11 53:12,
20 57:14
58:21 61:12
67:3 69:9
70:7 75:5
82:14,17 83:4
86:10,17 87:9
93:8,18 96:13
97:11 99:9
110:4 120:21
121:19
126:16

**bail**
56:7 57:11,12
71:25 73:1
125:6,24
126:7 129:4,
7,9,10,15

**Baja**
108:8

**bank**
69:20,23,25
70:2,5 71:13
72:19 74:6,
14,18,24
76:25 77:5,6,
7,9,24

**banners**
108:6

**base**
19:3,10

**based**
25:10 42:9

**basic**
98:18 114:12,
15

**basing**
28:25

**basis**
17:20,24
33:23 48:10
116:14
133:19 134:2

**Bates**
82:11,12
95:11 115:21
119:16

**Bates-
stamped**
80:10 88:4

**began**
11:13

**beginning**
5:5,19 27:24
67:4 77:3
79:5 93:9,19
126:17

**behalf**
5:10,14 6:1
96:7 101:12
111:19

**Behnke**
5:20 6:19
7:23 9:24
11:12 12:2
16:18 17:10,
22 24:1,11
25:8 27:7,19
28:4,17 29:2,
10,19 31:21
32:12 33:2,14

54:4 78:5
85:3 101:7

35:2,7,15
36:1,18
37:15,20
38:10 40:9
41:8,13 43:9
49:8,21 53:4,
11,14 55:20
56:16 60:14,
25 61:6 62:6
63:12,22 64:9
65:15 66:4,
19,22,24
67:8,20 68:10
73:15 75:9,17
76:5 78:17
79:2,17 80:8,
15 83:3 85:9
86:3 87:4,20
88:5,9,10
89:23 90:7
92:17,25
93:3,11,14,21
94:15,22,25
95:3,6,9,15,
22,23 96:15,
16 98:10 99:6
100:8 103:2,
19 104:4,25
106:15
108:17
110:13
111:23
115:15,18,19
118:9 119:2,
12,15 123:2,8
124:20,21
125:11,15
126:11,19
129:17,20
130:2,19
132:10
135:13 136:2

**believed**

89:14 101:7

**belonged**
70:3 106:5

**belonging**
72:4

**Ben**
6:9

**Bernardino**
33:9 47:6
102:6,9

**Berry**
84:3,7,10
86:9 113:23
128:2,7

**Bilash**
51:1

**bill**
30:24 46:5
64:8,12 84:18
86:14 97:16
98:24 109:9
113:17
130:13
134:17 135:6

**billed**
63:18,25
69:12 70:19
106:13 130:4
133:25

**biller**
66:11 68:5

**billers**
67:10,17,24
68:12,17,19
79:15,22
81:3,8 82:9
130:17 134:4
135:6

**billing**

64:7,17,18,21
65:8,14,23
66:8,16 67:10
78:8,20 83:19
84:16 85:23
86:6,12 96:11
126:22,25
127:11,12,14
128:5 133:23
134:7 135:2

**billings**
69:14,18

**bills**
64:11,14,23,
25 78:12 97:9
114:12
127:18
133:16,20

**biweekly**
17:25

**BLS**
114:15

**Blue**
96:5

**board**
60:3,7

**bottom**
79:22 88:12
115:21
116:12
125:22

**Brady**
117:16,17,21
120:11,13

**break**
66:21 67:9
92:25 93:22

**briefly**
93:22

**LORI POZUELOS**

bring
50:19

brought
131:25

Brownloe
66:13

bullet
79:4 82:19

bullets
79:3

business
59:10,12
62:25 70:1
73:8,19 90:22

businesses
72:5

buzzing
55:17

---

**C**

California
5:2,9,15 6:5,8
47:6 60:1

call
14:6 22:6
36:13 41:23
54:4,7 86:24
123:21

called
37:1 41:22
54:3,10 94:11
123:17

calls
9:21 16:13
23:18 24:7
29:16 31:18
32:8,9,23,24
37:10,17,22

49:5,19 65:11
66:1 73:12
80:6 85:6
90:3 103:13,
14 106:11
118:4,22,23
135:9

Cantos
8:10 12:16,24
18:11,16,18,
25 42:13,23
45:20 46:4
57:18 81:15,
23 82:8 117:7
119:23 120:5,
16 121:8,19

Cantos's
58:2

captain
16:2,7,11
26:22 30:24
32:2 45:7
80:17,18
116:19

care
98:18,23,25
99:5 106:22
107:2,4,21
108:4 110:10
111:6 127:8
134:13 135:5

case
5:7 7:10,14
9:7,13,15
10:4,7,11
11:20,25
13:11,12,14
14:5,7,8,10,
22 15:3 16:17
17:18 18:4,7,
10,20,25

19:2,4,6,10,
11,15 20:3,
16,24 22:13,
17 23:12,15,
16,24 24:24
25:2,17 26:2,
9,14,20,25
28:8,11,20
29:7,13,23,25
30:2 37:2
38:13,15
39:1,4,11,15
41:16 60:11
61:9 68:1
76:8 81:8,21
82:3 89:15
92:15 95:11
102:20
116:20 117:2
118:13,16
119:6 124:4,
16 134:25

case/
investigation
120:23

cases
19:3 23:14
35:23 114:12
129:14

caused
34:12 63:18
82:5 90:8
130:13,14
133:16,20

CCT
84:16

CDI
134:25

cell
55:17 124:14

certificate
103:24

certification
104:9

certified
59:25

chain
80:11

chambers
51:13 53:15
54:8,18 55:25
123:13 126:6

changed
100:3,7

charge
97:20

charged
68:13

charges
10:25 11:3
13:16,25
14:12,21 23:5
28:5 29:4
31:22 32:5,20
33:17 47:14
61:8 67:14
68:5 81:16
91:14 97:14

Chavez
88:13,20

check
116:22 117:6
125:7

checked
12:12

checks
77:11,13
91:23

Cherie
6:5 27:16
28:1

chronological
116:9

circle
86:10

circumstances
48:14

civil
7:18,25 8:14,
18,22,23
11:7,13,17,23
12:17,20
13:1,4,7,12,
14 14:5,7,10,
16,22 15:3
18:4,6,10,22
19:2,3,6,10,
11,15,21,22,
24 20:3,16,
18,24,25
21:4,16 22:17
23:12,15
24:19,22
25:9,17 26:2,
14,20,25 27:2
28:6,11,19
29:6,14 31:10
33:9 34:5
35:9,13,24
36:14 37:2,8
38:6,13,15
39:1,4,11,15
41:16 42:18,
20 60:11 88:1
111:19 112:3
116:15,20
118:12,20
119:6 121:24
135:17

claim
  70:15 72:20
  75:2 79:10,
  18,21,22
  95:1,18
  96:14,17,21
  97:5,19,22
  98:2,4 99:4,
  19,21 100:10,
  13,14,20,25
  101:7,12,15,
  17,21,25
  105:9 106:8
  112:24
  113:20
  134:19,21

claims
  25:11,18
  30:14 70:11
  71:4 72:1,10,
  11,14 73:2,9,
  18 75:3 77:12
  78:22 79:7,16
  80:2 82:21,24
  83:19,21
  84:11,15,18
  85:23 86:20
  94:10,16
  95:18 96:23
  97:15 98:3
  99:7,21
  101:14,16,22,
  25 105:5,13,
  15,24 106:20,
  21 112:12
  113:10,11,25
  114:11
  130:17
  133:22,24
  134:2,6

clarification
  62:5 63:21
  110:12

clarify
  62:12

clarifying
  129:19

class
  122:16

classroom
  122:13

clean
  129:10

clear
  34:19

clerk
  50:22 51:11
  56:3

clerk's
  50:8,15,16,19
  52:11,16

clinical
  113:21

code
  56:7 97:16
  98:12,16
  114:13

codes
  127:11,12

coding
  127:4

Colin
  51:1

column
  96:4

columns
  97:12

commissione
  r
  14:6 18:12

committed
  48:15 78:7

committing
  49:2,16

communicate
  21:18 53:1,6

communicate
  d
  16:16 113:19

communicati
  ng
  124:1

communicati
  on
  16:7 17:6
  21:3 33:22
  38:12 123:22

communicati
  ons
  16:11,22

companies
  63:19 64:1,
  17,23 67:10
  70:10,20,24
  71:3,7 72:9
  77:23 78:13,
  23 79:11,19
  98:3,6 102:1
  105:12,14
  109:9 110:1
  112:10,13
  127:22
  130:10 134:1,
  20

