# EXHIBIT 2

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

```
JEFF T. GRANGE, M.D.,                    )
                                         )
                Plaintiff,               )
                                         )
        vs.                              )  No. 5:20-CV-00340 DSF (AGRx)
                                         )
LORI POZUELOS, in her individual and     )
official capacity; JASON WESSELY, in his )
individual and official capacity;        )
CALIFORNIA DEPARTMENT OF INSURANCE; and  )
DOES 1-10, individuals,                  )
                                         )
                Defendants.              )
_____)
```

VIDEOTAPED DEPOSITION OF

LANCE CANTOS

Wednesday, November 15, 2023

Reported stenographically by:
ANNA B. SACRIPANTI
CSR NO. 9533

JOB NO. 92456

LANCE CANTOS

November 15, 2023

```
 1                  UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4   JEFF T. GRANGE, M.D.,              )
                                       )
 5                      Plaintiff,     )
                                       )
 6          vs.                        )  No. 5:20-CV-00340 DSF (AGRx)
                                       )
 7   LORI POZUELOS, in her individual and  )
     official capacity; JASON WESSELY, in his)
 8   individual and official capacity;  )
     CALIFORNIA DEPARTMENT OF INSURANCE; and )
 9   DOES 1-10, individuals,           )
                                       )
10                      Defendants.    )
     _____)

11

12

13

14          VIDEOTAPED DEPOSITION OF LANCE CANTOS,

15      taken on behalf of Plaintiff, at  555 South

16      Flower Street, 30th Floor, Los Angeles,

17      California, beginning at 10:18 a.m., Wednesday,

18      November 15, 2023, stenographically reported by

19      ANNA B. SACRIPANTI, Certified Shorthand

20      Reporter, State of California, CSR No. 9533.

21

22

23

24

25
```

**LANCE CANTOS**

November 15, 2023

```
 1    APPEARANCES:

 2

 3    For Plaintiff:

 4         LARSON LLP
           BY:  JERRY A. BEHNKE, ESQ.
 5              DANIEL R. LAHANA, ESQ.
           555 South Flower Street, 30th Floor
 6         Los Angeles, California 90071
           213-436-4888
 7         jbehnke@larsonllp.com
           dlahana@larsonllp.com
 8

 9

10    For the Witness, Lance Cantos:

11         SAN BERNARDINO COUNTY DISTRICT ATTORNEY'S OFFICE
           BY:  BRENT SCHULTZE, ESQ.
12              Lead Deputy District Attorney
                Appellate Service Unit
13         303 W. Third Street, Fifth Floor
           San Bernardino, California 92415
14         BSchultze@sbcda.org

15

16

17    For Defendants Lori Pozuelos and Jason Wessely,
      individually and in their official capacity:
18
           CAAG - OFFICE OF THE ATTORNEY GENERAL
19         BY:  THOMAS M. MCMAHON, ESQ.
           300 S. Spring Street, Room 1702
20         Los Angeles, California 90013
           213-269-6616
21         thomas.mcmahon@doi.ca.gov

22

23    Also Present:

24         CHAD BRIGGS, Videographer

25
```

**LANCE CANTOS**

**November 15, 2023**

```
 1                           INDEX

 2

 3

 4    WITNESS                              EXAMINATION

 5    LANCE CANTOS

 6           BY MR. BEHNKE                     6, 92

 7           BY MR. MCMAHON                      60

 8

 9

10                         EXHIBITS

11    EXHIBIT NO.                              PAGE

12    Exhibit 1  Declaration in Support of Arrest Warrant  32
                 and/or Felony Pretrial Confinement
13
      Exhibit 2  Declaration in Support of Arrest Warrant  33
14               and/or Misdemeanor Trial Confinement

15    Exhibit 3  Ex Parte Motion for Examination of    35
                 Bail Under Penal Code Section 1275.1;
16               Points and Authorities; and Declaration
                 in Support Thereof
17
      Exhibit 4  Notes/Questions                  41
18
      Exhibit 5  Email chain                      48
19

20    / / /

21    / / /

22    / / /

23    / / /

24    / / /

25    / / /
```

**LANCE CANTOS**

```
 1    LOS ANGELES, CALIFORNIA,  WEDNESDAY, NOVEMBER 15, 2023
 2                 10:18 A.M. (PACIFIC TIME)
 3
 4          VIDEO OPERATOR:  We are on the video record.
 5    This is the beginning of media no. 1 in the deposition
 6    of Lance Cantos in the matter of Jeff T. Grange, M.D.
 7    versus Lori Pozuelos, et al., Case No. 5:20-cv-00340 DSF
 8    (AGRx) held at 555 South Flower Street, Los Angeles,
 9    California.  This deposition is being taken on behalf of
10    the plaintiff on November 15, 2023.  The time is now
11    10:18 a.m.
12          The court reporter is Anna Sacripanti.  I am
13    Chad Briggs, the videographer, on behalf of First Legal
14    Depositions located in Los Angeles, California.  This
15    deposition is being videotaped at all times unless
16    specified to go off the video record.
17          Would all present please identify themselves
18    beginning with the noticing attorney.
19          MR. BEHNKE:  Jerry Behnke from Larson LLP for
20    Plaintiff, Jeff Grange.
21          MR. LAHANA:  Daniel Lahana from Larson LLP on
22    behalf of the Plaintiff, Jeff Grange.
23          MR. MCMAHON:  Thomas McMahon, Deputy Attorney
24    General, representing the Defendant Lori Pozuelos and
25    the Defendant Jason Wessely.
```

