# EXHIBIT 29

```
                  UNITED STATES DISTRICT COURT

        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

JEFF T. GRANGE, MD,                )
                                   )
        Plaintiff,                 )
                                   )
     vs.                           ) Case No.
                                   ) 5:20-cv-00340 DSF (AGRx)
LORI POZUELOS, in her              )
individual and official            )
capacity; JASON WESSELY, in        )
his individual and official        )
capacity; CALIFORNIA               )
DEPARTMENT OF INSURANCE; and       )
DOES 1-10, individuals,            )
                                   )
        Defendants.                )
_____)
```

VIDEOTAPED DEPOSITION OF REBECA HYNDS

THURSDAY, DECEMBER 14, 2023

10:19 A.M.

REPORTED BY:

KIMBERLY ANN MORROW

CSR NO. 9396, RPR, CRR

JOB NO. 93364

```
 1     APPEARANCES:

 2

 3         For Plaintiff:

 4              LARSON LLP
                BY:  JERRY A. BEHNKE, ESQ.
 5                   DANIEL R. LAHANA, ESQ.
                555 South Flower Street
 6              30th Floor
                Los Angeles, CA 90071
 7              (213) 436-4888
                jbehnke@larsonllp.com
 8              dlahana@larsonllp.com

 9
           For Defendant:
10
                CAAG - OFFICE OF THE ATTORNEY GENERAL
11              BY:  THOMAS MCMAHON, ESQ.
                300 S. Spring Street
12              Suite 1702
                Los Angeles, CA 90013
13              (213) 269-6616
                Thomas.McMahon@doj.ca.gov
14

15         For the Witness:

16              OFFICE OF THE DISTRICT ATTORNEY
                COUNTY OF SAN BERNARDINO
17              BY:  BRENT J. SCHULTZE, ESQ.
                303 West 3rd Street
18              San Bernardino, CA 92415
                 (909) 3821-7735
19              bschultze@sbcda.org

20

21         Also Present:

22              MICHAEL KELLEY, VIDEOGRAPHER
                FIRST LEGAL DEPOSITIONS
23
                BEN FALSTEIN
24              CHERIE EDSON

25
```

**REBECA HYNDS**  December 14, 2023

```
 1                    INDEX TO EXAMINATION
 2
 3               WITNESS:   REBECA HYNDS
 4   EXAMINATION                                          PAGE
 5   By Mr. Behnke                                           6
 6   By Mr. McMahon                                         53
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                   INDEX TO EXHIBITS

 2                     REBECA HYNDS

 3

 4    MARKED            DESCRIPTION                               PAGE

 5    Exhibit 1    E-mail dated April 19, 2019
                   containing hero sheet                            13
 6
      Exhibit 2    E-mail dated February 24, 2020                   21
 7
      Exhibit 3    Declaration of Lori Pozuelos in Support
 8                 of Temporary Restraining Order and
                   Preliminary Injunction                           24
 9
      Exhibit 4    E-mail stream dated February 26, 2020
10                 Lori Pozuelos                                    28

11    Exhibit 5    E-mail stream dated February 26, 2020
                   from Rebeca Hynds                                32
12
      Exhibit 6    Declaration in Support of Arrest Warrant
13                 and/or Felony Pretrial Confinement               33

14    Exhibit 7    Application for Temporary Restraining
                   Order and Preliminary Injunction                 34
15
      Exhibit 8    E-mail dated February 27, 2020                   45
16
      Exhibit 9    E-mail dated February 28, 2020                   49
17
      Exhibit 10   Report of Investigation                          56
18

19

20

21

22

23

24

25
```