company
  21:10,11
  30:12 59:3,7,
  15,17 60:4,
  16,21 61:1,20
  62:9,18,19,23

65:14,17
  70:25 75:2
  83:20 87:17
  101:5 102:19
  105:5 106:13,
  17 109:25
  113:2,10
  114:18 128:8,
  13

complaint
  46:11,14,18
  75:22 76:15
  113:15 134:3

complete
  123:5

completed
  34:6 91:19

completely
  10:19

completing
  79:15

computer
  112:17,18

concern
  8:17 19:14,19
  29:5,12 35:3
  68:12

concerned
  68:19 132:5

concerns
  24:2,21 25:16
  27:1,8 28:6,
  18 29:20
  34:13 55:12
  114:1

concluded
  31:11 136:12

concludes
  136:8

conclusion
  32:9,24 49:5,
  19 80:6
  103:14 118:4,
  23

conduct
  48:11

conducted
  112:9 126:24

conducting
  127:2

conference
  127:9

Confinement
  43:2,5

confirm
  110:20

confirmed
  85:17

confusion
  21:9

connected
  108:7

connection
  39:11 43:11

constitutes
  102:13

Consultants
  65:20,22

contact
  13:23 17:3,17
  21:8,24 22:7
  30:5 45:16,18
  53:25 113:4,8
  114:22
  121:23

contacted
  9:5 13:15

**LORI POZUELOS**

November 03, 2023

18:12 107:24
114:19 117:6

**contacts**
30:9

**contained**
48:18 49:11
101:25

**contemplating**
81:20

**contents**
133:12

**continued**
55:7

**continues**
77:10

**continuing**
67:13

**conversation**
15:2 18:21
51:15 85:3
126:8

**conversations**
12:15 15:5
18:1 42:16,19
128:9

**convince**
129:4,8

**copies**
59:20,25

**copy**
47:20 53:19
54:14,19,23
95:12 116:19
130:23 136:6

**corner**
96:11

**corporate**
59:20

**correct**
7:3,16,17,20,
22 9:1,2,10,
18 11:7 13:20
14:2,18
18:17,23
20:12 21:4
22:1 24:13,
16,19 25:3,
11,14,15,24
26:12 30:6,7,
13,17 31:23,
24 32:3,4,7,
11,14,15,18,
22 33:1,10
36:22,23
38:6,14 39:1,
5,24 40:5
41:4,10,12
43:13 44:3
45:9,10,12
47:5,7 48:4,
12,13,23 50:5
51:8,9,14
53:17 57:25
58:9,10,12,15
62:20,21
63:3,8 65:17
68:15 69:7
70:12,16,17,
21 71:18
72:16,22,23
74:3,14,21
76:13 77:7
78:2,3,13
79:19,23,25
81:9,10 83:2
84:17,24,25
85:4,19,20,24
86:25 88:14,
15 89:2 91:5,

6 92:9,14
94:2 96:1,2,5,
6,11,12 97:21
101:19,20,22,
23 107:6
111:14
112:21,25
113:5 117:14
119:17
123:12,14,15
124:18
127:14
128:18
129:11 133:5,
13

**correctly**
68:14 85:23
86:6

**correspondence**
20:19,22

**counsel**
7:12 66:17

**counsel's**
95:9

**country**
40:7,15,21,24

**county**
102:6,9
103:18
104:13,14,19

**couple**
26:15 73:7
77:2 110:9
117:15

**court**
5:12 6:11
11:19,21
12:1,12 19:22
23:24 31:15

32:7,13,21
36:7 38:5,18,
20,22 41:3
51:11 56:3
88:8 93:12
95:5 105:3
108:13
115:17
123:11,23
125:13 129:4,
8 132:1,16
136:5

**courthouse**
20:5,11,13
33:10 50:2,4,
6 52:9

**courtroom**
52:17

**covered**
61:25

**CPA**
73:22,24

**CPT**
127:11

**created**
64:8

**crimes**
48:16,18
49:2,11,17

**criminal**
7:14 13:11,
14,16,25
14:8,11,20
15:3,11,19
16:17 18:13
19:15 23:11,
15,16 24:23
28:5,8,11,20
29:4,13,23,25
31:22 32:5

35:24 42:9
46:11,13 61:9
68:1,5 76:8,
15 91:13
95:11 116:15
118:16 134:3

**critical**
98:18,23

**Cross**
96:5

**cross-talk**
27:10 92:16

**Cuc**
58:3

**curious**
112:1

**current**
80:17

**custody**
37:13

**customers**
113:16

---

**D**

**DA**
16:12 50:10,
11 54:24
67:22,23 68:6
87:6,7,8

**DA's**
10:15 16:7,16
17:18 18:10
23:2 38:12
45:8,14,16
46:16 51:5
52:2,4,8 76:6
90:20 124:2
131:7

Daniel
5:22 110:25

dash
83:7

date
11:14 12:7,13
37:23 40:11
59:9 67:25
72:7,17 74:1
92:22 94:6
97:12 116:4
120:3,7
123:10
124:23 135:1

dated
80:21 88:16

David
65:19,22

day
9:4 23:7,9
31:15 33:9
34:8 36:3,4,6,
14 37:3,7
38:6,9,22
42:3,4 45:3,5,
25 75:21 89:6
91:9 117:12

daylight
5:12

days
24:16 38:24

DDA
55:7 56:1

dealing
124:4

deceive
86:19

deceived
79:6 82:20

98:6 105:4,
12,14

December
12:10,21
13:24 16:23
17:2,16 18:3

deceptive
99:22 102:1

decide
14:22 135:6

decided
34:9 35:22
36:5 37:24
68:23 117:1

deciding
14:16

decision
14:24 19:10
30:18 33:17,
23 67:16
90:10

Declarant
56:11 57:15

declaration
41:9 42:25
43:3 44:12
46:22 47:5
48:3 49:22,24
51:8 63:2,4,5,
6 72:16 74:3
75:10 76:10,
11,16 82:15
86:17 87:3,5,
10 105:2,3,10
130:8 131:9
132:1 133:4

declarations
43:10 87:21

declare

47:4

declares
58:14

DEF0198552
80:10

DEF0207047
82:13 83:6

DEF0224674
115:21

DEF0224705
119:17

DEF027944
88:4

defend
41:15

defendant
6:1 59:2
63:17 69:12
118:2 125:23

defendants
68:20,22

defending
35:9

defense
112:2

delay
90:6,8 91:25

delete
124:9

department
6:6,8 7:20
11:24 13:16
19:14 24:4
27:9 29:12
30:20,22
36:13,19 37:1
39:14,21 60:8
69:3 71:17

89:14 90:12,
18 105:21
106:24
107:16,20,24
122:8 124:17

department's
106:25

deposit
72:20 77:13

deposited
73:6 77:5,12

deposition
5:6,10,15 7:6,
12 25:23,25
26:1,10,13,
19,21,24
39:8,10
121:12,13,16
135:19 136:9,
12

depositions
5:14 26:15

deposits
72:8

deputy
5:25 14:6
18:12 45:21
50:3,10,11
71:19

derived
73:2

designation
100:21

details
106:6,9

detecting
27:14

Detective
6:3,7

determination
97:1,4,8
99:13 112:25
132:11

determine
14:4 20:5
23:8 37:16,21
61:13 64:16
90:21 100:21
106:3 119:7

determined
23:13 74:18
105:25

determining
14:9 67:14
105:19

developed
119:7

developing
27:3

Dianne
26:5

differently
99:12

direct
32:21 47:16
48:8 58:21
76:19 82:16

directing
34:1 77:2
96:13

direction
122:1,5

directly
16:3 64:19
69:21 71:4
127:23 128:4,
6

**director**
59:15 84:15,
23 108:3,21

**directors**
60:3,7 61:1,
10,16 63:3

**discovering**
29:1

**discovery**
39:4,14
132:15

**discuss**
8:3,12,13,21
19:1 34:3
35:13 36:2,8
42:13 55:7
82:3 86:7
94:14 134:4

**discussed**
8:1 30:13
34:7 35:6,8
64:24 67:19
68:11 76:4
78:10 81:7
91:2 121:11

**discussing**
133:23

**discussion**
15:1 18:9
35:20 55:8
71:19 85:13,
16

**discussions**
35:16 41:14
94:7

**dismissal**
82:5

**dismissing**
81:16,20

**disrupt**
29:6

**district**
8:2,8 9:5,11,
16,25 10:7,
11,24 15:9,
18,20,22
16:4,19 17:3
18:2 19:18
20:1 22:23
23:21 26:5,8,
11,17 29:3
30:1,10,20,25
32:2 33:16,22
44:23 45:22,
24 46:2,7,10,
20 50:3 56:24
58:9 63:13
69:2,4 71:20
76:2 81:1,19
87:14 90:11,
15 91:4
131:11,14,18
134:24