**LANCE CANTOS**

**November 15, 2023**

```
 1        A    Yes.

 2        Q    And focusing on the February 2020 time frame

 3   when you were working in major frauds, was that part of

 4   your job assignment?

 5        A    Yes.

 6        Q    During that time period February 2020, if you

 7   were going to proceed with filing a case by criminal

 8   complaint, were there sort of standard documents that

 9   you had to prepare to submit to court?

10        A    Well, we file a complaint to initiate the case.

11   There's also a warrant that gets generated.  Sometimes a

12   bail rec gets -- bail recommendation gets generated as

13   well.

14        Q    Is -- would the submission to the court also

15   have included a discovery packet?

16        A    Yes.  Yeah, usually there is discovery for the

17   court.

18        Q    And what is -- when you say "discovery," you're

19   referring to a discovery packet, what do you mean?

20        A    All the police reports are submitted -- well,

21   to the courts itself, we give summaries of reports.

22   Usually it's the first so many pages of investigation

23   report.  It gives the court enough information,

24   hopefully, to make a determination of probable cause.

25        Q    Is there also included typically in the
```

**LANCE CANTOS**

November 15, 2023

1    submission a packet of discovery that would be for

2    defense counsel?

3        A    Not -- not at that time, no, if we're talking

4    at the time of filing.

5        Q    Yes, at the time of filing.

6        A    No.

7        Q    When -- when the initial complaint and any

8    other documents like a 1275 hold, when that all is

9    getting submitted?

10       A    Prior -- currently, we don't submit discovery

11   for the defense to the courts.  In the past we used to.

12   We give all discovery, and the courts will give

13   discovery to defense counsel.  I'm not sure, at least in

14   this particular case.  I don't recall if that what the

15   practice was right then, if we were giving discovery for

16   defense at that time.

17       Q    When discovery was provided for the defense,

18   how was that submitted to the court?

19           MR. MCMAHON:  Objection.  Form.

20           How was it submitted to the court or to the

21   defendant?

22   BY MR. BEHNKE:

23       Q    Well, let me back up.  When that practice was

24   in place, would the discovery packet initially go to the

25   court with the rest of the filing documents?

**LANCE CANTOS**

 1        A    It would -- the documents -- discovery would go

 2    to the court.  Generally, it's in its own, some sort of

 3    envelope that indicates it's defense discovery.  Usually

 4    it's paper, but depending on the size of the -- the

 5    case, sometimes it's on a disc, that type of thing, some

 6    sort of CD of some kind.  Yeah, I'm not --

 7        Q    It would typically be sealed in an envelope of

 8    some type?

 9        A    Absolutely, yes.

10        Q    And, then, was it your understanding that

11    defense counsel, at some point, would then be able to

12    collect that information from the court?

13        A    That's correct.

14        Q    When a discovery packet was submitted to the

15    court with the filing documents, if it was a complex

16    case for instance, would that typically include all of

17    the discovery, or would there be selective items?

18            MR. MCMAHON:  Objection.  Form, vague.

19            I think it's a little unclear, when you say

20    discovery packet, if you mean discovery packet for the

21    court in terms of probable cause or a discovery packet

22    in that case being for the defense counsel.

23    BY MR. BEHNKE:

24        Q    Referring to the envelope that you described

25    earlier that would be marked as discovery for defense

1    counsel, if it was a complex case with voluminous

2    discovery, would that packet normally include all of the

3    discovery, or would there be selective items?

4        A    Generally, it's selective items.  I think we

5    tried to give all the investigation reports.  But a lot

6    of times, there are attachments.  There are just other

7    types of evidence like, for example, emails, and they

8    are so voluminous, that type of thing, that we wouldn't

9    be able to necessarily provide that at that time, so.

10   But, generally, we try to give all the -- the reports

11   to, the investigation reports, to -- for the defense

12   side.

13       Q    Now, a little while ago, you said that there

14   may also be occasions when -- I believe you said the

15   initial investigation report may be submitted to the

16   court for the court's use?

17       A    We give essentially -- well, my practice, I

18   guess, is to give a summary that's usually based on that

19   part of the investigation reports.  Most investigation

20   cases have from one to two pages, up to ten pages, of

21   something that, essentially, summarizes the case.

22            And I usually take that and redact it if it

23   needs to be redacted, and I submit that to the court so

24   they can take a -- have a sense of the case.