REBECA HYNDS            December 14, 2023

```
 1                   VIDEOTAPED DEPOSITION
 2           THURSDAY, DECEMBER 14, 2023; 10:19 A.M.
 3                          -oOo-
 4           THE VIDEOGRAPHER:  Good morning.  This is the
 5   beginning of Media No. 1 in the deposition of Rebeca Hynds
 6   in the matter of Grange versus Pozuelos, Case No.
 7   5:20-cv-00340 DSF (AGRx) being held at 555 South Flower
 8   Street, 30th floor, Los Angeles, California.
 9           This deposition is being taken on behalf of the
10   plaintiff on December 14, 2023, at 10:19 a.m. Pacific
11   standard time.  The court reporter is Kimberly Morrow.
12   I'm Michael Kelley, the videographer on behalf of First
13   Legal Depositions located in Los Angeles, California.
14   This deposition is being videotaped at all times unless
15   specified to go off the video record.
16           Would all present please identify themselves
17   beginning with the witness after which the court reporter
18   will swear in the witness.
19           THE WITNESS:  Good morning.  My name is
20   Rebeca Hynds.  I'm a Deputy DA with San Bernardino County
21   District Attorney's Office.
22           MR. SCHULTZE:  Good morning, Brent Schultze, San
23   Bernardino County District Attorney's Office.
24           MR. MCMAHON:  Good morning, Thomas McMahon,
25   Deputy Attorney General, counsel for defendants
```

```
 1      Q.    Do you recall when that occurred?
 2      A.    I did not review my e-mails prior to today.  I
 3   don't have a specific recollection as to when that was.
 4   It's been almost at least three years, almost four
 5   years.
 6      Q.    How many times did you meet with Lori Pozuelos
 7   before the case was actually filed in February of 2020?
 8      A.    I believe there were at least two more
 9   meetings with Lance, but there may have been other
10   meetings with her one on one.  At that time and at any
11   time when I was in asset forfeiture there was no time
12   when I was assigned an investigator or anyone to assist
13   in trying to serve any of the documents that I would
14   need in order to accomplish this.  There were several
15   bank accounts as well as some properties, so I'm just
16   one person, and I needed assistance in order to serve
17   the seizures on the bank accounts and also to make the
18   recordings of the lis pendens at the recorder's office.
19   I think one of them was also out of county, and also I
20   needed to serve defendants and also other interested
21   parties of any of the property.
22      Q.    So when you had these meetings prior to the
23   filing, were the logistics of the things you just
24   described topics that you discussed at those meetings?
25      A.    As we got closer to the time of actually
```

```
 1   through this.  My initial question is whether this
 2   appears to be the declaration you were referencing in
 3   the February 24th e-mail?
 4        A.   Yes, I believe so.
 5        Q.   If you turn to page 10, there's a signature.
 6             Do you recognize that signature?
 7        A.   It looks to be Lori Pozuelos.
 8        Q.   It says executed this February 26, 2020, at
 9   San Bernardino, California.
10             Do you see that?
11        A.   Yes.
12        Q.   Did Lori Pozuelos come to your office to sign
13   this or did she sign it separately?
14        A.   I don't have a specific recollection.  It
15   sounds like from this e-mail my practice would be to
16   have her come to the office and sign it.  Also the date
17   is different, so...
18        Q.   If you go back to Exhibit 2, on Monday,
19   February 24th, it looks like you wrote about meeting on
20   Wednesday?
21        A.   Then it would be the 26th.  Okay.  I don't
22   have a specific recollection of her coming to the
23   office.  However, this would indicate to me it's my
24   practice to draft the declarations and use hero sheets.
25   As I stated, in a majority of my work was in civil asset
```

```
 1   forfeiture and I would use declarations oftentimes of
 2   officers.
 3        Q.   So the declaration that is marked as
 4   Exhibit 3, did you prepare this document?
 5        A.   Yes.
 6        Q.   From where did you get the information to
 7   prepare this document?
 8        A.   From the reports that were provided to me.
 9        Q.   By whom?
10        A.   Well, I believe they were copies from
11   Lance Cantos, but they were also reports from the
12   Department of Insurance.
13        Q.   Is it fair to say they were reports of the
14   Department of Insurance investigation of Jeff Grange?
15        A.   Yes.
16        Q.   But you may have actually received them from
17   Mr. Cantos?
18        A.   It's possible.  I have several binders.  I
19   don't know that I had received all of the e-mails.  I
20   don't know if I'd gone through all the e-mails in the
21   Grange case.  I believe I looked through many of the
22   reports and especially ones that are related to any
23   summaries of payments that were made by insurance
24   companies or any billing for medical billing.
25        Q.   Were you aware that at the time of this
```

```
 1   declaration in February of 2020 that Department of
 2   Insurance was also prosecuting a civil Qui Tam case
 3   against Dr. Grange?
 4          MR. MCMAHON:  Object to form.
 5          MR. SCHULTZE:  Go ahead and answer.
 6          THE WITNESS:  I didn't hear the objection.
 7          MR. MCMAHON:  Object to the form of the
 8   question.  You can answer.
 9          THE WITNESS:  Okay.  I was aware that there
10   was an investigation.  I'm not sure when I became aware
11   of the other civil case ongoing.  That wasn't something
12   I wasn't talked to.  I didn't talk to the Department of
13   Insurance about their ongoing investigation in the civil
14   side, and I believe that Lance was involved in
15   talking -- Lance Cantos was involved in talking to the
16   Department of Insurance regarding their separated
17   investigation and how far they took it.
18          At some point I did become aware that there
19   was another -- that there was a civil case ongoing.
20      Q.  (BY MR. BEHNKE:)  But you don't recall whether
21   you were familiar with that before this file?
22      A.  I don't recall.  I might have been.
23          (Exhibit 3 was marked
24           for identification.)
25      Q.  (BY MR. BEHNKE:)  Before you prepared and
```