**disturb**
55:22

**division's**
124:13

**doctor**
108:23 111:8

**doctors**
107:3,5,9
110:10

**document**
42:25 43:3
44:7,19 47:12
56:6,9,20
57:2,5,8,9
58:18,22,23
59:2 62:17
63:10 69:12

**disrupt**
75:12,25 76:4
82:12 88:3,11
111:7,11
115:20
119:20 120:8
128:17

**documentatio
n**
105:22

**documented**
110:17 111:6,
9 115:2

**documents**
15:11 21:10,
12,19,23
39:21 43:6
50:18,21
51:5,6,7,11
52:5 54:20,22
56:3,23
59:20,25
110:19,22
125:6 131:19
132:12,25
133:10

**DOI**
120:12,24
121:7

**dollar**
69:21

**Don**
62:3

**Downs**
62:3

**downstairs**
56:1,2

**drop**
81:25

**drop-off**

**97:23 98:5**
101:18

**duly**
6:15

___

**E**

___

**e-mail**
10:18 15:7,8,
12,24 20:1
21:19,20 31:1
40:6,10 46:15
64:5 73:21
79:15 80:9,
11,20 81:18,
24 83:4,13
84:3,9 85:21
88:12,18,25
90:2 91:3

**e-mailed**
15:17 130:9

**e-mails**
64:2,20,22,24
68:18 78:11
82:11 88:4,11
134:14

**earlier**
30:4 52:1
76:25 81:7
89:13 113:4,8
123:10
127:16

**Edson**
6:4,5 27:11
28:2

**effect**
8:23

**electronically**
23:24

**Emergency**

**59:13,21**

**employee**
84:8 113:3

**employees**
112:11
113:10

**encourage**
30:1 80:24
81:3

**encouraging**
16:19

**end**
12:10 13:24
42:20

**ended**
125:2

**enforcement**
47:19 130:22
131:13,22

**enforcement'
s**
131:10

**engage**
73:8

**engaged**
39:3 73:19

**ensure**
31:7

**Enterprises**
65:5,7

**entire**
124:10
132:20

**entities**
67:12 71:2

**envelope**
131:20,23,25

132:12,17,24
133:3,13

**equipment**
102:21
103:22
108:25

**equipped**
103:20,21
104:17

**Eric**
80:11,16,21
81:18

**escrow**
73:5

**established**
77:11

**estimate**
74:11 132:18

**estimating**
52:23,24

**et al**
5:7

**evaluating**
92:2

**evening**
30:19 31:6
33:19 36:12,
24 37:6 42:1

**event**
100:1,5,17,23
107:21,23

**events**
109:13,17

**evidence**
24:7 25:5
27:3 28:7,19
37:11 39:23
40:4 41:6

55:14 63:24
65:11 66:1
69:17 71:23
72:18,24,25
78:12,15 79:9
85:6 87:15
89:18 91:17,
22 112:1
118:22 119:7
134:18 135:9

**exact**
11:14 12:7
37:23 40:11
52:7 57:22
59:9 61:4
65:2 69:21
71:9,12 72:7,
17 74:1 84:1
90:5 91:1
92:22 94:6
100:4 120:3
124:23

**Examination**
6:18 56:7
129:22 132:9

**examined**
6:16

**exchange**
108:4

**exculpatory**
24:5 27:3
118:1,7
122:24

**excuse**
14:7 23:2
68:23 82:17
89:20 132:14
136:9

**execute**
7:24 31:4,11
32:16 33:18

34:22 36:21
70:4 74:9,13
91:2

**executed**
36:11,19 47:6
75:18

**executing**
8:22 36:17
89:5,15

**execution**
90:19

**exhibit**
43:2,5,22,25
44:5,6,9,11
46:23,25
49:23 56:8,14
62:7 69:9
70:8 71:20
75:11,15
76:10 80:10,
13 82:13,15
83:1,5 86:18
88:6,7 95:4,
16 96:14
97:11 115:16
119:13,16
125:12,16
129:25
130:19
132:13 133:5,
16

**exhibited**
47:18 130:21

**exhibits**
7:9 43:7

**exist**
35:24

**existed**
119:1

**expected**
12:6

**Expedited**
136:7

**expert**
28:10 111:18

**explain**
57:11 105:16
109:3 127:10

**explained**
42:8 73:23
85:21 108:2
112:16 113:7,
24 127:16

**explanation**
63:2,7

**express**
19:14,19

**extent**
72:13 73:16
115:6

---

**F**

**FAA**
103:18,23
104:9

**fact**
8:13,18
12:16,20
38:24 40:23
54:4 86:22
87:14 99:18
101:8 106:12
134:10

**factors**
103:16 104:2,
5 105:18
106:2

**facts**
24:7 25:5
37:10 41:6
55:14 65:11
66:1 78:6,15
85:6 89:18
118:22 135:9

**fair**
21:15 90:14

**fall**
91:1

**Falstein**
6:10

**familiar**
43:15 57:19

**farther**
86:8

**favorable**
118:19 119:8

**faxed**
130:9

**February**
7:15 9:9,12
11:6,25 12:6
29:22,24 33:7
36:12,25 37:6
38:2,13 39:23
45:4,7 46:21
56:25 71:23
72:25 75:19,
24 76:7 87:23
123:9 134:25

**fee**
109:21

**feel**
10:12 118:25

**feloniously**
129:5

**LORI POZUELOS**

November 03, 2023

**Felony**
43:4

**felt**
100:6 105:15

**figure**
69:21 70:13
71:9,12 82:5

**figured**
34:18 81:12

**file**
10:25 11:2
16:20 30:2
56:2 132:21

**filed**
9:7,13,19
10:1 13:17
14:1,8,12,21
23:24 28:5,
12,21 29:5,
13,23,25
31:22 32:5,21
33:17 67:15
68:1 75:22
124:19
134:24

**filing**
7:14 9:16
10:13 15:11,
19 16:17
18:14 19:3,10
22:25 23:3,9,
11,22 30:12,
25 32:3 42:10
45:4,8,15
68:5 76:8
89:15,24
91:13

**filled**
79:10 96:1
134:10

**find**
22:11 25:20
112:6 125:1
133:18

**findings**
78:6

**Finish**
53:3

**finished**
55:24

**Fish**
108:11

**five-minute**
66:21

**flew**
107:2

**flight**
38:3 39:24
40:25 106:6,
23 107:1,4,5
110:11,16
111:8,10,12

**flights**
106:25
107:10
108:23 110:9,
15,18,21
111:1,4,7,14

**flow**
78:1

**Flower**
5:9

**fly**
107:25

**focus**
43:25 59:1
80:22 88:25

**focused**

18:2 106:19
118:17

**focusing**
112:10
113:18 119:3
123:9

**folder**
133:11

**follow-up**
30:10

**foregoing**
58:15

**form**
7:21 9:21
11:9,22 17:8,
19 23:18 24:6
25:4 27:4
28:15 29:8,16
31:17 32:8,23
33:11 34:24
35:5,11 36:15
37:9 38:7
40:3 41:5,11
44:20 49:4,18
53:8 55:13
60:12,22 61:2
63:9 64:3
65:10,25
67:18 68:7
70:15 73:12
76:1 78:14,24
79:13 80:5
85:5,25 87:1,
18 89:17 90:3
94:13 95:1,18
96:7,14,17
98:1,8 99:4,
21,23 100:10,
13,14,20
101:12
102:24