25       Q    The summary report that you're describing,

**LANCE CANTOS**

November 15, 2023

```
 1   would that be something you would prepare, or you're
 2   talking about a summary report that typically the
 3   investigating officer prepared?
 4       A   That's part of -- I do not prepare that.  It is
 5   something that would come from the investigation
 6   reports.
 7       Q   And in your practice, when submitting a summary
 8   report to the court, how would that typically go to the
 9   court?
10       A   Well, it would be part of those documents with
11   the other complaint forms, et cetera.  I believe that's
12   packaged in its own envelope too, but I -- I don't know
13   for sure.  Our admin secretary would have taken care of
14   that, but I believe it's in its own separate envelope.
15       Q   And would that have been marked in some way?
16       A   I believe so.
17       Q   What's your understanding of how that envelope
18   would be marked?
19       A   I just -- I don't know exactly what is put on
20   there.  I just -- my understanding is that we -- it's
21   somehow designated for the courts.
22       Q   In cases where an application for an arrest
23   warrant is being submitted, would the investigating
24   officer go to court with that packet?
25       A   Generally, yes.
```

**LANCE CANTOS**

November 15, 2023

```
1       Q    Would -- would you or another deputy district
2   attorney typically also go to court with the
3   investigating officer?
4       A    No.  That's not a -- no.  I've -- I've never
5   gone, no.
6       Q    So you've never accompanied an investigating
7   officer to go see a judge to get an arrest warrant?
8       A    I have not.
9       Q    When did you first become involved in the
10  matter involving Jeff Grange?
11      A    Approximately a year before filing, I think.  I
12  don't have an exact date.
13      Q    Had the investigation by the Department of
14  Insurance regarding Jeff Grange been submitted to your
15  office before you were assigned the matter?
16      A    Yes.
17      Q    There was -- so, before you, was there another
18  deputy district attorney that had been handling it?
19      A    Yes, there was.
20      Q    Do you know who that was?
21      A    It was Deputy District Attorney Diane Harrison.
22      Q    Was Lori Pozuelos the primary investigator on
23  this case?
24      A    Yes.
25      Q    Was Lori Pozuelos your primary point of contact
```

**LANCE CANTOS**

November 15, 2023

```
 1      at Department of Insurance?

 2          A    Yes.

 3          Q    Did you have any other investigators besides

 4      Lori Pozuelos who provided information to you regarding

 5      Jeff Grange?

 6          A    I don't think so.  I'll say no.

 7          Q    As best as you can recall, was Lori Pozuelos

 8      the source of the information that you received

 9      regarding the investigation of Jeff Grange?

10          A    Yes.

11          Q    Other than Lori Pozuelos, you did not assign

12      any investigators on your own to go out and do witness

13      interviews.  Is that correct?

14          A    No.  I did not assign anybody.

15          Q    At the time you were assigned to the Jeff

16      Grange matter, were you aware that the Department of

17      Insurance also had a pending civil lawsuit against him?

18          A    I'm sorry.  One more time.

19          Q    When you took over the Jeff Grange case from

20      Deputy District Attorney Harrison --

21          A    Uh-huh.

22          Q    -- did you know that the Department of

23      Insurance had a pending civil lawsuit against Jeff

24      Grange and the ambulance company?

25              MR. MCMAHON:  Objection.  Form.
```

**LANCE CANTOS**

November 15, 2023

```
 1              THE WITNESS:  Right when I took over, I did not

 2   know that.  I think soon thereafter, after I read the

 3   reports or got information, I did learn there was

 4   that -- that civil suit going on.  But initially, no,

 5   not immediate like that.

 6   BY MR. BEHNKE:

 7       Q    Do you recall how you learned about the civil

 8   case?

 9       A    Honestly, I don't.  I don't remember that

10   exactly.

11       Q    At any point, did you speak with Mitch

12   Neumeister from the California Department of Insurance?

13       A    Yes.  I remember speaking with him.

14       Q    Were you aware at the time that he was handling

15   the civil case for the Department of Insurance?

16       A    I don't -- I knew at one point he was, but I'm

17   not sure when I learned when he was.

18       Q    How did you come in contact with Mitch

19   Neumeister?

20       A    I remember having a phone conversation with

21   him.  I'm not sure how, if I called him or he called me.

22       Q    What did you talk to him about?

23       A    When I spoke with him, I was -- so I was trying

24   to understand the whole process how Department of

25   Insurance worked and how they were divided.  And so,
```

LANCE CANTOS

November 15, 2023

```
 1    when I spoke with him, I was trying to get information
 2    about, essentially, the division between the criminal
 3    side and civil side.  I was really trying to figure out
 4    if they had Brady Policy and how that worked and how
 5    they were walled off from each other.
 6         Q    When you say you wanted to know if they had a
 7    Brady Policy, what do you mean by Brady Policy?
 8         A    So Brady is a discovery, essentially a
 9    discovery case where we have an obligation as
10    prosecutors to -- to obtain the discovery that's -- to
11    obtain discovery and get discovery over to the other
12    side, to defense side.  We have an obligation, anything
13    in our possession, and that extends to agencies that we
14    have -- that we have control over or that are somehow
15    associated with us.
16              And because Lori Pozuelos worked for the
17    Department of Insurance, and at one point when I
18    realized, you know, I knew there was a civil case at one
19    point, I didn't want the line to be blur between my case
20    and their case.
21              So I was trying to -- ultimately, what happens
22    with Brady is that if they are under our control
23    essentially, then I have -- I'm obligated to search for
24    discovery they may have and turn that over as well.  And
25    I didn't think -- I didn't want them to be a part of my
```