1    filed the declaration that we marked as Exhibit 3, had
2    you reviewed any transcripts of testimony from the civil
3    case?
4         A.   No, not that I know of.
5         Q.   Do you know whether you had any deposition
6    transcripts from the civil case?
7         A.   I don't.  I don't believe I would because my
8    understanding from Mr. Cantos was he was very involved
9    in making sure that there was separation between our
10   case and our investigation and the rest of whatever
11   investigation DOI was doing.
12        Q.   How do you know that?
13        A.   In conversations with Lance.
14        Q.   Did you ever have any conversations with
15   Mitchell Neumeister from the Department of Insurance?
16        A.   I don't recall.
17        Q.   Did you ever have any conversations with an
18   attorney named Curtis Leavitt?
19        A.   Not that I know of.  I don't recall.
20        Q.   As part of your duties in filing the
21   forfeiture paperwork, were you also responsible for
22   reviewing the investigative file to determine whether or
23   not there was probable cause to support the charges?
24        A.   No.
25        Q.   Was that Mr. Cantos?

1      A.   Yes.

2      Q.   On Exhibit 3, direct your attention to page 5,

3  paragraph 12.  Paragraph 12 begins, Symons owned by

4  Grange also billed their ambulance transport Symons did

5  not provide.

6         Do you see that?

7      A.   Yes.

8      Q.   Do you have information about who the owners,

9  officers and directors were of Symons when you were

10 preparing this?

11     A.   I'm not sure if I had that in front of me of

12 all that information.

13     Q.   If you had information stating that Dr. Grange

14 was one of several shareholders of Symons, would you

15 have prepared a declaration that said Symons is owned by

16 Grange?

17        MR. MCMAHON:  Object to the form.  Vague.

18 Calls for speculation.

19        THE WITNESS:  I might have stated it

20 differently.  My understanding was that Mr. Grange had

21 stated he was not going to be billing for any of his

22 work that he did during San Bernardino County concerts

23 and that he did end up billing for those things and that

24 he used the sheriff's department to do that.