103:12 104:1,
22 106:8,10
111:21 118:3,
21 122:25
134:2 135:8

**forms**
79:10,18,21,
22 96:21
97:5,19,22
98:2,7 99:19,
21,24 101:7,
8,21,25 102:3
134:11,13,19,
21

**formulate**
131:3

**forward**
11:6 14:10,22
19:6 23:17

**forwarded**
31:1 84:2

**found**
45:3,14 70:2
92:13 106:7

**foundation**
90:4

**frame**
16:24 17:17
18:3 40:13
66:10 90:1
116:8

**fraud**
25:10 78:7

**fraudulent**
77:12

**fraudulently**
77:4

**freezing**
41:3 76:13

**Friday**
5:1

**front**
7:3 51:19,21
95:17

**frozen**
27:12

**fully**
103:20,21
104:17
105:16

**funds**
57:13 71:24

**future**
36:3

---

**G**

---

**gated**
34:16

**gave**
16:1 26:1
33:4 48:3
51:4 105:22
109:8 122:1,4

**general**
6:1 122:11,12
127:12

**George**
14:6

**give**
17:21 22:6
48:14 51:11
95:12 127:11
135:19

**Good**
6:4

**Grange**
5:7,24 7:15,

**LORI POZUELOS**

November 03, 2023

25 20:7,14
22:12 28:10
30:18 31:4
33:8,18 34:11
36:14,25 38:3
39:13 41:2
48:12 49:2,
10,16 59:14
62:3,9,17,22
63:25 64:21
69:7,17 70:3
71:4,8,10,24
72:5,14 73:1,
17,21 78:1,7,
12,18,22
79:5,9 80:4
82:19 84:24
85:4,14,17,22
86:19 87:15
105:4,11
108:2,20,24
109:3,8
111:16,19
112:4 113:9
119:8 121:17
125:20
127:17,23
128:10,22
130:3,4,8,16
133:16,20
134:3,6,18
135:1,4

**Grange's**
25:23 26:10
39:7 41:19
59:6 60:20
72:22 74:6,24
82:2 92:2
111:10

**ground**
63:19 78:8
82:23 94:10
95:18 97:15

98:2,16 99:21
101:6,14
114:10

**grouped**
105:9

**guess**
113:16

**guesstimate**
74:10

**H**

**half**
97:12

**halfway**
83:7

**hand**
75:10

**handed**
45:1 46:22,25
55:1 133:6

**handing**
80:9 119:10
125:9

**handle**
117:1

**handled**
83:19

**handling**
113:10
116:14,25
118:12

**handwriting**
126:3

**handwritten**
43:22 44:14

**happen**
18:21 36:3

54:17 81:13
82:6 89:25
115:12
124:22

**happened**
21:13 22:6
49:23 50:16
51:3 53:23
54:11 72:11,
15 73:25
105:6

**Harrison**
26:5

**heading**
120:11

**health**
79:6 82:20
86:19 127:8

**hear**
27:11,12,13,
16 28:1 55:11
81:4

**held**
5:8 37:6

**helicopter**
102:15,19,22
103:5,7,8,9,
22 104:18
106:5 108:10
109:6,22,25
110:1

**helicopters**
108:4,22
109:1,16
110:5,7

**hereto**
47:21 130:24

**highlighted**
116:13

**hill**
34:17

**hold**
57:12 125:4
128:21 129:2

**home**
34:16,17

**Hood**
80:12,16,22
81:18

**hope**
91:21

**hospital**
82:25 107:3,
25

**hospitals**
102:17

**hour**
66:18 127:10

**house**
92:14,18,19,
20,21

**human**
112:24

**humans**
112:20

**Hynds**
8:11 12:16,24
30:15 45:20
46:4 50:1,10,
11,22 55:7
56:1 76:3
123:11

**hypothetical**
102:25
103:13
135:10

**I**

**Icon**
102:20 110:3

**idea**
7:24 86:13

**identify**
5:18

**identifying**
95:20,25

**immediately**
53:21

**immunity**
81:4

**impact**
22:13,16
23:11 24:23
41:15

**important**
128:16

**improperly**
63:18

**inches**
132:19

**include**
49:14 50:19
63:1,6 86:22
98:4 101:17

**included**
51:4 63:5
70:6 79:22
118:11

**includes**
88:11

**Incomplete**
102:25
103:13

LORI POZUELOS

November 03, 2023

135:10

**incorporated**
47:21 48:19
49:12 130:24

**indicating**
39:24

**indication**
110:22

**indiscernible**
27:10 92:16

**individual**
32:7,17,20
33:5 99:9
103:23 129:3

**individuals**
88:13,19

**info**
116:15

**information**
10:4 24:5
25:7 30:12,17
48:10 60:10
62:25 64:7
72:20 76:4
81:19 95:6,
21,25 101:24
107:17 108:9
109:19 115:8
116:24 118:1,
19 120:4
121:7,10,23,
24 122:18,24
123:3 128:12
130:16
133:21 134:7,
9,15,16 135:4

**informed**
33:16 48:9

**initial**

74:7 77:13

**initially**
10:1,17
112:17

**injured**
104:18 109:5

**inputted**
64:25

**inputting**
23:5

**inquiry**
119:5

**inside**
20:13 92:23

**instance**
39:4 61:10
102:6 106:24
112:23

**instances**
105:7 112:20

**insurance**
6:6,8 7:20
11:24 19:14
21:9,11,23
24:4 27:9
29:12 30:12
36:13,19 37:2
39:14,21 60:8
63:19,25
64:23 69:3
70:10,19,24,
25 71:3,6,11,
17 72:1,9,10,
20 73:2,9,18
75:2 77:23
78:13,23
79:6,11,19
82:20 83:18
86:19 87:16
89:14 90:12,

18 96:3,21
98:3,6 101:5
102:1 105:4,
12,14 109:9
112:10,12
113:2,9 122:8
127:3,22
128:8,13
130:10 134:1,
16,20

**intel**
34:10,12

**intentionally**
79:5 82:20
86:19

**interest**
60:21 62:8,11
63:8

**interpretation**
102:13

**interrogatories**
39:18

**interview**
65:4,16,19
66:5,12
67:11,17 69:6
85:10 94:4
101:5 108:7,
11 109:24
110:20
111:13
112:11 113:9,
23,24 114:9
115:3,5

**interviewed**
68:4 81:9
94:1 100:24
101:1 105:21

**interviewing**

67:24 68:12,
17,22 82:9

**interviews**
30:11 94:7,8
115:7

**investigated**
72:1 73:3
75:3 80:3
90:24 106:19,
22

**investigating**
25:14 70:11
73:10,18

**investigation**
8:25 28:25
29:1 35:25
49:14 59:19,
24 64:16 65:3
66:12 67:14
78:7 79:12
91:13 94:2
97:6 98:2
99:14 102:12,
19 109:20
112:9 120:5
126:20,24
127:2 128:17

**investigations**
126:25
128:23

**investigator**
118:15
120:24 121:3
122:8 124:2

**investigators**
53:7

**involved**
33:3 64:7,21
98:13,25

99:19 102:20
110:5 112:20
120:24

**involvement**
107:18

**involving**
7:19 105:24

**Isaac**
65:19,22

**issue**
34:21,25 40:6
69:19 86:11
113:17 114:7
124:17

**issued**
9:8 36:6 42:9,
14 128:24

**issues**
55:6 117:16

**issuing**
34:1,3

**J**

**jail**
31:7 37:6,17,
22

**January**
12:10,22
15:13,17 17:2
23:4 29:24
84:4 85:1

**Jeff**
5:6,24 48:12
49:2,9,16
59:6 60:20
62:3,9,17,22
64:21 69:6,17
70:3 71:4,8,
10 72:4,5

**LORI POZUELOS**

November 03, 2023

74:6,24 78:1,
7,12 80:3
84:23 85:3,
14,16,17,21
86:18 87:15
125:19

**Jerry**
5:20

**Joe**
8:5,12 22:20
88:13,19

**John**
83:8,14,16,
17,23 84:9,14
86:9 93:23

**Judd**
62:3

**judge**
7:3 31:3
50:20,23,25
51:2,10,12,16
52:18,21,25
53:5,16,19
54:5,11,24
55:2,4,6,24
122:24 123:4,
16,19 129:14
132:24 133:7