LANCE CANTOS

**November 15, 2023**

```
 1    Brady obligation to turn information over.

 2        Q    And during that conversation, what did

 3    Mr. Neumeister tell you?

 4        A    I don't remember any exact words.  I just left

 5    with the impression they don't really have one, some

 6    sort of Brady policy over there.  I just didn't know.

 7    It just was a vague conversation in that sense.

 8        Q    Did he provide you with any details about the

 9    civil lawsuit?

10        A    Details, I'm not sure what you mean by details.

11    In terms of facts of the case or something or --

12        Q    Let's start there.  Did he share with you the

13    facts of the case or share with you what their

14    allegations were in the civil case?

15        A    No.

16        Q    Did he share with you information about the

17    status of the civil case like what discovery had been

18    done, whether there was a trial coming up or anything

19    like that?

20        A    No.  Again, I don't remember the exact words.

21    But I remember the impression I got was they were trying

22    to find out what -- what the status of my case was

23    because, essentially, if we were going forward, then,

24    they wouldn't necessarily have to do their -- their work

25    or do their discovery and those types of things as part
```

LANCE CANTOS

November 15, 2023

1    of their case.

2            So I think -- well, I guess it's speculation.

3    I just was thinking they were trying to manage their

4    case in that sense.

5        Q    So did he ask you about time estimations on the

6    criminal case or anything like that?

7        A    I -- I don't recall specifically.  I know when

8    I first had the case that I was -- it was still very new

9    to me.  So I hadn't really reviewed that stuff.  So I

10   had -- I just -- I guess I'm -- I just -- I don't -- I

11   don't think so.

12           So I just remember being very, just very new to

13   it and just trying to figure things out.  So there was

14   just no way I could provide any type of estimate, and I

15   wouldn't do that anyways.

16       Q    So if Mitch Neumeister had asked you for an

17   estimate even if you had an estimate in your own mind,

18   is that something you would not have shared with him?

19       A    Yeah.  I mean -- yeah.  I mean I would,

20   generally with my cases, if people tried to ask

21   questions, I'll wait until -- I, essentially, say that

22   I'm hoping I have a filing decision, you know, one way

23   or the other hopefully at a certain time, if I have

24   something like that.

25           But -- but again in something like -- in this

**LANCE CANTOS**

1  case, I probably -- again, I'm so new to it I

2  couldn't -- I'm not sure I can even have given an

3  estimate on that.

4      Q    Do you recall any other conversation with

5  Mr. Neumeister during this telephone call you've been

6  describing?

7      A    No.

8      Q    Did you have any other communications with

9  Mitch Neumeister after that telephone call?

10     A    I -- I remember him getting a call from him.

11  I'm not sure if -- I remember having conversation with

12  him.  I don't know if I -- I remember getting a call.  I

13  either picked up and spoke with him at that time or I

14  returned the call.  But I know we -- we did have a

15  conversation.

16     Q    Approximately how long after the initial

17  conversation did the second conversation take place?

18     A    That would have been months, but I can't give

19  you an exact amount of time.

20     Q    And what was the substance of that

21  conversation?

22     A    I think he -- it was more -- it was a status

23  check, you know, trying to find out I think, again, when

24  and/or if we were going to file a case.

25     Q    Did he share with you in that conversation any

**LANCE CANTOS**

1   details about the procedure of the civil case?

2       A    No.

3       Q    Did he share with you, for instance, whether

4   they had a trial date set?

5       A    He may have.  Again, I -- I think he was trying

6   to manage his case, the impression I got, in terms of

7   doing discovery items and everything.  So I think,

8   again, I got the impression he was just trying to figure

9   out where I was to figure out what he was going to do.

10      Q    When you say you have the impression that he

11  was trying to manage his case, did he ever say anything

12  to you about whether or not the filing of a criminal

13  case would result in stoppage of the civil case?

14      A    Yeah.  I think he -- he did say something along

15  those lines.

16      Q    Do you recall what he said about that?

17      A    Not exactly.  But, essentially, my case would

18  probably put a halt to their proceedings.

19      Q    After that second conversation with

20  Mr. Neumeister that you just described, did you have any

21  other contact with him?

22      A    Just one more.

23      Q    When was that?

24      A    It was after the case was filed.  It was during

25  the -- when the civil case was going on, and I received

**LANCE CANTOS**

November 15, 2023

1  a call from him.  I don't know.  It's like February of

2  '20 or -- or it was March or something like that.

3       Q    If the -- the criminal complaint was filed on

4  February 27.  Do you recall about how many -- how long

5  after that this call happened?

6       A    Within a week, I think.  I'm not sure exactly.

7       Q    And when he called you, what did he say?

8       A    Well, he had asked me -- so they -- the civil

9  case was ongoing.  And he was asking me whether if

10  they're trying to settle the civil case, or there's

11  apparently some sort of proposal to settle it there.

12  And apparently they were trying -- they want to see if I

13  would dismiss my case as part of that civil case.

14       Q    Did he share with you any details about what

15  the terms of such a settlement would be?

16       A    No.

17       Q    And how did you respond when he asked whether

18  you would be willing to dismiss the civil case?

19       A    I said no.  It's -- it's improper.

20       Q    When you say it's improper, what do you mean?

21       A    It's -- it's unethical.  It's just wrong.  I

22  mean, I couldn't do that.  I have an obligation.  My

23  case is -- it's essentially, in my mind, it was using

24  the criminal case as leverage in a civil case.