25     Q.   (BY MR. BEHNKE:)  Did you have information

```
 1   regarding who actually submitted the bills to the
 2   insurance companies?
 3       A.   It's my understanding that it was Grange's
 4   company.
 5       Q.   What was that based on?
 6       A.   The review of the reports that I had.  It's
 7   also my -- never mind.
 8       Q.   I think we discussed this earlier.  The
 9   factual information in this declaration, such as what we
10   just covered in paragraph 12, is it fair to say that you
11   derive that information from the investigative reports
12   that Department of Insurance generated in the
13   investigation?
14       A.   That's correct.
15       Q.   For instance, you weren't on your own going
16   out and investigating Symons and it's ownership or
17   anything like that.  You were relying on the Department
18   of Insurance investigation?
19       A.   Correct.
20       Q.   Do you recall whether in the process of
21   drafting Exhibit 3, whether Detective Pozuelos made any
22   edits or pointed out anything to you that she thought
23   was wrong that you needed to fix, anything like that?
24       A.   I don't recall specifically.
25   ///
```

```
 1              (Exhibit 4 was marked
 2               for identification.)
 3       Q.   (BY MR. BEHNKE:)  Now I'm going to hand you
 4   what I marked as Exhibit 4.
 5              This set of e-mails, stream of e-mails appears
 6   to start at the back of the document.  If you could turn
 7   to page 3, a couple inches down is the e-mail that I
 8   believe we already looked at is Exhibit 2, the
 9   February 24, 2020 e-mail regarding meeting Wednesday
10   morning to sign the declaration.
11              Do you see that?
12       A.   Yes.
13       Q.   Then as you go up the page, at the top, very
14   top of page 2 there's another e-mail in that chain from
15   Lori Pozuelos to you also February 24, 2020.  "Hi,
16   Rebeca confirming I'll plan on coming Wednesday morning.
17   What time are you thinking," correct?
18       A.   Yes.
19       Q.   And then turn to page 2 of the document.
20   There's a series of e-mails between you and
21   Lori Pozuelos dated February 25th, 2020.
22              Do you see that?
23       A.   Yes.
24       Q.   Without getting into the details of each of
25   the items, is it fair to say that during these e-mails
```