**judge's**
54:18 55:11
123:13 126:3

**July**
80:18,21 81:8

**June**
10:22,24

**K**

**Kaiser**
83:19,21 84:8

94:9 113:14,
18 114:10
127:24 128:7

**Kamari**
66:13

**kind**
116:9 122:1,4

**knew**
24:12,15,18
25:9 37:12
38:5,25 39:3,
7 47:9 58:18
85:2

**knowledge**
9:20 16:6
127:12

**KP**
86:10

**L**

**L-O-R-I**
6:22

**lack**
129:9

**Lacks**
90:4

**Lahana**
5:22 27:15
94:23

**Lance**
8:10 12:16
18:11,15
42:13,23
45:19 46:4
57:18 58:2
81:15,23
82:2,8 117:7
119:23 120:5,
16 121:8,19

**language**
20:10

**large**
61:14

**Larson**
5:20,22

**late**
42:1 72:11

**law**
47:18 130:21
131:9,13,22

**lawsuit**
35:10 88:1
112:3 124:19,
25

**lawyers**
116:14,24
117:1 118:20

**learn**
11:17,21
109:19

**learned**
114:6

**leave**
40:24

**leaving**
40:7

**Lee**
30:24 46:5

**left**
40:21 41:23
54:18

**legal**
5:14 32:9,24
49:5,19 80:6
103:14 118:4,
22

**legitimate**
78:19

**letting**
9:6 15:9
18:11 20:2
51:17

**level**
84:17 114:13

**Levitt**
20:23 21:3,6,
7,12,18,22,25
22:11

**license**
104:14

**licensed**
103:17
104:19

**licensing**
104:5,8

**Lieutenant**
110:25

**life**
98:18 114:15

**Linda**
92:6

**lines**
117:15

**Lisa**
136:9

**listed**
48:16 49:2,17
66:16 78:5
102:3 104:5

**litigating**
38:25

**litigation**
28:19

**live**
92:4

**LLC**
65:20

**LLP**
5:20,22

**loan**
103:7

**located**
5:15

**location**
91:23 97:23
100:2,7,16,17
101:19 107:2

**locations**
90:23 91:24
92:1 98:5

**Loma**
92:5

**long**
23:1 52:4,14
56:4

**looked**
12:1 47:2,14
105:1,23
120:20 128:5

**Lopez**
8:5,12,13,18,
21 22:20,21
23:10 30:23
33:20 53:25
54:3,4,7,10
55:9 123:17,
22

**Lori**
5:6,7 6:3,7,
14,22 44:13
83:10 136:9

LORI POZUELOS

November 03, 2023

Los
  5:2,9,15

loss
  117:22

lot
  19:1 54:20
  103:15

lower
  96:10 97:11
  119:17
  120:10

lowest
  114:13

lunch
  92:25 93:7

_____ M _____

made
  13:10 19:5
  24:13 30:18
  33:17 67:17
  68:19 72:3,8
  105:9 119:24
  129:15

mailed
  130:9

main
  100:5,16,23

make
  14:23 40:24
  85:22 86:5
  96:25 97:4,8
  99:11,13
  112:24
  117:23 119:5
  132:11

making
  30:13,16
  117:22

123:21

manager
  66:16 135:2

manila
  131:19
  132:12,17,24
  133:3,11,13

March
  40:14

mark
  43:2,5 56:8
  75:11 80:10
  82:13 88:5
  95:1 115:14
  119:10

marked
  43:7 49:23
  56:14 75:15
  80:13 83:1,5
  88:7 95:4
  115:16
  119:13 125:9,
  12 133:4

Marshall
  76:21

Martella
  83:9,14,16,17
  84:10,14
  85:2,10,22
  86:9,23 93:23
  94:8 96:19
  113:7 127:16

Martella's
  83:23 85:16

matter
  5:6 47:19
  102:12
  130:22

Mcmahon

5:25 7:21
9:21 11:9,22
16:13 17:8,19
23:18 24:6
25:4 27:4,13,
16 28:1,3,15,
22 29:8,16
31:17 32:8,23
33:11 34:24
35:5,11,21
36:15 37:9,18
38:7 39:25
40:3 41:5,11
49:4,18 53:2,
8,13 55:13
60:12,22 61:2
63:9 64:3
65:10,25
66:17,20,23
67:6,18 68:7
73:12 75:4
76:1 78:14,24
79:13 80:5
85:5,25 87:1,
18 89:17 90:3
93:2,4 94:13
95:8,14,20
98:8,22 99:23
102:24
103:12 104:1,
22 106:10
111:21 118:3,
21 119:14
122:25 123:7
124:19
129:18,23
132:7 135:8
136:3,7

Mcnamara
  13:22 14:15
  15:2,6,14,17

MD
  5:7

meaning
  129:3 132:4

means
  70:22

meant
  105:11
  133:16

Media
  5:5 27:24
  67:4 93:9,19
  126:17

medical
  78:19 84:15,
  23 99:3,8
  100:6 101:2
  102:21
  103:21,22
  104:17
  106:22 107:1,
  21,23 108:3,
  21,25 110:6

meet
  21:6 46:2
  51:10

meeting
  45:17 82:2

meetings
  60:3,7

mentioned
  113:4

message
  41:23 83:8,
  13,14 84:9
  86:8 124:5

messages
  124:7

met
  21:7 51:12
  76:3 81:25

Mexico
  105:24 107:3,
  9 109:13,17

Michael
  5:13

Mid
  15:13

middle
  7:18,25 8:22
  22:12 29:14
  35:9 120:10

mike
  98:21

mileage
  97:9,16,19,20
  98:4 101:17

Miles
  66:5,7

million
  125:6

mind
  40:24 118:11

mine
  25:2

Minimal
  127:5

minutes
  52:15 56:5
  60:2,6

Mischaracteri
zes
  33:12

Misdemeanor
  43:1

misstated
  125:25

Mitch

12:3 16:22
20:20 36:9
41:19,22
117:6,8,9,10,
12 118:12
119:5 135:19

**moment**
56:19

**money**
57:11 70:10
71:1,8,11
72:13,21
73:1,5,6,17,
18 77:5,14,
15,22 90:24
125:5

**monitoring**
11:20

**month**
40:8,12

**morning**
6:4 9:6,9,12
23:6,23 30:24
31:25 45:7

**motion**
56:7 57:9
69:10

**motions**
128:25

**move**
14:10,22

**moved**
92:9 100:22

**Moving**
11:6

**Mueller**
14:6

**multiple**
32:6

**mumbling**
63:23

**N**

**names**
64:14

**narrative**
106:11

**needed**
10:18 107:25
120:18

**Neumeister**
12:3 13:19
16:23 20:20
22:3,11 36:9
41:19 42:17
117:9,10,13
118:12 119:5
135:20

**no-bail**
125:2,3
128:23
129:15

**Norman**
107:14,17
108:16

**notation**
117:11

**note**
52:22 100:1

**notebook**
116:10

**noted**
110:10

**notes**
115:24 116:4,
6,9 119:23
120:2

**notice**
32:20

**noticing**
5:19

**November**
5:1,11 10:10,
12 136:10

**number**
5:5,8 17:21
27:24 48:16
61:5 65:2
67:4 75:13
82:12 88:19
93:9,19
115:21
119:16
126:17 134:8

**numbered**
95:11

**numbers**
30:14,16

**O**

**oath**
6:24 24:23
135:3

**object**
7:21 9:21
11:9,22 17:8,
19 23:18 24:6
25:4 27:4
28:15 29:8,16
31:17 32:8,23
33:11 34:24
35:5,11 36:15
37:9 38:7
40:3 41:5,11
49:4,18 53:2,
8 55:13
60:12,22 61:2