25       Q    Did you tell Mr. Neumeister no?

LANCE CANTOS
**November 15, 2023**

```
 1       A    That's correct, yeah.

 2       Q    And when you told him no, how did he respond?

 3       A    I think he just accepted that.  Yeah, I think

 4  he just accepted that.  I don't recall him being upset

 5  or anything like that.

 6       Q    When that proposal was suggested by

 7  Mr. Neumeister, did you feel uncomfortable with the

 8  prospect of using dismissal of the criminal case as, I

 9  believe you called it leverage to get the civil

10  settlement?

11       MR. MCMAHON:  Objection.  Form.

12  Mischaracterizes his testimony.

13       THE WITNESS:  Was I uncomfortable?  Yes.

14  BY MR. BEHNKE:

15       Q    And you said no.  Correct?

16       A    I said no.

17       Q    Did you say that was the last contact you had

18  with Mr. Neumeister?

19       A    That is the last contact with him.

20       Q    Did you ever have any communications with

21  Curtis Leavitt?

22       A    No.  I'm not sure who that is.

23       Q    All right.  Did you have any conversations with

24  Lori Pozuelos about the suggestion from Mr. Neumeister

25  of trying to reach a settlement involving both criminal
```

**LANCE CANTOS**

**November 15, 2023**

1    and civil cases?

2        A    Did I have a conversation with her regarding --

3    I know I told her at one point.  I'm not sure when.

4    But -- but I know I told her.  It was -- yeah.  That

5    was -- yeah, I needed to tell her it can't -- it can't

6    be done.

7        Q    And how did she respond when you told her about

8    it?

9        A    Honestly, I don't remember.

10       Q    When the criminal case was filed against

11   Dr. Grange, were you the one that prepared the documents

12   for the criminal filing, or did someone else in your

13   office do that?

14       A    No, I did that.

15       Q    And do you recall what documents you prepared

16   for the filing?

17       A    It would have been the criminal complaint, the

18   arrest warrant, and the bail rec, recommendation.

19       Q    When you say "bail recommendation," are you

20   referring to a -- there was a motion for bail hold.  Is

21   that what you're referring to, or you're thinking of

22   something different?

23       A    Probably the same, but I -- I just don't recall

24   that.  I'd have to look if we did two separate documents

25   or a 1275.

**LANCE CANTOS**

November 15, 2023

```
1    BY MR. BEHNKE:

2       Q    Yeah, I'm just trying to get a handle on it.  I

3    understand from your testimony that you prepared the

4    documents including one of the declarations in support

5    of arrest warrant, obviously the criminal complaint.

6           Then, once that was filed, did you have any

7    role in deciding how the arrest warrant was going to be

8    executed, or was that left to Department of Insurance?

9           MR. MCMAHON:  Object to the form.

10          THE WITNESS:  I didn't have a role in how they

11   were going to execute or where they were going to

12   execute.  We just left it up to them to execute it how

13   they wanted to.

14   BY MR. BEHNKE:

15      Q    Getting back to the discussion we had earlier

16   about the statute of limitations, was it your

17   understanding at the time that if the complaint was

18   filed February 27, 2020, which is a Thursday, if say

19   Friday the 28th, 2020, Dr. Grange appeared in criminal

20   court and was arraigned on that complaint, that that

21   action would have tolled the statute of limitations?

22      A    Yeah.  That if he was arraigned, actually yes.

23      Q    Did you meet personally with Lori Pozuelos on

24   the day of filing?

25      A    I believe so, yes.
```

**LANCE CANTOS**

1      Q      Do you recall when that was on that day?

2      A      I -- no.

3      Q      What was the purpose for your meeting with Lori

4   Pozuelos on that day?

5      A      Well, they would have to -- so we were filing.

6   Once we're filing, we usually have a detective, the

7   investigating officer on the case, walk it over to the

8   warrant side, and they can execute the warrant.

9      Q      So the documents for the filing that the

10   district attorney's office prepares, does that include

11   the complaint, the declaration for arrest warrant?

12   These are the documents we've been talking about?

13      A      Yes.

14      Q      So is it typically the investigating officer

15   that takes that over to court and actually files it?

16      A      Well, we file the documents electronically.  So

17   it goes over, it gets filed.  The warrant and the

18   discovery get walked over.  So if you, um, so yes.  So

19   it's kind of a split thing in that sense.  So those

20   documents physically get walked over at least at the

21   time.  Now, I think it's different now, but.

22      Q      But, at that time, is it your recollection

23   that, at that time, the complaint would have been

24   electronically filed?

25      A      Yes.

**LANCE CANTOS**

November 15, 2023

```
 1      Q    And I believe you said earlier that you don't
 2   recall in any case ever going over to court with the
 3   investigating officer to see the judge?
 4      A    I don't recall that.  I don't think I've ever
 5   gone over.  I'm sure I have not.
 6      Q    Do you know whether Rebecca Hynds went to court
 7   with Lori Pozuelos in this case?
 8      A    I believe she did.
 9      Q    Do you know why that was?
10      A    Ms. Hynds was doing the, essentially, what we
11   call the season freeze.  And I think she -- well, I
12   don't know for sure.  I assume it was part of her
13   requirements to get her papers signed.
14      Q    You said you're assuming that.  Did you have
15   any discussion with Ms. Hynds about that?
16      A    I don't recall having a discussion, but I'm
17   sure we did.
18      Q    Was there a reason that Rebecca Hynds was
19   handling that portion of the case and not you?
20      A    That's a function of the unit that she was
21   assigned to.
22      Q    What unit is that?
23      A    Asset forfeiture.
24      Q    And at that time, was that normal practice for
25   your office that the criminal prosecution would be
```

**LANCE CANTOS**

November 15, 2023

1    talking about.