1    A.   Yes.
2    Q.   I don't believe we have it here, but would
3  there also have been a separate order that the judge
4  would have signed granting the temporary restraining
5  order?
6    **A.   There might have been, yes, a perspective**
7  **order.**
8    Q.   Other than the declaration of Lori Pozuelos,
9  the application that we have marked as Exhibit 7 and
10 possibly a separate proposed order for the Court to
11 review, were there any other documents in connection
12 with this case that you prepared?
13   **A.   I believe there might have been the petition**
14 **unless it's within here, petition for forfeiture, the**
15 **forfeiture that would state all the different assets and**
16 **then later or maybe at the same time there was a request**
17 **to place a lis pendens on, I believe it's three**
18 **properties.**
19   Q.   If an application for bail hold was submitted,
20 is that a document you would have prepared?
21   A.   No.
22   Q.   On February 27, 2020, the day of the filing,
23 when you met with Lori Pozuelos on that day, was it just
24 you and Lori Pozuelos, or was Lance Cantos also a part
25 of the meeting?

```
 1      A.   My recollection is that the meeting was at the
 2   DA's office and prior to going over to court we may have
 3   met with Lance and other people from our office.  When I
 4   went over to court, I believe it was just me and
 5   Pozuelos.
 6      Q.   When you went to court with Detective
 7   Pozuelos, did you take documents with you?
 8      A.   I did, yes.
 9      Q.   What did you take to court?
10      A.   I took the documents that we discussed, the
11   application for temporary restraining order.  I believe
12   I would also have an order for that, a petition for
13   criminal forfeiture, possibly other documents relating
14   to lis pendens and ones that I discussed in the previous
15   e-mails about the ones that I would need in order to
16   file.
17      Q.   Did you take documents related to the criminal
18   complaint and any application for bail hold or anything
19   like that?
20      A.   I'm not sure.  At the time I believe I had my
21   briefcase with me and I was walking over with
22   Lori Pozuelos, so I don't know she may have had
23   documents with her.  I may have offered to put them in
24   my briefcase as we walk.  Our office is just across the
25   street from the courthouse in San Bernardino.
```

```
 1        Q.   Other than the documents you described related
 2   to the asset forfeiture, were you responsible for
 3   putting together any of the other materials to take to
 4   court?
 5        A.   I was not.  Prior to coming -- I was not.
 6        Q.   Do you recall whether there were documents
 7   related to the criminal filing separate from the
 8   forfeiture documents you were responsible for that went
 9   to court when you went with Detective Pozuelos?
10             MR. MCMAHON:  Object to form.  Vague.
11             THE WITNESS:  Upon reviewing this case I did
12   try to look at the case in the Open Access.  It looked
13   like a complaint was filed and it was electronically
14   filed, and in talking to other people within the office
15   about that time in our office we had an older computer
16   system, an intra computer system that was just for the
17   DA's office.
18             At that time we could -- and for a long time
19   we could file our complaints electronically.  For a time
20   from the sheriff's department we did get some of their
21   discovery electronically.  However, at that time I don't
22   believe we were able to transmit our discovery over to
23   court electronically.  So likely if Pozuelos was coming
24   to court, she would have documents with her for the
25   filing.
```

```
 1      Q.   I know you say that's likely?
 2      A.   Correct.
 3      Q.   What do you recall her taking to court?
 4      A.   I'm not sure.
 5      Q.   Do you recall you, yourself, carrying anything
 6   to court other than the forfeiture documents you
 7   described?
 8      A.   I recall likely putting my documents in my
 9   briefcase and having several -- soft leather
10   briefcase -- several copies for the Court.  I don't
11   recall specifically if she had some documents with her
12   or if I offered to carry them.
13      Q.   In preparing to go to court if there were
14   documents necessary to take to court related to the
15   criminal complaint, would those have been put together
16   separate from you handling your asset forfeiture stuff?
17           MR. MCMAHON:  Object to form.
18           THE WITNESS:  That's the purview of
19   Lance Cantos.  He was the criminal DA.  He was the one
20   in charge of filing the criminal complaints and
21   providing discovery or a copy to the Court, however that
22   might be.
23      Q.   (BY MR. BEHNKE:)  So when you walked over to
24   court with Detective Pozuelos, I believe you already
25   said you think that was just you and Detective Pozuelos?
```

```
 1          The judge was uncomfortable with that and did
 2   not want to take my paperwork and suggested I wait
 3   until, even though the case had been filed, but there
 4   was a date certain where the defendant might be.
 5      Q.   So on February 27th when you and Lori Pozuelos
 6   went to court, you first went to an agency window.
 7           Did you actually file these documents at that
 8   time?
 9      A.   I did not.
10      Q.   What happened when you went to the agency
11   window?
12      A.   I believe that was where Lori Pozuelos was
13   doing some kind of something with the case.  I don't
14   know if she was dropping off discovery and making sure
15   that they had received the electronically filed
16   complaint and/or if she was doing the arrest.  It's
17   speculation.
18      Q.   So without speculating, did you interact with
19   the clerk at the agency window or was that Detective
20   Pozuelos?
21      A.   It was Pozuelos is my recollection.
22      Q.   After going to the agency window, where did
23   you go next?
24      A.   To the courtroom with Judge Bilash.
25      Q.   What did you take with you to the courtroom?
```

```
 1    STATE OF CALIFORNIA)
                         )
 2    COUNTY OF LOS ANGELES   )

 3

 4              I, KIMBERLY ANN MORROW, a Certified Shorthand

 5    Reporter, do hereby certify:

 6              That prior to being examined, the witness in

 7    the foregoing proceedings was by me duly sworn to

 8    testify to the truth, the whole truth, and nothing but

 9    the truth;

10              That said proceedings were taken before me via

11    Zoom and were taken down by me in shorthand and

12    thereafter transcribed into typewriting under my

13    direction and supervision;

14              I further certify that I am neither counsel

15    for, nor related to, any party to said proceedings, nor

16    in any way interested in the outcome thereof.

17              In witness whereof, I have hereunto subscribed

18    my name.

19

20    Dated:   December 31, 2023

21

22

23
                        Kimberly Ann Morrow
24                      _____
25                      KIMBERLY ANN MORROW, CSR NO. 9396
```