63:9 64:3
65:10,25
67:18 68:7
73:12 76:1
78:14,24
79:13 85:5,25
87:1,18 89:17
90:3 94:13
98:8 99:23
102:24
103:12 104:1,
22 106:10
111:21 118:3,
21 122:25
135:8

**Objection**
16:13 28:22
80:5

**obligation**
7:2 118:1,19,
25

**obligations**
117:16

**observed**
48:17 49:2,
10,16

**obtain**
26:13,19
37:17,22
59:20,23
60:2,6 74:23

**obtained**
25:23 26:10
33:4 41:3
59:25 61:13
64:6 69:25
71:25 74:5,19
77:5,19,21
81:19 129:5

**obtaining**
24:4 122:9

**occur**
78:21 79:8
82:22 86:21

**October**
89:9 91:20

**October-2017**
90:1

**offer**
81:3

**offered**
112:2

**office**
8:2,8 9:6,12,
16 10:7,15
15:19,23
16:8,15,16,19
17:4,18 18:2,
10 19:19 20:2
22:24 23:2
26:8 30:21,25
32:3 33:16,22
38:12 44:24
45:8,14,16,
17,25 46:3,7,
11,16,21
50:8,15,17,19
51:5 52:2,5,8
56:25 58:6,9
76:3,6 81:1,
20 89:5
90:11,16,20
91:4 124:3
131:7,12,14
134:24
135:19,20

**officer**
33:24,25
34:4,9 56:11
59:14 62:15,
24

officers
61:19 62:2
63:3 123:24

official
47:18 130:21

on-site
82:25

one-page
88:3 95:1
115:20

ongoing
7:19 8:14 9:1
88:1

open
132:24

operated
59:13 62:23

operates
59:3 62:18

opinion
98:1

opportunity
33:5

opposed
36:3 73:19

option
32:13,19

options
32:6 33:15

order
41:3 76:12
82:16 91:2,7
95:2 115:14
116:10
119:11
125:10

Original
83:7

overhear
55:8

oversimplifyi
ng
70:18

owned
62:22 72:5

owner
109:25

ownership
59:7,10,12
60:20 62:8,
11,13 63:8

owns
59:2 62:17

_____

P

P-O-Z-U-E-L-
O-S
6:22

p.m.
93:6,10,16,20
126:14,18
136:11,12

Pacific
5:11

package
26:16,21 51:4
132:15

packet
50:9,12

paid
30:14 69:13
70:10,20,24
71:7 72:13
75:2 109:15,
18,21

Pam
66:5,7

papers
50:9

paperwork
49:25 51:19
52:22,25
53:5,9,10,16
54:11 133:1

paragraph
47:17 48:9,16
49:3,9 59:1
76:20 78:4,5
82:18 86:18
87:13 130:2,
20 131:4
132:4,13
133:15

paraphrasing
68:14

part
7:9 59:19
62:24 79:11
92:15 94:2
97:5 99:4
108:1 113:24
117:2 120:10,
12 122:7
127:9

Parte
56:6

parts
47:20 120:12
130:23

patient
94:10,17
95:21 96:15,
22 100:11,22
101:8 102:16,
22 103:10

104:18
107:25
110:10 111:6
114:11
133:21
134:11,13

patient's
95:24

patients
82:24 85:18
100:24 110:7

patients'
134:15

Paul
108:11

pay
70:25 71:3
94:10 114:10

payments
72:3

PCR
134:11

Peace
56:11

Penal
56:7

penalty
47:4,10
58:14,19

people
68:22 69:3
99:15 107:23
113:22
118:12
121:24

percent
44:8 69:5

Perez

88:13,18,23

performed
135:5

period
17:24 29:25
30:6 61:15,24
62:1 92:9
119:3,4

perjury
47:4,10
58:14,19

permission
109:9

person
76:24 103:8

personal
70:5 95:20,25

personally
36:17 48:17
49:1,10,16
54:23 87:16
130:8

personnel
102:21
103:22
104:18 107:1,
6,10 108:25
109:4 110:6,
15,21 111:4

persons
48:17 49:10
67:11 111:13

pertained
55:6

pertinent
47:20 130:23

phone
21:19,21
55:17 124:10,

LORI POZUELOS

November 03, 2023

12

**phones**
124:11,13,14, 24

**phrase**
131:9

**physical**
100:1

**picking**
102:16

**pickup**
97:23 98:5
101:18

**piggyback**
101:3

**pile**
49:25

**place**
7:15 9:4
84:19 85:3
91:1 94:4

**plaintiff**
5:10,21,23

**plan**
91:2 96:3

**planned**
8:15 31:6

**planning**
36:13 90:19
91:9

**plans**
40:15,20,23

**point**
8:25 10:13,25
19:5 23:17
24:15 37:7
54:14 66:5
76:7 79:4

81:7 82:19
87:8 90:14
91:8 94:9
112:19 115:6
119:4 121:22
124:9

**portion**
61:15

**posing**
120:16

**position**
83:24

**positions**
62:15

**possessed**
118:20

**possibility**
27:2 81:17

**possibly**
128:7

**post**
71:25 73:1
129:3,10

**posting**
57:11

**potentially**
68:20 89:8

**Pozuelos**
5:6,7 6:3,7,
14,22 44:13
83:10 129:24
136:9,10

**preclude**
68:5

**prepare**
7:5,11

**prepared**
43:11 44:9,22

47:19 49:1,14
52:6 56:21
64:10 80:3
130:22

**present**
5:18 20:14
68:16 78:22

**presented**
48:2 63:14
78:6,19 130:3

**president**
83:25 84:1
108:12,13

**Pretrial**
43:2,4

**prevented**
35:4

**prior**
9:12,17 17:16
22:10 24:2
26:25 29:22
30:12 39:1
81:15 108:15
119:3,4
131:14 135:1

**private**
20:23 84:11
102:19

**probable**
48:15

**problem**
68:16

**procedure**
97:13

**proceed**
14:16 23:14
35:23 86:11
89:15

**proceeding**
19:15 20:19
25:10 26:25

**proceedings**
28:7

**proceeds**
129:5,9

**process**
52:4 90:25
112:19

**processed**
83:20 112:12,
17 130:17

**processing**
18:19,24

**produced**
39:13,20
60:11

**prohibition**
68:21

**promote**
108:5

**promoter**
107:12

**promoters**
107:11 108:1
109:18

**properties**
73:4,7

**property**
71:24 73:1

**prosecuting**
20:24

**prosecution**
120:12

**Prosecutor**
57:16

**prove**
57:13

**provide**
44:25 78:9
102:7 103:3,5
107:1 116:15
118:2 122:23
123:4 132:15
134:7,15
135:4

**provided**
10:5 11:5
26:3,4,16,18
56:24 98:14
99:1,2 102:2
103:5,10
105:16,19,22,
25 106:7,14,
17,22 107:4
108:8,24
119:25
122:18 134:9