2        Q    Do you recall whether that was in anticipation

3    of actually filing a case?  Or was it some sort of

4    preliminary information meeting?

5            MR. MCMAHON:  Object to the form.

6            **THE WITNESS:  I -- I don't recall specifically.**

7    **I might have to -- my -- my thought was I believe we**

8    **were, you know, if we're going to do a 186.11, seize and**

9    **freeze action with this, then we have to start**

10    **preparing.  So I assume that's what we were talking**

11    **about how we were, you know, what -- what was needed for**

12    **that.**

13    BY MR. BEHNKE:

14        Q    And in the third paragraph, she wrote, "I had

15    initially given a copy of all the assets I found to

16    James Secord back in August 2017."

17            Do you know who James Secord is?

18        **A    Yes.  He is a -- he's retired now, but he was a**

19    **deputy district attorney in our -- in our office.**

20        Q    Was he an asset forfeiture attorney back in

21    August 2017?

22        **A    I do not know.**

23        Q    Then she wrote, "I have checked on the property

24    assets to determine if ownership has changed.  Things

25    have changed since then due to Grange selling his home

1    and buying another home and also selling some additional

2    properties so I have updated the records."

3            Did she ultimately provide that information to

4    you?

5        A    I do not know.

6        Q    In April 2019, at the time she wrote this email

7    to you, were you handling the 186.11 portion of the

8    case, or was that an asset forfeiture lawyer?

9        A    At the time of this?

10       Q    Yes.

11       A    I guess -- I guess the best way -- can I?

12           So when I inherited the case, there was talk of

13   doing 186.11.  And, obviously, based on this, it was

14   something given to -- there's an indication it was given

15   to James Secord.

16           So, following up on that, I was -- it sounds

17   like I was setting up the meeting so we can discuss that

18   with the asset forfeiture attorney there.  So I wasn't

19   handling 186.11.  But in that -- in a sense, I was

20   facilitating that.  That's probably the best way to put

21   it.

22       Q    And then in her last paragraph, she wrote, "I

23   also received a phone call from the attorneys last week

24   who are handling the civil case asking if there has been

25   any update.  They have scheduled depositions for their

LANCE CANTOS

November 15, 2023

1    case and are proceeding with preparing for the trial set

2    for June.  They again asked if it appeared that the case

3    would be filed criminally, and I advised them that I did

4    not have an exact answer for them."

5              Now, I want to focus on the top email, which is

6    this, your response to Lori Pozuelos dated April 3,

7    2019.

8        A    Yes.

9        Q    And you wrote, "Something came to mind.  Please

10   document the contacts with the civil attorneys.  Please

11   include a description of the matter spoken about and if

12   any information or documentation were shared."

13             Then you went on later to write, "If a

14   discovery or Brady issue is raise, the documentation

15   will make answering a motion much easier."

16             Why were you concerned with making sure she

17   documents her interaction with the civil attorneys?

18       A    Well, again, part of it is I'm trying to keep

19   the case as separate.  But I really didn't know how

20   they -- and I'm not sure when I had that conversation

21   with Mr. Neumeister, but I was concerned again that

22   there wasn't really a true wall.  There wasn't a

23   separation.  And if -- so then the next best thing to

24   do, if there isn't something that keeps them separate,

25   and we could do our cases independently, but the next

**LANCE CANTOS**

November 15, 2023

```
 1    best thing was to document everything, turn it over,
 2    be -- be open with it.
 3              So if there is contact or if there is something
 4    along the lines of information sharing, you know, the
 5    only thing we can do is just be open about it and let --
 6    let the other side know this is what happened at this
 7    meeting or that meeting or this conversation or that
 8    conversation.
 9       Q    What was it that caused you concerns about --
10    I believe the way you described it was keeping the civil
11    case separate from your case?
12       A    So, again, I don't know when I had the
13    conversation with -- I'm sorry -- the -- the civil
14    attorney.  So, again, because I didn't think I, you
15    know, there wasn't really some sort of Brady issue --
16    Brady Policy.  I was concerned there.
17              Obviously, down here in the email chain, there
18    was a -- there's contact made.  Again, I thought there
19    was a wall between civil side and criminal.  This gave
20    the impression to me there was not a wall.
21              So, again, if there wasn't -- if there wasn't a
22    high enough wall there, then the best thing to do is
23    document, and again make it -- make it open, and just
24    let everybody know this is what's going on here and
25    stuff.
```

**LANCE CANTOS**

November 15, 2023

1    Q    Did you ever tell Lori Pozuelos that you

2    thought there was a problem with her communicating with

3    the civil attorneys?

4    **A    I'm not sure if I had that specific**

5    **conversation like that.**

6    Q    Did you think at the time that there would be a

7    problem with Lori Pozuelos getting information from the

8    civil attorneys?