**provider**
83:18 96:11
97:16 102:2,5
103:17
104:15 106:4
107:21 113:5

**providers**
79:6 82:20
86:20 135:3

**providing**
6:23 15:15
64:7 87:25
102:10
103:25
104:12,20,23
107:22 108:4,
22 133:21

**purchases**
73:4,7

purposes
120:13

pursued
35:10

put
44:4 49:25
55:22 96:17
99:9 106:8
111:10 133:6,
8

**Q**

question
26:23 39:2
49:13 53:3
56:20 104:16
111:14
112:23
118:10
120:16 121:9,
12 124:20
129:13

questioning
13:16

questions
13:11,13
51:22 116:25
120:18
121:20
128:20
129:19 130:3,
5,20

qui
7:18 26:8
120:23

quick
125:7

**R**

race
109:13,16

racers
109:5

races
108:8

raise
29:5

raising
29:12

Rancho
58:3

reach
22:10

read
40:2 47:1,12
54:2 64:18
75:6 86:1
87:10 93:12
98:12 132:25

reads
44:13 47:17
48:9 78:18
79:4,5 84:10
89:4

ready
10:12 89:15
91:13

real
86:13 125:7

reason
23:16 31:9,13
38:3 40:18
115:8

reasoning
90:6

Rebeca
8:10 12:16
30:15 45:20
46:4 50:1
56:1 123:11

recall
8:24 10:6
11:13 12:7,8,
23 15:12,25
18:8 19:12,
17,20 21:13
39:12 40:11
41:21 42:21
45:19 50:25
51:23,24 52:7
54:6 60:19
61:24 62:2
67:25 68:3
71:22 72:7
73:25 80:1
83:23 84:1
91:25 93:24
94:6 100:12
101:10 109:7
110:2 114:4,
5,7,23,24
120:3 121:13,
21 123:1
124:23
126:10
127:19 128:1,
8,11,25
129:12 130:5,
19 133:2
135:25

receive
16:3 46:13,18
122:9,17,22
127:7

received
26:22 32:2
46:15 69:18,

21 71:10
77:23 112:11
113:17
116:24
126:21 127:3,
13 128:12

recess
27:22 67:2
93:7,17
126:15

recognize
43:6 44:6,7
57:23 115:22
119:19
125:17

record
5:4,17 6:21
27:18,20,23
40:2 66:23,
24,25 67:3
75:6 93:3,4,5,
8,11,14,15,18
126:12,13,16
136:10

recorded
128:14

records
10:18,20
11:5,19,21
12:1,12
38:20,23
61:12 64:5
69:20,23,25
74:6,14,19,24
76:25 134:12

redacted
95:6,21 96:1

refer
61:12 94:16
102:4 116:18
117:20

reference
47:22 77:6
86:22 97:23
117:8 130:25

referenced
70:8 78:11

references
76:20

referral
26:7

referred
20:9 21:11
84:22

referring
20:11 62:9,20
69:24 77:16,
17 80:25
82:23 95:10
104:8 121:1
133:3,9
134:10

refers
116:19

reflected
90:1 96:4
98:5

regard
108:9

regular
17:6,20

reiterated
84:16

related
25:10 26:1,8
61:8 67:10
72:14 124:16

remaining
55:5

LORI POZUELOS

November 03, 2023

**remember**
16:25 21:17
26:24 37:23
52:20 54:13,
21 55:1,15
60:24 61:4,21
74:22 76:17
82:10 90:5,8,
10,13 92:22
100:4 128:2
129:16

**removed**
34:18

**rephrase**
36:24 109:14
121:10

**reply**
81:11

**report**
10:19 90:15
97:2 110:10
111:6 115:2,
5,12 121:19
128:14

**reported**
49:15 127:22

**reporter**
5:12 6:11
62:5 63:21
88:8 93:12
95:5 108:13
110:12
115:17
125:13 136:4,
5

**reports**
7:9 47:19,25
48:6,19,23
49:1,12,13
82:1 90:20
91:4,10

101:11 115:7,
9 130:22
131:10,11,14,
23

**representative**
87:16 127:21,
25 128:9,13

**representatives**
101:6 113:11,
14 114:9

**representing**
21:10

**request**
10:25 21:12
30:11 57:10
62:5 63:21
110:12
111:10

**requested**
21:11

**requests**
39:18

**required**
111:11
124:14

**requirements**
104:10,11

**reschedule**
89:8

**rescue**
102:7

**research**
59:10

**researched**
65:14

**residence**

92:2

**respect**
105:5

**respond**
15:14 18:18
42:11

**responded**
102:7

**responding**
102:15

**response**
114:13

**responsible**
109:4

**restraining**
76:12 82:16

**review**
37:17,22
38:20 50:12
52:5 57:2
58:23 64:22
77:11 112:24
113:21
133:12

**reviewed**
7:9 53:24
54:11 64:5,20
67:9 68:18
79:18 87:9
101:6,21
130:7 131:8

**reviewing**
10:4 11:4
30:15,16
87:22 113:25

**ride**
101:3

**risk**
38:3 39:24

40:25

**Roger**
107:14,17
108:15

**role**
108:9

**room**
131:19

**roughly**
66:9

**routinely**
94:9

_____

**S**

**safe**
34:11

**safer**
34:21

**safety**
33:24,25
34:4,9,13
35:3

**sake**
95:9

**Sam**
5:13

**San**
33:9 47:6
102:6,9

**satisfied**
132:3,12

**SBDA's**
89:4

**scenario**
99:11

**scene**

102:15

**scoping**
20:3,9

**Score**
108:15

**Scott**
13:22

**scratching**
98:20

**search**
10:17 64:6
69:25 70:4
74:8,13,17
77:20 89:6,
20,21,25
90:22 91:24

**Secretary**
60:1,5

**Section**
56:8

**secure**
91:23

**seizing**
76:12

**seizure**
41:10

**self-surrender**
33:5 35:4

**send**
20:1 32:20
120:2

**sentence**
63:17 78:18
80:23 89:4

**sentences**
77:3

separate
19:2 23:14
25:2 27:5
28:25 35:23,
25 133:4

September
83:9 89:8
94:5

sergeant
8:5 22:20
30:23 31:1
33:20 35:18
53:25 54:3,4,
7,10 55:9
69:5 88:24
123:21

service
97:13 103:11
104:13,21,23
106:14,17
108:23

services
108:5 109:10

serving
34:16

set
82:11 129:14

shared
45:11

shareholders
59:17 60:16
63:7

sheriff
106:25 110:5

sheriff's
102:7 105:21
106:24
107:16,20,24

sheriffs

102:9

shortly
41:22 72:8
73:5

show
125:4

showed
38:23 64:6
101:13 111:8

showing
64:22 72:20
97:10 105:22
125:16

sic
47:18

side
44:4 96:17

sign
51:19 52:5
55:4 75:21

Signa
113:15
114:20,21

signature
43:19,23,24
44:1,2 56:11,
17 57:15,17,
19,22,24 58:2
75:14,18

signatures
56:10

signed
34:9 41:9
47:1,10,14
48:22 49:22
51:6,7,18,21
52:21,25
53:5,10,16,
19,20,22,25

54:1,12,24
55:2 57:3,6
58:8,24 62:7,
16 63:25
71:20 72:16
74:3 76:11,16
77:18 87:11,
21,24 123:16,
19 130:7
131:8,18
132:25

signing
47:9 54:5
58:18 75:25
131:15

SIMNSA
25:11

site
99:15

situation
33:3 94:12
107:15

situations
94:18 106:19
107:15 129:7

skimmed
87:12

slated
37:1

Solorzano
5:13

sound
38:14

source
26:19

South
5:8

speak
7:11 9:11

17:11 22:5,15
41:25 42:12
127:21

speaking
16:25 25:25
84:22 99:1
114:8 129:1

speaks
63:10

Specialties
59:14,21

specific
40:4 62:1
77:8 97:3
100:25 105:8
114:8 122:15,
16 127:14
133:22 134:8

specifically
16:25 45:19
64:12 79:1
94:19 100:12
107:7 111:5
134:4

speculation
9:22 16:14
23:19 24:8
29:17 31:18
32:9,24 37:10
65:12 66:2
73:13 85:7
90:4 103:13
118:5,23
135:10

spelling
6:20

spend
31:7

spoke
12:23 13:1

22:2 23:10
41:18 42:22
81:15,23
84:14 93:22
96:19 113:10,
25 114:2,24
117:7 128:6

spoken
21:20 127:17,
23 128:4

spreadsheets
30:16

stabilizing
109:4

staffed
104:17

start
6:20 12:6,13
79:3

started
11:7,18 18:22
19:21 21:16
79:15

starting
12:17,20
13:2,4,7 79:4

starts
69:11

state
60:1,5 102:8

stated
14:20 15:10
18:19 19:1
26:7 42:14
101:2 108:20
111:6

statement
79:14

LORI POZUELOS

November 03, 2023

statements
48:17 49:11,
15 77:22

states
47:3 59:2
69:12 75:18
77:4 78:5
82:19

stating
6:20 79:15

status
16:16 59:7

stock
62:13

street
5:9 52:10

strike
20:16 29:23
64:4 87:9
111:16
122:21
134:23
135:22

stuff
124:3

subject
84:10

submit
10:15 91:3

submitted
9:15 10:2,6,
11,16,23
25:11 64:11,
12,15,22
70:15 78:12
79:10 80:3
90:15 91:10
96:3,7,22
98:3 101:12