9         MR. MCMAHON:  Object to the form.

10        **THE WITNESS:  Did I -- one more time, please.**

11   BY MR. BEHNKE:

12   Q    Back when this email exchange happened,

13   April 2019, did you think there would have been some

14   problem with Lori Pozuelos getting information from the

15   civil attorneys?

16   **A    I didn't know if there was an actual -- I**

17   **didn't -- I was trying to prevent problems, I think, in**

18   **many respects, something like this, again.**

19        **If she received a phone call, it's like --**

20   **obviously, I could -- I'm thinking there's communication**

21   **going on, I just wanted to make -- that would obviously**

22   **make it difficult to my case if there's either a**

23   **discovery source.**

24        **There's ethical rules for me, you know, again**

25   **doing criminal prosecution and obtaining discovery in**

**LANCE CANTOS**

```
 1   that way.  So I -- again two different systems.  I'm
 2   trying to keep them different, I mean keep them
 3   separate.
 4        Q    So when you say obtaining -- as a criminal
 5   prosecutor obtaining discovery in that way, are you
 6   referring to ethical considerations with a criminal
 7   prosecutor using civil discovery to get information on a
 8   target?
 9        A    Things that might be in the -- you have two
10   ongoing cases.  You have two ongoing cases.  And using
11   information obtained in one of those ongoing cases, yes.
12   I mean, I was concerned that's going to raise ethical
13   issues.
14        Q    Did you do anything to attempt to utilize the
15   civil discovery process to get information?  For
16   instance, did you, at any point, ever suggest to
17   Mr. Neumeister that he should propound certain questions
18   in his interrogatories or anything like that?
19        A    No, no.  I don't want -- I did not want to have
20   any type of influence in that civil case.
21        Q    So when you expressed the concerns in this
22   particular email, the April 3, 2019 email, were you
23   concerned about Lori Pozuelos getting information from
24   the civil side and not being -- not documented in some
25   way?
```

**LANCE CANTOS**

**November 15, 2023**

```
 1              MR. MCMAHON:  Object to the form.

 2              THE WITNESS:  I was -- I was concerned with any

 3     information coming from that civil case into my case.

 4     And whether it was coming from Lori or anybody else

 5     somehow coming in, yes.  I was concerned with that.

 6     BY MR. BEHNKE:

 7         Q    In the April 3 email to Lori Pozuelos, you

 8     instructed her to document any contact she had with

 9     civil.  Correct?

10         A    Yes.

11         Q    You didn't tell her to stop talking to civil.

12     Correct?

13         A    I -- I don't know.

14         Q    You didn't --

15         A    I don't recall that.

16         Q    You didn't express that in this email?

17         A    No, I did not.  No.

18         Q    You don't recall whether you had a conversation

19     to that effect?

20         A    I do not recall that.

21         Q    In summer of 2021, when there were discussions

22     regarding potentially dismissing the criminal case, did

23     anyone from the Department of Insurance suggest to you

24     that before doing so, you immunize all of the billers

25     and interview them?
```

**LANCE CANTOS**

November 15, 2023

1  decide?

2      A    Ultimately, yes.

3      Q    And which incidence of fraud to include in the

4  complaint.  You know what I mean by that?  Which

5  instances of either air ambulance fraud or ground

6  transport fraud, which ones to use in the complaint.

7  That decision was yours too, was it not?

8      A    Yes.

9      Q    Which court to file the charges in, was that

10  your decision?

11      A    I think there are rules of court that tells us

12  where to file.

13      Q    So would it be fair to say that, if you didn't

14  believe that criminal charges were warranted, you would

15  not have filed the criminal charges?

16      A    That's correct.

17      Q    It didn't matter what Lori Pozuelos thought.

18  You had to be believed -- you had to believe that there

19  was probable cause for criminal charges and for an

20  arrest.  Correct?

21      A    That's correct.

22      Q    Can you pinpoint the date when you decided that

23  you would be filing criminal charges against Dr. Grange?

24      A    No.

25      Q    Would it be at some point in late 2019 or early

**LANCE CANTOS**

November 15, 2023

1    2020, anyway you can quantify it?

2        A    It -- it was late in 2019.

3        Q    Okay.

4        A    I know I was trying to get it out.  Just --

5    there's just loose ends, things like that, to take care

6    of, yeah.

7        Q    Okay.  And who else was involved in the San

8    Bernardino County district attorney's office in your

9    decision to file criminal charges against Grange?

10            MR. SCHULTZE:  Objection.  Attorney work

11   product.  Oppressive to the witness to answer,

12   privileged.  I'll direct him not to answer.

13   BY MR. MCMAHON:

14       Q    You were asked about the timing of the criminal

15   charges being filed with the arrest warrant and the

16   other documents in February of 2020.

17            Do you recall that?

18       A    Yes.

19       Q    And I believe you indicated that the reason for

20   that timing was your concern about the statute of

21   limitations on the charges you were filing.  Correct?

22       A    Yes.

23       Q    Were you motivated in any way to act on

24   February 27, 2020 in order to disadvantage Dr. Grange in

25   the civil qui tam lawsuit?

**LANCE CANTOS**

**November 15, 2023**

1   the record, or shall we go off real quick?