105:2,3,13,15
114:12
130:13,15
133:17,20
134:20

submitting
78:8 79:6
82:21 86:20

subpoena
70:4

subsequent
74:17

substance
16:10 18:9
30:8 35:19

suggest
89:13

suggested
99:19

suggesting
64:21

sum
125:24

summarize
101:15

summon
31:14

summons
32:19 34:1,3,
22 35:1

superiors
82:3

supervision
8:1,3

supervisor
29:3

supervisors

19:13 22:15
122:4

supplied
131:11,13

supplies
97:13

supplying
130:16

support
41:9 43:1,3
76:11 98:18
114:16

supposed
37:7

surprised
61:14,17,18

surveillance
20:7

swear
6:11

sworn
6:15

Symons
59:13,21
62:4,20
64:11,17,18
65:8,23 66:8
67:10 70:15,
19 71:2,7
72:3,13,21
73:8,16,19
75:2 77:7,9
84:11 96:8,22
101:13
106:13 107:5,
8,10,18,20
108:1,5
109:4,21
110:6,15,21

111:4 113:11,
19 114:2,6,8,
19,22,24
127:18 135:2

Symons'
108:9

system
23:6 112:18

_____

T

takes
84:19

taking
31:3 85:3
108:16

talk
8:9 12:19
18:3 22:19,21
67:23 82:8
110:24
113:13,19
121:8

talked
117:12
133:24

talking
40:13 69:1

tam
7:19 26:9
120:23

team
33:21 113:21
120:13

Telena
84:3,7,10
86:9

telephone
15:24 86:24

124:5

telling
128:9

Temecula
92:11,18,19

temporary
82:16

ten
56:5 75:13

tent
99:3,8 100:6,
18,23 101:2,4
107:21,23

tentatively
89:7

term
129:9

terms
32:6

testified
6:16 111:19
131:17 135:3,
12,15

testify
37:8

testifying
24:18,22
25:17,21
37:14

testimony
6:24 33:12
87:25

text
124:5,6,7

thanked
15:15

thereof

LORI POZUELOS

November 03, 2023

48:16

thick
132:17,19

thinking
100:10,15,20

third-party
83:18 113:3

Thomas
5:25 88:12,
18,23

thought
68:6 99:22

threatened
34:1,5

Thursday
30:19 31:6
33:7 36:12,24
37:6

time
5:12 8:14
9:19 11:3,10
12:21 16:2,6,
24 17:7,17
18:3 19:16
22:3 24:13
27:21,24
29:4,13,24
35:9 40:12
41:18 46:22
51:24 52:7,22
55:10 59:8
60:23 61:3,
15,24 62:1,7
63:24 66:10
67:1,4 74:5,
20 75:1 82:4
87:24 88:24
89:19,22
90:1,24 91:1
92:5,7,8 93:1,

6,9,19 116:8
118:17
121:11
126:14,17
131:18 135:2

times
5:16 17:3,5
18:6 53:10

timing
23:21

titled
42:25 43:3
56:6

To-dos
120:11

today
6:24 7:2,6

told
12:9 13:3
31:1 49:1
55:4 81:16
82:1 85:22
86:23 87:16
97:3 101:7
107:8,9 109:7
113:8 114:5,7
115:4 127:17
135:21

top
58:13 88:25
95:24 116:1

total
70:9

tracked
77:4

training
122:7,9,11,
12,14,17,22
126:21 127:3,

7,8,13

transcript
25:24 26:11
121:13

transcripts
26:14,19
116:20

transferred
72:4,21 73:5,
16,23 77:14,
15,24 90:25

transport
25:11 59:3
62:18,19 72:2
73:24 82:24,
25 84:19
94:12,18
98:17,19,23
101:14 102:3,
5,8,10 103:9,
25 104:20
105:17,20
106:1 114:13,
16 133:22,24

transported
94:11,17
96:23 100:11
101:9 102:22
103:6 114:11

transporting
102:16

transports
63:20 69:13
78:8,20 79:7
82:21 84:17
85:2,18
86:21,24
87:17 103:23
104:18
105:16,23,24
106:3 107:19

108:10 109:6,
21 110:4,8

treat/no
94:11,17

treated
82:24 99:10,
16

treating
109:5 110:7

treatment
98:14 99:20
107:22

trial
7:3,19,25
8:14,18,23
11:7,13,17,25
12:5,8,13,17,
20 13:2,4,7
14:17 18:22
19:21,22,24
20:18,25
21:1,4,16
22:8,12 24:5,
12,19,22 25:9
27:1 29:15
31:10 33:9
34:5 35:14
36:14 37:3,8
38:6,21
42:18,20
111:19
135:17,23

trips
86:13

true
47:5,20 58:15
102:2 130:23

truth
7:2

turn
47:3 56:9
69:9 75:11
78:4 118:8,19
124:10

turned
10:19 117:23
124:15

Turning
44:4

two-page
82:12

type
44:7,19 87:5

typed
43:19

_____

U

Uh-huh
43:20 74:12
95:8

uncovering
28:7,20

undermine
28:8

undersigned
58:14

understand
6:23 7:1 24:9
31:19 36:21
39:2 49:6
57:10 68:8
74:11 80:25
107:18 118:6
123:3 135:14

understanding
59:11 62:8

November 03, 2023

109:12,15
110:6,14
117:25
118:18 129:2

**understood**
84:23 121:3

**units**
102:7

**unredacted**
95:13

**update**
15:16,22
16:1,3 81:12

**V**

**vacation**
40:7,16

**vague**
7:21 11:9
17:8,19 24:7
27:4 29:8,17
31:17 32:10,
25 33:11
35:5,12 37:9
49:4,18 53:9
60:22 61:2
65:10,25
67:18 68:7
76:1 78:14
79:13 80:6
85:6 89:17
94:13 98:8
99:23 102:24
103:12
106:10 118:3,
21 122:25
135:9

**vehicle**
20:8 38:18

**venue**
107:22

**verbiage**
131:3

**verified**
12:13

**verify**
20:14

**versus**
5:7 13:12,14
106:7

**vice**
83:25 108:11,
13

**video**
5:17

**view**
34:19

**W**

**Waguespack**
5:13

**wait**
52:11,18

**waited**
31:10

**waiting**
34:5

**walk**
45:5 52:8

**walked**
36:7 50:3
101:4

**walking**
31:2

**wanted**

41:24 42:5,12
85:22 86:5
116:22

**warrant**
9:7 31:3,11
32:14,16
33:4,18 34:8,
22 36:6,11,
17,20,22
42:8,14 43:1,
4,12 51:18
53:24 54:1,3,
15 55:5 56:2
64:6 122:10,
15,19,23
123:5,17,19
125:2,3,4,19
129:15
133:10

**warrants**
10:17 34:16
69:25 70:4
74:8,9,13,17
77:20 89:5,6,
16,20,21,24,
25 90:19,22
91:24 128:23

**water**
67:6

**weapons**
34:14,18

**Wednesday**
83:9

**week**
17:15

**weekend**
31:7

**weekly**
17:24,25
30:5,8

**Wesson**
76:21 77:4

**Wesson's**
77:10

**window**
52:12,16

**wipe**
124:14

**wiped**
124:10

**withdraw**
64:4

**witnesses**
24:18,22
25:3,17,21
48:25 49:15
87:25 99:1

**Wittman**
65:4,7

**word**
32:2 45:7
100:3

**wording**
100:7

**words**
100:5

**work**
51:20 55:23
58:11 76:21
122:7 126:20
135:4

**worked**
83:17

**working**
15:10,19,20
22:24 23:3,5
107:8 108:22

**write**
63:4

**writing**
44:17 115:22
126:4

**written**
57:20 115:8,
11 125:23

**wrote**
80:22,24,25
81:11 84:14
86:9,11,18
115:6 117:15
120:23 126:1

**Y**

**year**
21:16 61:8

**years**
9:1,16 72:15
74:2

**yesterday**
84:15

**you-all**
27:12

**Z**

**Zoom**
6:6