2          MR. BEHNKE:  We can go off the record.

3          VIDEO OPERATOR:  Okay.  So we will go off the

4   video record.  The time is 1:24 p.m.

5          (Off the record.)

6          VIDEO OPERATOR:  Back on the video record.  The

7   time is 1:28.

8   BY MR. MCMAHON:

9      Q    Dr. Grange, just one last question, did you

10  make the decision to dismiss the criminal charges?

11         MR. SCHULTZE:  Objection.  Attorney work

12  product, privileged.  It will be oppressive to the

13  witness.  The witness is directed not to answer.

14                   EXAMINATION (Resumed)

15  BY MR. BEHNKE:

16     Q    Did Detective Pozuelos provide you with any

17  evidence that Dr. Grange might have hindered the

18  criminal prosecution?

19     **A    I don't recall anything like that.**

20     Q    You answered a bunch of questions a few moments

21  ago regarding your evaluation of the case, your

22  assessment of probable cause.

23         Was the -- or strike that.  Were the decisions

24  that you made regarding this case based upon the factual

25  information that Detective Pozuelos provided to you?

**LANCE CANTOS**

1        **A      Yes, yeah.**

2        Q      At any point during the time that the

3   investigation was pending before you actually filed

4   charges, did you instruct Detective Pozuelos to not

5   interview anyone?

6        **A      I don't recall ever doing anything like that.**

7        Q      At any point, did you tell her not to interview

8   the billers who submitted the bills to the insurance

9   companies?

10       **A      No.**

11              MR. BEHNKE:  I have nothing further.

12              We have no objection to him reviewing.

13              VIDEO OPERATOR:  Did you want to get your

14   orders on the record?

15              DEPOSITION OFFICER:  Do you need a copy,

16   Mr. McMahon?

17              MR. MCMAHON:  Yes, but not expedited.

18              DEPOSITION OFFICER:  Okay.

19              VIDEO OPERATOR:  Okay.  I would do mine on the

20   record.  Did you want a copy of the video?  If so, did

21   you want it synced to the transcript?

22              MR. BEHNKE:  Can we make that request later?

23              VIDEO OPERATOR:  Absolutely.

24              MR. BEHNKE:  Yeah.  We don't need that now.

25              VIDEO OPERATOR:  Same question, Mr. Schultze.

**LANCE CANTOS**

1          MR. SCHULTZE:  I do not need anything.

2          VIDEO OPERATOR:  Thank you.

3          And same question, Mr. McMahon.

4          MR. MCMAHON:  I'm sorry?

5          VIDEO OPERATOR:  Video order?

6          MR. MCMAHON:  I will have a video order, yes.

7          VIDEO OPERATOR:  Great.  Would you like it

8    synced to the transcript?

9          MR. MCMAHON:  I believe I should say yes.

10          VIDEO OPERATOR:  Okay.

11          MR. BEHNKE:  If you're going to send him, we'll

12    make a request too.

13          VIDEO OPERATOR:  Okay.  So you want to go

14    ahead?

15          MR. BEHNKE:  Yeah.

16          VIDEO OPERATOR:  Okay, great.

17          And thank you.  So this concludes today's

18    deposition of Lance Cantos on November 15, 2023.  Off

19    the video record at 1:31 p.m.

20                          -oOo-

21

22

23

24

25

**LANCE CANTOS**

November 15, 2023

```
1    STATE OF _____)
                                    )   ss
2    COUNTY OF _____)

3

4

5          I, the undersigned, declare under penalty of

6    perjury:

7          That I have read the foregoing transcript;

8          That I have made any corrections, additions, or

9    deletions that I was desirous of making;

10          That the foregoing is a true and correct

11    transcript of my testimony contained therein.

12          EXECUTED this _____ day of _____,

13    20_____, at _____, _____.

14

15

16

17          _____
                        (LANCE CANTOS)
18

19

20

21

22

23

24

25
```

LANCE CANTOS

November 15, 2023

```
 1                      REPORTER'S CERTIFICATE

 2

 3          I, ANNA B. SACRIPANTI, CSR No. 9533, Certified

 4     Shorthand Reporter, certify:

 5          That the foregoing proceedings were taken before

 6     me at the time and place therein set forth, at which

 7     time the witness was put under oath by me;

 8          That the testimony of the witness, the questions

 9     propounded, and all objections and statements made at

10     the time of the examination were recorded

11     stenographically by me and were thereafter transcribed;

12          That a review of the transcript by the deponent

13     was requested;

14          That the foregoing is a true and correct

15     transcript of my shorthand notes so taken.

16          I further certify that I am not a relative or

17     employee of any attorney of the parties, nor financially

18     interested in the action.

19          I declare under penalty of perjury under the laws

20     of California that the foregoing is true and correct.

21          Dated this 4th day of December, 2023.

22

23

24

25          ANNA B. SACRIPANTI, CSR NO. 9533
```

**LANCE CANTOS**

```
 1   Errata Sheet

 2

 3   NAME OF CASE: JEFF T. GRANGE vs LORI POZUELOS

 4   DATE OF DEPOSITION: 11/15/2023

 5   NAME OF WITNESS: Lance Cantos

 6   Reason Codes:

 7        1. To clarify the record.

 8        2. To conform to the facts.

 9        3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                                    _____
```